I9OKMAT1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              18 CR 124 (JPO)

5    LEONARD MATHEWS,

6                   Defendant.

7    ------------------------------x

8                                             New York, N.Y.
                                              September 24, 2018
9                                             9:45 a.m.

10   Before:

11                    HON. J. PAUL OETKEN,

12                                            District Judge
                                             -And a Jury-
13

14                         APPEARANCES

15

16   GEOFFREY S. BERMAN,
          United States Attorney for the
17        Southern District of New York
     JUSTIN V. RODRIGUEZ
     DOMINIC GENTILE
18   EMIL BOVE
          Assistant United States Attorneys
19
     BRUCE K. KAYE
20        Attorney for Defendant

21

     ALSO PRESENT:
22
     SABRINA PARISI, USAO Paralegal
23   ELVIS COLE, NYPD

24

25             (Case called; jury pool not present)

I9OKMAT1

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  Starting with the government, |
| 2 | counsel, please state your name for the record. |
| 3 | MR. RODRIGUEZ:  Good morning, your Honor.  Justin |
| 4 | Rodriguez, for the United States.  With me at counsel table is |
| 5 | AUSA Dominic Gentile, AUSA Emil Bove, Ms. Sabrina Parisi, a |
| 6 | paralegal with our office, and Detective Elvis Cole, with the |
| 7 | NYPD. |
| 8 | THE COURT:  Good morning. |
| 9 | MR. RODRIGUEZ:  Good morning. |
| 10 | MR. KAYE:  Good morning, Judge Oetken.  I'm Bruce |
| 11 | Kaye, for Mr. Mathews. |
| 12 | THE COURT:  Good morning. |
| 13 | Give me a second to get organized here. |
| 14 | (Pause) |
| 15 | THE COURT:  We have a few minutes to go over some |
| 16 | preliminary matters.  The jury department is getting everyone |
| 17 | organized, and the potential jurors watch a film, so they're |
| 18 | not ready until at least 10:15, I believe. |
| 19 | Let me start by going over a few questions about the |
| 20 | witnesses I should mention.  I see there are a couple of |
| 21 | additions:  Shaun McGee, Susan Johnson and Isaac Toribio. |
| 22 | MR. RODRIGUEZ:  Yes, your Honor.  So in the |
| 23 | persons-and-places list we previously provided, we had an entry |
| 24 | for a records custodian from Otis Bantum Correctional Center. |
| 25 | That's Mr. McGee.  We also had an entry for a records custodian |

I9OKMAT1

1    from T-Mobile.  That's Ms. Johnson.  The government doesn't

2    expect that Mr. Toribio will be a witness but, rather, should

3    be in the "persons whose name may be mentioned at trial"

4    bucket.

5              THE COURT:  Okay.  I was just going to mix all those

6    together --

7              MR. RODRIGUEZ:  Oh, sure.

8              THE COURT:  -- as potential witnesses and/or people

9    who might be mentioned and then just list names.  Is that okay

10   with everybody?

11             MR. RODRIGUEZ:  Yes.  For the Court's information,

12   that's just what we expect.

13             THE COURT:  Okay.  So I will add those.  Give me one

14   second.

15             On the list, there was somebody named Staten, as in

16   Staten Island, and it said Jamesa, J-a-m-e-s-a.  I assume

17   that's supposed to be James?

18             MR. RODRIGUEZ:  No, your Honor, but this is also a

19   witness who was going to testify about the statement that

20   Mr. Mathews made while he was in custody, that your Honor has

21   ruled, in the past Friday's order, will not be coming in.  So

22   that person will not be testifying.

23             THE COURT:  Okay.  So I can take that off?

24             MR. RODRIGUEZ:  Yes, your Honor.

25             THE COURT:  All right.

I9OKMAT1

1        Any other changes to the witness or places lists?

2        MR. RODRIGUEZ:  No, your Honor.

3        MR. KAYE:  Excuse me, Judge.

4        THE COURT:  Yes.

5        MR. KAYE:  I would like to verbally place a witness'

6    name on there, if I could.

7        THE COURT:  Sure.

8        MR. KAYE:  The defense may call Ronald Dwyer,

9    D-w-y-e-r.  He's a defense investigator.

10        THE COURT:  All right.

11        MR. KAYE:  Thank you.

12        THE COURT:  I think the only remaining issues are

13    those that are those in the letters I've received over the

14    weekend, essentially.

15        One issue is the Giglio disclosures related to

16    Detective Cole and Detective Joseph Marquez, which was orally

17    made by Mr. Kaye.  And I received the government's letter on

18    September 21st relating to those issues.

19        The first issue is, related to the Giglio disclosures,

20    having reviewed the redactions and the disclosures and the

21    disclosures compared to the in camera submission of the more

22    complete versions of the disclosed materials, I do conclude

23    that the Giglio disclosure was adequate and satisfies the

24    requirements by Brady and Giglio on the part of the government.

25    The portions that are redacted, I confirmed, are not relevant

I9OKMAT1

1    to any of the issues that could possibly be Giglio material.  I

2    think they are proper redactions.

3            The next question is whether the two incidents

4    regarding Detective Cole and the one incident regarding

5    Detective Marquez -- when I say "incident," I'm talking about

6    prior CCRB complaints -- whether any of those three matters

7    should be precluded on cross-examination.  Obviously, I have

8    the government's letter.

9            Mr. Kaye, do you want to address any of that in

10   response to the letter?

11           MR. KAYE:  I can tell the Court that with regard to

12   Marquez, even I don't believe that's necessarily relevant to

13   his truthfulness --

14           THE COURT:  With respect to Marquez?

15           MR. KAYE:  Right.

16           -- stopping someone on the street with or without the

17   requisite level of cause.  I'm going to withdraw that.

18           THE COURT:  Okay.

19           MR. KAYE:  But I would like to speak to Detective

20   Cole, if I could.

21           Judge, I don't know how many years Detective Cole had

22   on the police department at the time of these two incidents in

23   2009, but I suspect he wasn't a rookie.  We have what could be

24   a pattern here of not notifying a supervisor of adverse actions

25   relating to his patrol duties.

I9OKMAT1

1          In February of 2009, we know that he failed to prepare

2     a stop-and-frisk report, and we know that he failed to maintain

3     an activity log.  In December of that year, when he failed to

4     secure a marijuana cigarette as evidence, he failed to notify

5     his supervisors of that.  It's not so much that he lost a

6     marijuana cigarette; it's more that it seems he did not want

7     anyone to know about it, he didn't want anyone to know that he

8     lost the evidence.  The patrol guide requires that he tell his

9     supervisors of that situation.

10          And that's consistent with what he did in February of

11     2009, a stop a frisk of a civilian on the street, that was of

12     questionable justification, and it seems like he didn't want

13     anyone to find out about that either, and he failed to prepare

14     the stop-and-frisk report, which would have reflected that.

15     That's his job.  He's required to do that.

16          He also failed to place that in his activity log.

17     Again, that's another requirement of the job.  When police

18     interact with citizens, they're required to document it.  And I

19     believe that the failure to document it, the failure to have it

20     written out somewhere so he can be called on it if necessary,

21     the failure to notify the supervisor that he did lose this

22     evidence, does go to his ability to be truthful, and it goes to

23     his credibility, because he was not a rookie, he knows these

24     things are required.

25          I believe the pattern suggests an intentional effort

I9OKMAT1

to bury it, to conceal it, and to never have to be called on

it, because most citizens don't call CCRB and most citizens

don't even ever make an issue of it.  These two, however, did,

and it seems like he was caught failing to follow the proper

paperwork to document it.

    We believe that those facts do bear upon his

credibility.

    THE COURT:  Why does it go to truthfulness, though?

Just failing to do something, that maybe is a pain to do or

whatever it is, whatever, why he didn't -- he didn't think it

was worth it or he forgot -- how does that go to someone's

likelihood of being dishonest?

    MR. KAYE:  Well, I don't believe it was negligent.  If

it was negligent, I would agree with the Court, it doesn't go

to his truthfulness, if it's negligence, but because it

happened in February and then it happened again in December and

it's acts failing to document something that would paint him in

a negative light and he did that purposefully, well, then that

does go to his credibility, because he doesn't want any

documentation that could affect his promotion, rank, standing,

and he's willing to lie about it, he's willing to bury it, he's

willing to not document it.

    THE COURT:  Okay.

    Would you like to respond, Mr. Gentile?

    MR. GENTILE:  Yes, sir.  Thank you.

I9OKMAT1

1          Detective Cole came on the police department in July

2     of 2008.  He had less than a year when the first complaint was

3     made against him, in February of 2009.

4          Moreover, your Honor, the fact that the detective

5     failed to do something is not evidence of a lack of candor on

6     his part.  In fact, there is nothing in the report -- and your

7     Honor has reviewed the report -- that indicates that he

8     intentionally failed to notify his desk officer or

9     intentionally failed to fill out a report.

10         In fact, what the defense doesn't understand is that

11    Detective Cole, when he failed to notify, the allegation was

12    that he failed to notify the desk officer.  It doesn't mean

13    that he didn't have a supervisor aware of what happened.  In

14    fact, his training officer, who was with him that day, was with

15    him and was aware of the fact.  His allegation, the

16    substantiated part of the CCRB, is that he failed to notify the

17    desk officer specifically.

18         The police department has a lot of supervisors

19    assigned to it, a lot of oversight and a lot of supervision.

20    He failed to notify the desk officer as he's required to do --

21    the defense is correct -- when something like that happens.

22    However, to suggest that there is some nefarious act or

23    intention on Detective Cole's part is just a blatant

24    misrepresentation of what the CCRB says.

25         As indicated in our letter to the Court on

I9OKMAT1

1    September 21st, the defense shouldn't be allowed to

2    cross-examine Detective Cole on the CCRB complaints because

3    they're almost -- number one, they're almost a decade old,

4    they're not probative of his truthfulness or of his character

5    for truthfulness, and their introduction into the trial would

6    only mislead the jury.

7              Two of the many cases cited in the government's letter

8    of September 21st are particularly apposite here:  U.S. versus

9    Lights and U.S. versus Polenco.  The district court refused to

10   allow cross-examination on allegations that CCRB found to be

11   substantiated.

12             And the circumstances in Lights are very similar to

13   the circumstances here.  The officer in Lights was found -- the

14   allegations against him that were substantiated were very

15   similar to the allegations that were substantiated against

16   Detective Cole in that it was an improper stop and that he

17   failed to fill out a stop, question and frisk report.  In that

18   case, your Honor, Judge Sweet precluded cross-examination on

19   that very issue.  And we request the Court to do the same here.

20             THE COURT:  Having reviewed the documents and some of

21   the cases cited by the government, I do agree with the

22   government.  I think this situation is fairly similar to the

23   Lights case and the Polenco case.

24             In addition, as Judge Castel pointed out, in the

25   United States versus Nelson, the CCRB investigative process is

I9OKMAT1

1    an informal and not adversarial process.  I don't think that

2    means that in any situation it's not probative of truthfulness,

3    but I do think as to the complaints we're talking about, which

4    are almost ten years ago, that there really isn't anything

5    going toward the propensity for truthfulness as to these

6    complaints.

7            Therefore, I apply the reasoning of the judges in the

8    Lights case and Polenco case.  I do think that, because neither

9    of them really involves a question that would be probative of

10   truthfulness or credibility, I'm going to grant the

11   government's application to preclude the cross-examination of

12   Detective Cole on those two CCRB complaints.

13           There is also an issue raised -- I understand that the

14   defendant doesn't challenge the motion as to Marquez's

15   April 2014 CCRB complaint.  So that is granted, without

16   objection.

17           Then there's the issue of the 2006 shooting by Witness

18   Two, who's a lay witness, who volunteered to the government

19   that in approximately 2006 a man tried to steal drugs and

20   Witness Two shot a gun at the would-be robber.

21           Mr. Kaye, do you want to address anything regarding

22   that?

23           MR. KAYE:  Yes.  Thank you, Judge.

24           The Flaherty case was decided on somewhat different

25   facts.  In Flaherty, the circuit had held that the cooperating

I9OKMAT1

1  witness could not be confronted with a second murder that he

2  had committed.  We have just this one very serious offense,

3  this discharge of a weapon at another person.  Indeed, it's

4  eerily similar to the crime at the heart of this indictment,

5  the shooting on a street of a civilian.

6          In Flaherty, the primary difference was that their

7  witness didn't lie to them about the existence of this prior

8  bad act.  Ms. Seabrooks did.  She hid it from the government.

9  She concealed it from them, she refused to disclose it to them

10 despite numerous proffers, despite them probably telling her --

11 and I've sat in on many of these proffers -- don't lie to us,

12 don't lie to us, tell us the truth.  And that, I believe, is

13 the linchpin of the distinction between Flaherty and this case.

14 The government wants to preclude cross-examination about a

15 violent act, a shooting, that their witness lied to them about.

16 We believe that is proper cross-examination material.

17          What could demonstrate more of a disregard for life

18 than trying to take the life --

19          MR. RODRIGUEZ:  Your Honor, can we pause for one

20 second?  I think the jury is entering the hallway.  I just want

21 to close the door.

22          THE COURT:  Yes.

23          MR. KAYE:  I got it.

24          (Pause)

25          MR. KAYE:  As I was saying, Judge, if Ms. Seabrooks is

I9OKMAT1

willing to fire a gun at someone, potentially take their lives,
lie about it, even though she's been urged repeatedly by the
government to tell them the truth regarding her past, that
should bear directly upon her truthfulness, her credibility,
her ability to tell the truth.

        And the Court should also know, in reaching this
decision, that this witness has been a lifelong drug abuser.
She has been addicted to crack cocaine for 20 or 30 years.  She
has arrests going back to when she was 19/20 years old, drug
possession, drug sale, drug use, prostitution.  She's been to
state prison.  This was intentional, that she kept it from the
government.  She thought that they would never find out about
it.

        The fact that, despite being pressured by the federal
government to disclose it, she didn't want to, and --

        THE COURT:  So you want to cross-examine not on the
crime itself or the event itself but on the fact that she
didn't disclose it to the government until recently?

        MR. KAYE:  Both.  But if the Court is inclined not to
permit me to cross-examine her with regard to the facts of the
shooting, well, I don't want to lose both arguments, then I'm
happy to just cross-examine her on the fact that there was a
very serious felony incident that took place that she refused,
intentionally refused, to disclose to the government.

        THE COURT:  Let me hear from the government.

I9OKMAT1

1          MR. RODRIGUEZ:  Thank you, your Honor.  I can just

2     start with the facts.

3          New York City police detectives met with Ms. Seabrooks

4     and asked her about the shooting because she was one of the

5     people who was shot.  They asked her about her prior

6     relationship with the defendant.

7          THE COURT:  You mean at the time or recently?

8          MR. RODRIGUEZ:  Oh, no; shortly after the shooting.

9     Just to lay out --

10          THE COURT:  You're talking about the shooting in this

11     case?

12          MR. RODRIGUEZ:  Yes, I apologize.  Just to lay out a

13     bit of the chronology here --

14          THE COURT:  Got it.

15          MR. RODRIGUEZ:  -- after meeting with the detectives,

16     she came and met, and the notes of these interviews -- when she

17     met with the detectives, it was recorded, and the defense has

18     the audio recording.  She then came and met with the government

19     in proffer sessions.  I believe in that first one -- and this

20     is reflected in the notes -- we asked her about the shooting

21     and about her dealings with the defendant.  We weren't sure at

22     that point whether she would be a witness in this case.

23          Then, when we met with her again and it looked like

24     she would be a witness, we did what we always do, which is, if

25     we're going to explore the possibility of a nonprosecution

I9OKMAT1

agreement, you need to tell us about your prior crimes.  And

that's exactly what she did.  We didn't know about this

shooting.  She wasn't arrested for it, she wasn't charged for

it, she was completely honest with us, and told us about that

shooting that happened 12 years ago.  We memorialized it in our

notes.  And we turned it over to defense counsel.  That's how

the government knows about it.  That's how defense counsel

knows about it.

            THE COURT:  So she didn't lie about it --

            MR. RODRIGUEZ:  And she didn't --

            THE COURT:  -- and cover it up?

            MR. RODRIGUEZ:  That's correct, your Honor.

            To be clear, we had prior meetings with her in which

it didn't come up because we didn't debrief her, ask her about,

her prior criminal history at that point, but when the question

was put to her, she was completely honest about that crime as

well as other crimes that defense counsel has mentioned and

that we are not trying to suggest are untrue in any way.

            So the suggestion that she has lied about this is

simply not true.  The only way that the government knows about

it, that the defense knows about it, is because she was honest

about it and she disclosed it.

            The second point is, once we sort of appreciate those

facts, is, does it go to truthfulness?  The answer to that,

which is clear from the case law, is no.  We're not suggesting

I9OKMAT1

1    at all that this conduct is in any way not serious -- I think

2    Mr. Kaye is correct, it is very similar to the conduct in this

3    case -- but that's not the question.  The question is:  Does it

4    go to truthfulness?  The cases that the government cites and

5    even the case that Mr. Kaye points to, I think, would

6    acknowledge the seriousness of it, but it doesn't go to

7    truthfulness.

8              For those reasons, your Honor, we think Mr. Kaye

9    should be precluded from cross-examining the witness about it.

10             THE COURT:  Okay.

11             I do agree that, under Rule 608, the fact that this

12   shooting did not go to truthfulness and really the Flaherty

13   case, Second Circuit's decision in Flaherty, is on point even

14   though the facts are somewhat different.  There are many other

15   cases that stand for the proposition that, notwithstanding that

16   a prior crime or prior bad act is very serious, unless it goes

17   to truthfulness and the character of truthfulness, it's not

18   subject to cross-examination as a specific act.

19             So I'm going to grant the government's application as

20   to that.

21             Can we put off until a break the other open issues and

22   proceed with jury selection, since they're here?

23             MR. RODRIGUEZ:  Yes, your Honor.

24             MR. KAYE:  Yes.

25             THE COURT:  Okay.

I9OKMAT1

1          I want to remind everybody, as you probably know, that

2    I ruled we're not going to speak in open court with the names

3    of the jurors; we're going to be using their randomly assigned

4    numbers.  And they will have a card, so we will be talking in

5    terms of Juror No. 1, Juror No. 2, et cetera.  Even though

6    they're only prospective jurors, we'll say Juror No. 1.

7    Obviously, when we have a completed jury of what will be 14

8    people, 12 jurors plus two alternates, we will then renumber

9    them, and those will be the numbers that we use during the

10   actual trial.

11         So I am going to take -- Mr. Hampton is copying the

12   jury list.  He will be back in a second, within a minute, and

13   then he will bring in the jurors and then we'll proceed.

14         (Voir dire ensued)

15

16

17

18

19

20

21

22

23

24

25

I9OAAMAT2                      Jury Instructions

1              (A panel of 12 jurors and two alternates sworn)

2              THE COURT:  Ladies and gentlemen of the jury, now that

3        you have been sworn, I will briefly tell you something about

4        your duties as jurors.

5              At the end of the trial I'll be giving you more

6        detailed instructions and those instructions will control your

7        deliberations.  At the end of the presentation of the evidence

8        and my final charge to you, it will be your duty to decide from

9        the evidence and the facts what the facts are and then apply

10       the law to those facts.  In doing so you must follow the law as

11       I give it to you.  Remember, you are the sole judges of the

12       facts.  You must not take anything I may say or do during the

13       trial as indicating what your verdict should be.  Do not be

14       influenced by my taking notes or by my typing something on my

15       computer.  What I write may have nothing to do with this trial

16       or what you are concerned with at the trial.  You, the jury,

17       and I, the Court, play different roles in this proceeding.  My

18       main duties are to rule on objections, oversee the trial and at

19       the end of the trial to instruct you on the law that applies.

20       Your duty is to accept those instructions of law and to apply

21       them to the facts as you find them.

22              As members of the jury you are the sole judges of the

23       facts.  You pass upon the evidence.  You determine the

24       credibility of the witnesses.  You resolve such conflicts as

25       there may be in the testimony.  You draw whatever reasonable

I9OAAMAT2                          Jury Instructions

1   inferences that you decide to draw from the facts as you

2   determine them and you determine the weight of the evidence.

3          To that end, do not conclude from any of my questions

4   or any of my rulings on objections or anything else I do during

5   the trial that I have any particular view as to the credibility

6   of witnesses or how you should decide the case.  Any opinion I

7   might have regarding the facts is of absolutely no consequence.

8   It is your sworn duty and you have taken your oath as jurors to

9   determine the facts.

10         Just as I have my duties as a judge and you have your

11  duty as jurors, it is the duty of each lawyer in the case to

12  object when the other side offers testimony or evidence that

13  the attorney believes is not properly admissible.  It will be

14  my job to rule on those objections.  Therefore, why an

15  objection was made or how I rule on it, is not your concern.

16  You should draw no inferences from the bare fact that an

17  attorney objects to any evidence, nor should you draw any

18  inference from the fact that I may sustain or overrule an

19  objection.

20         From time to time the lawyers and I may hold

21  conferences out of your hearing at a side bar or at the bench

22  or in the conference room.  Those conferences involve

23  procedural and other matters and none of the events relating to

24  those conferences should enter into your deliberations.  To be

25  clear, the personalities and the conduct of counsel in the

I9OAAMAT2                          Jury Instructions

courtroom are not of issue.  If you form a reaction of any kind
to any of the lawyers in the case, favorable or unfavorable,
whether you approve or disapprove, of their behavior as
advocates, those reactions should not enter into your
deliberations.

          Now I've referred to the evidence in the case and that
raises an important question.  What is evidence?  Evidence
consists of the sworn testimony of the witnesses, the exhibits
received in evidence and the stipulations of the parties.  That
is, any agreements that the parties have about certain facts.

          In determining the facts you must rely upon your own
recollection of the evidence.  What then is not evidence?  The
following does not count as evidence.

          (Continued on next page)

I9OKMAT3

1          THE COURT:  (Continuing)  What then is not evidence

2    the follow does not count as evidence.  Any testimony that I

3    strike or exclude is not evidence.

4          Second, any exhibit that was not received in evidence

5    is not evidence.

6          Third, arguments by lawyers are not evidence.  And the

7    reason is simple:  Advocates are not witnesses.  The opening

8    and closing arguments of each party help explain how they want

9    you to analyze and think about the evidence, which consists of

10   the testimony of witnesses, of the documents and other exhibits

11   that are entered into evidence.  What the lawyers will say is

12   intended to help you understand the evidence or lack of

13   evidence when you deliberate to reach your verdict, but it's

14   only the witnesses' answers that are to be considered evidence,

15   not the attorneys' questions.

16         Finally, any statement that I may make does not count

17   as evidence.

18         You will have an opportunity to observe the witnesses

19   from this witness stand.  It will be your job to decide how

20   believable or credible each witness was in his or her

21   testimony.  You are the sole judges of the credibility of each

22   witness and the importance of his or her testimony.

23         It is for you, the jury, and for you alone -- not the

24   lawyers, not the witnesses, not for me as the judge -- to

25   decide the credibility of the witnesses who testify and the

I9OKMAT3

1   weight that their testimony deserves.  The ultimate question

2   for you to decide in passing upon credibility is:  Did the

3   witness tell the truth before you in this trial, in this

4   courtroom?

5        Now, as I said, this is a criminal case.  That means

6   that the law presumes the defendant to be innocent of all

7   charges.  The government has the burden of proving the

8   defendant's guilt beyond a reasonable doubt.  This burden does

9   not shift to the defendant.  In other words, the defendant does

10  not have to prove his innocence.  He's presumed innocent of the

11  charges contained in the indictment.

12       The defendant thus begins the trial with a clean

13  slate.  This presumption of innocence alone is sufficient to

14  acquit the defendant unless you, as jurors, are unanimously

15  convinced beyond a reasonable doubt of his guilt, after careful

16  and impartial consideration of all the evidence in the case.

17  It is removed if and only if you, as members of the jury, are

18  ultimately satisfied that the government has sustained its

19  burden of proving the defendant's guilt beyond a reasonable

20  doubt.

21       Now, the question naturally arises:  What exactly is a

22  reasonable doubt?  The words almost define themselves.  It is a

23  doubt that a reasonable person has after carefully weighing all

24  the evidence.  It is a doubt founded in reason and arising out

25  of the evidence in the case or the lack of evidence.

I9OKMAT3

Reasonable doubt is a doubt that appeals to your reason, your

judgment, your experience, your common sense.  Proof beyond a

reasonable doubt must therefore be proof of such a convincing

character that a reasonable person would not hesitate to rely

and act upon it in the most important of his or her own

affairs.

I must emphasize that "beyond a reasonable doubt" does

not mean beyond all possible doubt.  It is practically

impossible for a person to be absolutely and completely

convinced of any disputed fact that by its very nature cannot

be proved with mathematical certainty.  In the criminal law,

guilt must be established beyond a reasonable doubt, not all

possible doubt.

Further, the government is not required to prove each

element of the offense by any particular number of witnesses.

The testimony of a single witness may be enough to convince you

beyond a reasonable doubt of the existence of the elements of

the charged offenses if you believe that the witness has

truthfully and accurately related what he or she has told you.

That all being said, if, after a fair and impartial

consideration of all the evidence and lack of evidence, you are

not satisfied of the guilt of the defendant with respect to a

particular count of the indictment, if you do not have an

abiding conviction of the defendant's guilt -- in sum, if you

have such doubt as would cause you as prudent persons to

I9OKMAT3

1    hesitate before acting in matters of importance to

2    yourselves -- then you have a reasonable doubt, and in that

3    circumstance, it is your sworn duty to return a verdict of not

4    guilty on that count of the indictment as to the defendant.

5            On the other hand, if, after a fair and impartial

6    consideration of all the evidence, you do have an abiding

7    belief of the defendant's guilt, a belief you would be willing

8    to act upon without hesitation in important matters in the

9    personal affairs of your own life, then it is your sworn duty

10   to convict the defendant.

11           I also want to caution you about certain principles

12   governing your conduct as jurors, some of which I've mentioned.

13           First, do not talk to each other about the case or

14   about anyone who has anything to do with it, until the end of

15   the case when I send you to the jury room and I say you may now

16   begin your deliberations.  I will instruct you at that time

17   that you are free to begin deliberating as a jury.

18           That doesn't mean you can't talk to each other.  You

19   can talk about the weather, you can talk about your kids or

20   whatever else, but you can't talk about the case, the

21   witnesses, the lawyers, anything having to do with this trial.

22   You can talk about other things but not about anything about

23   the case.  You have to keep an open mind until you've heard all

24   the evidence and I instructed you in detail about what the law

25   is to apply.  Only then can you to begin deliberating with each

I9OKMAT3

1    other to talk about the case.

2            Second, you may not talk with anyone else about this

3    case or with anyone who has anything to do with it, until the

4    trial has ended and you've been discharged as jurors.  "Anyone

5    else" includes members of your family and your friends.  You

6    may tell them that you're a juror in a criminal case, but

7    please do not tell them anything else about it until you've

8    been discharged by me.  When the case is over, I'll explain to

9    you, you can talk about the case but only when everything is

10   done in the case, including the deliberations.

11           Third, do not let anyone talk to you about the case or

12   about anyone having anything to do with it.  If someone tries

13   to talk to you about it, please report it to me immediately

14   through Mr. Hampton or the Court security officer.

15           This includes the lawyers and the witnesses in the

16   case.  So if you happen to run into a lawyer or a witness in

17   the hallway or in the elevator, please do not speak to them.

18   And, as I said, if they don't speak to you, it's not because

19   they're being rude, it's because I've told them not to speak

20   with any of you while the trial is going on.

21           Fourth, do not do any research or investigation into

22   the case on your own.  Do not read about any news stories,

23   articles about the case or anyone having anything to do with

24   it.  You may not use Google or the Internet or any source to

25   research any aspect of the case or any of the people or places

I9OKMAT3

1    involved.  Do not visit any of the scenes described during the

2    trial.  That is because the case must be decided based only on

3    the evidence that is admitted during the trial.  There are very

4    specific rules, that exist for a reason, about the type of

5    evidence that can be admitted.  It's my job to make sure that

6    the evidence you see and hear in this courtroom is the legally

7    proper evidence.  So you can't consider anything else.  The

8    parties have a right to your consideration of only the evidence

9    in the case and the proper evidence.

10          Also, please do not use any social media or discuss

11    the trial or any of the people involved.  That means:  Please

12    don't go on Facebook or Twitter or Snapchat or any other social

13    media sites to discuss anything about the case.  The parties

14    are entitled to have you personally render a verdict on this

15    case on the basis of your independent valuation of the evidence

16    presented here in the trial.  Speaking to others about the

17    case, even your family, before you deliberate or exposing

18    yourself to evidence outside the courtroom would compromise

19    your service and the fairness to the parties.

20          Finally, I'm just going to give you a summary of the

21    stages of the trial:

22          First, each party may make what's called an opening

23    statement, although they're not required to.  An opening

24    statement is not evidence.  It's an outline of what that party

25    intends to prove, and it is offered to help you follow the

I9OKMAT3                    Opening – Mr. Rodriguez

1   evidence.

2          Next, the government will present witnesses, and the

3   defendant may cross-examine them.  The defendant is not

4   required to present any witnesses or evidence but may do so if

5   he wishes.

6          After that, the attorneys will make their closing

7   arguments, or summation, to summarize and give you their

8   interpretation of the evidence.  As with opening statements,

9   the closing arguments are not evidence.

10         After the closing arguments, I will give you

11  instructions on the law, and then you will retire to the jury

12  room, which is in the back, to begin your deliberations.

13         Please do not make up your mind about what the verdict

14  should be until after I have instructed you on the law at the

15  end of the case and you have heard all the evidence in the case

16  and you go to the jury room to deliberate.  Keep an open mind.

17  The parties deserve, and the law requires, that you given them

18  an opportunity to be fully heard.

19         That concludes my opening preliminary instructions.

20  We are now at the point in the case where we are going to hear

21  opening statements from the parties.

22         Counsel for the government, would you like to deliver

23  an opening statement?

24         MR. RODRIGUEZ:  Yes, your Honor.

25         Leonard Mathews wanted someone dead.  Why?  Because

1   Mathews is a leader in the Bloods street gang, and someone

2   known around the neighborhood as Ike disrespected and

3   embarrassed Mathews in his own gang's turf.

4            On October 20th, 2017, Ike confronted Mathews on a

5   corner in the Bronx, that Mathews controls for the Bloods.

6   Now, first, only words were exchanged, but after a while, fists

7   started flying and a fight broke out.

8            Now, Mathews did not fight well.  He looked weak in

9   front of everyone watching, in his own territory, on a corner

10  where he regularly sold drugs.  He failed to command the

11  respect that a Bloods leader must command.  He failed to

12  display the strength that a Bloods leader must display.

13           So, minutes after the fight, he called to his side his

14  obedient Bloods foot soldier, Juan DeJesus, to protect his

15  reputation and to maintain his position in the gang.

16           That man, Leonard Mathews, the defendant, ordered his

17  soldier to shoot and kill Ike.  His soldier was ready to follow

18  orders, because that's a soldier's job, to follow the orders of

19  his leader.

20           So, to get the job done, Juan DeJesus, Mathews'

21  soldier, got an 18-year-old young woman, named Ciara Edwards to

22  go get a gun.  Then, only about an hour or so after the fight,

23  Mathews and DeJesus went looking for Ike.  And when they found

24  him, DeJesus raised up, he fired multiple shots, but he missed

25  the person that Mathews had ordered him to kill.  Instead, he

1    hit three innocent bystanders, people who had nothing to do

2    with this gang dispute, people who were shot because of the

3    order that Mathews gave.

4           Now, after the shooting, there were loose ends to tie

5    up.  Ciara Edwards, the young woman who was brought into all

6    this, she knew too much, she'd seen it all.  So later that

7    night, Mathews' soldier, Juan DeJesus, took Edwards to a park.

8    There, he slashed her throat, he stabbed her, and he left her

9    alone to die.  Miraculously, she dragged herself out of that

10   park and survived.

11          Juan DeJesus tried to murder Ciara Edwards, to silence

12   her, to protect himself, his gang, and his leader, Leonard

13   Mathews.  That's why we're here today, because Leonard Mathews,

14   a Bloods leader, ordered his Bloods foot soldier, Juan DeJesus,

15   to shoot and kill Ike, because Leonard Mathews -- because of

16   the order that he gave -- got three people shot.

17          Over the next few minutes, let me briefly address the

18   charges that the defendant now faces.  Then I'll spend a few

19   minutes going over what the evidence in this case will show.

20   Finally, I'll talk about all of the different types of evidence

21   that you will see in this case, and how exactly the government

22   will prove that the defendant is guilty of all these crimes.

23          Let's talk about the charges.

24          Now, Judge Oetken will instruct you on the law at the

25   end of this trial, and what he says controls.  But for now, let

I9OKMAT3                        Opening - Mr. Rodriguez

1    me say this:

2              The defendant is charged with participating in a

3    racketeering enterprise, that is, a criminal organization.

4    That organization is the Bloods.  You'll hear that Mathews,

5    together with other Bloods members and associates, committed

6    crimes, crimes including attempted murder, conspiracy to commit

7    murder, and drug trafficking.

8              Mathews now faces six federal charges.  Three of these

9    charges relate to violent crimes in aid of racketeering; that

10   is, violent crimes on the night of October 20th, 2017, that

11   Mathews, as a Bloods leader, caused his soldier, Juan DeJesus,

12   to commit, in order to maintain Mathews' position in the gang.

13             Mathews also faces a drug-trafficking charge as well

14   as a weapons and ammunition charge related to his efforts to

15   cause DeJesus to call Ike.

16             So what will the evidence show in this trial?  It will

17   show that Mathews has been with the Bloods for years.  He

18   belongs to a set, or a group, of the Bloods called the Gangsta

19   Milla Bloods or GMB.  He's a leader in the set known as the Big

20   Homie.  You'll learn a lot about the Bloods during this trial;

21   for example, how people are brought into the gang and

22   initiated, the colors, codewords, handshakes, hand signals,

23   that Bloods use to show their loyalty and flaunt their

24   membership in the gang.

25             Mathews worked with other Bloods members to traffic

drugs.  His apartment on Jerome Avenue was home base for the
distribution operation.  That's where Mathews, surrounded by
other members of the gang, weighed out and bagged up heroin and
crack cocaine for sale.  Mathews sold drugs in the protected
territory of the Gangsta Milla Bloods, including that same
corner where Ike confronted, disrespected, and embarrassed him.

You'll also learn about what led to that shooting on
October 20th, 2017.  Juan DeJesus, the defendant's Bloods
soldier, got into a fight the day before the shooting.  Ike
confronted Mathews about that fight in GMB territory on the
night of the shooting.

Minutes after the fight ended, Mathews called his
soldier on the phone, and he rushed to his side.  Mathews then
started plotting his revenge, with DeJesus and other members of
the gang who were there that night.  When DeJesus arrived, he
told Ciara Edwards, the 18-year-old young woman who he brought
into this, that he needed to put in some work for the big
homie.  Mathews was the big homie.

DeJesus instructed Edwards to go with some people and
get a gun.  So Edwards did what she was told.  She followed
others to an apartment a few blocks away, where someone gave
her a gun.  She put the gun in her jeans, and went back to the
corner where Mathews and DeJesus were standing.

Mathews and DeJesus went to look for Ike, with Edwards
following behind them, carrying the gun.  When they found him,

I9OKMAT3                              Opening – Mr. Rodriguez

1    DeJesus took the gun and opened fire.  But, as I mentioned, he

2    didn't hit Ike; he hit three other people.

3            Now, after the shooting, Mathews, DeJesus, Edwards,

4    and others who helped plan the attack, went back to Mathews'

5    apartment, a few blocks away.  There, Edwards threw the gun on

6    Mathews' bed, he wiped it down to remove any evidence, and then

7    they kicked Ciara Edwards out of the bedroom.  They closed the

8    door.

9            After a few minutes, DeJesus emerged from the bedroom

10   and left with Edwards.  A few hours later, DeJesus repeatedly

11   slashed and stabbed Edwards in a park, to kill her and keep her

12   quiet.

13           That's what the evidence will show in this case.

14           So how will the government prove its case?  You will

15   see and hear many different types of evidence in this case.

16   You'll see physical evidence and electronic evidence.  You'll

17   hear the defendant's own words as well as the testimony of

18   witnesses.

19           So let's start with the physical evidence of what

20   happened on the night of the shooting, October 20th, 2017.

21   You'll see security camera video recovered by the NYPD after

22   the shooting.  The video shows the fight between Mathews and

23   Ike, with Ciara Edwards standing just a few feet away.  It

24   shows Mathews calling DeJesus, who arrives minutes later.

25           You'll see Mathews surrounded in a circle by his foot

1    soldiers, including DeJesus, as he orders his revenge.  On

2    video, Mathews directs Edwards and DeJesus into a corner store

3    so that DeJesus can check the gun.  Then, on video, DeJesus

4    takes the gun from Edwards' pants, checks it out, and chambers

5    around.  You'll see DeJesus and Mathews going to look for Ike,

6    DeJesus firing that gun, and then running from the scene with

7    Edwards.

8           In addition, five shell casings that were recovered

9    from the scene of the shooting -- these are the parts of the

10   bullets that are ejected from the gun and left behind after it

11   fires -- will also be in evidence before you.

12          There is also going to be physical evidence of

13   Mathews' drug-dealing.  You'll watch video of him selling crack

14   cocaine in December of last year.  You'll see the crack that he

15   sold that day.

16          In addition, you'll see crack cocaine and a digital

17   scale that had cocaine residue on it that was recovered from

18   Mathews' apartment in January of this year.

19          The second kind of evidence you'll see will be

20   electronic evidence; for example, evidence from Facebook.

21   You'll see pictures posted on Facebook of Bloods members,

22   including Mathews, DeJesus and others, posted with Bloods

23   hashtags and emojis -- or symbols, pictures -- of these Bloods

24   proudly displaying their gang membership, wearing Bloods colors

25   and flashing Bloods hand signals.

I9OKMAT3                    Opening - Mr. Rodriguez

1          The evidence will also include phone records and data

2     extracted from Mathews' phone and DeJesus' phone -- evidence of

3     their crimes that they never thought would see the light of

4     day, evidence like their call histories and text messages,

5     messages in which Mathews and DeJesus used Bloods codewords

6     when talking to other Bloods members.  You'll see the web

7     browsing history on Mathews' phone and how, for more than a

8     week, he was constantly checking news stories about the

9     shooting.

10          Third, you'll hear the defendant's own words in

11     evidence; for example, a video from Mathews' phone in which

12     Mathews proudly declares his gang membership, shouting out at a

13     party, "GMB, GMB," which stands for Gangsta Milla Bloods, right

14     before he turns the cell phone camera on himself and identifies

15     himself as the big homie.

16          You'll see a video-recorded interview between Mathews

17     and police shortly after the shooting, during which Mathews

18     lied about how well he knew DeJesus, lied to protect his fellow

19     Blood.

20          Finally, the evidence will include the testimony of

21     witnesses.  And these witnesses will fall into a few different

22     categories.  One of the people who was shot on the night of

23     October 20th, 2017, will testify.  There will be law

24     enforcement officers and witnesses who collected evidence from

25     the shooting.  You'll hear from an experienced New York City

1    gang detective, who's an expert on the Bloods.

2            You'll hear the testimony of witnesses who have been

3    buying crack cocaine from Mathews and his workers for a long

4    time.  These are some of the people whose drug addictions

5    Mathews has been exploiting and profiting from for years.

6            During this trial, Ciara Edwards, the young woman who

7    carried the gun as Mathews and DeJesus stalked their intended

8    victim, the young woman who DeJesus left for dead in the park,

9    she will sit on that witness stand and tell you about the worst

10   night of her life.

11           Now, let me be clear:  Some of these witnesses have

12   committed crimes -- Edwards carried the gun that was used in

13   the shooting, she also sold drugs -- but the reality is, only

14   people who were involved in these crimes can tell you about it.

15   Only someone who was there can tell you about the plot to kill

16   Ike.

17           Now, Ciara Edwards and some of the other witnesses

18   have agreements with the government.  They'll tell you that.

19   And they'll tell you that if they testify truthfully, the

20   government will not prosecute them for certain crimes.  They'll

21   explain that to you themselves from the witness stand.

22           So listen carefully when these witnesses testify.

23   Scrutinize their testimony.  Ask yourself whether their

24   testimony is consistent with, and supported by, all the other

25   evidence in this case, evidence like the security camera video,

I9OKMAT3                          Opening - Mr. Rodriguez

1   the crack cocaine, the evidence from Facebook, the evidence

2   from Mathews' and DeJesus' phone, and the defendant's own

3   words.

4           After you've seen and heard all the evidence in this

5   case, you will have no reasonable doubt as to what happened

6   here -- that the defendant, Leonard Mathews, is a Bloods

7   leader, who ordered his Bloods soldier, Juan DeJesus, to kill

8   the person, Ike, who made the defendant look weak, that Mathews

9   did this to protect his reputation and protect and maintain his

10  position in the gang, that three people were shot because of

11  Leonard Mathews.

12          Now, we'll have a chance to address you again at the

13  end of this trial, but between now and then, I'd ask that you

14  do three things:

15          First, pay close attention to the witnesses as they

16  testify, to the video, and to all of the other pieces of

17  evidence as it comes in.

18          Second, follow Judge Oetken's instructions.

19          Third, use your common sense, the same common sense

20  you use every day in your lives as New Yorkers, the common

21  sense that guides every important decision that you make.

22          If you do these three things, at the end of this case,

23  you will reach the only verdict that is consistent with the

24  evidence, the law, and common sense -- that the defendant is

25  guilty.

I9OKMAT3                        Opening - Mr. Kaye

1              THE COURT:  Thank you, Mr. Rodriguez.

2              Mr. Kaye, opening for defendant?

3              MR. KAYE:  Thank you, your Honor.

4              May it please the Court, ladies and gentlemen of the

5     jury:

6              There really are two sides to every story.  And you

7     will hear both sides of a very compelling, real-life drama,

8     that will play out indeed before your eyes over the next

9     several days.

10             You have heard the government's theory of the case and

11    what they intend to prove, and now it is my turn.  This is my

12    opportunity to give you the other side of the story, the

13    opposite side of that coin, from this table.

14             The evidence will show that this was a crime committed

15    by other people, namely, Juan DeJesus and this 18-year-old

16    girl, Ciara Edwards.

17             The evidence will also show that Juan DeJesus is

18    already paying the price for his role in firing that gun on a

19    public sidewalk on a Friday night in the Bronx, shooting like a

20    crazy person and wounding three innocent people.  He did that

21    with the help of Ciara Edwards.  Without her help, no one gets

22    hurt.

23             The evidence will show Ciara Edwards has literally

24    gotten away with attempted murder.  The evidence will also show

25    that, although she did it and denied it and lied about it, that

I9OKMAT3                         Opening - Mr. Kaye

our government, through these brilliant prosecutors, made a
deal with her.  They literally made a deal with -- well, you
know the ending.

        The evidence will show that in order for Ms. Edwards
to get back home, to go back to a small town in Pennsylvania,
from which she fled, that she will continue her lies here
before all of you, on that witness stand -- lies, deceit,
cheating, fraud, all in this august setting.

        To do that, all she has to do is blame a petty
street-level crack dealer named Leonard Mathews, and, in
return, she will never ever have to face justice for what she
did.

        The evidence will show that Ciara, all of 18 years
old, hooked up to Juan DeJesus and literally went on a crime
spree here in New York City.  The evidence will show that these
two were blood thirsty, modern-day Bonnie and Clyde.  She came
here and engaged in serious crimes -- selling drugs, doing
drugs, prostitution, gun possession, and attempted murder.
Sadly, she paid a terrible price, because her Clyde Barrow
turned on her and stabbed her, and did leave her for dead.  And
that was a failed bid to silence her as a witness against him.

        What will the evidence not show?  It will not show
that Leonard Mathews ordered Juan DeJesus to do anything.  The
evidence will not show anything close to that.  Her crimes and
the crimes of Juan DeJesus have nothing to do with the Bloods

1    gang membership.  Rather, the evidence will show that Ciara did

2    what Juan DeJesus told her to do, and that Juan DeJesus fired a

3    gun because Juan DeJesus is a vicious, crazy, sociopathic

4    monster, not because Leonard Mathews told him to do it or

5    ordered him to do it, or expected him to do it, or directed him

6    to do it.

7           The evidence will show that Juan DeJesus is a madman.

8    It will not show that Leonard is a leader or a big shot or a

9    big homie of a local Bloods set.  Yes, Leonard was in a fight.

10   He was in a fight with a childhood friend.  You've heard his

11   name, Ike.  The evidence will show that they know each other

12   for ten or fifteen years, and, yes, the shooting did take place

13   a short time after that fight, but, no, Leonard did not have

14   Juan DeJesus try to shoot his old friend over what was nothing

15   more than a scuffle.  No blood, no injuries, no medical

16   treatment, no one even hit the ground in this fight that the

17   government is characterizing as so disrespectful to warrant an

18   attempted murder.

19          The evidence will show that there was no reason for

20   the shooting other than one that was conjured up in the sick

21   mind of a madman and followed with the help of Ciara Edwards.

22          The evidence will also show that the case against

23   Leonard Mathews was made by a sweet-talking, overly ambitious,

24   young police detective, with questionable methods, that took

25   advantage of drug addicts, and twisted their words and twisted

I9OKMAT3

1    their thoughts.  And this trial may seem like a modern-day

2    Sharks versus the Jets from West Side Story, but I can promise

3    you, ladies and gentlemen, it is not anything that romantic.

4           The last piece of evidence that I want to alert you to

5    are these surveillance tapes that the government has alluded

6    to.  These tapes will be played for you, the jury, but I warn

7    you ahead of time, they are silent movies, and the plot is

8    written and directed and narrated through the testimony of

9    Ciara Edwards, a woman who will do anything to stay out of

10   federal prison, including entering into an agreement with the

11   government.

12          I will have another opportunity to address you at the

13   end of the case, ladies and gentlemen.  Thank you.

14          THE COURT:  Thank you, Mr. Kaye.

15          Ladies and gentlemen, you've heard the opening

16   statements of the lawyers for each side in the case.  We will

17   now proceed to the testimony in the case.  It's 4:34.  I will

18   be letting you out by 5:00 every day.  I think we can get one

19   witness probably done today.

20          Is the government ready with its first witness?

21          MR. RODRIGUEZ:  Yes, your Honor.  The United States

22   calls Detective Steven Reyes of the New York City Police

23   Department.

24          THE COURT:  Okay.

25          Let me just make sure.  Are you guys okay for another

I9OKMAT3

1    15, 20 minutes in terms of does anybody need the bathroom right

2    now?

3              Okay, great.

4              All right.  The government will bring its first

5    witness.  Mr. Hampton has notebooks for the testimony.  I'm

6    going to give you the option of taking notes.  You will be

7    leaving your notepads here on your chairs, and then only when

8    you deliberate will you take them back, and you can refer to

9    them.  They're not to be shared with your fellow jurors,

10   they're just for your own recollection.  You're not required to

11   take notes.  If you want, you can just rely on your

12   recollection, but if you'd like to take notes, you're welcome

13   to.

14             It's not something you can take home or anything.

15   When we're done with the trial, we'll be destroying the notes,

16   but if you'd like to take notes during the testimony, you may.

17             Does everybody have a pad and pen?

18             JUROR:  We're missing --

19             THE COURT:  Hold on one second.

20             Is everybody all set?  If you would please put your

21   juror number on the front of the pad, so we can keep track, and

22   every day when you go home, I'm going to ask you to close your

23   notepads, leave them on your chairs, and they will be there in

24   the morning.

25             Mr. Rodriguez, you may proceed.

I9OKMAT3                         Reyes - Direct

1                MR. RODRIGUEZ:  Good afternoon, sir.

2                Where do you work?

3                THE WITNESS:  I work for the NYPD --

4                THE DEPUTY CLERK:  Excuse me.

5                THE COURT:  Sir, would you please stand.  We forgot to

6       swear in the witness.

7        STEVEN REYES,

8            called as a witness by the government,

9            having been duly sworn, testified as follows:

10               THE DEPUTY CLERK:  Please state your full name and

11      spell your last name slowly for the record.

12               THE WITNESS:  Steven Reyes, R-e-y-e-s.

13               THE DEPUTY CLERK:  Thank you.  Please be seated.

14               THE COURT:  Mr. Rodriguez, you may proceed.

15      DIRECT EXAMINATION

16      BY MR. RODRIGUEZ:

17      Q.  Good afternoon, sir.

18               Where do you work?

19      A.  NYPD, five-two squad.

20      Q.  Is the NYPD the New York City Police Department?

21      A.  New York City Police Department.

22      Q.  How long have you worked there?

23      A.  Approximately 16-1/2 years.

24      Q.  What is your title at the NYPD?

25      A.  Detective.

I9OKMAT3                          Reyes - Direct

1   Q.   How long have you been a detective?

2   A.   A little over two years.

3   Q.   In October 2017, what was your title?

4   A.   I was a detective.

5   Q.   Where were you assigned?

6   A.   In the Bronx, five-two squad.

7   Q.   What's the five-two squad?

8   A.   That's the detective unit in -- within the five-two.

9   Q.   Does the five-two refer to the 52nd Precinct?

10   A.   That is correct.

11   Q.   What area of the city does that precinct cover?

12   A.   Webster Avenue.

13   Q.   At that time, October 2017, what were your duties and

14   responsibilities?

15   A.   At that time, I was a detective there, and basically we

16   handled burglaries, robberies, grand larcenies, homicides,

17   whatever comes in that the precinct level needs help with.

18   Q.   Detective Reyes, let me direct your attention to

19   October 20th of 2017.

20         Were you on duty that day?

21   A.   Yes, I was.

22   Q.   What assignment, if any, did you receive?

23   A.   There was a shooting that happened on that day, and we all

24   went out to conduct our investigation.

25   Q.   What, if anything, did your investigation consist of?

I9OKMAT3                           Reyes - Direct

1    A.  We did video canvassing.

2    Q.  What do you mean by video canvass?

3    A.  Well, what I do is I go out, and basically I look at the

4    building, try to find out exactly where the incident took

5    place.  I look at the angles of the cameras.  If it covers --

6    if I believe it covers that -- basically where the incident

7    took place, then I go about trying to view the video.

8    Q.  Did you receive information about where this incident took

9    place?

10   A.  Yes, I did.

11   Q.  In what general area did you go to canvass video that

12   night?

13   A.  2693 Morris Avenue.  There's a building right there.

14   Basically, I went down, asked for permission to the super, and

15   retrieved video.

16   Q.  Were there other places that you went as well?

17   A.  Yes, there was.

18          MR. RODRIGUEZ:  Ms. Parisi, can you please pull up

19   Government Exhibit 400 on the witness' screen and on my screen

20   as well.

21   Q.  Detective Reyes, do you see the exhibit in front of you?

22   A.  Yes, I do.

23   Q.  Do you recognize what is shown in this exhibit?

24   A.  This is the area of Kingsbridge and Morris where the

25   incident took place.

I9OKMAT3                          Reyes - Direct

1   Q.  Detective Reyes, is this a fair and accurate representation

2   of the area where you went to canvass that night?

3   A.  Yes, it is.

4            MR. RODRIGUEZ:  Your Honor, the government offers

5   Government Exhibit 400.

6            THE COURT:  Any objection?

7            MR. KAYE:  Just briefly, voir dire, your Honor?

8            THE COURT:  Yes.

9   VOIR DIRE EXAMINATION

10  BY MR. KAYE:

11  Q.  Detective, I see that the exhibit also has the names of

12  certain restaurants, and shops, and markets on it and such.

13            Did you determine whether or not all of those

14  restaurants, shops, and markets and such that are also on the

15  exhibit are actually still there?

16  A.  I couldn't tell you right now if they were there or not.

17  Q.  Who would know that?

18  A.  Basically, the only way we can determine for sure if

19  they're still there is heading back over to the scene.  But

20  right now, I can't tell you every single shop that's listed on

21  this that's still, you know, open for business.

22  Q.  So, in that sense, this is not a fair or accurate

23  representation of everything because you actually didn't verify

24  the presence or absence of these various places, true?

25  A.  My thing was to go over to where the shooting location

I9OKMAT3                        Reyes - Direct

1    happened and -- which was over on Morris Avenue, and

2    investigate that.  We didn't go to every single shop and

3    everything there.

4    Q.  So my question is:  Given all of that, this does not fairly

5    and accurately reflect the presence of all the various shops,

6    and markets, and bodegas, and stations that are reflected and

7    indicated on the map; is that true, yes or no?

8    A.  Yeah.

9              MR. KAYE:  We object.

10             MR. RODRIGUEZ:  Your Honor, the government offers

11   Government Exhibit 400 for the general layout of the streets

12   and the area where Detective Reyes canvassed for video, as he's

13   testified.

14             THE COURT:  Is it accurate as to that?

15             THE WITNESS:  Yes.

16             THE COURT:  As to the layout of the streets?

17             THE WITNESS:  Layout of the streets, it is accurate.

18             THE COURT:  Okay.

19             Did you want to say something?

20             MR. KAYE:  Well, then it should be redacted.  We only

21   ask it be redacted.

22             THE COURT:  No, I think it's clear enough for the

23   purpose of the layout of the streets.  I think it's

24   sufficiently clear, and it's received.

25             Exhibit 400 is received.

1           (Government's Exhibit 400 received in evidence)

2           THE COURT:  Let me just say, since that's the first

3   exhibit that I've admitted, as soon as I admit an exhibit, that

4   means it's in evidence, you'll have it in the jury room when

5   you deliberate, and you can then see it on your screens once

6   it's admitted as evidence in the case.

7   BY MR. RODRIGUEZ:

8   Q.  Detective Reyes, I'm going to hand you what's been marked

9   for identification as Government Exhibits 403-A and 403-B.

10          Detective Reyes, do you recognize what's depicted in

11  these images?

12  A.  Yes.  That's the building I did my video canvass.

13  Q.  Is that the video canvass that you referred to on

14  October 20, 2017?

15  A.  Yes.

16  Q.  Do these photos fairly and accurately depict the building

17  and surrounding area on October 20, 2017?

18  A.  Yes.

19          MR. RODRIGUEZ:  Your Honor, the government offers

20  Government Exhibits 403-A and 403-B.

21          THE COURT:  Any objection?

22          MR. KAYE:  Your Honor, I don't see them on the

23  monitor.

24          THE COURT:  Yes.  Can you make it so the attorneys and

25  Court can see them?

I9OKMAT3                      Reyes - Direct

1            MR. KAYE:  May I?

2            THE COURT:  Do you see it?

3            MR. KAYE:  I do see it now.

4            May I have a brief voir dire?

5            THE COURT:  Okay.

6   VOIR DIRE EXAMINATION

7   BY MR. KAYE:

8   Q.  Detective, these photos, 403-A and 403-B, these are

9   photographs of the scene taken by you?

10  A.  No.

11  Q.  Who took them?

12  A.  I don't know who took these pictures.

13  Q.  When were they taken?

14  A.  I don't know when they were taken.

15  Q.  And the vehicles that we see, were those vehicles present

16  at the time of this shooting, as they are in the photographs?

17  A.  I don't know when the pictures were taken, so I can't say

18  yes.  When we showed up, it was nighttime.

19  Q.  Could this photograph -- withdrawn.

20           Could these two photographs have been taken months

21  later?

22  A.  I couldn't tell you.  I don't know when the photographs

23  were taken.

24  Q.  Could they have been taken yesterday, for all you know?

25           MR. RODRIGUEZ:  Objection.

1           THE COURT:  Overruled.

2           You can answer, if you understand.

3           THE WITNESS:  Looking at the way the person is

4    dressed, I wouldn't say yes because they weren't long sleeves,

5    and there's a child with a bookbag.

6    BY MR. KAYE:

7    Q.  But in terms of the building locations and how the building

8    relates to the sidewalk and the light posts, you're saying in

9    that regard, they are fair and accurate representations?

10   A.  Yes.

11   Q.  But you're not making any representations that this is what

12   the scene looked like at the time you were there?

13   A.  No.

14   Q.  And you are not making representations that this is where

15   the vehicles were at the time of the shooting, correct?

16   A.  Correct.

17           MR. KAYE:  With that proviso, your Honor, I don't have

18   an objection.

19           THE COURT:  Okay.  403-A and 403-B are received in

20   evidence.

21           (Government's Exhibit 403-A and 403-B received in

22   evidence)

23   BY MR. RODRIGUEZ:

24   Q.  Detective Reyes, do you recall the address of the building

25   where you went to canvass for video that night?

I9OKMAT3                        Reyes - Direct

1    A.  2693 Morris Avenue.

2    Q.  Is this a photo of the building where you went to canvass

3    for video that night?

4    A.  Yes.

5    Q.  Which street is shown in the foreground of Government

6    Exhibit 403-A, which is on the left side of the screen?

7    A.  That's Morris Avenue.

8    Q.  Can you show the jury --

9            MR. RODRIGUEZ:  Ms. Parisi, if you can please pull up

10   Government Exhibit 400 and put that on the left side of the

11   screen and keep 403-A on the right side of the screen.

12   Q.  Can you show the jury, using Government Exhibit 400, which

13   is the map, where that building is located, on which street?

14   A.  That's looking on Morris Avenue.

15   Q.  Between which cross streets?

16   A.  Between Kingsbridge and East 196th Street.

17   Q.  Detective Reyes, do you recall approximately what time you

18   went to this location on October 20, 2017?

19   A.  I believe it was approximately between 10:30 and 11:00 at

20   night.

21   Q.  Did you go alone or with a partner?

22   A.  No, we went -- the entire squad, pretty much.  It was all

23   hands on deck.

24   Q.  What, if anything, did you notice about whether this

25   location that's depicted in 403-B had security cameras?

I9OKMAT3                          Reyes - Direct

1   A.  Can you repeat the question again?  I didn't quite hear

2   you.

3   Q.  What, if anything, did you notice about the location where

4   you went to canvass for security cameras, if it had any?

5   A.  The location was a crime scene.

6   Q.  Excuse me?

7   A.  There was a crime scene.

8   Q.  But did you see if the building where you went had any

9   cameras?

10  A.  Yes, yes.

11  Q.  Did you notice if it had more than one camera?

12  A.  Yes, it did have more than one camera.

13  Q.  What did you do when you arrived at the location?

14  A.  What I did is I scouted for the cameras.  Once I did find

15  cameras, I was able to look for the super, ask the super for

16  permission, and then go downstairs and view the video.

17  Q.  Did you view the video?

18  A.  Yes, I did.

19  Q.  What, if anything, did you notice about the timestamp on

20  the video as you were watching it?

21  A.  The timestamp on the video was off from the actual time

22  that was going on.

23  Q.  And, generally speaking, how did you approach your review

24  of this video?

25  A.  What I usually do is I look at what's going on live, and

I9OKMAT3                          Reyes - Direct

1  then I will determine whether I have to go a couple of hours

2  up, a couple of hours down.

3  Q.  And what steps, if any, did you take to identify video

4  footage that appeared relevant to your investigation?

5  A.  Once I basically find the video I'm looking for, or the

6  incident that actually happened, then I'll just throw a thumb

7  drive into the DVR, set it up, so that I can download that

8  video.

9  Q.  Did you follow those steps in this investigation?

10  A.  Yes, I did.

11  Q.  Did you identify video that was relevant to your

12  investigation?

13  A.  Yes, I did.

14  Q.  What did you do after you identified that video?

15  A.  Once I identified the video, I downloaded it onto a thumb

16  drive, and then we took it back to the office for

17  investigation.

18  Q.  Detective Reyes, I'm showing you a disk that's been marked

19  for identification purposes as Government Exhibit 200.  It

20  contains Sub-Exhibit 200-A.

21          Do you recognize this disk?

22  A.  Yes, I do.

23  Q.  How do you recognize it?

24  A.  I viewed the video and also signed off on it.

25  Q.  When did you -- did you review the contents of this disk

I9OKMAT3                        Reyes - Direct

1   before testifying today?

2   A.  Yes, I did.

3   Q.  And, generally, what does it contain?

4   A.  It contains the video I downloaded on that night.

5           MR. RODRIGUEZ:  Your Honor, the government offers

6   Government Exhibit 200 and Sub-Exhibit 200-A.

7           THE COURT:  Any objection?

8           MR. KAYE:  I haven't seen it.  Is the government going

9   to play it, so we can see what it is?

10          MR. RODRIGUEZ:  Your Honor, once it's admitted into

11  evidence, we will play it.  We provided copies of it to the

12  defense counsel before today's proceedings.

13          MR. KAYE:  Judge, I don't know what's on that disk.

14  The government has absolutely provided me copies, but I don't

15  know what's on that disk.  Can we see it first, just counsel?

16          THE COURT:  How long is the video?

17          MR. RODRIGUEZ:  It's about 40 seconds, your Honor.

18          THE COURT:  Could you splay to counsel first?

19          MR. RODRIGUEZ:  Yes.

20          Ms. Parisi, please play Government Exhibit 200-A on

21  counsel's monitors.

22          THE COURT:  Can you add the Court to counsel?

23          MS. PARISI:  I'm not sure.

24          THE COURT:  That's okay.

25          (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I9OKMAT3                        Reyes – Direct

1              MR. RODRIGUEZ:  Your Honor, the government offers

2    Government Exhibit 200 and Sub-Exhibit 200-A.

3              MR. KAYE:  Brief voir dire?

4              THE COURT:  Okay.

5    VOIR DIRE EXAMINATION

6    BY MR. KAYE:

7    Q.   Detective, how many minutes, seconds, or hours of video did

8    you see at 2693 Morris?

9    A.   It wasn't much.  It was pretty much what I downloaded is

10   what I, you know --

11   Q.   There was nothing before it, and there's nothing after it?

12   A.   Pretty much this is what I downloaded, so --

13   Q.   I understand that that's what you downloaded.  My question

14   is:  What didn't you download?  What, if anything, existed on

15   the videotape before what we're looking at, you and I, and

16   after, if anything?

17   A.   There was nothing much after that.  It was pretty much

18   whatever was going on live at that time.  So what I downloaded,

19   it pretty much was basically the incident itself.

20   Q.   So you decided what portions of a larger video you would

21   put on a thumb drive, true?

22   A.   Yes, yes.

23   Q.   Well, what you didn't put on the video, is that preserved

24   for the jury?

25   A.   No.

1          THE COURT:  This is cross-examination.

2          200 and 200-A are received in evidence.

3          (Government's Exhibits 200 and 200-A received in

4     evidence)

5          MR. RODRIGUEZ:  Ms. Parisi, can you please bring up

6     and publish to the jury Government Exhibit 200-A and pause it

7     at the beginning of the video.

8     BY MR. RODRIGUEZ:

9     Q.  Government Exhibit 200-A is up on the screen.  There's a

10    timestamp in the upper left-hand corner.  It's stamped

11    "10/20/2017, Friday, 09:48:00, Camera 1" in the lower

12    right-hand corner.

13         Detective Reyes, in which direction is the camera

14    facing in this portion of the video?

15    A.  This portion of the video, the camera is facing towards

16    Kingsbridge.

17         MR. RODRIGUEZ:  Ms. Parisi, can you please play

18    Government Exhibit 200-A from the beginning until the timestamp

19    09:40:23.

20    Q.  Detective Reyes, generally speaking, what is the location

21    of the street that this footage from the camera showed?

22    A.  This is Morris Avenue.

23         MR. RODRIGUEZ:  Ms. Parisi, can you please play

24    Government Exhibit 200-A from the timestamp that it's currently

25    on, which is 09:48:23, to the end of the clip.

I9OKMAT3                        Reyes - Cross

1              (Pause)

2    Q.  Detective Reyes, does this portion of Government Exhibit

3    200-A show a different angle than the previous clip?

4    A.  Yeah.  It shows from within the courtyard looking onto

5    Morris Avenue, the entrance of the building.

6              MR. RODRIGUEZ:  Your Honor, may I have one moment?

7              THE COURT:  Yes.

8              (Pause)

9              MR. RODRIGUEZ:  No further questions at this time.

10             THE COURT:  Okay.

11             Mr. Kaye, cross-examination?

12             MR. KAYE:  Judge, can I also just note my objection to

13   the admission of this into evidence?

14             THE COURT:  Noted.

15             MR. KAYE:  Given that -- well, I'll cover that with

16   the witness.

17   CROSS-EXAMINATION

18   BY MR. KAYE:

19   Q.  Good afternoon, Detective.

20   A.  How are you?

21   Q.  You were not there at the time of this shooting event,

22   correct?

23   A.  No, I wasn't.

24   Q.  What you have chosen to place on the thumb drive is just

25   based on your best investigative skill and effort, true?

I9OKMAT3                        Reyes - Cross

1    A.   True.

2    Q.   But given that you weren't there at the time, how can you

3    tell us whether or not the video fairly and accurately reflects

4    what took place at that time, on that date, and at that

5    location?  How would you know that?

6    A.   Well, the video is showing someone definitely shooting at a

7    crowd of people that were down the block.

8    Q.   How do you know that was the shooting at issue?

9    A.   That was the only shooting on that day.  If there was other

10   shootings on that day, we would have gotten a call to

11   investigate.

12   Q.   How do you know that the date and the timestamp is

13   accurate?

14   A.   Well, that's the date of the shooting.  The timestamp, it

15   is off.

16   Q.   Did you look at your watch, and look at the time on your

17   watch, and then look at the time on the video timestamp?

18   A.   When I get there, and I usually do a video download, what I

19   usually do is I usually look at the live view.

20   Q.   What did you do at this time?

21   A.   I'm sorry?

22   Q.   What did you do at this time?

23   A.   This time?  I did what I'm explaining.  I looked at the

24   live view, looked at the time, and then adjust accordingly.  Of

25   course, I have to look at my watch as well.

I9OKMAT3                          Reyes - Cross

1    Q.   When you looked at your watch, what time did it say?

2    A.   I can't tell you at that time, and I don't recall.

3    Q.   What time did it say on the video?

4    A.   The video, I believe, said 9:20.

5    Q.   So was your watch an hour early, or an hour late, or

6    something else?

7    A.   Like I said, it's almost a year ago.  I don't recall

8    exactly what time I got there and which way I had to adjust.

9    Q.   What you're saying to our jury is that the timestamp on the

10   video is off, correct?

11   A.   Correct.

12   Q.   All I'm asking you to do is tell the jurors, how off is it?

13   A.   I don't know exactly how --

14   Q.   Well, who would know?

15   A.   What?

16   Q.   Who would know?

17   A.   Basically, I put that into my report that it was off.

18   Exactly how much it was off?  I don't know.  I can't recall.

19   Q.   So, given that the timestamp is off in an amount that you

20   don't know, and given that you were not a witness, a live

21   witness, to what is depicted in the video, how can you tell

22   this jury that the video accurately portrays what took place at

23   that time?

24   A.   Through the video that I viewed, I saw someone shooting,

25   and that's what actually happened.

I9OKMAT3                          Reyes – Cross

1   Q.  So you're telling the jury that the video fairly and

2   accurately reflects a video that you saw, correct?

3   A.  Yes.

4   Q.  You're not telling the jury that the video fairly and

5   accurately reflects what took place if you were standing on the

6   street and live observing it, are you?

7   A.  Yes, I am saying that.

8   Q.  How would you know what took place live on the street if

9   you weren't there live on the street?

10  A.  Well, because through the video recording.  The video

11  recording is showing exactly what happened on that point in

12  time.

13  Q.  And how do you know it's accurate if you weren't there at

14  the time the shooting took place?

15  A.  I am going on what I saw on video.

16  Q.  Correct.  You're not going on your own personal knowledge,

17  true?

18  A.  I have to go on what I saw on that video.

19  Q.  I kind of have to ask it again and ask you to answer my

20  question, if you can, with a yes or no.

21        You're not going off of your own personal knowledge;

22  yes or no?

23  A.  No, not my personal knowledge.

24        MR. KAYE:  The defense objects to the introduction in

25  that the foundation has not been properly laid, your Honor.

I9OKMAT3                          Reyes - Cross

1    This is not a witness with knowledge.

2    BY MR. KAYE:

3    Q.  Can you tell the jury who directed you to search for video,

4    what was the name of the supervisor that did that?

5    A.  I'm sorry?

6    Q.  Who directed you to search for video?

7    A.  No one directed me.  Basically, at that point in time, once

8    we get there, we do that automatically.  We don't need to get

9    any type of permission or anything.

10   Q.  Who did you search for the video with?

11   A.  I went alone.

12   Q.  Did you know what you were looking for?

13   A.  Yeah.  I was looking for the video at that angle and

14   someone shooting.

15   Q.  Were you looking for suspects?

16   A.  Yes.

17   Q.  And did you see Mr. Mathews on the video?

18   A.  Excuse me?

19   Q.  Did you see Mr. Mathews on the video, the defendant?

20   A.  I saw someone shooting on the video.  I don't know if it

21   was Mr. Mathews or anything.  At that point in time, we didn't

22   know the person's name or information.

23              (Continued on next page)

24

25

I9OAAMAT4                        Reyes – Cross

CROSS-EXAMINATION

BY MR. KAYE:

Q. Well, you can look at him here. Did you see him on the

video, sir?

A. Like I said, at that point in time, I can't tell you right

now that's the person. I downloaded the video and I gave it

then to the lead detective.

Q. Well, you told the jury that there was a video before the

40-second clip that they'd seen?

A. Correct.

Q. And you told the jury that there was video after the

40-second clip they'd seen, correct?

A. Correct.

Q. And you looked at those other portions of the video, true?

A. True.

Q. Can you tell the jury whether Mr. Mathews is on the video

after or before the 40-second clip?

A. I, basically what I saw was what I downloaded. It's

someone coming up shooting, then leaving with a female

afterwards.

Q. Should I take that to mean that you did not see Mr. Mathews

either before the 40-second clip the jury has seen or after the

40-second clip the jury has seen, sir?

A. No. Basically, it's what I downloaded. That's when I got

to see the subject.

I9OAAMAT4                         Reyes - Cross

1   Q.   Yes.  But did you see my client before what you downloaded?

2   A.   No.

3   Q.   Did you see him after what you downloaded?

4   A.   No.  He was running away.  So --

5   Q.   Is it your testimony that that was my client?

6   A.   I'm sorry?

7   Q.   You said he was running away.  Is it your testimony that

8   that was my client in the video?

9   A.   Could be your client, yes.

10  Q.   Do you know that for a fact?

11  A.   Like I said, I'm not the lead detective, so I don't know

12  exactly.  My job here was basically just the downloading of the

13  video and the witness.

14  Q.   But you are the witness on the stand and my question to you

15  is that your testimony to the jury that my client, Leonard

16  Mathews, is the person running and shooting in that video, yes,

17  no, or your don't to know?

18  A.   I would say "yes".

19  Q.   You would say yes or --

20  A.   Yes.

21  Q.   Did you arrest my client?

22  A.   No, I didn't.  All I had part here was --

23  Q.   Had you ever seen my client prior to the time you walked

24  into this courtroom, sir?

25  A.   No, I've never seen your client.

I90AAMAT4                    Reyes - Cross

1    Q.   So this happened nearly a year ago, didn't it?

2    A.   Yes.

3    Q.   And it's your testimony that you're able to discern the

4    facial features of someone running in a video and match it to

5    this young man sitting here at this table?

6    A.   Yeah.

7    Q.   How much time did you spend with the super in the basement

8    gathering video?

9    A.   I would say probably about half an hour or less,

10   approximately.

11   Q.   Half on hour or less?

12   A.   Yes.

13   Q.   And you put it on the flash drive?

14   A.   Correct.

15   Q.   Where is the flash drive?

16   A.   That flash drive pretty much once I give it to the lead

17   detective he uploads it into the case file and then that gets

18   taken care of that way.

19   Q.   So did the lead detective, is that Detective Cole?

20   A.   Detective Maye.

21   Q.   Detective Maye?

22   A.   Yes.

23   Q.   So Detective Maye was the one that decided what would and

24   what would not be placed on a disk; is that your testimony?

25   A.   No.  I decided it was going to be on placed at that point

I9OAAMAT4                    Reyes - Cross

 1   in time.

 2   Q.   You decided it was going to be placed on the thumb drive?

 3   A.   Yes.

 4   Q.   My question is who decided what would be placed on the

 5   disk?

 6   A.   On the disk I signed?

 7   Q.   The disk that was marked into evidence.

 8   A.   I don't know who was going to decide who was going to place

 9   what I download onto that disk.

10   Q.   Do you know where the thumbdrive is that happens to have

11   all of video on it?

12   A.   That was uploaded into Detective Maye's case.

13   Q.   And you say uploaded into the case?

14   A.   That's basically NYPD server.  It gets uploaded there.  It

15   remains there.

16   Q.   So it's available --

17   A.   It's available.

18   Q.   It is available if we wanted to see it?

19   A.   Yes.

20   Q.   All of the video.  And was the length of it?

21   A.   What we, pretty much what we have here is the entire video.

22   Q.   That's it, 40 seconds?

23   A.   Just about, yeah.  I can't tell you exactly because it was

24   a year ago almost, exactly how long the video is.

25   Q.   But if we were ever to find that flash drive, the

I9OAAMAT4                         Reyes - Cross

1   thumbdrive, that would reflect all the video that the super

2   showed you beginning to end?

3   A.  Yeah.

4   Q.  It took you a half an hour to observe and download 40

5   seconds?

6   A.  Yeah, just about.

7   Q.  You told us that there is video before and video after,

8   didn't you?

9   A.  There is video before and after.  It doesn't mean I

10  downloaded the video before and after.  If that's the case I'll

11  be downloading 24 hours of video.

12  Q.  Do you remember, let's say for ten minutes before the video

13  we're seeing and for ten minutes after the video we're seeing?

14  A.  I would not download that much.

15  Q.  But do you remember seeing those portions of the video?

16  A.  I can't recall.

17  Q.  Did it show people running?

18  A.  People were pretty much just hanging out in front of the

19  building.

20  Q.  Hanging out in front of?

21  A.  2693 Morris.

22  Q.  In front of the building in which you were downloading

23  video with the super?

24  A.  Yes.

25  Q.  Did it look like those people were involved in this

1    offense?

2    A.   No.

3    Q.   Just neighbors?

4    A.   I don't know if they were neighbors.  Could be people just

5    hanging out.

6    Q.   Just residence?

7    A.   Could be residents, could be people just hanging out.

8    Q.   You don't know whether or not they had anything to do with

9    this shooting, do you?

10   A.   No.

11   Q.   Did you request any video at that location from the night

12   before?

13   A.   No.

14   Q.   Were you asked to locate any video from the night before?

15   A.   No.

16   Q.   Do you know if any other members of the 52nd Precinct

17   Detective Squad that were asked by Detective Maye or Detective

18   Cole or anyone, to go out and find video of an incident that

19   happened the night before?

20   A.   No.

21   Q.   Were you aware of whether or not there was an incident that

22   took place the night before?

23   A.   Not at this point in time, no.  I was not aware.

24   Q.   Did you look for video on Morris Avenue?

25   A.   On Morris.

1    Q.  Did you look for a video on Crescent Avenue?

2    A.  Yes, I did.

3    Q.  Tell us about that?

4    A.  The video equipment was not being, wasn't able to download.

5    So basically I just viewed video but that's it.  I was not able

6    to download anything.

7    Q.  Well, where did you view video?  What was the address on

8    Crescent?

9    A.  I can't recall at this point.

10   Q.  Well, did you write that down in your memo book?

11   A.  That probably would be in my memo book, yes.

12   Q.  Do you have your memo book?

13   A.  I don't have any memo book on me, no.

14           MR. KAYE:  Do we have his memo book?

15   Q.  What would help you to refresh your recollection?

16   A.  I would need to see my notes.

17   Q.  Do you have your notes?

18   A.  No, I don't have now notes.

19   Q.  Where are your notes?

20   A.  My memo book would be at the precinct.

21   Q.  At the precinct?

22   A.  Yes.

23   Q.  You came to testify in court without your memo book?

24   A.  Yes.

25   Q.  Do you remember the addresses at all that you went to?

I9OAAMAT4                          Reyes - Cross

1   A.  Just the address where I downloaded the video.

2   Q.  Well, how many other buildings did you go to?

3   A.  Just two.

4   Q.  Two more?

5   A.  No.  Two in total.

6   Q.  The one you have shown us?

7   A.  Yes.

8   Q.  And the one on Crescent?

9   A.  On the corner of Crescent and Morris.

10  Q.  Crescent and what?

11  A.  Morris Avenue.

12  Q.  Does Crescent and Morris intersect?

13  A.  Yes.  Excuse me.  One-nine-six and Morris.

14  Q.  You went into a building pretty much in the middle of

15  Crescent Avenue and then you went into a building where

16  Crescent meets one-nine-six, a block to the north?

17  A.  I went to the building on one-nine-six and Morris, OK, and

18  then the building on Morris Avenue.

19  Q.  So you never went to Crescent?

20  A.  No, I didn't.

21  Q.  All right.  Did you go to any buildings on one-nine-six?

22  A.  The building I am saying on the corner of one-nine-six and

23  Morris Avenue.

24  Q.  Did you attempt to get any video on Jerome Avenue?

25  A.  No.

I9OAAMAT4                         Reyes - Cross

1            MR. KAYE:  Thank you, detective.

2            THE WITNESS:  Thank you.

3            MR. RODRIGUEZ:  Nothing further from the government,

4    your Honor.

5            THE COURT:  Thank you.  You may step down.

6            Ladies and gentlemen, it's a little after five.  I

7    apologize for keeping you after five.  Generally I will be

8    letting you go by five o'clock for scheduling purposes.

9            We're going to have breakfast for you by 9:15.  It's

10   not going to be eggs Benedict but it will be some coffee and

11   some, I don't know, doughnuts and bagels and stuff like that.

12   So please, please try to arrive by 9:15.  We'll start everyday

13   promptly at 9:30.  But of course with can't start until all of

14   you are here.  So please try to be here, shoot for 9:15 and

15   definitely be here by 9:30 and then we'll continue with the

16   testimony in the case.

17           I just want to remind you as I've already said, please

18   don't discuss the case.  You are welcome to say you are on jury

19   duty in a criminal case in federal court but please, don't

20   discuss the case with anyone else.  Don't do any research on

21   the case or anything like that.  It's very important that this

22   case be decided for the fairness of the parties based solely on

23   the evidence that you hear in this courtroom.

24           So have a nice evening, everybody.  Please leave your

25   pads closed on your chairs and we'll start back tomorrow

1    morning.  Have a good night and we'll see you tomorrow.

2            Mr. Hampton needs to talk to you briefly in the back.

3    So please follow him in the back.

4            (Jury not present)

5            THE COURT:  You all could be seated.

6            Well, we finished the witness.  This is the witness

7    who had the vacation issue?

8            MR. RODRIGUEZ:  Yes, your Honor, thank you for that.

9    So we preserved his family vacation.

10           THE COURT:  Are there any other matters we all wanted

11   to address?

12           MR. RODRIGUEZ:  Just to avoid what happened today

13   although, it was on the government's exhibit list.  We'll send

14   defense counsel a list of all of the video that we expect to

15   introduce into evidence through witnesses tomorrow.  Again,

16   even though it's already on the exhibit list, just so there

17   continues to be no surprises about that.

18           THE COURT:  You have had the video?

19           MR. KAYE:  That was not the issue.  I've seen the

20   video a hundred times.  The issue is I would like to see what

21   it is the government is asking to show the jury at that time,

22   not relying upon my memory from the last time I looked at it.

23           THE COURT:  But how he is he supposed to do that?

24           MR. KAYE:  To show it to counsel.

25           THE COURT:  It's going to make a very long trial.

I9OAAMAT4                        Reyes – Cross

1          MR. KAYE:  The videos are just very brief clips, your
2     Honor.  They're similar to this in length.
3          THE COURT:  Right.  But can you make a note to
4     yourself that the video that is going to be shown is the one
5     that shows this, so we don't have to show everything twice?
6          MR. KAYE:  Look what happened today.  The video was
7     played.  The witness has no knowledge as to whether or not that
8     is a fair and accurate representation of what took place.
9          THE COURT:  He was the guy who got the video at the
10    building.  His only personal knowledge was the personal
11    knowledge that he went to the system that recorded video and
12    that's all the relevant personal knowledge he needed.
13         MR. KAYE:  But the Court admitted it, nonetheless.  Is
14    the Court admitting it subject to connection by a witness that
15    has knowledge?
16         THE COURT:  Do you want to address this?
17         MR. RODRIGUEZ:  Your Honor, no such witness is
18    necessary.  There would never be video played in federal court
19    unless there was a person in the video there at the time who
20    had the kind of knowledge that Mr. Kaye seems to require.  Why
21    even have security cameras at that point I wonder?
22         But the point is your Honor's exactly right.  His
23    personal knowledge is, this is the video that I pulled from
24    this system.
25         THE COURT:  He said where the system was and what

1    place in the world is showed.  So I don't know what more he has

2    to show to have personal knowledge that this is a video of "X"

3    place.

4            MR. KAYE:  Well, he's not introducing a video of a

5    place.  He's introducing a video of an event that he did not

6    witness.  That's my point.

7            THE COURT:  That's why you need video.  Obviously, he

8    couldn't say, I know this is how it unfolded, because he wasn't

9    there and that's why we need video.  But he testified that he

10   sat there and he looked for video and he got the video of the

11   shooting.

12           MR. KAYE:  Well, he testified that he got the video of

13   a shooting.  No one has said that that is the shooting,

14   especially him.  It's complete speculation that that's the

15   video.  Maybe it was.  It's likely that it was.

16           But yes, to answer the counsel's query, yes, they need

17   a witness who actually saw the shooting to lay the proper

18   foundation that it's a fair and accurate representation of the

19   shooting or somebody looking out the window or somebody that

20   participated in it, not a detective that comes to a

21   surveillance monitor in the basement of a building and is shown

22   something.

23           That, in the defense's estimation, is not a proper

24   foundation.

25           THE COURT:  OK.  Your objection is noted.  I don't

I9OAAMAT4                          Reyes - Cross

1    agree that it's not a proper foundation but your objection is

2    noted.

3              MR. RODRIGUEZ:  Finally, your Honor, it would be

4    impossible -- I don't think that the Court is suggesting

5    this -- that for example, if we put a witness on the stand

6    tomorrow, we'll pull a lot more video than the 40 seconds that

7    was shown today, that we have to show it to defense counsel in

8    court ahead of time we are going to be here a very long time.

9    Instead, what we've done is identified for defense counsel what

10   video is going to be on that disk.  It is going to be a disk

11   that was previously reviewed and that's the wrong procedure.  I

12   don't see why it would be any different.

13             MR. KAYE:  Could I just say one more thing?

14             THE COURT:  Sure.

15             MR. KAYE:  The government is calling Ciara Edwards to

16   testify.  So there is a witness who is starring in that video

17   who can lay a proper foundation.  And whether or not they have

18   another witness who is starring in these other videos or who

19   appears in those videos or who saw the event live is what's

20   needed to lay a proper foundation that the videos fairly and

21   accurately reflect what took place at that date, time and

22   location.

23             So I will have the same objection.  Counsel is right.

24             THE COURT:  OK.  Anything else?

25             MR. KAYE:  Could we just know what witnesses are being

1  called tomorrow?

2          THE COURT:  Yes.  What's next on tap?

3          MR. RODRIGUEZ:  One moment, your Honor.

4          Your Honor, on Saturday evening the government sent

5  defense counsel a list of our first five witnesses.  We intend

6  to do the same thing this evening.  But since we already got to

7  one, let me just mention those other four.  It's going to be

8  Officer Guija, Officer Adbul-jabar, Detective Colleen Horan and

9  Officer Anthony Caltabiano.

10         THE COURT:  The last one was?

11         MR. RODRIGUEZ:  Anthony Caltabiano.

12         THE COURT:  Is Abdul-jabar related to the Kareem

13 Abdul-jabar?

14         MR. RODRIGUEZ:  Your Honor, I'm going to refer to my I

15 colleague on that one.  Not that I'm aware of.

16         MR. KAYE:  Judge, these are very quick witnesses.

17 Each once is five or 10 or 15 minutes.  So in order to prepare

18 to cross-examine the witnesses with some meat on their bones,

19 can the government tell me which witnesses they are considering

20 calling, which one witnesses are in New York?  Which witnesses

21 are in the running to be called?  And not make me wait until

22 ten or 11 o'clock at night and have me sitting in my office.  I

23 know they are going to be there.  I'd rather not be.

24         MR. RODRIGUEZ:  Your Honor, as I mentioned, we will do

25 that this on evening.  It's not going to be at ten or

I9OAAMAT4                          Reyes – Cross

1       11 o'clock at night.  Defense counsel has the next four.  We'll

2       replenish with another five.  So, as soon as we get back to our

3       office and regroup a bit, we'll send the next five witnesses.

4               MR. KAYE:  Could I get it by seven o'clock; is that

5       reasonable?

6               MR. RODRIGUEZ:  Sure.  Seven o'clock is fine.

7               THE COURT:  Great.  I think we have the issue of the,

8       quote, "big homie" statement on which I received a letter from

9       defense counsel and a responsive letter from the government.

10              And the other thing is from my order on Friday I

11      wanted the defendant to indicate by today whether the defendant

12      intends to dispute the facts regarding the admission of gang

13      affiliation.

14              MR. KAYE:  He does.

15              THE COURT:  OK.

16              MR. KAYE:  I have an affidavit.

17              THE COURT:  OK.  Do you have it now?

18              MR. KAYE:  Yes.

19              THE COURT:  OK.  So you want to submit that?

20              MR. KAYE:  Can I?

21              THE COURT:  Yes.  You don't want to submit live

22      testimony?

23              MR. KAYE:  Well, if that's what the Court is

24      directing, then I will but I think the affidavit is sufficient

25      to get him the hearing.

1        THE COURT:  OK.  I'll take a look at it.

2        Have you all received it yet?

3        MR. RODRIGUEZ:  We have not, your Honor.

4        THE COURT:  OK.

5        MR. KAYE:  I have a copy for the government to look at

6    while I find the original.

7        THE COURT:  Is this something that you submitted on

8    the docket?

9        MR. KAYE:  I did not.  Did I put it on ECF?

10       THE COURT:  Yes.

11       MR. KAYE:  No, your Honor, I didn't.

12       THE COURT:  Are you prepared to?

13       MR. KAYE:  I certainly can if that's what the Court

14   prefers.

15       THE COURT:  You can give me copy for now but I think

16   it should go on ECF in some form.

17       MR. KAYE:  All right.  It's unsigned.  I will put the

18   unsigned on ECF tonight.

19       Also, judge, is there some way that the monitor in

20   front of the witness stand can be adjusted because I literally

21   cannot see the witness's face or the lips, having to move away

22   from the lectern to do that.

23       THE COURT:  We'll try to move it a little bit.  These

24   monitors are unfortunately large.

25       MR. RODRIGUEZ:  Your Honor, we've only received this

1   affidavit for the first time and maybe your Honor wants some

2   time to review it as well and we can address it further.  But I

3   just want to state for the government's position now that this

4   affidavit doesn't actually seen to be sufficient to trigger a

5   supression hearing.  The facts as set forth in the affidavit

6   don't suggest that Mr. Mathews made the statement -- which he

7   admits making the statement -- but there are no facts in here

8   to suggest that it was made in response to questioning.  And so

9   again, having just gotten this affidavit now and the Court

10  needs time to further consider it but the government would just

11  want to make its position known at this time.

12          THE COURT:  OK.  I'll review it tonight and I'll rule

13  tomorrow morning on the other issue about the "big homie"

14  statement.  All right?

15          MR. KAYE:  Yes, your Honor.

16          THE COURT:  Are the any other matters we need to

17  discuss tonight?

18          MR. KAYE:  Not for the defense.

19          MR. RODRIGUEZ:  No, your Honor.

20          Thank you.

21          THE COURT:  Have a good night everybody.  See you

22  tomorrow.

23          (Adjourned to September 25, 2018 at 9:30 a.m.)

24

25