I9PAAMAT1                      Jury Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                v.                          18 CR 124 (JPO)

5    LEONARD MATHEWS,

6                    Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        September 25, 2018
9                                       9:30 a.m.

10
     Before:
11
                        HON. J. PAUL OETKEN,
12
                                        District Judge
13

14                          APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     JUSTIN VICTOR RODRIGUEZ
17   DOMINIC A. GENTILE
     EMIL JOSEPH BOVE, III
18        Assistant United States Attorneys

19   BARASCH MCGARRY SALZMAN PENSON & LIM
          Attorneys for Defendant MATHEWS
20   BY:  BRUCE KEVIN KAYE

21   ALSO PRESENT:  Sabrina Parisi, Paralegal

22

23

24

25

1

2                    (Trial resumed; jury not present)

3                    THE COURT:  Good morning, everyone.

4            I received a letter from the government last night

5     regarding defense counsel's intended questioning of Officer

6     Maye about certain statements made by DeJesus in a post-arrest

7     interview on October 26, 2017.

8            Mr. Kaye, have you had a chance to see the letter?

9            MR. KAYE:  Yes.  I haven't had a chance to put in a

10    written opposition to it but I can speak to it.

11           THE COURT:  OK.

12           MR. KAYE:  Judge, obviously, we disagree strongly with

13    the government's position.  It's clear that the government is

14    speaking out of both sides of its mouth.  The government has

15    submitted a motion several days ago wherein they request to

16    introduce certain statements that Mr. DeJesus made, namely,

17    that they only reference to Ms. Edwards as a declaration

18    against penal interests and/or co-conspirator statement.

19           They've also made an application to your Honor to

20    introduce the statement of Mr. DeJesus to the Department of

21    Corrections regarding his gang affiliation.  Yet, they're now

22    coming in here and telling the Court that a statement by that

23    same individual is not a declaration against penal interest.

24           THE COURT:  But as to those other two examples,

25    clearly, there's corroborated evidence.  Whereas, they're

1    arguing there is no corroborating evidence.

2            MR. KAYE:  I argued there was no corroborating

3    evidence for both of those statements and the Court presumably

4    found that there was corroborating evidence.  I didn't see

5    corroborating evidence necessarily of DeJesus' Department of

6    Corrections gang affiliation declaration.  I didn't see any

7    corroborating evidence of his statement which was classic

8    hearsay upon hearsay statement in that my client allegedly told

9    him something and then he told that something to Ms. Edwards.

10   So that was even double hearsay.  I failed to see the

11   corroboration in that.

12           This statement, I would submit there is corroboration

13   because it was repeated over and over.  There was a four hour

14   questioning by very experienced homicide squad detectives on

15   videotape.  The detective then went into the Bronx Grand Jury,

16   took on oath to tell the truth and reiterated that statement

17   before the grand jury.  That same detective, Detective Maye

18   then signed a sworn felony complaint against Mr. DeJesus,

19   wherein he repeated that statement.  So it's under oath in two

20   venues and of course we are the video of the statement itself.

21   The government may take issue with various portions of his four

22   hour long interrogation session but I submit there are various

23   forms of corroboration and when it's offered under oath, that

24   is probably the strongest indication that the detective who

25   took the statement believed it was true.

1          THE COURT:  So in what way did the officer make a

2     statement about his statement that was under oath?

3          MR. KAYE:  He was called as a witness before the grand

4     jury that indicted Mr. DeJesus.

5          THE COURT:  OK.  Then he related that statement.

6          MR. KAYE:  Yes, your Honor, he did in the grand jury.

7     And then there's also the felony complaint that he swore out.

8     The felony complaint states on it that this complaint is

9     submitted under penalty of perjury.  And in the complaint it

10    says deponent, Detective Maye, further states that defendant

11    stated in sum and substance, quote, she had been talking about

12    telling on me, so I just stabbed her.  Below which is false

13    statements made her which is punishable by a Class A

14    misdemeanor.  Of course, I'm not going to belabor the record by

15    reading the same into the grand jury.

16         But he swore to it that it was set and that was

17    obviously true or it would never have been asked to relate to

18    the grand jury and place it in the complaint.

19         I would also say in terms of corroboration at no time

20    in this case or in this litigation has there ever been a

21    suggestion that the defendant orchestrated or ordered or

22    directed this attack on Ms. Edwards.  That was a recent vintage

23    in this case.  I think the first advanced notice by the

24    government was in a letter to Mr. Palmer in May of 2018.  Up

25    until that point, this case had been Juan DeJesus solely

1    responsible for the slashing of Ms. Edwards.  Juan DeJesus

2    solely charged with it.  In fact, my client was charged by

3    Detective Maye but not with the slashing on Ciara Edwards.  He

4    was charged with the shooting.  He was processed and the Bronx

5    District Attorney's Office then dropped the case.  They decline

6    to prosecute.  They withdraw the application because they

7    didn't have sufficient evidence.

8              So that serves I submit as corroboration that at no

9    time did the Bronx District Attorney's Office other even

10   Detective Maye believe that the defendant was involved in the

11   slashing of Ms. Edwards and all the statements and all the

12   police action are consistent with that.

13             THE COURT:  Just to be clear, I haven't watched the

14   video yet.  I just got the CD this morning.  But what exactly

15   are you planning to or proposing to inquire of Detective Maye?

16             MR. KAYE:  Sure.  That he swore out the complaint

17   wherein he swore that in sum and substance DeJesus stated, she

18   had been talking about telling on me, so I just stabbed her.

19   And his statement in the grand jury where he said, quote, We

20   spoke further about the stabbing of the young lady that was

21   just in here.  He said that she was with him when the shooting

22   occurred.  He was worried about her talking to the police

23   because she had said she got caught she would tell what

24   happened, so he was thinking in his mind that he was probably

25   going to kill her and that's it.

I9PAAMAT1                    Jury Trial

1          THE COURT:  OK.  So the only statements you are

2    talking about are the ones relating to Witness One.

3          MR. KAYE:  Right.

4          THE COURT:  OK.  Do you want to respond briefly?  I

5    probably won't rule on this right now, so if you want we can do

6    this later.

7          MR. GENTILE:  I'll leave it up to the discretion of

8    the Court.

9          Your Honor, in the first instance the context matters

10   here.  So statements that Mr. Jesus made during a four hour

11   interrogation on an attempted murder charge is certainly

12   different than statements he made to Department of Corrections

13   officials while incarcerated and in their custody.  The

14   incentive to lie is exponentially greater in the former than in

15   the latter.

16         The statements he made during this four hour

17   confession are being cherry-picked by the defense on several

18   issues.  The reason they are not reliable and the reason the

19   Court shouldn't allow them is because he changed his story more

20   than once during that confession.  And as your Honor will see

21   if you have the time to look at video we provided, DeJesus

22   indicates that he arrived on the set after they called me

23   because of the fight because the gang leader ordered him to

24   retaliate.

25         He didn't say that.  I'm paraphrasing.

1          He says he did not care too much about what the fight

2     was about because he was ordered to show up.  He later suggests

3     that he acted alone.  But he also tells the detective that he

4     was summoned there by other members of the gang.  So his

5     statements are not reliable on either end of the spectrum and

6     the defense has not told you about that.  That's why we believe

7     that these statements should not be permitted.

8          THE COURT:  OK.  Well, I think -- you are not calling

9     Maye this morning, are you?

10         MR. GENTILE:  Well, that's one of the issues we'd like

11    to address for the Court.  We were prepared to call him because

12    of this issue.  Now we have to delay his testimony until

13    tomorrow or until the Court rules.

14         THE COURT:  Obviously, I want to rule but I want to

15    look at some of the case law and look at the disk.

16         MR. GENTILE:  Your Honor, if the defense is permitted

17    to elicit this statement, we would reserve the right to impeach

18    those statements with bringing in the DVD and showing the

19    statements that I just told you DeJesus made, that contradicted

20    this assertion.

21         THE COURT:  So you would be opening the door,

22    Mr. Kaye, I assume to the statements that are inconsistent that

23    Mr. Gentile just described.

24         MR. KAYE:  There are no statements in the four hour

25    videotape that are inconsistent with my client not directing,

1    ordering or partaking in the assault on her.  So we're going to

2    have a potentially disagreement as to whether or not --

3             THE COURT:  OK.

4             MR. KAYE:  I will direct the Court's attention to the

5    last 40 minutes of the video because it was four hours long and

6    that section that deals with this issue really is the last 40

7    minutes.

8             THE COURT:  So this is all four hours?

9             MR. GENTILE:  Yes, it is, your Honor.

10            THE COURT:  So which part should I listen to or watch?

11            MR. GENTILE:  We cite the timestamps in the letter

12   that we sent to the Court.

13            THE COURT:  OK.

14            MR. GENTILE:  And the only other thing I would add,

15   your Honor, is it's not just whether his statements were

16   inconsistent.  We should be allowed to impeach an out-of-court

17   declarant statements with this DVD as well.  So it's not just a

18   matter of inconsistency.  It's matter of impeaching.

19            MR. KAYE:  Well, the impeachment material has to be

20   related to that which the defense offers.  Otherwise, it is not

21   impeachable material.  It's just a backdoor way of the

22   government getting in otherwise inadmissible evidence.  Doesn't

23   it have to counter those portions that the defense offers?

24            THE COURT:  So you want to impeach the declarant?

25            MR. GENTILE:  Yes, with the statement that we feel are

1   inconsistent and which we're outlined in our submission.

2            THE COURT:  But if he asks only about the matters

3   related to Witness One and none of the stuff about the

4   attempted murder.  He is saying that there is nothing

5   inconsistent with that.

6            MR. GENTILE:  Actually, I think some of the statements

7   that we wrote in our submission contradict that.  For instance,

8   on page two we have where he says, I don't know none of them

9   people who was at the bodega on the night of shooting, that

10  would presumably include the witness.

11           MR. KAYE:  Judge, that's so far afield of the issue

12  here.  That's cherrypicking evidence that barely scratches as

13  impeachment, not knowing any of the people around the bodega.

14  We're talking about whether or not the defendant ordered the

15  silencing of a witness.  It's a very specific direct issue

16  here.  Can the government show us where in the four hours

17  DeJesus says something opposite to that.  For example, yes, I

18  did tell him to kill him.  Yes, we did talk about.  That of

19  course, would be proper and I couldn't have --

20           THE COURT:  OK.  What's going to be impeachment or not

21  I think is a later issue depending on the primary issue.  I

22  think I need to look at some of the case law and look at this.

23  So let's do that first.

24           MR. KAYE:  Before we start up today, I was told that

25  the government is also calling a gang expert today and I did

I9PAAMAT1                    Jury Trial

1    have a motion.  It was done very late.  I didn't put it onto

2    ECF.  I've given a copy of it to the government.  Can I hand a

3    copy it up to Mr. Hampton?

4              THE COURT:  Yes.  You all have a copy?

5              MR. RODRIGUEZ:  We did receive a hand copy about ten

6    minutes ago from defense counsel.  Obviously, we would ask for

7    an opportunity to review it.  Your Honor, will see the request

8    from defense counsel as a request to display tattoos or lack of

9    tattoos on his arms.

10             THE COURT:  Is this what you meant to hand up?

11             MR. KAYE:  Oh, I'm sorry.

12             MR. RODRIGUEZ:  The only thing I'll say about that now

13   is whether or not the defendant is permitted to do this.

14   Obviously, it wouldn't happen before the defendant's case.  So,

15   I think the government will have some time to respond and we'd

16   do that expeditiously and the Court will have time --

17             THE COURT:  When are you planning to call this

18   witness?

19             MR. RODRIGUEZ:  Today.

20             THE COURT:  So when were you planning to respond?

21             MR. RODRIGUEZ:  I think the request here doesn't

22   relate to the gang expert who is going to testify today.  I

23   understand this request which we got ten minutes ago to be that

24   Mr. Mathews is going to make a demonstration of sorts which the

25   government has to look at but doesn't seem to be proper but if

1    it were to be proffered at all and the Court who would allow

2    it, it would happen during the defense case.

3            MR. KAYE:  I would want to do it on cross-examination

4    and I would have their gang expert who presumably is going to

5    cover the subject of gang tattoos look at it.  The defendant

6    will stand up.  He'll show the expert his tattoos, the absence

7    of gang tattoos and then I'll be able to ask him a question.

8    So I did plan on doing it with a witness who has something to

9    say about it as opposed to him just showing something that the

10   jury wouldn't even know the relevance of.

11           THE COURT:  OK.

12           MR. RODRIGUEZ:  Your Honor, the jury's going to hear

13   his testimony and then the defense will put on their case.

14   Mr. Kaye can connect the two if he wants in closing but there

15   is no reason to jump out of order for a demonstration that's

16   really being done as part of the defense's case.

17           The other thing I'll mention is I don't anticipate

18   that Detective Jeselson who is a witness that we're talking

19   about is going to opine on in his direct testimony, tattoos or

20   specific tattoos or anything like that.  So for all of these

21   reasons, if this is going to happen at all, it should happen

22   during the defense's case.

23           MR. KAYE:  Well, if we don't hear the subject of

24   tattoos, then that may weigh in favor of the government's

25   opposition.  If we do, then I would submit that my anticipated

I9PAAMAT1                    Jury Trial

 1    use of my client's body, his physical characteristics is

 2    relevant and is proper and I recently did this in August before

 3    Judge Woods and it was found to be a perfectly proper method of

 4    submitting evidence to the jury without the defendant

 5    subjecting himself to cross-examination.

 6               THE COURT:  OK.  When are you planning to call the

 7    expert?

 8               MR. RODRIGUEZ:  Your Honor --

 9               THE COURT:  Just tell me who we have.

10               MR. RODRIGUEZ:  I think the witnesses today will be

11    the following order:

12               Officer Guija, Officer Abdul-jabar, Detective Horan,

13    Detective Caltabiano, Detective Jeselson who is the expert that

14    we're talking about.

15               THE COURT:  That's good.  So Jeselson, I am assuming

16    isn't until the afternoon.

17               MR. RODRIGUEZ:  Depending on the length of

18    cross-examinations, I expect that each of those witnesses's

19    direct will not be terribly long.

20               THE COURT:  OK.  I'll have to think about the issue of

21    the tattoos.

22               Before we bring in the jury, I want to rule on the,

23    quote, "big homie" statement

24               Defendant moved in a letter to preclude Witness One

25    from testifying that Juan DeJesus, an unindicted co-conspirator

introduced the defendant to her as, quote, "big homie", arguing

that this statement is hearsay.

First, I find the statement is a statement against

penal interest by an unavailable witness, namely, DeJesus.

Defendant cites U.S. v. Williamson 512 US 594, for the

proposition that Rule 804(b)(3) is not allowed admission of

statements that are non self-incriminatory, that is

incriminatory of the declarant and while it is true that the

statement is primarily incriminatory of the defendant, it is

also probative of DeJesus's membership in the Bloods because it

tends to show his awareness of the term and his role in the

hierarchy.  It is sufficiently against penal interest as to

DeJesus to come within Rule 804(b)(3).

Second, I also conclude that the statement is

admissible as a co-conspirator statement in furtherance of

conspiracy.  Therefore, I find it admissible under

801(d)(2)(E).  As Judge Nathan explained in U.S. v.  Murgio, 15

CR 769, the rule does not require that the conspiracy for

purposes of the rule be the one charged in the indictment.

In addition to the specific alleged conspiracy to

murder Toribio, the evidence referenced by the government

establishes racketeering and drug trafficking conspiracies

involving DeJesus and the defendant that were ongoing in the

days and weeks prior to October 20, 2017.  The proffered

evidence establishes that Witness One was being recruited by

1    DeJesus for participation in those activities and that the

2    statement at issue was therefore in furtherance of those

3    associated conspiracies.

4            Finally, I find the statement is probative of the

5    racketeering counts and that its probative value is not

6    outweighed by the danger of unfair prejudice.

7            Can we begin with the first witness?  The last juror

8    just showed up at 9:51.  So unfortunately, it was late but

9    they're all here now.

10           MR. RODRIGUEZ:  We do anticipate some of the witnesses

11   this morning introducing video exhibits similar to what

12   Detective Reyes did yesterday.  As I mentioned, these are

13   videos that have been disclosed to the defense a week ago.  He

14   has exact copies of the videos that are going to be in

15   evidence.  The government has no interest in wasting the jury's

16   time having it played again when exhibits have been handed

17   over.  And if it were to happen again today, the witnesses

18   would be spending a significant amount of time watching video

19   because while they're going to be admitting a significant

20   portion a lot of video, we're not going to play it all it for

21   the jury right now.

22           So with that, I just wanted to make that record.

23           THE COURT:  OK.

24           MR. KAYE:  Judge, I am still going to want to see that

25   portion that the government wants to display to the witness.

I9PAAMAT1                      Jury Trial

1   They don't want to show the witness a full 60-minute clip of a

2   blank surveillance.  I completely the understand.  They want to

3   focus on a particular clip which is a number of seconds.  I

4   think that despite the fact that I have all the videos and I

5   have all of this material and various forms, is not a

6   substitute for my client looking at what the witness is being

7   shown.

8           THE COURT:  You have had the videos.  If you have an

9   evidentiary objection, I think you need to raise it in advance.

10          MR. KAYE:  Well, I need to see exactly what

11  foundational questions the government's going to be asking

12  these witnesses.  The government doesn't serve the video on us

13  and give us a prelude to what foundational questions they're

14  going to ask.  I have to hear it.  I'd like to see it.

15          THE COURT:  I am going to have to take it case by

16  case.

17          MR. KAYE:  The videos are critical items of evidence.

18  Most of their case revolves and the videos.

19          THE COURT:  It's clear to me that there's foundation.

20  I'm not going to allow all of this voir dire where it's shown

21  repeated times.  It's clear from the testimony that there's

22  foundation.

23          MR. KAYE:  Well, we have these police detectives who

24  are pulling isolated bits of video.  I don't believe the

25  defense has received all the videos before and after.  Remember

1    these detectives are going to the bodega or the store and

2    they're cherrypicking what it is they feel relevant.  So at a

3    minimum, will I be permitted to establish that, that they

4    decided what they were going to copy?

5              THE COURT:  Sure.  That's for cross.

6              MR. KAYE:  OK.

7              THE COURT:  All right.  So we'll bring in the jury.

8              MR. KAYE:  Yes, your Honor.

9              (Jury present)

10             THE COURT:  Please be seated.

11             Good morning, ladies and gentlemen.  Welcome back.  We

12   are continuing with the testimony in the trial.

13             Is the government ready with its next witness?

14             MR. GENTILE:  The government is ready, your Honor.

15   The government calls Police Officer Carlos Guija.

16             THE COURT:  All right.

17    CARLOS GUIJA,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. GENTILE:

22   Q.  Good morning, officer.

23   A.  Good morning.

24   Q.  Where do you work?

25   A.  I work in the NYPD.

1  Q.  How long have you been with the New York Police Department?

2  A.  I've been with the NYPD for two and a half years.

3  Q.  When you say "NYPD" do you mean the New York Police

   Department?

5  A.  Yes, sir.

6  Q.  And was what your title?

7  A.  Police officer.

8  Q.  And do you work within a particular unit within the NYPD?

9  A.  The 52 Precinct.

10  Q.  Approximately, how long have you been assigned to the 52nd

   Precinct?

12  A.  Approximately, two years.

13  Q.  What geographical area does the 52 precinct cover?

14  A.  The north side of the Bronx.

15  Q.  What is your assignment in the 52 Precinct?

16  A.  Patrol officer.

17  Q.  What are your duties and responsibilities as a patrol

   officer?

19  A.  Take reports, affect arrests, issue summonses.

20          MR. KAYE:  I'm sorry?

21  A.  Affect arrests, issue summonses, also responding to 911

   aided calls and car accidents.

23  Q.  I'd like to direct your attention to October 20, 2017.

   Were you working on that day?

25  A.  Yes.

1  Q.  What shift were you working?

2  A.  I was working the three p.m. to 11:35 p.m.

3  Q.  Did you respond to a report of gunshots being fired in the

4  precinct?

5  A.  Yes.

6  Q.  How were you made aware of this report?

7  A.  Through the 911 dispatcher.

8  Q.  Where did the 911 dispatcher direct you to respond?

9         MR. KAYE:  Note my objection.

10        THE COURT:  Noted.  Overruled.

11 A.  Responded to 2690 Morris Avenue.

12 Q.  Approximately, what time did this call come across your

13 radio?

14 A.  Approximately, 11:05 p.m.

15 Q.  And approximately, how long did take you to get to the

16 scene at 2690 Morris Avenue?

17 A.  About a minute after.

18 Q.  And what did you observe upon your arrive?

19        MR. KAYE:  I am sorry.  I couldn't hear.  "About a

20 minute", he said?

21        THE COURT:  Yes.

22 A.  11:06.

23 Q.  What did you observe upon your arrival at 2690 Morris

24 Avenue?

25 A.  Upon my arrival a lot of chaos, a lot of people screaming,

I9PAAMAT1                    Guija - Direct

1   yelling, crying.  I also observed two victims with shot wounds.

2   Q.  Sorry.  Could you repeat the last part?

3   A.  It was two victims that were shot.

4   Q.  Two victims that were shot.  And where were these people

5   located when you got there?

6   A.  They were, we was at 2603 Morris Avenue.

7   Q.  2603?

8   A.  Across the street from the address that they gave us.

9   Q.  So it wasn't 2690.  It was the building across the street?

10  A.  I am sorry.  Yes.

11          MR. KAYE:  Objection.

12  Q.  What are the cross streets for --

13          THE COURT:  Overruled.  Go ahead.

14  Q.  What are the cross streets for the area where you

15  responded, 2690?

16  A.  It's Kingsbridge Road and East 196 Street.

17  Q.  And what type of area is this, residential or commercial?

18  A.  Residential.

19          MR. GENTILE:  Officer Guija, I am going to ask to you

20  look at a document.

21          Please publish Government Exhibit 400.

22  Q.  If you look on the screen there, do you recognize this

23  area?

24  A.  Yes.

25  Q.  OK.  What does this area depict?

I9PAAMAT1                    Guija - Direct

1   A.  It's the area where the shots fired occurred.

2   Q.  I am going to ask you to point on the screen and circle the

3   area where you responded to that evening and where you observed

4   people who were shot.

5        (Pause)

6   Q.  Thank you.

7        Is Morris Avenue is a one-way street or a two-way

8   street?

9   A.  It's a one-way street.

10  Q.  What direction does traffic flow?

11  A.  North.

12  Q.  What steps did you take when you first arrived at the

13  scene?

14  A.  I made sure the -- first I observed the victims, made sure

15  that they were OK.  My partner called for an ambulance.  We

16  assisted the aid and took information and then my lieutenant

17  came and took over the scene.

18  Q.  The lieutenant took over the scene?

19  A.  Yes.

20  Q.  Did you assist in securing the crime scene?

21  A.  No.

22  Q.  So who set up the crime scene?

23  A.  The other officer there securing the scene.  I was pretty

24  much with the victims.

25  Q.  You testified earlier that you said two people were shot?

I9PAAMAT1                    Guija - Direct

1   A.  Yes.  There was two people shot and then we later found out

2   there was a third victim shot.

3        MR. KAYE:  Objection to "we".  Just ask the officer if

4   he could testify to what he did.

5        THE COURT:  Just testify to what -- Well, what was the

6   question?

7        MR. GENTILE:  I was asking the officer his previous

8   testimony was that he observed two people shot and before I

9   finished my question he started to answer.

10  Q.  So did you later learn that another individual was a victim

11  of a shooting?

12  A.  Yes.

13  Q.  And did you speak to any of the victims that were shot

14  there?

15  A.  Yes.

16  Q.  And how many victims did you speak to?

17  A.  Two.

18  Q.  Why weren't you able to speak to the third victim?

19  A.  The other victim transported himself to the hospital.

20  Q.  And where specifically did you observe the people who were

21  there who were shot?

22  A.  They were on the west side of Morris.

23  Q.  Is that across street from 2690 where the radio run was --

24  A.  Yes.

25  Q.  Did you observe anything at the crime scene while you were

I9PAAMAT1                    Guija - Cross

1    there?

2    A.   Yes.

3    Q.   What did you observe?

4    A.   There were shell casings.

5    Q.   And what are shell casings, can you explain to the jury?

6    A.   It's a bullet -- it's what the, where the bullet that the

7    ammunition -- it's part of the bullet.  I'm sorry.

8    Q.   What steps did you take to safeguard those bullets or spent

9    shell casings?

10   A.   Well, first we stood near the shell casings, made sure

11   nobody was around it.  We cordoned the area where the shell

12   casings were.  Later on we put tape around it.

13   Q.   Did you specifically stand near one or more of the shell

14   casings?

15   A.   Yes.

16             MR. GENTILE:  Thank you, your Honor.  Nothing further.

17             Thank you, Mr. Gentile.

18             Mr. Kaye, cross?

19   CROSS-EXAMINATION

20   BY MR. KAYE:

21   Q.   Good morning, Officer Guija.

22   A.   Good morning.

23   Q.   Officer Guija, did you also -- withdrawn.

24             You said that part of your job description is to

25   prepare reports?

I9PAAMAT1                    Guija - Cross

1    A.  Yes.

2    Q.  Did you prepare a report in this case?

3    A.  Yes, I did.

4    Q.  Did you prepare what's known as a complaint report?

5    A.  Yes, I did.

6    Q.  Is that also the first police document documenting an

7    unusual event or occurrence?

8    A.  Yes.

9    Q.  You indicated that one of the victims was not at the scene

10   when you got there but was at the hospital; is that correct?

11   A.  Yes.

12   Q.  What was the name of that person, if you know?

13   A.  I don't recall.

14   Q.  Was that Deanna Seabrooks?  Does that refresh your

15   recollection?

16   A.  No.  I don't recall.

17   Q.  Do you know the names of the people that were shot?

18   A.  Not by memory, no.

19   Q.  Do you have your reports with you?

20   A.  I do not.  I have no reports.

21   Q.  You came to court without your memo book today?

22   A.  I have my memo book.

23   Q.  Does it reflect the names of the three individuals that

24   were shot then?

25   A.  No.  I didn't write the names of the victim in the memo

1    book.

2    Q.   Where did you write the names of the victims?

3    A.   On the reports.

4    Q.   And did you just remember it in your head and then when you

5    got back to the precinct, put it on the report?

6    A.   Well, there was scratch notes.

7    Q.   Where are your scratch notes?

8    A.   I'm not sure if I actually put it all on my memo book or

9    had another piece of paper that I wrote.

10   Q.   Did you most likely just throwaway your scratch notes?

11   A.   I don't know if I did or not.  It might be in my locker.  I

12   don't know.  I put everything inside my locker.

13   Q.   Well, there is an extremely serious response by you,

14   correct?

15   A.   Yes.

16   Q.   Is it likely that you would have retained or discarded the

17   scratch notes?

18   A.   Most likely, yes.

19   Q.   Pardon?

20   A.   Most likely I probably discarded the scratch notes after I

21   entered everything in my reports.

22   Q.   Is there a more serious event that would cause you to not

23   discard your scratch notes?

24   A.   Like what?  I'm sorry.

25   Q.   Withdraw the question.

1          What else did you scratch note besides the names of

2    the victims?

3    A.   Just the name of the victims.   Then later on I was waiting

4    for the third victim because we didn't ID the third victim

5    until one of the other officers went to the hospital.

6    Q.   You have used that term "we" before when you were

7    questioned by Mr. Gentile.   Who was this other individual?

8    A.   My partner.

9    Q.   What is his or her name?

10   A.   Officer Dowen, D-O-W-E-N.

11   Q.   Thank you.

12          Is PO Dowen still assigned to the 52 Precinct?

13   A.   Yes.

14   Q.   Do you know if PO Dowen took notes?

15   A.   Not sure.

16   Q.   Did you ever go to the hospital?

17   A.   No.

18   Q.   Did you take statements from the two victims that were at

19   the scene?

20   A.   Yes.

21   Q.   And what questions -- I am not asking to you tell me what

22   they said.   What questions did you ask the victims?

23   A.   Did they see who shot?   What they heard.   When it occurred?

24   Where were they hit?

25   Q.   And did you ask those questions of them together or close

I9PAAMAT1                         Guija - Cross

1   proximity to both of them or separately?

2   A.   Separately.

3   Q.   Were you with PO Dowen when you did that?

4   A.   No.

5   Q.   Did you put a communication over the police radio system

6   that included a description of the shooter?

7   A.   I did not.  Somebody else did.

8   Q.   Was that Officer Dowen?

9   A.   I don't recall who put it over.

10  Q.   But a description of the shooter did go out over the police

11  radio?

12  A.   Yes.

13  Q.   While you were still at the scene?

14  A.   Yes.

15  Q.   Did it come over before you arrived at the scene?

16  A.   After I arrived at the scene.

17  Q.   Thank you.

18            Now, the description that you put over, did it include

19  the gender of the suspect?

20  A.   Well, I didn't put over the description.

21  Q.   I apologize.  The description that you heard, did it

22  include whether the suspect was a male or a female or both?

23  A.   I don't recall.

24  Q.   Have you listened to any of the police communications since

25  that day?

1  A.  No.

2  Q.  Before you testified here today, did you meet with AUSA

3  Rodriguez and the prosecution team?

4  A.  Yes.

5  Q.  Did you go over certain police paperwork?

6  A.  Yes.

7  Q.  Did that include your memo book?

8  A.  Yes.

9  Q.  So your memo book is still in your locker but copies are

10  with the government?

11  A.  Yes.

12  Q.  And you don't have copies with you today?

13  A.  No.  I have my memo book with me.

14  Q.  Does it include the entry that was made for this incident?

15  A.  Yes.

16        MR. GENTILE:  Excuse me, your Honor.  I wanted to

17  interrupt.  The document that the defense is asking about was

18  disclosed to the defense.  He has possession of those

19  documents.

20        THE COURT:  All right.  Thank you.

21        MR. KAYE:  Court's indulgence, your Honor?

22        THE COURT:  Yes.

23        MR. KAYE:  So dim in here I'm having a hard time

24  seeing.

25        (Pause)

I9PAAMAT1                    Guija - Cross

1    Q.  Isn't it true, Officer Guija, that your complaint report

2    does not indicate anything in terms of clothing that the

3    assailant was wearing?

4    A.  I don't recall.

5    Q.  Can I attempt to refresh your recollection by showing you

6    something?

7    A.  Yes.

8    Q.  I'm just going to ask you to look at these three pages to

9    yourself.

10           MR. KAYE:  May I approach the witness?

11           THE COURT:  Yes.  Did you show counsel?

12           MR. KAYE:  Yes.

13   Q.  Just take a look at this to yourself and let us know when

14   you have had a sufficient chance to look at it.

15           (Pause)

16   Q.  Does your original complaint report indicate the clothing

17   that the suspect is wearing?

18   A.  No.

19   Q.  And am I correct that there is a box on this document, on

20   every complaint document --

21           MR. GENTILE:  Objection, your Honor.

22           THE COURT:  Sustained.

23   Q.  Did you indicate whether or not the suspect had a gang

24   affiliation?

25           MR. GENTILE:  Objection, your Honor.

I9PAAMAT1                         Guija - Cross

1              THE COURT:  Sustained.

2  Q.  Do you know whether or not the suspect had a gang

3  affiliation?

4  A.  No, I do not.

5              THE COURT:  I thought you were using the document to

6  refresh recollection.

7              MR. KAYE:  Well, that is my intention.

8              THE COURT:  Well, then you have to ask, does it

9  refresh your recollection?

10             MR. KAYE:  I'm sorry.  I thought I did that.

11 Q.  Did it refresh your recollection as to whether or not you

12 indicated on your report the clothing of the assailant?

13             MR. GENTILE:  Objection, your Honor.

14             THE COURT:  What's the objection?

15             MR. GENTILE:  He is suggesting the answer to the

16 witness.

17             MR. KAYE:  This is cross-examination, right?

18             THE COURT:  Overruled.  The question is:

19             Does it refresh your recollection as to something you

20 knew previously?

21             MR. KAYE:  Just, yes or no.

22 A.  Yes.  I mean, looking at my reports --

23 Q.  We're not asking you to read the report.  Does the report

24 refresh your recollection as to whether or not you indicated on

25 the report the assailant's clothing?

I9PAAMAT1                    Guija - Cross

1    A.  Yes.

2              MR. GENTILE:  Objection again, your Honor.  The

3    defense counsel is reading from the report.  He should be

4    asking the witness what he remembers from the report.

5              THE COURT:  OK.  Sustained.

6              MR. KAYE:  OK.  I'll adopt that question.

7    Q.  Based on what you recall from the report, did you indicate

8    whether or not the suspect was wearing any particular clothing?

9    A.  No.

10   Q.  Did you indicate, yes or no, whether or not the suspect was

11   gang affiliated?

12   A.  No.

13   Q.  You spoke to the jurors about shell casings, correct?

14   A.  Yes.

15   Q.  Where did you see the shell casings?

16   A.  The shell casings were on Morris Avenue on the west side of

17   Morris Avenue close to East 196.

18   Q.  West side of Morris closer to 196 Street?

19   A.  Correct.

20   Q.  Were they in the street?  Were they on the sidewalk?  Were

21   some on the street?  Some on the sidewalk?  Were they in

22   between cars?  Where were they?

23   A.  Sidewalk.

24   Q.  All of the shell casings were on the sidewalk?

25   A.  Recollection --

1   Q.   Pardon me?

2   A.   Yes.

3   Q.   How many shell casings were on the sidewalk?

4   A.   Approximately, four or five.

5   Q.   Did you voucher them?

6   A.   No, I did not.

7   Q.   Were you the very first police officer, if you know, to see

8   those four or five shell casings all on the sidewalk closer to

9   196 Street?

10  A.   No.

11  Q.   Who was?

12  A.   There were other officers there.  I don't know their names.

13  I can't remember their names right now.

14  Q.   Did you get there at the same time as those other officers?

15  A.   Yes.

16  Q.   Were they from the 52 Precinct?

17  A.   Yes.

18  Q.   Can you tell the jury, approximately, how many other

19  officers were there at the same time as you from the 52

20  Precinct?

21  A.   About ten.

22              (Continued on next page)

23

24

25

I9PKMAT2

1   CROSS-EXAMINATION

2   BY MR. KAYE:

3   Q.  And how do you know that other officers observed the shell

4   casings before you did?

5   A.  Well, we were canvassing for the evidence, so we were all

6   going on the streets looking for shell casings.

7   Q.  With flashlights?

8   A.  Flashlights, yes.

9   Q.  Were you walking on the street, or were you walking on the

10  sidewalk?

11  A.  I was on the sidewalk.

12  Q.  And was another officer in front of you or besides you that

13  saw it first?

14  A.  There were officers in front of me.

15  Q.  Well, when you saw the shells, were there cones protecting

16  them?

17  A.  When I first saw them?  No.

18  Q.  Was there anything documenting their location before you

19  saw them?  A piece of paper, a cigarette box, anything?

20  A.  No.

21  Q.  So what did you do, if anything, to make sure that no one

22  kicked it accidentally?

23  A.  Well, we cordoned the area.  Nobody was allowed in the

24  area.  So it was officers, and myself included, standing near

25  close to the shell casings.

I9PKMAT2

1    Q.   And, obviously, you know how important it is to maintain

2    the crime scene?

3    A.   Yes.

4    Q.   Did you make a request that the shell casings be sent to

5    the ballistics lab for fingerprinting?

6    A.   I didn't.

7    Q.   Do you know if any detective made that request?

8    A.   My lieutenant.

9    Q.   What is your lieutenant's name?

10   A.   Lieutenant Malony.

11   Q.   Is it M-a-l-o-n-y?

12   A.   Yes.

13   Q.   Is he a patrol lieutenant?

14   A.   A patrol lieutenant.

15   Q.   Could you tell what caliber shell casing you were looking

16   at?

17   A.   No.

18   Q.   But it was obviously a semiautomatic cartridge, correct?

19   A.   It's a cartridge, yes.

20   Q.   A cartridge used in a semiautomatic weapon?

21   A.   It was a cartridge.  I don't -- I can't tell you -- it's a

22   cartridge.

23   Q.   And you have bullets for your weapon, correct?

24   A.   Yes.

25   Q.   And do you have a semiautomatic weapon?

I9PKMAT2                    Guija - Redirect

1    A.   Yes.

2    Q.   How do you put the bullets into the magazine?  What do you

3    do to do that?

4    A.   I use my hands to put them inside the --

5    Q.   You use your fingers, right?

6    A.   Yes.

7    Q.   Take your bullet between your thumb and your forefinger,

8    and you put it into the magazine, true?

9    A.   Yes.

10          MR. KAYE:  No further questions.

11          THE COURT:  Thank you.

12          Is there any redirect?

13          MR. GENTILE:  Yes, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. GENTILE:

16   Q.   Officer Guija, you testified earlier that you didn't know

17   who the victims were.  I'm going to hand you a document that's

18   marked 3503-02.

19          MR. GENTILE:  May I approach, your Honor?

20          THE COURT:  Yes.

21   Q.   I'm going to ask you to take a look at that and see if that

22   refreshes your recollection.

23          MR. KAYE:  Excuse me, I didn't hear the witness said

24   his recollection required refreshing.

25          THE COURT:  He did during your cross-examination.

1           MR. KAYE:  During mine.

2           MR. GENTILE:  The defendant -- the witness testified

3    that he didn't recall --

4           MR. KAYE:  Okay.  I just thought it had to be on

5    counsel's questioning.

6           THE COURT:  I don't think it does.

7           MR. KAYE:  Okay.

8    BY MR. GENTILE:

9    Q.  Does that refresh your recollection?

10   A.  Yes.

11   Q.  And who were the two victims that you interviewed when you

12   arrived at the scene?

13   A.  Mr. Cordero Noel and Deeanna Seabrooks.

14          THE COURT:  Who was the first one?  You said Cordero?

15          THE WITNESS:  Noel.

16          THE COURT:  Noel?

17   BY MR. GENTILE:

18   Q.  Is this the report that you prepared in connection with

19   your response that evening?

20   A.  Yes.

21   Q.  I'm just going to point you to the top of the report.  If

22   you can take a look at the report and tell the jury the address

23   where this occurred?

24   A.  In front of --

25   Q.  Don't read off the report.  Just if that refreshes your

I9PKMAT2                        Abdul-Jabbar - Direct

1    recollection.

2    A.   2693 Morris Avenue.

3              MR. GENTILE:  Thank you.  No further questions.

4              THE COURT:  Okay.  Thank you.

5              You may step down.  Thank you, sir.

6              (Witness excused)

7              THE COURT:  The government may call the next witness.

8              MR. GENTILE:  Your Honor, the United States calls

9    Police Officer Stephanie Abdul-Jabbar.

10             THE COURT:  Okay.

11    STEPHANIE ABDUL-JABBAR,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14             THE DEPUTY CLERK:  Please state your full name and

15    spell your last name slowly for the record.

16             THE WITNESS:  Officer Abdul-Jabbar, A-b-d-u-l hyphen

17    J-a-b-b-a-r.

18             THE DEPUTY CLERK:  Thank you.  Please be seated.

19    DIRECT EXAMINATION

20    BY MR. GENTILE:

21    Q.   Good morning, Officer.

22    A.   Good morning.

23    Q.   Where are you employed?

24    A.   The NYPD.

25    Q.   When you say "NYPD," what does that stand for?

1   A.   The New York City Police Department.

2   Q.   How long have you been with the New York City Police

3   Department?

4   A.   A little over 11 years.

5   Q.   What's your title?

6   A.   Police Officer.

7   Q.   Do you work within a particular unit within the NYPD?

8   A.   Yes.  The Evidence Collection Team.

9   Q.   Is that sometimes called ECT?

10   A.   Yes.

11   Q.   How long have you been assigned to the Evidence Collection

12   Team, or ECT?

13   A.   A little over three years.

14   Q.   What are your responsibilities as an officer assigned to

15   the ECT?

16   A.   We respond to various crime scenes, and collect evidence,

17   and send it to different destinations.

18   Q.   Do you have -- do you receive any specialized training in

19   connection with your assignment?

20   A.   Yes.

21   Q.   What is that?

22   A.   We go to the police lab in Queens and receive training for

23   collecting of evidence.

24   Q.   Have you responded to crime scenes involving shootings

25   before?

1   A.  Yes.

2   Q.  Approximately how many?

3   A.  More than 15.  Around 15 or 20.

4   Q.  What geographical area of the city does the ECT unit cover?

5   A.  We cover the entire Bronx.

6   Q.  Officer Abdul-Jabbar, were you working on October 20, 2017?

7   A.  Yes.

8   Q.  And what shift were you working that day?

9   A.  I was working on midnight.

10  Q.  What hours are those, if you can tell?

11  A.  11:00 p.m. to 7:35 a.m.

12  Q.  Were you instructed to respond to a shooting that evening?

13  A.  Yes.

14  Q.  Where were you directed to respond to?

15  A.  I responded to the vicinity of 2690 Morris Avenue.

16  Q.  Is that a residential or commercial area?

17  A.  A residential area.

18  Q.  Approximately what time did you arrive at the scene?

19  A.  I arrived there at midnight 27.

20          MR. KAYE:  I'm sorry?

21          THE WITNESS:  I'm sorry.  12:27 a.m.

22  Q.  12:27 --

23          THE COURT:  Do you mind pulling up a little bit, so

24  you're speaking into the mic?

25          THE WITNESS:  Oh.

1              THE COURT:  Thank you.

2    BY MR. GENTILE:

3    Q.  What did you observe when you first arrived there?

4    A.  The scene was already roped off with police tape.

5    Q.  What were some of the things you did when you arrived?

6    A.  I conferred with the officers that were on-scene, and they

7    detailed the evidence that was on-scene.

8    Q.  Was a crime scene already established at that point?

9    A.  Yes.

10   Q.  Can you describe what you saw?  How was the crime scene

11   established?

12   A.  Like I said, there was police tape closing off the street

13   on the corner of Morris and Kingsbridge.

14   Q.  Did you encounter any victims at the scene?

15   A.  No.

16   Q.  Did you recover any evidence from the vicinity of 2690

17   Morris Avenue or 2693 Morris Avenue on October 20, 2017?

18   A.  Yes.

19   Q.  How did you find these pieces of evidence?

20   A.  An officer on the scene pointed them out on the sidewalk.

21   Q.  And what did this evidence consist of?

22   A.  There was one fired bullet and five shell casings.

23   Q.  Can you tell the jury what a shell casing is?

24   A.  It's the part of the bullet that ejects out of the firearm.

25   Q.  Is that for a revolver or a semiautomatic weapon?

I9PKMAT2                         Abdul-Jabbar - Direct

1    A.  A semiautomatic.

2    Q.  Did you record the location of these items that you

3    recovered?

4    A.  Yes, I did.

5    Q.  How did you record them?

6    A.  I wrote them down on the back of the sheet of the job that

7    I received.

8    Q.  Did you take photographs of the scene?

9    A.  Yes, I did.

10   Q.  Officer Abdul-Jabbar, I'm going to hand you what's been

11   marked as Government Exhibit 401-A to 401-J.

12            Do you recognize these photographs?

13   A.  Yes.

14   Q.  What are they?

15   A.  These are the photographs I took on the scene.

16   Q.  Do these photos accurately depict the crime scene you

17   responded to on Morris Avenue on October 20, 2017?

18   A.  Yes.

19            MR. GENTILE:  The government offers Government

20   Exhibits 401-A to 401-J into evidence.

21            THE COURT:  They're received.

22            MR. KAYE:  Could I see them first?  Can I see?

23            MR. GENTILE:  We've already provided copies to

24   defense.

25            MR. KAYE:  I want to see what the government's moving

I9PKMAT2                          Abdul-Jabbar - Direct

1    into evidence.  Yes, I acknowledge receipt previously.  I'd

2    like to see it to make sure it's --

3              THE COURT:  Do you guys have a copy?

4              MR. KAYE:  I don't know what the officer is looking

5    at.

6              THE COURT:  You can proceed.  It's in.

7              MR. GENTILE:  It's into evidence?

8              THE COURT:  Yes.

9              (Government's Exhibits 401-A to 401-J  received in

10   evidence)

11             MR. GENTILE:  May we publish?

12             THE COURT:  Yes.

13             MR. GENTILE:  Ms. Parisi, please publish Government

14   Exhibits 401-A and 401-B side by side, A on the left and B on

15   the right.

16   BY MR. GENTILE:

17   Q.  Officer Abdul-Jabbar, can you explain to the jury what's

18   depicted in the photo on the left?

19   A.  The photo on the left is 2693 Morris Avenue.

20   Q.  What's the significance of the orange cone there in front?

21   A.  That is where I recovered the fired bullet from.

22   Q.  When you say "fired bullet," this is different from the

23   shell casing?

24   A.  Yes.  It's the entire bullet.

25   Q.  The photo on the right-hand side of the screen?

1  A.  That's 2725 Morris Avenue.

2  Q.  And what's the significance of this location?

3  A.  That's the front of the building where I recovered the

4  shell casings from.

5  Q.  How many shell casings did you recover?

6  A.  Five.

7  Q.  And all five were recovered in front of 2725?

8  A.  Yes.

9          MR. GENTILE:  Ms. Parisi, please publish Government

10  Exhibits 401-C and 401-A, keeping A on the left and C on the

11  right.

12  Q.  Can you explain to the jury what's depicted in 401-C, the

13  photo on the right-hand side of the screen?

14  A.  That's the fired bullet that's shown on the cone that's on

15  the left picture, to the left.

16          MR. GENTILE:  Ms. Parisi, please publish Government

17  Exhibits 401-D and 401-E, with D on the left and E on the

18  right.

19          I'm sorry, could you just go back to 401-A.  I'm

20  sorry, maybe 401-C.  I apologize.

21  Q.  Can you just circle on the screen in front of you where

22  that fired bullet is in reference to the cone?

23          Thank you.

24  A.  You're welcome.

25          MR. GENTILE:  Now, Ms. Parisi, if you can put 401-E

I9PKMAT2                        Abdul-Jabbar - Direct

1    back up on the screen on the right.

2    BY MR. GENTILE:

3    Q.  Officer Abdul-Jabbar, what's depicted in these photos,

4    first the one on the left?

5    A.  That's one of the shell casings.

6    Q.  And the photo on the right?

7    A.  Another of the shell casings.

8          MR. GENTILE:  Ms. Parisi, can you please publish

9    Government Exhibits 401-F and 401-G side by side, with F on the

10   left and G on the right.

11   Q.  Officer Abdul-Jabbar, can you tell the jury what's depicted

12   in these photos, starting with the photo on the left?

13   A.  That's another of the shell casings, and the one on the

14   right is another shell casing.

15   Q.  Can you tell the jury what the significance of the orange

16   cones are?

17   A.  It's just to help aid in the photographs, to point out

18   where the ballistics are.

19   Q.  Thank you.

20         MR. GENTILE:  Ms. Parisi, please publish Government

21   Exhibit 401-H.

22   Q.  Officer Abdul-Jabbar, what's depicted in this photo?

23   A.  That's the last of the shell casings.

24   Q.  Thank you.

25         MR. GENTILE:  Ms. Parisi, please publish 401-I.

1    Q.  Officer Abdul-Jabbar, what are we looking at in this

2    photograph?

3    A.  That's the corner of Morris Avenue and Kingsbridge Road.

4    Q.  Is that how far the crime scene extended?

5    A.  Yes.  That's where I initially responded to.

6         MR. GENTILE:  Ms. Parisi, please publish Government

7    Exhibit 401-J.

8    Q.  Can you describe to the jury what we're looking at here?

9    A.  That's just a zoom-in of the corner of Kingsbridge and

10   Morris of the blood that was on the scene.

11   Q.  Officer Abdul-Jabbar, what steps did you take to collect

12   the bullet and shell casings?

13   A.  When I first arrived on-scene, and I put down the orange

14   cones to where the evidence was, I took pictures of the

15   evidence, and then I collected and put them in coin envelopes.

16   Q.  What is a coin envelope?

17   A.  It's just a small yellow paper envelope.

18   Q.  Did you place the coin envelope inside anything else?

19   A.  Yes.  Once I went back to my office, they were placed

20   inside a plastic security envelope.

21   Q.  What does a plastic security envelope consist of?

22   A.  It's just a plastic envelope, and it's used to transport

23   the evidence.  So I placed the coin envelopes inside the

24   plastic security envelope, it gets sealed, I sign it, and send

25   it to the lab, in this case to the lab.

1    Q.  When you sent it to the lab, do you voucher these items?

2    Do you invoice them formally?

3    A.  Yes.

4    Q.  I'm going to hand you what has been marked as Government

5    Exhibits 100 and 101.

6            Do you recognize these items?

7    A.  Yes.

8    Q.  Can you open up the envelope to -- how do you know -- are

9    these the same items you recovered on the evening of

10   October 20, 2017?

11   A.  Yes.

12   Q.  And how do you know that?

13   A.  It has the voucher number on here, and my name on it.

14           MR. GENTILE:  Your Honor, the government offers

15   Government Exhibits 100 and 101.

16           THE COURT:  They're received.

17           (Government's Exhibits 100 and 101 received in

18   evidence)

19           MR. KAYE:  Judge, may I have a brief voir dire?  Very

20   brief.

21           THE COURT:  Is it about admissibility?

22           MR. KAYE:  Yes.

23           THE COURT:  Okay, go ahead.

24

25

I9PKMAT2                          Abdul-Jabbar - Direct

1    VOIR DIRE EXAMINATION

2    BY MR. KAYE:

3    Q.  Officer, you didn't even open up the envelope and look at

4    the bullets?

5    A.  I list -- I saw the list of items that are on the envelope.

6    Q.  I understand that.  But you did not look to see what's

7    inside, did you?

8    A.  No, I didn't.

9    Q.  So you're telling the jury that that's what is inside, the

10   casings and the lead, but you haven't even looked in it, have

11   you?

12   A.  No, I didn't look.

13   Q.  Can you do that, please?

14   A.  Sure.

15   Q.  Thank you.

16          THE WITNESS:  Can I speak?

17          THE COURT:  Yes.

18          THE WITNESS:  These are the coin envelopes that I

19   placed the ballistics in it, and then the coin envelopes go

20   into this plastic security envelope, which is stapled together,

21   but it's usually open.  And this would be the fired bullet, and

22   these are the -- these will be the five shell casings.

23          MR. GENTILE:  May we publish, your Honor?

24          THE COURT:  Yes.

25

I9PKMAT2                      Abdul-Jabbar – Direct

1  BY MR. GENTILE:

2  Q.  Just for the record, Officer Abdul-Jabbar, have you

3  reviewed these government exhibits prior to today?

4  A.  No.

5          Do you want me to seal it back up?

6  Q.  No.  Just hand it to me.  Thank you.

7          Officer Abdul-Jabbar, can you describe what we're

8  looking at here?

9  A.  This would be the fired bullet.

10  Q.  Is this the bullet you recovered on the evening of

11  October 20th, 2017?

12  A.  Can I look at the pictures again?  I'm sorry.

13  Q.  I'm sorry.

14  A.  Yes.

15  Q.  Are these the five shell casings you recovered on

16  October 20, 2017?

17  A.  Yes.

18  Q.  Did you cause this evidence to be sent to the police

19  laboratory?

20  A.  Yes.

21  Q.  How did you do that?

22  A.  We do a voucher on the computer that we attach to the

23  evidence to send to the lab.

24          MR. GENTILE:  Thank you.  No further questions.

25          THE COURT:  Thank you.

1          Mr. Kaye?

2          MR. KAYE:  Thank you.

3  CROSS-EXAMINATION

4  BY MR. KAYE:

5  Q.  Good morning.

6  A.  Good morning.

7  Q.  Did you have a partner working with you?

8  A.  Yes.

9  Q.  Who was your partner?

10  A.  Detective Weibke.

11  Q.  Spell that for the record?

12  A.  Weibke, W-e-i-b-k-e.

13  Q.  So when you said "we send it to the lab," did you mean

14  yourself and Detective Weibke or yourself and someone else?

15  A.  Yeah, me and Detective Weibke worked together.

16  Q.  When you say you send it to the lab, do you actually drive

17  it to the lab, hand it to someone, or does a messenger do that?

18  A.  No.  We take it to the precinct of occurrence and deliver

19  it to the desk, and then they have a messenger deliver it to

20  the borough, and then the borough has a messenger deliver it to

21  the lab.

22  Q.  So once it leaves your custody, you don't see it again,

23  true?

24  A.  No, not until this point.

25  Q.  Is today the first time you've seen it in nearly a year?

1   A.  Yes.

2   Q.  And the bag that you put it in has been opened since that

3   time, apparently, correct?

4   A.  Yes.

5   Q.  You have no personal knowledge of who opened the bag, true?

6   A.  No.

7   Q.  Or when they opened it?

8   A.  No.

9   Q.  And where they opened it?

10  A.  No.

11  Q.  Or what circumstances they opened it under, correct?

12  A.  No.

13  Q.  Did you place any identifying mark on each shell casing, so

14  you could discriminate the shell casings you picked up from any

15  other shell casings of the same make and caliber?

16  A.  No, I didn't.

17  Q.  Why not?

18  A.  It's not procedure for us to mark them.

19  Q.  How can you ever definitively state that the shell casings

20  you picked up a year ago are the same shell casings if you

21  don't place any identifying mark on the shell casing?

22  A.  I definitely can't say.

23  Q.  So you're not telling the jury definitively that those are

24  the five shell casings you picked up from Morris Avenue on

25  October 21st, 2017?

I9PKMAT2                    Abdul-Jabbar- Cross

1   A.  Those shell casings are the same caliber and make that I

2   placed in the bags -- in the bag that I opened here.

3   Q.  Which has been previously opened by someone else?

4   A.  It has.

5   Q.  So you're not able to tell the jury that those are, in

6   fact, the same shell casings, given that you did not initial

7   them, correct?

8   A.  Correct.

9   Q.  You also told our jury that the deformed piece of lead was

10  found in front of the entrance to one of the buildings; is that

11  correct?

12  A.  Yes.

13  Q.  And I believe Mr. Gentile showed you a photograph marked

14  Government Exhibits 401-A and C that showed the deformed piece

15  of lead on the ground next to a cone, correct?

16  A.  Yes.

17  Q.  Isn't it true, however, that you have indicated on other

18  police paperwork that you found that deformed piece of lead in

19  a lobby, not on a sidewalk?

20  A.  No.  I didn't --

21  Q.  Didn't you indicate in your memo book that you found it in

22  a lobby, Officer?

23  A.  I don't have my memo book in front of me, but I marked

24  behind the run sheet that the -- it was discovered to the -- in

25  front of the building, either to the left or the right on the

1    sidewalk.

2    Q.  Can I show you your memo book to try to refresh your

3    recollection?

4    A.  Yes.

5              MR. KAYE:  Your Honor, may I approach?

6              THE COURT:  Yes.

7    Q.  Please read this to yourself.  Don't read it out loud.

8              (Pause)

9    Q.  Does that refresh your recollection as to whether or not

10   you wrote in your memo book that you found the deformed piece

11   of lead in the lobby?

12   A.  That was another job.  That wasn't the same job.

13   Q.  Did you go to two different shooting jobs that night?

14   A.  Yes.

15   Q.  Where was the second shooting job?

16   A.  The one where it was recovered from the lobby was at 611

17   Crotona Park.

18   Q.  Oh.  Can I see that, please?

19   A.  Yes.

20   Q.  I apologize.

21             MR. KAYE:  May I?

22             THE COURT:  Yes.

23             THE WITNESS:  Do you need me to point it out?

24             MR. KAYE:  Yes.

25             THE WITNESS:  Sorry.

I9PKMAT2                          Abdul-Jabbar- Cross

1          This is for the job we're talking about now, 2690.  I

2    was done with that job at midnight 50.  98 means I left that

3    location.  84, I went to 611 Crotona Park for another assault.

4    And that's where I --

5    BY MR. KAYE:

6    Q.  You were busy?

7    A.  Yes.

8    Q.  I apologize.

9          When you got to the scene, it was dark, true?

10   A.  Yes.

11   Q.  Did you see any officers walking around with flashlights

12   looking for other evidence?

13   A.  Yes.

14   Q.  Did you see Officer Guija doing that?  He just testified.

15   A.  I can't say exactly who I saw.  There were a lot of

16   officers on-scene.

17   Q.  But were they still looking for ballistic evidence when you

18   arrived?

19   A.  I believe so.  I'm not sure.  I can't remember.

20   Q.  Is it fair to say you didn't get there until well over an

21   hour after the shooting had already taken place?

22   A.  That's correct.

23   Q.  And you don't know what was going on in that period of

24   time, do you?

25   A.  No.

I9PKMAT2                        Abdul-Jabbar- Cross

1   Q.  You said tape was placed up on Morris Avenue, correct?

2   A.  Yes.

3   Q.  And you showed the jury a photograph of tape placed at

4   Morris and East Kingsbridge Road, correct?

5   A.  Yes.

6   Q.  Was tape placed at the north end of Morris where it

7   intersects with 196th Street, I believe?

8   A.  I believe so, yes.

9   Q.  Are there any photos of that?

10  A.  No.

11  Q.  Is there any reason why you didn't photograph that?

12  A.  I didn't collect any evidence from that corner.

13  Q.  Did you collect any evidence from the other corner, Morris

14  and Kingsbridge Road?

15  A.  No.  That's -- initially, I usually take a picture of where

16  I initially respond to, where the crime scene begins, and the

17  detectives that were on-scene from the squad wanted a picture

18  of the blood that was on-scene.

19  Q.  That deformed piece of lead looks like it struck something;

20  is that right?

21  A.  I won't be able to tell.  I can't tell.

22  Q.  That's not your area of expertise?

23  A.  No, it's not.

24  Q.  Okay.  Fair enough.

25          When you picked up shell casings, whether it's those

I9PKMAT2                          Abdul-Jabbar- Cross

1    or not, did you use your fingers, or a tool, or a glove, or

2    something else?

3    A.  No.  Just my fingers.

4    Q.  Just your fingers?

5    A.  Yes.

6    Q.  Of course you had a glove on, true?

7    A.  No.  We don't have to wear gloves to pick up ballistics.

8            MR. KAYE:  Could I have the evidence, sir?

9            Thank you.

10   Q.  So if, let's say, the shell casing is on the sidewalk, you

11   can't place something inside it, like a pen, even, and lift it

12   up like this to preserve it for fingerprinting?

13   A.  I'm sure you can pick it up with a pen.  We're not required

14   to.

15   Q.  The New York City Police Department doesn't require the

16   Evidence Collection Team to safeguard potential identifying

17   evidence?

18   A.  We weren't trained to do so.

19   Q.  How many years have you been in this unit?

20   A.  Over three years.

21   Q.  Three years on the date that you responded to this or three

22   years today?

23   A.  A little over three years ago to this day, I guess.

24   Q.  So you were two years in the unit at that time?

25   A.  Approximately, yes.

I9PKMAT2                      Abdul-Jabbar- Cross

1   Q.   And how many jobs -- shootings with ballistics evidence had

2   you processed a year ago at the time?

3   A.   I want to say over ten.

4   Q.   And is it your testimony that this is the first time you've

5   picked up shell casings at a scene?

6   A.   No, it's not the first time.

7   Q.   Is it your testimony that invariably in all of the other

8   nine scenes, you've always just picked up the bullets with your

9   fingers?

10  A.   Yes.

11  Q.   Your fingers have oils on them, don't they?

12  A.   Yes.

13  Q.   And that destroys the presence of any latent fingerprints,

14  doesn't it?

15  A.   Yes, but in this instance, we don't have to take DNA on the

16  shell casings.

17  Q.   What about fingerprints?

18  A.   We're not required to do so.

19  Q.   Who doesn't require it?  The police commissioner?

20  A.   The police lab that gives us our job training.

21  Q.   Well, can you agree with me that if you pick up a shell

22  casing, with the oils on your finger, you're absolutely

23  positively 100 percent destroying any potential latent

24  fingerprints of the person that loaded the bullet into the

25  magazine?

I9PKMAT2                        Abdul-Jabbar - Redirect

1   A.  Yes.

2            MR. KAYE:  I have no further questions.

3            THE COURT:  Any redirect?

4            MR. GENTILE:  Yes, your Honor.  Thank you.

5   REDIRECT EXAMINATION

6   BY MR. GENTILE:

7   Q.  Officer Abdul-Jabbar, I'm going to hand you back what's

8   been marked as Government Exhibits 100 and 101.

9            MR. GENTILE:  May I approach, your Honor?

10           THE COURT:  Yes.

11  Q.  I'm going to ask you to take a look at that plastic bag

12  that's contained in that envelope.

13  A.  Yes.

14  Q.  Do you recognize that bag?

15  A.  Yes.

16  Q.  Can you tell the jury what that bag is?

17  A.  This is the plastic security envelope that I placed the

18  coin envelopes with the ballistics inside of.

19  Q.  How do you know that's the same plastic security envelope

20  with the bullets you placed inside on October 20, 2017?

21  A.  This is my signature here, my tax number, my command, and

22  the date that I responded to the shooting.

23  Q.  I'm going to ask you to look in the envelope and pull out

24  the coin envelopes that you testified about earlier.

25           Can you tell the jury what's written on those coin

I9PKMAT2                        Abdul-Jabbar - recross

1    envelopes?

2    A.  The --

3            MR. KAYE:  Objection.  Objection.  Are those in

4    evidence, too, or just the contents?

5            THE COURT:  They're all in evidence.

6            MR. KAYE:  Thank you.

7            THE COURT:  You can answer.

8            THE WITNESS:  These are the coin envelopes where the

9    ballistics were in, and it details what's inside each envelope,

10   the ECT run number that was assigned, the complaint report

11   number, the location, and where the ballistic was picked up

12   from.

13   BY MR. GENTILE:

14   Q.  And who wrote that information on those coin envelopes?

15   A.  On these?  My partner, Detective Weibke.

16   Q.  Do you have any knowledge about whether fingerprints can be

17   taken off of shell casings?

18   A.  As far as I know, no.

19           MR. GENTILE:  Thank you, your Honor.

20   RECROSS EXAMINATION

21   BY MR. KAYE:

22   Q.  Officer, didn't you just tell us, when I was asking

23   questions, that you know that the oils on your skin a hundred

24   percent, absolutely, destroy any potential latent fingerprints?

25   A.  You asked me if my oils would damage if there are any.

1    Yes, they would, but we are not trained to take fingerprints

2    off the ballistics recovered.

3    Q.   I understand that.   But you were just asked by the

4    government's counsel whether or not you know that latent

5    fingerprints can be lifted off of a shell casing, and you said

6    they can't.

7    A.   I said I -- I don't recover them off the shell casing.   I

8    have --

9    Q.   You're not telling the jury that latent fingerprints cannot

10   be lifted off a shell casing, are you?

11   A.   I don't know if they can or not.   I have not done so.

12   Q.   Right.   And the envelope that counsel for the government

13   just showed you --

14   A.   Yes.

15   Q.   -- with all your identifying marks on it, you've already

16   told the jurors that that envelope hadn't been seen by you in

17   nearly a year, correct?

18   A.   That's correct.

19   Q.   And that when you have first seen that envelope, it had

20   been opened by someone else, correct?

21   A.   Yes.

22   Q.   And given that you don't have your initials on any of the

23   shell casings, it's possible, isn't it, that someone that

24   opened the envelope could have changed the contents of the

25   envelope?

I9PKMAT2                          Abdul-Jabbar - recross

1   A.   Anything is possible.  He asked me how I can identify the

2   bag.  I identify the bag by my signature on it.

3   Q.   That's right.

4            You're identifying the bag, you're not identifying the

5   contents of the bag, are you?

6   A.   The way you want me to identify it, no, I'm not.

7            MR. KAYE:  Thank you.

8            THE COURT:  Thank you.

9            Anything further?

10           MR. GENTILE:  Nothing further, your Honor.

11           THE COURT:  Okay.  Thank you, ma'am.  You may step

12   down.

13           (Witness excused)

14           THE COURT:  Do you all need a break, a bathroom break?

15           Let's take a ten-minute bathroom break, folks.  If you

16   would leave your pads closed on your chairs.  I'm just going to

17   remind you that you are not yet discussing the case, so please

18   do not discuss anything about the case.  We'll take ten

19   minutes, and then we'll continue with the evidence in the case.

20   So you'll go back to the jury room after leaving your pads on

21   your chairs.

22           (Continued on next page)

23

24

25

I9PKMAT2

1          (Jury not present)

2          THE COURT:  Okay, folks.  We'll see you in ten

3    minutes.

4          (Recess)

5          THE COURT:  Are we ready for the jury?

6          MR. GENTILE:  Yes, your Honor.

7          MR. KAYE:  Judge, I just wanted to alert the Court

8    that I'm going to write something from the Internet on my

9    phone, I'm not texting.  Is that okay?

10          THE COURT:  Like blogging about the case?  Wait, what

11   do you mean you're going to write something?

12          MR. KAYE:  I just need to take some notes from a

13   website that I'm accessing with my cell phone.  I didn't want

14   the Court to think I was checking my messages.

15          THE COURT:  Oh, okay.  That's fine.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Okay, folks.  Welcome back.  You may be

3    seated.

4              Government, you may call your next witness.

5              MR. GENTILE:  Thank you, your Honor.

6              The United States calls Detective Colleen Horan.

7     COLLEEN HORAN,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  Please state your full name and

11   spell your last name slowly for the record.

12             THE WITNESS:  Colleen Horan, last name H-o-r-a-n.

13             THE DEPUTY CLERK:  Thank you.  Please be seated.

14             THE COURT:  You may inquire.

15             MR. GENTILE:  Thank you, Judge.

16   DIRECT EXAMINATION

17   BY MR. GENTILE:

18   Q.  Good morning, Detective.

19   A.  Good morning.

20   Q.  I'm going to ask you just to speak into the microphone.

21             Detective, where do you work?

22   A.  I work at the police laboratory in the firearms analysis

23   section for the New York City Police Department.

24   Q.  What position do you hold?

25   A.  I am a detective, and I'm assigned as a firearms examiner.

1   Q.  Approximately how long have you been with the New York City

2   Police Department?

3   A.  About 16 years.

4   Q.  Approximately how long have you been a firearms examiner?

5   A.  About 11 years.

6   Q.  What are your duties and responsibilities as a firearms

7   examiner?

8   A.  I determine the operability and identification of firearms

9   and ammunition that are confiscated within all five boroughs of

10  New York City.  I also microscopically examine and compare fire

11  evidence, such as cartridges, cartridge casings, and bullet

12  fragments to determine whether or not they came from the same

13  source.

14  Q.  When you refer to microscopic examinations, can you

15  describe what you mean by that?

16  A.  Sure.

17          Again, I take fired evidence, which are parts of a

18  cartridge of ammunition, a cartridge casing or a bullet, and I

19  can examine them under a compound microscope.  It's actually a

20  comparison microscope.  So it's two compound microscopes that

21  are linked by an optical bridge, and all that means, basically,

22  is I can look at two pieces of evidence at the same time in the

23  same field of view.

24  Q.  Since joining the NYPD, have you received any specialized

25  training in firearms and ballistics analysis?

I9PKMAT2                     Horan - Direct

1    A.  Yes.

2    Q.  Would you please explain to the jury what training you have

3    received?

4    A.  Sure.

5           I've taken an approximately two-and-a-half-year

6    AFTE-based training course.  And AFTE stands for The

7    Association of Firearm and Tool Mark Examiners, and it's an

8    international organization which is the governing body for this

9    area of forensic science.

10          The course consisted of formal and informal lectures

11   and presentations, training assignments, practical exercises,

12   on-the-job training with experienced examiners, as well as oral

13   and written exams.

14          We covered smokeless powder, black powder, rimfire and

15   centerfire ammunition, revolvers, shotguns, rifles, homemade

16   devices, and all their respective cycles of fire.

17          Most of the training was microscopy training, which is

18   hands-on microscopic examination and comparison of fired

19   evidence.

20          I've also taken armorer courses from Sig arms, Kahr

21   Arms, Beretta and Benelli, Colt and Glock.  And armorer courses

22   are given by the manufacturer of these weapons, which certify

23   me to make minor modifications and repairs to their weapons.

24          I've also taken a course in serial number restoration

25   with the Bureau of Alcohol, Tobacco, Firearms, and I am trained

I9PKMAT2                        Horan - Direct

1   with the integrated ballistics information system, which is a

2   computer database of fired cartridge casings.

3   Q.  Were you required to take any examinations in connection

4   with your training?

5   A.  Yes.  At the conclusion of each section of my training, I

6   had to take a competency test as well as proficiency tests

7   every year in every discipline that I perform casework.

8   Q.  Thank you.

9        What is your educational background?

10  A.  I have a Bachelor of Science in chemistry from Manhattan

11  College.

12  Q.  Approximately how many microscopic comparisons have you

13  performed as a firearms examiner?

14  A.  I have performed over 400 cases microscopically, which

15  include thousands of microscopic comparisons on top of what I

16  performed in training for two years.

17  Q.  When you say "cases," can you explain what you mean by

18  that?

19  A.  Typically, a case -- what we consider a case is a group of

20  evidence that come in that is related to a certain incident.

21  So if it's a microscopic examination, it's typically linked to

22  a shooting incident.

23  Q.  Is it possible to do multiple microscopic examinations in a

24  single case?

25  A.  Yes, it's typical.

1    Q.  Have you ever testified in a court of law about microscopic

2    examinations that you've performed?

3    A.  Yes.

4    Q.  Approximately how many times?

5    A.  For microscopic examinations?  About seven times.

6            MR. GENTILE:  Your Honor, the government offers

7    Detective Horan as an expert in microscopic analysis of

8    ballistics evidence.

9            MR. KAYE:  No objection.

10            THE COURT:  All right.  She's an expert.

11            MR. GENTILE:  Thank you.

12    BY MR. GENTILE:

13    Q.  Detective Horan, I'm going to show you an item that's been

14    marked for identification as Government Exhibit 108.

15    A.  Thanks.

16    Q.  Does Government Exhibit 108 fairly and accurately depict

17    the parts of a cartridge?

18    A.  Yes.  It's much larger than a regular cartridge, but, yes.

19    Q.  Will Government Exhibit 108 assist you in describing the

20    parts of a cartridge to the jury?

21    A.  Yes.

22            MR. GENTILE:  Your Honor, the government offers

23    Government Exhibit 108 as a demonstrative only.

24            MR. KAYE:  No objection.

25            THE COURT:  108 is received as a demonstrative.

1              (Government's Exhibit 108 received in evidence)

2    BY MR. GENTILE:

3    Q.   Detective Horan, please describe Government Exhibit 108 to

4    the jury.

5    A.   Sure.

6              So this is a model of a cartridge of ammunition or a

7    round of ammunition.  Sometimes people may refer to it as a

8    bullet, but, really, the bullet portion is this portion on top

9    with the rounded profile.

10             This is the projectile.  This is the part that

11   would -- after the cartridge is discharged in a firearm, this

12   is the part that would go down the barrel towards a target.

13   That's actually the bullet.  It's held in place by a cartridge

14   casing, which is the cylinder-shaped piece right here.

15             At the -- behind the bullet when it's unfired, there

16   is gunpowder, so that's what burns and forces the bullet down

17   the barrel towards the target.

18             At the bottom of the cartridge casing is the headstamp

19   and primer area.  So the headstamp area is the circular part,

20   it's just a smooth circle, it's flat, and that's typically --

21   on a regular cartridge, it's typically where it would be marked

22   with the make or the manufacturer, and usually it will have the

23   caliber.  And the caliber just refers to the size of the

24   ammunition, because a firearm is manufactured in order to fire

25   a certain size of ammunition, they range.  There's multiple

I9PKMAT2                          Horan - Direct

1   calibers that you can have, but each gun fires typically one

2   caliber only.

3           The center part in this case, it looks gray here, it's

4   just a circle, that's called the primer, and that's the part

5   that holds a small amount of explosive.  So a firing pin is an

6   internal part of the firearm.  When the firing pin comes

7   forward, it actually crushes the primer and causes a small

8   explosion, and that ignites the gunpowder, which burns and

9   forces the bullet down the barrel.  So that's the primer area

10  there.

11          On this particular model, it shows you a section that

12  looks like an even smaller circle.  That is just a model of a

13  firing pin impression.  So after a cartridge is fired, it

14  leaves an impression of the firing pin there.

15  Q.  Thank you.

16          Is the bullet, when it travels through the cylinder of

17  a revolver or of a gun, firearm, is it altered in any way as it

18  passes through?

19  A.  I'm sorry, can you repeat that?

20  Q.  Is the bullet altered in any way as it passes through the

21  firearm?

22  A.  So as a bullet travels down the barrel, yes, it's -- when

23  it's manufactured, it's smooth, and as it travels down the

24  barrel of a firearm, whether it's a revolver or a pistol, a

25  rifle, it picks up what we call rifling markings.  So each

barrel after -- during the manufacturing process, a series of

lands and grooves are inside the inside of a barrel.  Sometimes

they're cut, and sometimes -- there are different methods of

making that rifling, but the purpose of that rifling is to

impart a spin on the bullet so that it has more accuracy,

something like how a quarterback throws a football, when they

spin it, it's called gyroscopic stability, which is a fancy

word for better accuracy.

So that rifling imparts landing groove impressions on

the barrel.  So this model shows you little cutout portions.

Inside that rifling, there are even more distinct markings,

individual characteristics that are specific to that barrel.

Q.  Thank you.

What happens to the shell casing after the bullet is

discharged?

A.  That depends on the type of firearm.  If it's a revolver,

after the bullet is -- goes down the barrel towards a target,

the cartridge casing is empty, and it remains inside the

firearm.  So a revolver, it stays inside the cylinder until

someone takes it out.

For a semiautomatic pistol, when a round is

discharged, and the bullet goes down the barrel towards a

target, that empty cartridge casing is extracted and ejected

from the firearm through the ejection port, which is at the top

of the semiautomatic pistol.

1        There's a moving part on the top of a semiautomatic

2   pistol called the slide.  And the slide moves rearward,

3   extracts and ejects the cartridge casing, and as it moves

4   forward, if there's another round present, the next round is

5   then placed into the chamber, and it's ready to fire again.

6   Q.  Does the process of firing a weapon leave any marks on the

7   shell casings themselves?

8   A.  Yes.  When a round of ammunition is discharged, not only

9   does the bullet go down the barrel, but because of that small

10  explosion, and the thousands of pounds of pressure that's

11  created, and the burning gunpowder behind the bullet, the

12  cartridge casing is actually made from a softer metal than the

13  firearm, so that the firearm is able to shoot well more than

14  one round of ammunition.  So the softer metal, due to the

15  energy of discharge, it heats up, and it expands against the

16  inside of the firearm.

17       So any toolmarks that are made inside the firearm,

18  inside the chamber, as well as the breechface, and the chamber

19  is where the cartridge is held when it's ready to be fired.

20  And when I talk about breechface, that's the flat portion of

21  the firearm, it's inside, and that's where the flat portion of

22  the cartridge casing, that's where it would sit against when

23  it's waiting to be fired, basically.  There is a hole in the

24  breechface, and that's where the firing pin comes forward and

25  strikes the primer.

1        All of those motions, all of those surfaces that are

2   in contact with the cartridge casing make impressions or

3   striations, which are different markings that are imparted on

4   the cartridge casing.

5        And each firearm is made by tools, so when the firearm

6   is finished, it has toolmarks on it.  There are machines that

7   make it, and there are layers of the process of making

8   firearms.  So it creates different layers of markings that are

9   then imparted on the softer metal of the cartridge casing.

10  Q.  Where do you conduct microscopic examinations for the NYPD?

11  A.  At the firearms analysis section in the police laboratory.

12  Q.  Where is that located?

13  A.  In Jamaica, Queens.

14  Q.  What types of equipment are kept in the lab?

15  A.  In the firearms analysis section?

16  Q.  Yes.

17  A.  In the firearms analysis section, we have a bullet recovery

18  system, which is where we test firearms that are received.  We

19  have balances, we have calibers, and those are all measuring

20  devices for fired bullets.  And we have comparison microscopes.

21  Q.  Are there any governing bodies that oversee the operations

22  of the police laboratory?

23  A.  Yes.  We're certified by -- the acronym is ANAB, A-N-A-B,

24  and it's the American National Standards Institute, American

25  Society for Quality National Accreditation Board.

I9PAAMAT3                          Horan - Direct

1    BY MR. GENTILE:

2    Q.  How does evidence typically arrive at the lab?

3    A.   It typically comes through our, or it actually always comes

4    through our Unit Evidence Control Room and it's sealed, for

5    Firearms Analysis Section it's typically sealed in a plastic

6    security envelope which has a serial number on it.  And it is

7    accompanied with paperwork which states what type of evidence

8    we're receiving, as well as what kind of examinations are

9    requested.

10   Q.  And typically who seals the evidence in those plastic

11   envelopes?

12   A.   The vouchering officer.

13   Q.  And do they typically come to you sealed?

14   A.   Yes.

15   Q.  At what point in the process do you get involved?

16   A.   After the events in question, the vouchering officer will

17   voucher anything that's pertinent and submit it for

18   examination.  If there are no other examinations that are

19   requested before Firearms Analysis, then we'll be the next

20   people who receive it.  Once it's logged into our computer

21   system, we take custody of it and do our analysis.

22   Q.  And what are some of the steps you take to ensure the

23   integrity of evidence you receive?

24   A.   As we're taking custody of it we inspect the packaging that

25   we're receiving making sure that it's sealed properly and that

1    the packaging is intact.  We also cross reference the number on

2    the packaging with the voucher which again, the voucher just

3    lists what we should be receiving.

4    Q.  So are those the procedures that are in place for tracking

5    the evidence as it comes to you and it's assigned as it comes

6    to the lab, is assigned to a firearms examiner?

7    A.  Yes.

8    Q.  I'm sorry.  Could you explain that process?  How was

9    evidence tracked at the lab?

10   A.  It is through our Laboratory Information Management System

11   and it's a bar coding system.  So every package that comes into

12   the lab in order to be analyzed gets a, it's basically a yellow

13   sticker that has a serial number on it and any pertinent

14   numbers from the incident that occurred is on there.  So I have

15   my own personal bar code and the evidence is scanned in the

16   computer to me personally when I am doing my examination.  And

17   then when I am done with my examination I return the evidence

18   to the evidence control room and it's scanned in the same way.

19   Q.  Can you please describe the steps you take in the beginning

20   of the examination process?

21   A.  When I receive the evidence after I make sure that the

22   packaging is intact.  I make sure that I am receiving the

23   correct package as listed on voucher.  I go back to my work

24   station and I do an inventory.  So everything that's written on

25   that voucher that I should be receiving, I make sure that it's

I9PAAMAT3                    Horan - Direct

1   inside the packaging once I open it and I record what I

2   received and how I received it.  If there were other individual

3   packages inside the outer container, I take a record of that.

4           The next thing I do is I after I make sure that

5   everything's accounted for, I begin my analysis and I record

6   the characteristics of any evidence I've received.  And what

7   that basically means, the characteristics of evidence that I

8   can see with the naked eye, I don't need a microscope to

9   document that.

10  Q.  Detective, did you examine certain evidence in connection

11  with this case?

12  A.  Yes.

13  Q.  I am going to place before you what's been marked as

14  Government Exhibits 100 and 101.

15          MR. GENTILE:  May I approach, your Honor?

16          THE COURT:  Yes.

17          (Pause)

18          THE WITNESS:  Thank you.

19  Q.  Do you recognize these exhibits?

20  A.  Yes, I do.

21  Q.  How do you recognize them?

22  A.  I recognize them because they're in the packaging that I

23  created and labeled and they are all marked by me with the lab

24  number, each item number and my initials and they're just

25  engraved.  I use an engraving tool to scratch those numbers

1    into the surface of each piece of evidence.

2    Q.  I am going to ask you to draw your attention to the plastic

3    bag that's accompanying that exhibit.  Can you tell the jury,

4    was the evidence contained in that plastic bag when you

5    received it?

6    A.  Yes.

7    Q.  Was it sealed?

8    A.  Yes.

9    Q.  Based on the microscopic analysis you conducted, did you

10   draw any conclusions with respect to the evidence?

11   A.  Yes.

12   Q.  Contained in those exhibits?

13   A.  Yes.

14   Q.  What did you conclude?

15   A.  I concluded that the five cartridge casings that I received

16   in this case were all fired from the same firearm.

17   Q.  What was the basis for that conclusion?

18   A.  The basis for that conclusion was that each cartridge

19   casing had the same class characteristic.  So they were of the

20   same caliber and the same type of breach face pattern which is

21   again the markings that the internal parts of a firearm would

22   make on flat portion of the cartridge casing.  They also share

23   the same individual characteristics.  And what I mean by

24   "individual characteristics" is something that I have to look

25   under the microscope to observe.  There are patterns and

1   imperfections that are created microscopically in a firearm.

2   And when a cartridge casing is discharged, those imperfections

3   are then transferred to the cartridge casings and they're

4   visible under a microscope and they share those individual

5   characteristics and so they were fired from the same firearm.

6   Q.  Thank you.

7          I just want to direct your attention again to the

8   plastic bag.  Can you open it up and just identify the officer

9   that is assigned or signed their name to that bag.

10  A.  Yes.  It's a signature.  So it looks like an S-A-J and her

11  tax number is present on it.

12  Q.  OK.  And you said, was that bag sealed when you received

13  it?

14  A.  Yes.

15  Q.  And does the voucher number on that bag correspond with the

16  voucher number that you received with the item?

17  A.  Yes.

18  Q.  Finally, Detective Horan, I am going to ask you, is it

19  possible to recover fingerprints off of a fired shell casing?

20  A.  I believe that it is possible but it's not likely.  When

21  cartridge casings, any fired evidence that comes into the

22  laboratory that's even requests fingerprints be done -- we have

23  a Case Management Unit and their job is to assess the priority

24  of certain cases and certain examinations.  And requests that

25  come in on fired bullets or fired cartridge casings or

1  fingerprints have been very unsuccessful.  Unsuccessful enough

2  that they decline the requests for a fingerprint analysis.

3  Q.  So does the police lab do fingerprint analysis on fired --

4  A.  Not typically, no.

5  Q.  Thank you.

6          MR. GENTILE:  No further questions.

7          THE COURT:  Mr. Kaye.

8          MR. KAYE:  Thank you, your Honor.

9  CROSS-EXAMINATION

10  BY MR. KAYE:

11  Q.  Good afternoon.

12  A.  Good afternoon.

13  Q.  I'm sorry.  Are you a detective?

14  A.  Yes.

15  Q.  I'm just going to call you "detective".

16  A.  Sure.

17  Q.  Detective, you said that it is possible to recover

18  fingerprints from shell casings, correct?

19  A.  I can't say it's impossible.  I don't do that analysis.  So

20  I have never personally recovered fingerprints from a fire

21  cartridge casing and I can't say it's impossible.

22  Q.  That's not your area of expertise, is it?

23  A.  No.

24  Q.  Your area of expertise is the ballistic evidence itself,

25  true?

I9PAAMAT3                        Horan - Cross

1   A.  Yes.

2   Q.  The shell casings, the cartridges, the manner in which the

3   bullet itself moves through the firearm and such, true?

4   A.  Yes.

5   Q.  There are other experts within the New York Police

6   Department whose area of expertise is limited to fingerprint

7   evidence, true?

8   A.  Yes.

9   Q.  In fact, the New York Police Department has an entire

10  section called the "Fingerprint Section", doesn't it?

11  A.  Yes, "Latent Print Development Unit", yes.

12  Q.  Is there just one Latent Print Develop Unit or are they in

13  multiple counties?

14  A.  There is as part of the police laboratory there's a Latent

15  Print Development Unit that develops fingerprints on certain

16  things and that would be the section that would conduct the

17  fingerprint analysis on a cartridge casing.  And once

18  fingerprints are developed then they're put forth to the

19  sections in the boroughs that do the comparisons.

20  Q.  And you said it's not typically done.  Is that accurate

21  when you said it's not typically done?

22  A.  When I -- yes, because I haven't come across a request for

23  fingerprints on fired evidence in the last, approximately, six

24  years that it's been entertained.  They basically deny that

25  request.

I9PAAMAT3                      Horan - Cross

1   Q.  How many experts with your qualifications that do what you

2   do does the police department employ?

3   A.  I'm sorry.  Can you just repeat that?

4   Q.  How many microscopists are there employed by the New York

5   Police Department?

6   A.  About 12.

7   Q.  You say you haven't seen it in six years?

8   A.  Right.

9   Q.  But you can't speak for the other 11?

10  A.  Correct.

11  Q.  You said that the evidence typically comes sealed in a bag,

12  correct?

13  A.  Yes.

14  Q.  And you said that you received this sealed?

15  A.  This case?

16  Q.  Yes.

17  A.  Yes.

18  Q.  How do you know that?

19  A.  Because when I received it, I checked the seals when I

20  received it.  I always do.

21  Q.  How do you remember that?

22  A.  I documented on my inventory worksheet.

23  Q.  And how many pieces of ballistics have you tested and come

24  across since you've received this one?

25  A.  I'm not sure.  Hundreds, I'm sure.

I9PAAMAT3                          Horan - Cross

1    Q.  And how many had you received before you received this

2    evidence?

3    A.  Maybe hundreds.

4    Q.  Is there anything particularly unique or special about this

5    bag?

6    A.  This particular bag has a serial number on it that I record

7    on my worksheet when I recorded that I received it sealed.

8    Q.  But the contents of the bag bore no initials from the

9    recovering officer, did it?

10   A.  The contents, I don't believe they had initials on this

11   particular case, no.

12   Q.  That's not the case across the board.  You received

13   ballistics evidence with the initials or some identifying mark

14   from the recovering officer on occasion, don't you?

15   A.  Sometimes we do, yes.

16   Q.  Did you ever work in the ballistics section that tests

17   firearms for operability?

18   A.  Yes.

19   Q.  And you know, of course, that every firearm that's

20   recovered by any police officer in the field contains the

21   initials scratched into the frame of that firearm somewhere by

22   the recovering officer so he or she can identify it later on,

23   true?

24   A.  Many times it does.  Not always.

25   Q.  Is it supposed to?

I9PAAMAT3                          Horan - Cross

1    A.  I believe if it's feasible for them to do it, they're

2    supposed to, yes.

3    Q.  Well, certainly feasible for someone to scratch their

4    initials or any identifying mark into these shell casings,

5    correct?

6    A.  In my unit it is.  We have an engraving tool that we use,

7    yes.

8    Q.  Couldn't I take a pointy metal object and make a scratch

9    mark even with a name?

10   A.  Yeah, I guess you could.

11   Q.  You are a member of the AFTE?

12   A.  Yes.

13   Q.  Not every microscopist is a member of that organization; is

14   that fair to say?

15   A.  Yes.

16   Q.  And you're telling the jury that all of the shell casings

17   came from the same firearm, correct?

18   A.  Yes, they were fired from the same firearm.

19   Q.  OK.  So does the AFTE have a standard for people with your

20   expertise to come into court and testify to a jury that in your

21   opinion all of the shell casings were fired from one gun?

22   A.  The standard that we use is that the individual

23   characteristics that I was referring to earlier that I looked

24   for under the microscope from one cartridge casing to the other

25   are sufficient agreement.  So when I look at those individual

I9PAAMAT3                         Horan - Cross

the patterns of individual peaks and ridges and furrows which

constitute a contour pattern on the flat area of the cartridge

casing that they're in agreement that they came from the same

firearm.  So they're same pattern based on the different depths

and widths and the heights of individual characteristics.

Their spatial relationship, the way they reflect the light of

my microscope under the comparison microscope.

Q.  Is there a definition of sufficient agreement?

A.  "Sufficient agreement" means that -- and just bear with me

for a second because it's a little lengthy.  It's a little

wordy.  But basically, it exceeds the best known non match.

And what I mean by that is when I, through my training I've

compared different cartridge casings that are known to have

been fired from different firearms, as well as cartridge

casings that are known to have been fired from the same

firearm.  And so the threshold that we use is, we've examined

that multiple times and we've received cartridge casings, as

well as fired bullets that are also fired from consecutively

manufactured firearms.  So firearms that are from the same

manufacturer manufactured one right after the other using the

same exact tools.  So that's as close as possible that a

firearms marking can be without being from the exact same gun.

        And I was able, along with the people who I was

trained with, able to determine the difference from cartridge

casings and bullets that were fired from a firearm that was

I9PAAMAT3                          Horan - Cross

manufactured one right after the other.  I was able to

determine the difference between those cartridge casings.  So

that's the best known non match.

         So the agreement that is a threshold for me is whether

those patterns have enough agreement to surpass that and that

they're consistent with the thousands of known matches, so

thousands of cartridge casings that I've compared that I know

come from the same source.  In some cases I've fired them from

the same source.  So they're consistent with that agreement and

exceed the best known non match.

Q.  That is a mouthful.

A.  Yes.

Q.  Is there a known or a potential rate of error in this

field?  Meaning, let's say 19 examiners with your experience

and your skill and your knowledge, all look at the same

ballistics evidence, will they invariably agree 19 out of 19?

A.  Depending on what study?  There's a few different studies

that were done in order to determine an error rate and because

it is a subjective science, it's based on my interpretation.

It varies from examiner to examiner.  And I do know that some

of the studies that are done, it varies from I believe it's

point five percent to two percent error rate.

         Me personally, any studies that I've been a part of or

any proficiency testing or case work, I have a zero percent

error rate that I know of.

I9PAAMAT3                    Horan - Cross

1   Q.  The windows are rattling.  Sorry.  I didn't hear the last

2   part of what you said with the word "error rate" in it?

3   A.  For me personally after my proficiency testing, competence

4   testing and validation studies that I have been a part of, I

5   have a zero percent error rate that I know of.

6   Q.  But you also told the jury that this is a subject opinion,

7   true?

8   A.  Yes.

9   Q.  Meaning, it's what you believe is right?

10  A.  Based on my training an experience, yes.

11  Q.  I mean your opinion, of course, is honest.  That's honestly

12  what you believe is right, true?

13  A.  Yes.

14  Q.  But nonetheless, it's your opinion, correct?

15  A.  Yes.

16  Q.  And that is not to say that another expert in your field

17  invariably will always have the same opinion after looking at

18  the same marks, the same lands, the same grooves, the same

19  strides and such?

20  A.  Not always.  But it's one of the reasons that we also have

21  all of our cases technically reviewed.  Which means that

22  another competent examiner will reexamine the entire case to

23  make sure that they agree with my opinion.

24  Q.  So are you saying that another examiner looked at these

25  shell casings side by side?

I9PAAMAT3                           Horan - Cross

1    A.   As a technical reviewer, yes.

2    Q.   And are you saying that your opinion is that it is more

3    likely than not that they were fired from the same weapon or

4    are you telling the jury it's a hundred percent or something

5    else?

6    A.   I am saying in my opinion based on my training and

7    experience that all five cartridge casings were fired from the

8    same firearm.

9    Q.   In your opinion?

10   A.   Yes.

11   Q.   Your subjective opinion?

12   A.   Yes.

13   Q.   Have you ever looked at shell casings like these and

14   declared that you just don't know?

15   A.   Fired shell casings, yes.  It's called an inconclusive

16   conclusion.  And that means that there are similarities and

17   there are some dissimilarities but there's not enough

18   similarities to say that I think they're from the same firearm

19   and there is not enough differences to say that I think they're

20   from different firearms and it's called inconclusive.  And yes,

21   I have come to that conclusion at times.

22   Q.   What do you do in that situation?

23   A.   We report them as inconclusive.  They share the same class

24   characteristics.  So they look the same before I look at them

25   and high magnification.  And once I look at under high

I9PAAMAT3                    Horan - Cross

1    magnification I can't tell whether they came from the same

2    firearm or not.  That's how it's reported.

3    Q.  Do you weigh the shells?

4    A.  No.

5    Q.  So how would you know if they weigh the same?

6    A.  Well, for cartridge casings weight is not considered a

7    class characteristics.  The size and the caliber is considered

8    a characteristic.

9    Q.  You measured their diameter?

10   A.  No.  They're typically marked with the caliber.

11   Q.  Here we have what caliber shell casing?

12   A.  A .40 Smith & Wesson caliber.

13   Q.  Does that mean it'll fit in any .40 caliber firearm?

14   A.  Any .40 Smith & Wesson caliber firearm, yes.

15   Q.  And did you take photographs in this case?

16   A.  Yes.

17   Q.  How many photographs did you take?

18   A.  I took two photographs which is typical for microscopic

19   comparison.  We take photographs of an example of where the

20   breach face impressions and if they -- sorry.  If they're

21   identified as having come from the same source, we take a

22   picture of the preach face impressions which are markings left

23   on the cartridge casings, as well as firing pin impressions.

24   Q.  Can you tell the jury -- Withdrawn.

25         I am going to read you a definition and I'd like you

I9PAAMAT3                         Horan - Cross

1    to tell me whether or not you agree with that definition.

2           Reloaded is the process of loading firearm cartridges

3    by assembling the individual components rather than purchasing

4    completely assembled.

5           Is that a definition of reloading that you agree with?

6    A.  Yes.

7    Q.  And then can you tell the jury in layman's terms what

8    reloading is?

9    A.  "Reloading" means that you would use usually the same

10   cartridge casing that had been fired already.  And you use

11   usually a new projectile like a layperson would do it.  A

12   manufacturing company, an ammunition company typically doesn't

13   do this.

14          The other portion that you would need to replace from

15   a fired cartridge casing is the primer because the explosive in

16   there has already been spent.  So the primer needs to be

17   replaced, as well as the projectile or bullet.  The cartridge

18   casing can in some cases be reused.

19   Q.  Have you ever heard of the retail establishment named

20   Cabela's?

21   A.  Yes.

22   Q.  Can you tell the jury what they sell, generally?

23   A.  Generally, I don't -- I'm not a customer of Cabela's but

24   Cabela's generally selling hunting equipment and outdoor

25   equipment.  I believe they sell ammunition and some long arms.

1   Q.  Cabela's sells reloading bullet kits, don't they?

2   A.  Yes.

3   Q.  And have you heard of a similar sporting goods store named

4   Broman's?

5   A.  Yes.

6   Q.  And Broman's similarly sells these reloading kits, correct?

7   A.  I believe so, yes.

8   Q.  And anybody can buy them?

9   A.  Yes.

10  Q.  And Cabela's is located in the state of New York, correct?

11  A.  I don't know.

12  Q.  Well, there is one in Orange County, isn't there?

13  A.  I don't know.

14  Q.  There is one in Utica?

15  A.  I'm sure can you look a it up.  I'm sure there's one at

16  multiple locations.

17  Q.  Do you know for a fact without telling us what county it is

18  that Cabela's has a presence in the state of New York?

19  A.  I believe so.

20  Q.  And these reloading kits -- correct me if I'm wrong -- but

21  they allow enthusiasts to basically make their own bullets,

22  true?

23  A.  They allow them to, right, reuse the cartridge casing and

24  replace the parts that they need to make it a live cartridge

25  again.

1   Q.  Because it's cheaper than buying it from Smith & Wesson for

2   example?

3   A.  Sometimes.

4           MR. KAYE:  Thank you, detective.

5           THE COURT:  Any redirect?

6           MR. GENTILE:  Yes, your Honor.

7   REDIRECT EXAMINATION

8   BY MR. GENTILE:

9   Q.  Detective Horan, you've testified previously that your work

10  is checked by a supervisor at the lab?

11  A.  It's checked by another competent examiner.  In this

12  specific case our forensic science consultant and our technical

13  leader technically reviewed this particular case.

14  Q.  And what did the consultant include with respect to this

15  examination?

16          MR. KAYE:  Objection.

17  Q.  Did the consultant agree with your conclusion on this --

18          MR. KAYE:  Same objection.

19          THE COURT:  Overruled.

20          You can answer.

21  A.  Yes.

22          MR. GENTILE:  Thank you.

23          THE COURT:  You may step down.  Thank you.

24          Is the government ready with your next witness?

25          MR. RODRIGUEZ:  Yes, your Honor.

I9PAAMAT3                    Caltabiano - Direct

1          The United States calls detective Anthony Caltabiano.

2          THE COURT:  OK.

3    ANTHONY CALTABIANO,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. RODRIGUEZ:

8    Q.  Good afternoon, detective.

9          Where do you work?

10   A.  Five-Two Detective Squad.

11   Q.  For which organization?

12   A.  The NYPD.

13   Q.  Is that the New York Police Department?

14   A.  Yes, it is.

15   Q.  How long have you worked there?

16   A.  Approximately, eight years.

17   Q.  What's your current title?

18   A.  Detective.

19   Q.  How long have you been a detective?

20   A.  About a month.

21   Q.  In October of 2017, what was your title at that time?

22   A.  Police officer.

23   Q.  Where were you assigned at that time?

24   A.  The same place, the Five-Two Squad.

25   Q.  And does the Five-Two refer to the 52 Precinct?

1   A.  Yes.

2   Q.  What area of the city does that cover?

3   A.  Botanical Gardens area.

4   Q.  Which part?

5   A.  We cover Webster Avenue, as well as Fordham.

6   Q.  Which of the five boroughs?

7   A.  Bronx.

8   Q.  At that time, what were your duties and responsibilities in

9   October of 2017?

10  A.  It was -- I was on the investigative track.

11  Q.  Detective Caltabiano, let me direct your attention to

12  October 21, 2017.  Were you on duty that day?

13  A.  Yes, I was.

14  Q.  Did you receive any particular assignment that day?

15  A.  Yes, I did.

16  Q.  What assignment did you receive?

17  A.  I received to conduct a video canvass.

18  Q.  Can you explain to the jury what a video canvass is?

19  A.  A video canvass is when we go out after a crime -- it

20  doesn't matter what type of crime -- to look for any video

21  evidence of that crime.

22  Q.  Were you told to go to any particular area?

23  A.  Yes, I was.

24  Q.  Which area?

25          MR. KAYE:  Objection.  What he was told.

I9PAAMAT3                          Caltabiano - Direct

1    THE COURT:  Overrule.  You can answer.

2    A.  I was told to go to 77 East Kingsbridge Road in the Bronx.

3    Q.  And what, if anything, were you looking for there?

4    A.  I was looking for video, interior and exterior.

5         MR. RODRIGUEZ:  Ms. Parisi, can you please pull up

6    Government Exhibit 40 which is already in evidence.

7    Q.  Detective Caltabiano, can you show the jury on this map --

8    you can draw it with your finger -- where you conducted a video

9    canvass that day?

10   A.  Sure.

11   Q.  Can you just tell the jury the intersection that you've

12   just circled there?

13   A.  That is East Kingsbridge Road and Creston Avenue.

14   Q.  Detective Caltabiano, I am going to hand you what's been

15   marked for identification purposes as Government Exhibits

16   402-A, "B", "C" and "E", copies of which have been previously

17   provided to defense counsel.

18        Can you please look through those exhibits.

19        (Pause)

20   Q.  Have you had a chance to do so?

21   A.  Yes.

22   Q.  Do you recognize what's depicted in those exhibits?

23   A.  Yes, I do.

24   Q.  Generally speaking, what is depicted in those exhibits?

25   A.  That is the deli where I obtained video.

I9PAAMAT3                          Caltabiano - Direct

1   Q.  Do the photos that are Government Exhibits 402-A, "B", "C",

2   "D" and "E" fairly and accurate the depict that deli and the

3   surrounding area when you went there on October 21, 2017?

4   A.  Yes, it does.

5           MR. RODRIGUEZ:  Your Honor, the government offers

6   Government Exhibits 402-A, "B", "C", "D" and "E".

7           MR. KAYE:  No objection.

8           THE COURT:  They're received in evidence.

9           (Government's Exhibits 402-A, B, C, D and E received

10  in evidence)

11          MR. RODRIGUEZ:  Ms. Parisi can you please publish

12  Government Exhibit 402-A.

13          (Pause)

14  Q.  Detective Caltabiano, I am going to ask you to tap the

15  screen to remove the writing.

16          Detective Caltabiano, what does Government Exhibit

17  402-A show?

18  A.  It shows the deli where I obtained video.

19  Q.  Why did you go to this particular deli?

20  A.  Upon getting in in the morning I was, I gathered

21  information from the lead detective that --

22          MR. KAYE:  Note my objection.

23          THE COURT:  Noted.

24  A.  One of persons of interest was at the deli.

25  Q.  A person of interest with respect to what?

1   A.  With respect to a shooting that happened the night prior.

2   Q.  Detective Caltabiano, what is the street that is on the

3   right side of the image that's 402-A?

4   A.  It's going to be Creston Avenue.

5           MR. RODRIGUEZ:  Ms. Parisi, can you please publish

6   Government Exhibit 402 B.

7           (Pause)

8   Q.  Detective Caltabiano, what are we looking at in Government

9   Exhibit 402-B?

10  A.  We're looking at the same deli, different view.

11  Q.  What is the street that's in front of the deli in that

12  image?

13  A.  I'm sorry.  Can you just rephrase that?

14  Q.  Sure.  Do you see a street towards the right of the deli on

15  that image?

16  A.  Yes.  It's Creston.

17  Q.  What's the other street that's perpendicular to Creston?

18  A.  East Kingsbridge Road.

19          MR. RODRIGUEZ:  Thank you.

20          Can you please publish Government Exhibit 402-C.

21          (Pause)

22  Q.  Detective Caltabiano, what are we looking at in Government

23  Exhibit 402-C?

24  A.  Same deli, different view.

25  Q.  Is this a corner view of that deli?

1   A.  Yes, it is.

2   Q.  Is that East Kingsbridge Road on the left of the image?

3   A.  Yes, it is.

4   Q.  And is that Creston on the right of the image?

5   A.  Yes, it is.

6           MR. RODRIGUEZ:  Ms. Parisi, can you please -- before

7   you do that --

8   Q.  Detective Caltabiano, you have been to this location,

9   correct?

10          MR. KAYE:  Note my objection to form.

11  Q.  Detective Caltabiano, have you been to this location?

12  A.  Yes.

13  Q.  Were you there the day that you pulled the video?

14  A.  Yes.

15  Q.  Creston Avenue, what kind of incline or elevation is on

16  that road, if any?

17  A.  There's a very slight incline.

18          MR. RODRIGUEZ:  Thank you.

19          Ms. Parisi, can you please publish Government Exhibit

20  402-D

21  Q.  Detective Caltabiano, what are we looking at here?

22  A.  Same deli, different view.

23  Q.  What street is in the front of the image?

24  A.  So we're on Creston Avenue right now looking at the deli.

25  Q.  What street is on the left side of the image?

I9PAAMAT3                    Caltabiano - Direct

1   A.  East Kingsbridge Road.

2          MR. RODRIGUEZ:  Ms. Parisi, can you please publish

3   Government Exhibit 402-E.

4          (Pause)

5   Q.  Detective Caltabiano, what does Government Exhibit 402-E

6   show?

7   A.  Same deli, different view.

8          MR. RODRIGUEZ:  Thank you.

9   Q.  Detective, do you recall approximately what time you went

10  to this deli on October 21, 2017?

11  A.  I don't recall the time.

12  Q.  Is there anything that would refresh your recollection as

13  to what time you went?

14  A.  Yes.

15  Q.  I'm going to hand you what's been marked for identification

16  as 3507-1, a two-page document a copy of which has been

17  previously provided to the defense.  I am going to ask you to

18  read that middle of that first page to yourself quietly and

19  then put the document face down in front of you.

20          (Pause)

21  Q.  Have you reviewed that document?

22  A.  I have.

23  Q.  Does it refresh your recollection as to what time,

24  approximately, you went to this deli on October 21, 2017?

25  A.  Yes, it does.

1    Q.   What time was that?

2    A.   1330 hours.

3    Q.   Is that 1:30 in the afternoon?

4    A.   Yes.

5    Q.   What did you do when you arrived at this location?

6    A.   The first things we do is we get permission to access the

7    DVR system which is the hard drive for the video.

8    Q.   Is that what you did when you went to this location?

9    A.   Yes.

10   Q.   Did you notice that this location had any surveillance

11   cameras?

12   A.   Yes, it did.

13   Q.   Did you notice if it had more than one surveillance camera?

14   A.   Yes, it did.

15   Q.   And did this location have a recording system for its

16   surveillance cameras?

17   A.   Yes, it did.

18   Q.   Where was that recording system located?

19   A.   It was located in the back section of the deli in the

20   ceiling.

21   Q.   Generally speaking, what did you do after you were, as

22   you've testified, given access to that system?

23   A.   After we were given access, we pulled up what we needed to

24   pull up on the monitor.  And then after that we plug a USB or

25   into the hard disk and we download it into our USB.

1  Q.  What steps, if any, did you take to recover videos that

2  appear relevant to your investigation?

3  A.  So when we got to the deli, we pulled all the cameras that

4  were relevant to our investigation.

5          MR. KAYE:  Excuse me, your Honor.  I'm going to have

6  to object to the use of the words "what we did".  Could the

7  witness please testify to what the witness did?

8          THE COURT:  OK.  Just to clarify, then you talk about

9  what you did, make it clear that is "I" if you are with

10 someone.  Just clarify that.

11         THE WITNESS:  Yes.

12         THE COURT:  Were you with someone, by the way?

13         THE WITNESS:  Yes, I was.

14 Q.  Detective Caltabiano, what did you do, if anything, to

15 recover video that you thought was relevant to your

16 investigation at that time?

17 A.  What I did was I accessed the monitor and on the monitor

18 you bring up a menu and that allows to you back up on to the

19 USB drive.

20 Q.  Detective Caltabiano, I am going to show you what's been

21 marked for identification purposes as Government Exhibit 201.

22 It's a thumb drive that contains files marked Government

23 Exhibits 201-A, through 201-RR.

24         MR. RODRIGUEZ:  Copies of those exhibits have been

25 provided to the defense counsel.

1              (Pause)

2    Q.  Detective Caltabiano, could you recognize Government

3    Exhibit 201?

4    A.  I do.

5    Q.  How do you recognize Government Exhibit 201?

6    A.  I initialed it and dated it.

7    Q.  Have you reviewed the contents of that exhibit before

8    testifying today?

9    A.  I have.

10   Q.  What generally, are the contents of that exhibit?

11   A.  It's a video that I pulled at the location.

12   Q.  The location being the deli you have been testifying about

13   on October 21, 2017?

14   A.  Yes.

15            MR. RODRIGUEZ:  Your Honor, the government offers

16   Government Exhibit 201 which contains government sub-exhibits

17   201-A to 201-RR.

18            THE COURT:  You said 201-A through RR?

19            MR. RODRIGUEZ:  Yes, your Honor.

20            THE COURT:  OK.  Any objection?

21            MR. KAYE:  Just brief voir dire?

22   VOIR DIRE EXAMINATION

23   BY MR. KAYE:

24   Q.  Good afternoon.

25   A.  Good afternoon.

1  Q.  It is a flash drive?

2  A.  Yes, sir.

3  Q.  And when is the first time you saw that flash drive?

4  A.  On the 19th of September this year.

5  Q.  Did you bring it with you?

6  A.  I did not.

7  Q.  On the 19th of?

8  A.  September 19, 2018.

9  Q.  Just last week?

10  A.  Yes.  I didn't bring it with me though.

11  Q.  Who gave you that flash drive?

12  A.  Mr. Rodriguez.

13  Q.  Did you play any role in downloading or placing whatever is

14  on that flash drive?

15  A.  I did not place anything on this flash drive, no.

16  Q.  So do you know what's on the flash drive?

17  A.  I do.

18  Q.  How do you know that?

19  A.  Because I reviewed it with Mr. Rodriguez.

20  Q.  So you put the flash drive in some computer system and then

21  you looked at it?

22  A.  I didn't put it in the computer system but I did view it.

23  Q.  Were you present when it was put in?

24  A.  Yes.

25  Q.  Are you sure that's the same flash drive that you are

1    holding in your hand, the one that was put into the system?

2    A.  Yes, sir.

3    Q.  How do you know that?

4    A.  I initialed it and dated it.

5    Q.  And the video that you accessed the night after the

6    shooting, is that what's on that flash drive?

7    A.  Yes, pieces of it.

8    Q.  What happened to the other pieces of it?

9    A.  Everything that I put into the ECMS system, which is how we

10   document everything in the cases.

11   Q.  What does that mean?  Where is the rest of it?  That's not

12   on the thumb drive?

13           MR. RODRIGUEZ:  Objection to scope.

14           THE COURT:  Sustained.

15           MR. RODRIGUEZ:  May I inquire?

16           THE COURT:  Yes.  201-201-RR are received evidence.

17           (Government's Exhibits 201-A-201-RR received in

18   evidence)

19   BY MR. RODRIGUEZ:

20   Q.  Detective Caltabiano, I want to ask you about and show you

21   some of the video that's on Government Exhibit 201 which has

22   been admitted.

23           MR. RODRIGUEZ:  Ms. Parisi, can you please bring up on

24   the left side of the screen Government Exhibit 201-B, keeping

25   Government Exhibit 402-E on the right side of the screen.

1          MR. KAYE:  Your Honor, my objection is that foundation

2     has not been laid to have -- there's no testimony that these

3     videos affirm and accurately reflect what took place in that

4     deli on that date.

5          THE COURT:  Do you want to respond?

6          MR. RODRIGUEZ:  I believe your Honor has admitted the

7     exhibits into evidence.  I believe that the witness has

8     testified that he has reviewed them, the content of the disk,

9     before testifying today, and that they fairly and accurately

10    represent what he's pulled from the deli.

11         THE COURT:  Your objection is noted.  Overruled.

12         MR. KAYE:  But the witness did not see live what was

13    happening at the time.  How could he possibly say it's fair and

14    accurate?

15         THE COURT:  Your objection is overruled.  Noted.

16    BY MR. RODRIGUEZ:

17    Q.  Detective Caltabiano, to the right side of your screen is

18    Government Exhibit 201-B, which is in evidence.  In the upper

19    left-hand corner, there's a timestamp that says 10/20/2017 FRI

20    20:58:12.

21         Can you help orient the jury.  Which direction is this

22    camera facing with respect to the deli?

23    A.  It's facing the entrance.

24         MR. RODRIGUEZ:  Ms. Parisi, can you please play

25    Government Exhibit 201-B.

1          (Video playback)

2          MR. RODRIGUEZ:  Ms. Parisi, could you please bring up

3    Government Exhibit 201-F on the right-hand side and keep 402-E

4    on the left.

5    BY MR. RODRIGUEZ:

6    Q.  Government Exhibit 201-F is on the right side of the

7    screen.  In the upper left-hand corner is a timestamp that says

8    10/20/2017 FRI 21:43:06, and in the lower right-hand corner, it

9    says camera 15, and it's paused.

10          Detective Caltabiano, in which direction is the camera

11    facing in this exhibit?

12    A.  The camera is facing northbound on Creston Avenue.

13    Q.  And what's located --

14          MR. KAYE:  Excuse me, your Honor.  I also -- I'm sorry

15    to interrupt.  I also want to object that there's no foundation

16    that the timestamp is accurate.

17          THE COURT:  Noted.  Overruled.

18    BY MR. RODRIGUEZ:

19    Q.  Detective Caltabiano, what is located on the left side of

20    the video?

21    A.  On the left -- bottom left corner of the screen is the

22    entrance to the deli.  And in front of it is an icebox.

23          THE COURT:  Did you say icebox?

24          THE WITNESS:  Icebox.

25          THE COURT:  Thank you.

1           MR. RODRIGUEZ:  Ms. Parisi, could you please play

2    Government Exhibit 201-F.

3           (Video playback)

4           MR. RODRIGUEZ:  Thank you.  You can pause it right

5    there.  The timestamp is 21:43:51.

6           MR. KAYE:  Before the assistant launches into another

7    question:  Judge, the monitor for the audience is not on.  My

8    client's family is training to see.  Is there any way we can --

9    I don't know, does it work?

10          THE COURT:  Yes, it should be on.

11          MR. KAYE:  It's not on.

12          THE COURT:  We've been having some AV issues, which

13   they're going to try to fix, but --

14          MR. KAYE:  And mine is not on, but that's okay.

15          THE COURT:  We'll do our best.  Thank you.

16          MR. KAYE:  I'm sorry to interrupt.

17          MR. RODRIGUEZ:  Ms. Parisi, can you please take down

18   201-F and bring up Government Exhibit 201-J in its place.

19   BY MR. RODRIGUEZ:

20   Q.  Government Exhibit 201-J is on the right side of the

21   screen, Detective Caltabiano.  The timestamp in the upper

22   left-hand corner is 10/20/2017 FRI 21:43:07.

23          Can you help orient the jury.  In which direction is

24   this camera facing?

25   A.  This camera is facing east bridge on -- I'm sorry,

1   eastbound on East Kingsbridge Road.  The corner that you're

2   seeing is Creston Avenue, the intersection of Creston Avenue.

3   Q.  Thank you.

4           MR. RODRIGUEZ:  Ms. Parisi, can you please go to

5   timestamp 21:43:30.  And please play that until 21:44:45.

6           (Video playback)

7           MR. RODRIGUEZ:  Thank you.  You can remove Government

8   Exhibit 201-J.

9           And, Ms. Parisi, please bring up Government Exhibit

10  201-S.

11          201-S is now up on the screen.  Ms. Parisi, can you

12  please go to the timestamp 22:13:25.

13  BY MR. RODRIGUEZ:

14  Q.  Detective Caltabiano, Government Exhibit 201-S is up at the

15  timestamp 22:13:27.

16          Can you tell the jury in which way this view is

17  looking?

18  A.  This view is looking northbound on Creston Avenue.

19  Q.  Thank you.

20          MR. RODRIGUEZ:  Ms. Parisi, can you please play 201-S

21  through the 22:14:05 mark.

22          (Video playback)

23          MR. RODRIGUEZ:  Thank you.

24          Ms. Parisi, can you please pull up Government Exhibit

25  201-PP.  Can you please bring 402-E back up on the other side.

1    Thank you.   The time stamp on 201-PP is 22:40:15.

2    BY MR. RODRIGUEZ:

3    Q.   Detective Caltabiano, what is the viewpoint of this camera?

4    In the frame, in the lower right-hand corner, there's a stamp

5    that says camera 13.   Which direction is this camera facing?

6    A.   That's facing the corner of East Kingsbridge Road and

7    Creston Avenue.

8    Q.   Which street is on which side?

9    A.   East Kingsbridge Road is on the right side of your screen.

10   Creston Avenue is on the left side of your screen.

11   Q.   Thank you.

12        MR. RODRIGUEZ:   Ms. Parisi, can you please go to the

13   timestamp 22:40:35.   And please play that until 22:41:05.

14        (Video playback)

15        MR. RODRIGUEZ:   Thank you.

16        Please take down Government Exhibit 201-PP and put in

17   its place Government Exhibit 201-RR.

18        201-RR is on the left-hand side of the screen.   The

19   timestamp is 22:41:40.

20   BY MR. RODRIGUEZ:

21   Q.   Detective Caltabiano, what is the location that's being

22   shown here?

23   A.   That's inside the deli located at 77 East Kingsbridge Road,

24   and the camera --

25        MR. RODRIGUEZ:   Ms. Parisi, can you please play

1   Government Exhibit 201-RR.

2            (Video playback)

3            MR. RODRIGUEZ:  Ms. Parisi, can you please pause

4   Government Exhibit 201-RR.  The timestamp is now 22:42:00,

5   camera 3 in the lower right-hand corner.

6   BY MR. RODRIGUEZ:

7   Q.  Detective Caltabiano, what does this viewpoint show?

8   A.  The viewpoint shows the back end of the deli.

9   Q.  Thank you.

10           MR. RODRIGUEZ:  Ms. Parisi, can you please resume

11  201-RR.

12           (Video playback)

13           THE WITNESS:  My monitor went off.

14           MR. RODRIGUEZ:  Ms. Parisi, please pause.

15           THE COURT:  There we go.

16           THE WITNESS:  I'm back on.

17           THE COURT:  It's up.

18           MR. RODRIGUEZ:  Thank you.

19           Ms. Parisi, please resume, which is at the timestamp

20  22:42:13.  Please pause.

21  BY MR. RODRIGUEZ:

22  Q.  Detective Caltabiano, 201-RR is paused at the timestamp

23  22:42:13 in the lower right-hand corner.  It says camera 12.

24           What is the viewpoint in this part of 201-RR?

25  A.  This is a storage area in the back of the deli.

I9PKMAT4                          Caltabiano - Cross

1    Q.  Thank you.

2           MR. RODRIGUEZ:  Ms. Parisi, please play the remainder

3    of 201-RR.

4           (Video playback)

5           MR. RODRIGUEZ:  Thank you.  Please pause.

6           One moment, your Honor?

7           THE COURT:  Yes.

8           (Pause)

9           MR. RODRIGUEZ:  Nothing further at this time.  Thank

10   you.

11          THE COURT:  Thank you.

12          Mr. Kaye?

13          MR. KAYE:  Yes, thank you.

14   CROSS-EXAMINATION

15   BY MR. KAYE:

16   Q.  I should start by saying congratulations on your promotion.

17   A.  Thank you.

18   Q.  You're welcome.

19          Did you work as a police officer in the squad before

20   you were a detective?

21   A.  Yes.  We do 18 months.

22   Q.  Is that the procedure?

23   A.  Yes.

24   Q.  Did you note the make and the model of the DVR system

25   anywhere?

I9PKMAT4                        Caltabiano - Cross

1    A.  I did not.

2    Q.  Why didn't you do that?

3    A.  It's not common practice.

4    Q.  Did you take a photograph of it with your cell phone?

5    A.  No, I didn't.

6    Q.  You had a cell phone, I'm sure?

7    A.  Yes.

8    Q.  You had a camera, because you took photographs, true?

9    A.  Took photographs of what, sir?

10   Q.  Well, you were just going through photographs of the front

11   of the store with AUSA Rodriguez.

12   A.  Yes.

13   Q.  Did you take those photographs?

14   A.  I did not take them.  The DVR recorder.

15   Q.  No, the photographs of the street, of the front of the

16   store and such, not the video.

17   A.  Oh, that was Google.  That's not me.

18   Q.  Google?

19   A.  Yes.

20   Q.  Oh, okay.

21        But, in any event, you had your cell phone with you,

22   true?

23   A.  I did.

24   Q.  Do you think it would be helpful to the jury to take some

25   photographs of the system that you're going to come into court

I9PKMAT4                       Caltabiano - Cross

1   and testify about?

2   A.  I don't think that that's important.

3   Q.  Well, you said that you accessed these very important

4   videos from the monitor.  Is that your testimony?

5   A.  From the DVR hard drive box.

6   Q.  But did you testify that you went to the monitor, and you

7   pressed some buttons on the monitor?

8   A.  Yes.  The monitor shows what's on the DVR box.

9   Q.  Is there some kind of menu on the monitor?

10  A.  There is.

11  Q.  What does the menu say?  What options are available to

12  someone such as yourself in terms of what can be retrieved?

13  A.  When you go into settings, there's a backup button.  And

14  then you select the time frame and the cameras you would like

15  to pull, the date, the time, and what cameras.

16  Q.  How long did you spend doing this?

17  A.  I don't recall the exact amount of time I was at the deli.

18  Q.  Not exact, but just give the jury an approximation.

19  A.  I can't do that.  I don't feel comfortable.  I don't know.

20  Q.  Well, were you there an hour?

21  A.  I couldn't tell you.

22  Q.  Were you there a half hour?

23  A.  I couldn't tell you.

24  Q.  Why can't you tell us?

25  A.  I was back and forth a couple of times, and I don't know

I9PKMAT4                    Caltabiano - Cross

1   how long I was there each time.

2   Q.  So these videos were not all obtained on the same day, at

3   the same time?

4   A.  Same date, not the same time.

5   Q.  So on that date -- which is the next day, true, the 21st?

6   A.  Correct.

7   Q.  -- you came and went, came and went several times?

8   A.  Yes.

9   Q.  Where did you go to when you weren't retrieving the video?

10  What were you doing?

11  A.  We went back to the office.

12  Q.  And whatever you were doing, was that relevant and related

13  to this investigation, whatever you did?

14  A.  Yes.

15  Q.  What was it?

16  A.  To review the video.

17  Q.  Had you saved the video to a flash drive and then taken it

18  back to the squad to review?

19  A.  Yes.  It was uploaded onto a flash drive and taken back to

20  the office, where I reviewed it.

21  Q.  With whom?

22  A.  I don't remember myself, even.

23  Q.  You're familiar with Detective Maye, I assume?

24  A.  Yes.

25  Q.  Did you review it with Detective Maye?

1    A.  At that moment?  I don't recall, but there was a moment

2    when I did review it with Detective Maye.

3    Q.  Was this all on one flash drive or multiple flash drives?

4    A.  Well, that's why I had to go back a second time, the flash

5    drive didn't have enough storage.  The video, it's very clear,

6    so it takes up more space.  So when we didn't get the entire

7    amount, that's why we had to go back a second time.

8    Q.  So did you then wipe the first flash drive, or did you just

9    use a second one?

10   A.  I don't recall.

11   Q.  Well, is there more than one flash drive?

12   A.  I don't recall.  I have multiple flash drives.  I don't

13   recall if it was the same one used and wiped or if it was a

14   different one.

15   Q.  When you say you have multiple flash drives, you mean in

16   your drawer at the office, you have multiple, or in a bag in

17   connection with this investigation?

18   A.  So the flash drive we have is continuously wiped.  We put

19   all of the video on the computer, on the lead investigator's

20   computer -- that's the common practice -- and then I wipe my

21   hard drive.

22   Q.  You upload it?

23   A.  We upload it, yeah.  We upload it to --

24   Q.  So is everything that you put on the flash drive uploaded

25   and in existence in the police department's server somewhere?

1   A.  Yes.

2   Q.  How many hours, roughly, of video is uploaded and presently

3   on the police department server?

4   A.  I don't recall.  I don't know.

5   Q.  Well, can you give the jury an approximation of how much

6   video there is?  They've only seen some snippets.

7   A.  I can't -- I don't know exactly how much or approximately.

8   Q.  Who would know?

9   A.  I don't know.

10  Q.  Is there more than what they have seen?

11  A.  So those videos that you saw are snippets of video that I

12  have pulled.

13  Q.  Well, how did you know what was relevant to pull?

14  A.  So when I got in that morning, the lead investigator told

15  me where to go and what to look for.

16  Q.  And who was that?

17  A.  Detective Maye, M-a-y-e.

18  Q.  Did he tell you to look for a female accomplice?

19  A.  I was told to look for a female, yes.

20  Q.  Accomplice?

21  A.  Yes.

22  Q.  He used the word accomplice, didn't he?

23  A.  Somebody -- a female who was involved with the shooting,

24  not -- I don't know if the exact word accomplice was used, but

25  somebody who was present at the shooting.

1    Q.  Can I try to refresh your recollection as to whether or not

2    the word "accomplice" was used?

3    A.  Yes.

4            MR. KAYE:  May I approach the witness?

5            THE COURT:  Yes.

6            MR. RODRIGUEZ:  What are you showing him?

7            Thank you.

8            MR. KAYE:  You're welcome.

9    BY MR. KAYE:

10   Q.  Just read it to yourself.

11   A.  Okay.

12   Q.  Does that refresh your recollection as to whether or not

13   Detective Maye told you to obtain video footage which includes

14   images of a female accomplice?

15   A.  I used the word "accomplice."  Detective Maye, I don't know

16   if he used the word accomplice, but that's what I wrote for my

17   five.  A five is a document that we document everything of what

18   we did in the street.

19   Q.  So, in any event, you concluded that she was an accomplice,

20   fair to say?

21   A.  After watching the video of the shooting and getting the

22   information that I got, yes.

23   Q.  Do you have training in accessing the video, the

24   surveillance type video, training by the police department, or

25   do you just -- you're kind of young, so you grew up with

1    computers?

2    A.   Yes.

3    Q.   A little header?

4    A.   Can you rephrase that?

5    Q.   Do you have specific police department training on how to

6    access and download videos from a surveillance systems?

7    A.   I do not.

8    Q.   So whatever you know how to do is just from your own

9    knowledge of computers, growing up with computers?

10   A.   No.  It was shown to me by other -- in training, when we

11   train, but it's not an official department training.

12   Q.   Who trained you?

13   A.   Multiple people.  The whole office really helps out.

14   Q.   We saw video of a fight.  Do you recall that clip?

15   A.   I do.

16   Q.   And that was a fight involving the defendant, Mr. Mathews,

17   correct?

18   A.   I don't know who was involved in that fight.  That wasn't

19   my person of interest or people of interest.

20   Q.   Could you tell, just from looking at it now in court, that

21   he's in the video?

22   A.   I cannot.

23   Q.   You can't make an identification even?

24   A.   No, sir.

25   Q.   Okay.

1          Did Detective Maye ever ask you to go back to the

2     store to find video of a different fight, a fight that happened

3     one day earlier?

4     A.  No.  I was there for specifically the shooting.

5     Q.  So he asked you specifically to find video from

6     October 20th only, true?

7     A.  Yes.  From that shooting incident.

8     Q.  I understand.

9          Did you come to learn that there was a fight on the

10    19th at the same location?

11    A.  I'm unaware of that.  It had nothing to do with the

12    investigation.

13    Q.  So as you sit here now in the witness chair, you're unaware

14    of whether or not there was a fight at that location the day

15    before?

16    A.  The day before, meaning the 19th of October?

17    Q.  Yes, sir.

18    A.  I have no -- I don't know about the 19th of October.

19    Q.  What about the day before that, the 18th?

20    A.  I do not know.

21    Q.  And you were never asked by any member of the squad to

22    obtain videos of any other fights than the fight that we've all

23    just seen, true?

24    A.  At that specific location?  No.

25    Q.  What about Detective Cole, did Detective Cole, seated over

1    here to your left, ever ask you to obtain any video of a fight

2    that took place one or two days before the fight we've just

3    seen?

4    A.  He did not.

5    Q.  Do you know how long this DVR system retains video?

6    A.  I don't know.

7    Q.  Who would know?

8    A.  Either if they had a company install it, they would know,

9    the owner would know, a manager possibly would know.

10   Q.  In your experience, is a system of this sort going to be

11   likely to --

12               MR. RODRIGUEZ:  Objection.

13               MR. KAYE:  Does he know what I'm going to say?  I

14   guess he does.

15               THE COURT:  Well, what's your question?

16               MR. KAYE:  How long it retains images.

17               THE COURT:  You can answer, if you know.

18   BY MR. KAYE:

19   Q.  Do you know how long it retains video images?

20   A.  I don't have a DVR system.  It's different.

21   Q.  Because you don't know the make or the model of this

22   particular system, you couldn't even research it, could you?

23   A.  It's actually with the manufacturer of sets.  So you could

24   have the same make and model in two different places, and one

25   could be 30 days, another one could be a week.  It all depends

1    on the preferences.

2    Q.  How do you know that if you don't know what this particular

3    model, make, or manufacturer is?

4    A.  We do a lot of video canvasses, and the same make, the same

5    system that delis have set up, or apartment buildings, or

6    businesses, we're used to the interface, some are set up for

7    three days, some it's 24 hours, some 30, some 60 days.  It all

8    depends on their hard drive and everything.

9    Q.  Did you ask?

10   A.  I did not.

11   Q.  Why not?

12   A.  Once we got access to the DVR system, we were going to pull

13   everything that we needed -- I was going to pull everything I

14   needed right then.

15   Q.  Well, when you knew you were going to be called as a

16   witness in this prosecution, did you then go back and ask?

17   A.  I did not.

18   Q.  But you did speak to the owner of the bodega at some point,

19   didn't you?

20   A.  I need to look back on my document to see if it was an

21   owner or a manager.

22   Q.  You can take a look --

23   A.  Can I?

24   Q.  -- at what you have in front of you, sir --

25   A.  Thank you.

1   Q.  -- Detective.

2        Does that refresh your recollection as to whether or

3   not you spoke to the owner?

4   A.  It doesn't.  It's not documented.  Just a guy named Al,

5   A-l.

6   Q.  Is Al someone that's present in any of the video clips

7   we've seen?

8   A.  I wasn't looking for him.

9   Q.  Did you go and look for any other cameras?

10  A.  In regards to that specific location?

11  Q.  In regards to this unfortunate incident.

12  A.  I'm sorry, can you ask that again?

13  Q.  Yes.

14       Did you look for visible surveillance cameras on the

15  front of any other stores, or buildings, or businesses in or

16  around the immediate vicinity of this shooting?

17  A.  With my partner, I did.

18  Q.  Did you look at 2667 Creston for a camera?

19  A.  The only thing I documented in the case was 77 East

20  Kingsbridge.  That's what I did.  My partner did other fives as

21  well.

22  Q.  Who was your partner?

23  A.  At that time, Police Officer Santana.

24  Q.  Is Santana still with the police department?

25  A.  He is.

I9PKMAT4                          Caltabiano - Cross

1     Q.  Does he work in the Five Two?

2     A.  Five-Two squad, yes.

3     Q.  He was in the squad at that time, also?

4     A.  Yes.

5     Q.  But as a police officer?

6     A.  Yes.

7     Q.  Not a detective?

8     A.  Correct.

9     Q.  Santana.

10          Well, did Police Officer Santana look at the edifice

11    of the various apartment buildings on Creston Avenue for

12    visible domes or cameras that could have captured additional

13    evidence?

14    A.  I can't speak for Officer Santana, now Detective Santana.

15    I don't know what he did.

16    Q.  Well, were you present when Detective -- withdrawn.

17          Did Detective Maye give certain instructions to now

18    Detective Santana as to what he should be doing at the scene?

19    A.  I can't speak for Detective Santana.  I don't know what he

20    was told, by who he was told by, I just know what I was told.

21    Q.  But correct me if I am wrong:  Detective Maye told you, go

22    into the deli on the corner and do whatever you need to do with

23    regard to the DVR and nothing else?

24    A.  Like I said, I got information in the morning to go to the

25    deli where the female person of interest was along with the

1   possible shooter.

2   Q.  This is within the confines of your precinct, true?

3   A.  Yes.

4   Q.  You must have been up and down Creston, and Morris, and

5   East Kingsbridge Road, and East 196th Street hundreds of times,

6   true?

7   A.  A few times.

8   Q.  Daytime, nighttime, all time?

9   A.  Yes.

10  Q.  Am I correct that the following addresses are addresses of

11  actual buildings:  2667 Creston?  Yes?

12  A.  Without a map, I can't accurately say.

13  Q.  2675 Creston?

14  A.  I cannot accurately say without a map.

15  Q.  2682 Creston?

16  A.  Same.

17  Q.  2685 Creston?

18  A.  Same.

19  Q.  2696 Creston?

20  A.  Same.

21  Q.  2698 Creston?

22  A.  Same.

23  Q.  2707 Creston?

24  A.  Same.

25  Q.  What about 60 East 196, is that an address in the immediate

I9PKMAT4

1    vicinity?

2    A.   Unless I'm looking at it, I can't tell you right now.

3    Q.   What about 61 East 196?

4    A.   Same.

5    Q.   55 East 196?

6         MR. RODRIGUEZ:   Objection.

7         THE COURT:   Sustained.

8    BY MR. KAYE:

9    Q.   What about on Morris, is there a 2721 Morris?

10        MR. RODRIGUEZ:   Objection.

11        THE COURT:   Sustained.

12   Q.   What about Jerome Avenue, did you go anywhere to look for

13   video surveillance on Jerome Avenue?

14        THE WITNESS:   Can I answer that, Judge?

15        THE COURT:   Yes.

16        THE WITNESS:   I did not.

17        MR. KAYE:   Thank you, Detective.

18        THE COURT:   Should we break for lunch?

19        MR. RODRIGUEZ:   Nothing further from the government on

20   this witness.

21        THE COURT:   Thank you.

22        (Witness excused)

23        THE COURT:   Thank you.

24        Ladies and gentlemen, you may step down.  We're going

25   to break for lunch.  Please leave your notepads on your chairs

I9PKMAT4

1    closed, and we will continue with the evidence in the case at

2    2:00 o'clock.  Have a good lunch, everybody.

3              (Continued on next page)

I9PKMAT4

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Anything people wanted to talk about before lunch?

4          MR. RODRIGUEZ:  Just to give the Court an idea of

5   what's to come:  The government expects a volume of witnesses

6   after lunch:  Ms. Altagracia Coleman --

7          THE COURT:  Slow down.  Ms. Altagracia?

8          MR. RODRIGUEZ:  First name Altagracia, yes.  Last name

9   Coleman.

10          THE COURT:  Okay.

11          MR. RODRIGUEZ:  Detective Paul Jeselson.

12          THE COURT:  All right.

13          MR. RODRIGUEZ:  And Detective Elvis Cole.

14          Your Honor, obviously Detective Cole's testimony

15   raises the issue of the suppression issue.  It's still the

16   government's position that defense has not put forward anything

17   that creates a dispute of fact that would warrant a suppression

18   hearing.  Specifically, there's no affidavit or testimony that

19   the statement which the defendant admits that he made was made

20   in response to custodial interrogation.  No doubt he was in

21   custody, but the affidavit is silent as to -- not even silent,

22   it doesn't say he was asked a question.  So that's point number

23   one.

24          The other point that I think is going to be implicated

25   by this afternoon's cross-examination is that it's the

I9PKMAT4

1   government's position that Detective Cole or other detectives

2   should not be cross-examined on any charging decisions or

3   decisions not to prosecute made by the Bronx District

4   Attorney's Office.  That's completely irrelevant to their

5   personal knowledge and testimony in this case.  And we've

6   gotten signals from the defense counsel that that may be

7   questions asked of Detective Maye or Detective Cole, and so the

8   government would submit that it should not be permissible

9   cross-examination.

10          THE COURT:  That's on the reasoning that they're not

11   the ones who made the charging decision?

12          MR. RODRIGUEZ:  Correct, correct.

13          THE COURT:  Okay.

14          Mr. Kaye?

15          MR. KAYE:  I'll abide by that, Judge.

16          THE COURT:  Okay.

17          MR. KAYE:  The thing is, I need to run back to my

18   office and come back with a laptop if we expect Ms. Edwards to

19   take the stand today.  If not, then I can stay and do whatever

20   else we need to do.  So could the government tell us that?

21          MR. RODRIGUEZ:  So she will be after Detective Cole.

22   Obviously, whether we get there is going to be largely driven

23   by cross-examination.

24          MR. KAYE:  Okay.  I don't think we're going to get

25   there, because I have a substantial amount of cross-examination

I9PKMAT4

1    for Jeselson and Detective Cole.  But we could at least take

2    her direct, and then maybe I could be given ten minutes to run

3    to my office, if there's still time?  Is that acceptable?  I'm

4    only on Park Place.  I don't have far to go.

5         THE COURT:  So you're saying -- you're saying chance

6    it and not go get the laptop?  It seems unlikely we'll get to

7    your cross of her; is that right?

8         MR. KAYE:  Right.

9         THE COURT:  Do you think or not?

10         MR. RODRIGUEZ:  Based on what I'm hearing about how

11    long the cross-examinations of Detectives Jeselson and Cole

12    will be, I think that's probably a fair assumption.

13         And then the one other thing I'll just remind the

14    Court of is it's Detective Jeselson who implicates the tattoo

15    demonstration issue, and it's the government's position that

16    that should not happen on cross-examination, but, rather,

17    during the defendant's case, if at all, which the government is

18    not conceding on this point that it should be permitted.

19         THE COURT:  So I looked at the indication you referred

20    to, which was the dog fighting case --

21         MR. KAYE:  Oh.

22         THE COURT:  -- before -- right?

23         MR. KAYE:  Yes.

24         How did you know that?

25         THE COURT:  Because I talked to Judge Woods to get the

I9PKMAT4

1    case number, and I looked at the submissions in that case.

2             MR. KAYE:  Oh.

3             THE COURT:  Which seems like a different issue, but it

4    seems like that was an issue where there was a photo of someone

5    showing tattoos, and the parties agreed in your case to present

6    a photo showing the defendant didn't have the same tattoos as

7    in the photo.  So it wasn't an expert issue.  And for an expert

8    to testify that a particular person has no gang tattoos or

9    whatever, that would require a full examination of the person's

10   body.  I just don't see what you have in mind.

11            MR. KAYE:  What I have in mind is to show the two

12   tattoos that my client has.  He'd show one on his right forearm

13   and one on his left bicep area, and I would ask the gang expert

14   whether they're gang tattoos.

15            So in the dog fighting case, we had a photo of a

16   person holding the jowls of a heavily scarred fighting pit

17   bull, and you can see certain tattoos on the forearms of that

18   person, and Judge Woods allowed us to take a photograph of my

19   client's forearms, and show it to the jury, and compare it to

20   that photograph.

21            I'm just suggesting a similar demonstration.

22            THE COURT:  Well, in that case, the government agreed

23   to the procedure, so it was by consent.

24            MR. KAYE:  Well, they wouldn't stipulate, but what

25   they did was they said, we'll take a look at the tattoos, at

I9PKMAT4

1    the client's tattoos, and then we'll take a look at that photo,

2    if we believe they're different, then you can just show the

3    photo of your client's tattoos.  And that's what we did.

4           THE COURT:  Well, is there going to be any evidence

5    about the defendant having gang tattoos?

6           MR. RODRIGUEZ:  Your Honor, not that I expect.  What

7    the government would propose is:  If Mr. Kaye can provide us

8    with photos of the tattoos that he has in mind, we're happy to

9    take a look at them.  And my expectation is that we'll be happy

10   to stipulate that these tattoos are not gang tattoos.

11          MR. KAYE:  Acceptable.

12          THE COURT:  Okay.  I'd like you to confer about that,

13   and let me know if you can reach a stipulation.

14          MR. RODRIGUEZ:  Thank you.

15          THE COURT:  Okay.

16          MR. KAYE:  Yes, sir.

17          THE COURT:  Okay.  I'll see you back here about 2:00.

18          (Luncheon recess)

19

20

21

22

23

24

25

I9PKMAT4

```
 1                          AFTERNOON SESSION

 2                               2:14 PM

 3              (Trial resumed; in open court; jury not present)

 4              THE COURT:  Good afternoon, everybody.

 5              COUNSEL:  Good afternoon.

 6              THE COURT:  We were missing a juror, the last juror,

 7    until a couple of minutes ago, but I believe they're all here

 8    now.

 9              Before we bring them in, I started to look at the

10    video that was provided by the government this morning of the

11    DeJesus interrogation, and I wonder if, Mr. Kaye, you would

12    pinpoint the sections that you're talking about?  Because I

13    didn't -- the government's letter didn't identify the sections

14    that you're interested in, you, Mr. Kaye, are interested in,

15    which is the part about witness one, and I guess essentially

16    saying -- DeJesus saying something along the lines of it was he

17    decided to do it because he thought she was going to talk or

18    something.  Do you have the markers for that?

19              MR. KAYE:  I don't have the hour, minute, and seconds.

20    I could get that before the detective testifies, though, for

21    sure.  Did the Court concentrate on the last 40 minutes?  Or

22    did you --

23              THE COURT:  I didn't have time to watch all 40

24    minutes.  You said the last 40 minutes?

25              MR. KAYE:  Yes.
```

I9PKMAT4

1              THE COURT:  I didn't have time to watch all of it.

2              MR. KAYE:  I'll do it this evening.

3              THE COURT:  In any event, Maye is not testifying

4       today.  It's all right.

5              MR. GENTILE:  That's correct, Judge.

6              THE COURT:  So I'll be able to watch it tonight.

7              Is Altagracia Coleman next?

8              MR. GENTILE:  No, your Honor.  We have had a slight

9       change of plans.

10              THE COURT:  Okay.

11              MR. RODRIGUEZ:  Just flipping the next two witnesses.

12       So Investigator McGee from the Department of Corrections will

13       testify first and then Ms. Coleman.

14              THE COURT:  McGee?

15              MR. RODRIGUEZ:  McGee, Investigator Shaun McGee.

16              THE COURT:  Okay.  Are we ready for the jury, or did

17       you all want to talk about any of our issues?

18              MR. RODRIGUEZ:  Just briefly, your Honor.

19       Investigator McGee is a custodian of records at the New York

20       City Department of Corrections.  He is going to be

21       authenticating the recording of the call that was subject to

22       the motions in limine that we referred to as the little birdie

23       call.  We're going to lay a foundation for the business records

24       now, but because it's the entire call, and we don't think the

25       entire call is admissible, we're not going to offer it now.

I9PKMAT4

1     We'll offer it later through another witness that can isolate

2     the admissible portions.

3              THE COURT:  Okay.

4              MR. KAYE:  Is it just that one call?

5              MR. RODRIGUEZ:  So there are two calls on the CD,

6     because it had to be ordered from the Department of Corrections

7     for the calls on that day, but, again, we're only going to be

8     offering what was the subject of the motions in limine.

9     When --

10             THE COURT:  Which is on both calls or just one?

11             MR. RODRIGUEZ:  It's just on one call, but the CD that

12    came from the Department of Corrections has two calls on it.

13             THE COURT:  Okay.  But only a part is going to be

14    admitted?

15             MR. RODRIGUEZ:  Of one call.  Not through this

16    witness, a future witness, yes.

17             MR. KAYE:  And then, I'm sorry, that is the one and

18    only of all the jail calls?

19             MR. RODRIGUEZ:  Yes, your Honor.

20             MR. KAYE:  Okay.

21             THE COURT:  Okay.

22             Can we bring the jury in?

23             MR. RODRIGUEZ:  Yes.

24             (Continued on next page)

25

1              (Jury present)

2              THE COURT:  Good afternoon, ladies and gentlemen.

3              JURY MEMBERS:  Good afternoon.

4              THE COURT:  Welcome back.

5              Government, your next witness.

6              MR. RODRIGUEZ:  Your Honor, the United States calls

7    Investigator Shaun McGee.

8     SHAUN McGEE,

9         called as a witness by the Government,

10        having been duly sworn, testified as follows:

11             THE DEPUTY CLERK:  Please state your full name and

12   spell your first and last name for the record.

13             THE WITNESS:  Shaun McGee, S-h-a-u-n McGee, M-c-G-e-e.

14             THE DEPUTY CLERK:  Thank you.  Please be seated.

15   DIRECT EXAMINATION

16   BY MR. RODRIGUEZ:

17   Q.  Good afternoon, sir.

18   A.  Good afternoon.

19   Q.  Where do you work?

20   A.  New York City Department of Corrections.

21   Q.  How long have you worked there?

22   A.  Since February 2018.

23   Q.  Does the New York City Department of Corrections operate

24   jails in New York City?

25   A.  Yes.

1    Q.   What's your title there?

2    A.   Investigator.

3    Q.   How long have you been an investigator there?

4    A.   At corrections?  I've been an investigator since February

5    of 2018.

6    Q.   What are your duties and responsibilities?

7    A.   One of three custodian of records.

8    Q.   Are you familiar with the phone system inmates use at the

9    Department of Corrections facilities?

10   A.   Yes.

11   Q.   Are calls placed by inmates at Department of Corrections

12   facilities recorded?

13   A.   Yes.

14   Q.   Are the inmate and the person on the call notified that the

15   call is being recorded?

16   A.   Yes.

17   Q.   How are they notified?

18   A.   By automated message that is displayed at the beginning of

19   each call.

20   Q.   Are there other ways in which they're notified?

21   A.   There's other ways the inmate would be notified that his or

22   her call is subject to being monitored or recorded.

23   Q.   What are those ways?

24   A.   Well, at -- when a female/male enters a facility, a

25   Department of Corrections facility, they're assigned what's

1    called the inmate handbook.  In the inmate handbook, page 47,

2    it explains that their calls --

3              MR. KAYE:  Objection.  Objection.

4              THE COURT:  Hold on.

5              What exactly was the question?

6              MR. RODRIGUEZ:  The question was:  How are inmates

7    notified that their calls are being recorded?

8              THE COURT:  Okay.  Could you just answer the question

9    without stating anything from a manual or anything?

10             THE WITNESS:  Okay.

11             They're notified by three measures.  One of them would

12   be an inmate handbook, the second measure is signs placed up in

13   the facility, and the third is the automated message played at

14   the beginning of each call.

15   BY MR. RODRIGUEZ:

16   Q.  Are recordings of inmate calls maintained by the Department

17   of Corrections?

18   A.  Yes.

19   Q.  Does the Department of Corrections create and maintain

20   reports that provide certain details about recorded inmate

21   calls?

22   A.  Yes.

23   Q.  Investigator McGee, I'm going to hand you a disk and a

24   piece of paper.  The disk has been marked as Government

25   Exhibit 900; the piece of paper, Government Exhibit 900-A,

1    copies of which have previously been provided to defense

2    counsel.

3              Sir, do you recognize Government Exhibit 900, the

4    disk?

5    A.  Yes.

6    Q.  How do you recognize it?

7    A.  I recognize it to be a DVD retained in the inmate calls --

8    well, calls made to a particular number issued from the

9    Department of Corrections legal division.

10   Q.  Have you reviewed the contents of that disk before

11   testifying today?

12   A.  Yes.

13   Q.  What, if any, notations did you make on that disk?

14   A.  After reviewing and examining the disk, I signed and dated

15   it.

16   Q.  And, Investigator McGee, turning your attention to

17   Government Exhibit 900-A, which is the piece of paper, do you

18   recognize that document?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's a call log for numbers placed -- well, for calls

22   placed to a particular number.

23   Q.  Are the records that are part of the two exhibits I have

24   handed you, Government Exhibits 900 and 900-A, records made by

25   a person with knowledge, personal knowledge?

1    A.   Yes.

2    Q.   Were the records made at or near the time of the events and

3    acts recorded?

4    A.   Yes.

5    Q.   And were the records kept in the course of the Department

6    of Corrections' regularly conducted business activities?

7    A.   Yes.

8              MR. RODRIGUEZ:   Thank you, your Honor.   The government

9    is not offering them at this time.

10             THE COURT:   Okay.   Thank you.

11             Mr. Kaye, anything?

12             MR. KAYE:   I have a brief voir dire of the witness,

13   though?

14             THE COURT:   Yes.

15             MR. KAYE:   This is actually cross.

16             THE COURT:   Yes, this is cross.

17   CROSS-EXAMINATION

18   BY MR. KAYE:

19   Q.   Good afternoon, sir.

20   A.   Good afternoon.

21   Q.   You said you just started with the Department of

22   Corrections in February of this year?

23   A.   Correct.

24   Q.   How do you know -- withdrawn.

25             On what date was this record created?

1   A.  This record, in particular, that I'm holding, as far as the

2   DVD, was created on September 21st of this year.

3   Q.  On September 21st of this year, a record was created,

4   meaning a copy of something was made?

5   A.  The audio files for the call was pulled and put on the

6   disk.

7   Q.  Okay.  So what is the date of the audio call?

8   A.  The date of the call itself was November 14th, 2017.

9   Q.  Well, given that you were not employed -- you were not

10  employed by the Department of Corrections in November of 2017,

11  were you?

12  A.  Correct.

13  Q.  So, given that you were not employed on the date that the

14  record was created, how is it that you can tell the jurors here

15  that you know that it was created and made by a person with

16  knowledge?

17  A.  Well, the call itself was made on November 14th, 2017.  The

18  record was created on September 21st, 2018.

19  Q.  Okay.  But, therefore, the record was not created

20  contemporaneously to the call, true?

21  A.  I don't understand your question.

22  Q.  The record was not created at or near the time that the

23  call it's documenting was made?

24  A.  When any call initially is placed from a Department of

25  Corrections facility, it's saved on a secured server at or

I9PKMAT4

1    around the time of the call itself.  At any given time, an

2    investigator within the Department of Corrections can pull that

3    call, whether it be the day after or two years prior -- two

4    years after the date itself.

5    Q.  But the call that the record reflects was ten months before

6    the record was created, true?

7    A.  Right.  The inmate placed the call at a particular date,

8    and the recording itself was put on a disk and created on

9    September 21st, 2018.

10           MR. KAYE:  So the defense objects that this is not an

11   appropriate record for a business record, given that it's not

12   contemporaneous to the happening of the event.

13           THE COURT:  Okay.  It hasn't been moved into evidence

14   yet, but we'll address that if and when it is.

15           Any other questions?

16           MR. KAYE:  No.

17           MR. RODRIGUEZ:  Not from the government, your Honor.

18           THE COURT:  Thank you, sir.  You may step down.

19           (Witness excused)

20           THE COURT:  The government may call its next witness.

21           MR. RODRIGUEZ:  Your Honor, before the government

22   calls its next witness, the parties have reached a stipulation

23   on certain facts.  May the government read the stipulation to

24   the jury?

25           THE COURT:  Yes.

I9PKMAT4

1          MR. RODRIGUEZ:  Thank you.

2          May I publish, your Honor?

3          THE COURT:  Yes.

4          MR. RODRIGUEZ:  The parties have stipulated as

5     follows:

6          "On or about August 3, 2012, Leonard Mathews, the

7     defendant, was convicted in Bronx County Supreme Court of a

8     criminal sale of a controlled substance, specifically crack

9     cocaine, in or near school grounds, in violation of New York

10    Penal Law Section 220-44(2), a crime punishable by imprisonment

11    for a term exceeding one year."

12         Paragraph 2 of the stipulation:  "On or about

13    November 16, 2017, Juan DeJesus pled guilty to two counts of

14    attempted murder in the second degree, in violation of New York

15    Penal Law Sections 110 and 125.25(1), one count related to a

16    shooting on October 20, 2017, in the Bronx and one count

17    related to the stabbing of Ciara Edwards on October 21, 2017,

18    in the Bronx."

19         Paragraph 3 of the stipulation says:  "On or about

20    July 23rd, 2013, Juan DeJesus pled guilty to robbery in the

21    second degree, in violation of New York Penal Law Section

22    160.10(1), and petit larceny, in violation of New York Penal

23    Law Section 155.25."

24         Paragraph 4:  "On or about October 28, 2015, Juan

25    DeJesus pled guilty to arson in the third degree, in violation

I9PKMAT4

of New York Penal Law Section 150.10."

Paragraph 5:  "On or about October 28, 2015, Juan DeJesus pled guilty to attempted gang assault in the first degree, in violation of New York Penal Law Sections 110 and 120.07."

Paragraph 6:  "On or about March 6, 2014, Juan DeJesus pled guilty to robbery in the second degree, in violation of New York Penal Law Section 160.10(2)(a), and petit larceny, in violation of New York Penal Law Section 155.25."

The third and last page contains paragraph 7, which says:  "It is further stipulated and agreed that this stipulation, as Government Exhibit 1001, is admissible in evidence as a government exhibit at trial."

It's dated September 22nd, 2018.  It's signed by myself, on behalf of the United States Attorney, and by Mr. Kaye, on behalf of the defendant.

THE COURT:  You move 1001 in evidence?

MR. RODRIGUEZ:  Yes, your Honor.

THE COURT:  1001 is received as a stipulation.

(Government's Exhibit 1001 received in evidence)

(Continued on next page)

I9PKMAT4

1              MR. GENTILE:  Your Honor, the next witness the United

2    States calls is Altagracia Coleman.

3              MR. KAYE:  Excuse me, your Honor.  May we approach?

4              THE COURT:  Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9PKMAT4

1          (side bar)

2          MR. KAYE:  Judge, I am sorry to ask to you to approach

3    but this witness was sitting in the courtroom all morning.  I

4    think the witness maybe was here yesterday too.

5          MR. GENTILE:  No, that's not correct.

6          MR. KAYE:  She is sitting here listening to other

7    witnesses testify.  I didn't know she was a witness.  I'd have

8    to think which witnesses she heard and whether or not it could

9    color her testimony in any way but we object to that.  I think

10   that's just highly improper.

11         MR. GENTILE:  Your Honor, first of all, the witness

12   was, the first time she is here was today.  She didn't realize

13   that she couldn't sit in the courtroom because she's from out

14   of town.  She is from Upstate New York.  She was asked to come

15   pursuant to a subpoena.  She showed up this morning, later this

16   morning and sat it the courtroom because that's what she

17   thought she was supposed to do.  We had no way of getting in

18   contact with her direct.  We only had her work phone, so we

19   couldn't tell her not to sit in the courtroom.  When she came

20   here she sat in the courtroom.  She was here I guess probably

21   about an hour and when I saw her we asked her to leave so.

22         THE COURT:  What's the testimony about?

23         MR. GENTILE:  She is the individual who took the

24   statement from Juan DeJesus when he was in prison when he was

25   being processed and paid the admission.

I9PKMAT4

1          THE COURT:  OK.  Do we know, just so it's clear on the

2   record, during whose witnesses testimony she was in the

3   courtroom?

4          MR. GENTILE:  I believe it was after, right before

5   Detective Horan.  Actually, no.  I'm sorry.  It was before

6   Abdul-Jabbar.  So she heard one witness.

7          THE COURT:  So she heard Abdul-jabar?

8          MR. GENTILE:  No.  She heard Guija.

9          MR. KAYE:  Could we possibly ask the witness how long

10   she was in the courtroom and what testimony she heard?  And I

11   guess we could ask her if that is going to affect her testimony

12   in any way and that may satisfy the record just to be careful.

13          MR. GENTILE:  Your Honor, number one, none of those

14   witness, not even the first three witnesses mentioned Juan

15   DeJesus and certainly open to cross-examination by defense

16   counsel if he wants to ask her on cross.

17          THE COURT:  I don't think there's any testimony in any

18   way related to what she's testifying about or him.

19          MR. KAYE:  I can go into on cross?  You are not going

20   to object to that?

21          MR. GENTILE:  I am not going to object to you asking

22   what she heard when she was in the courtroom.

23          THE COURT:  Thank you.

24          (Continued on next page)

25

I9PAAMAT5                          Coleman - Direct

1          (In Open Court)

2               THE COURT:  All right.  Mr. Gentile.

3               MR. GENTILE:  Thank you, judge.

4     ALTAGRACIA COLEMAN,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7     DIRECT EXAMINATION

8     BY MR. GENTILE:

9     Q.  Good afternoon, Ms. Coleman.

10    A.  Good afternoon.

11    Q.  Before we get into the subject matter, what time did you

12    arrive at the courthouse today?

13    A.  Approximately, close to ten o'clock.

14    Q.  And where did you respond to initially?

15    A.  I sat in the second row.

16    Q.  OK.  And did you -- how long were you here for in the

17    courtroom?

18    A.  Before the detective told me to wait outside, probably an

19    hour.

20    Q.  OK.  All right.  Thank you.

21          Where are you employed, Ms. Coleman

22    A.  I'm employed by the New York State Department of

23    Corrections.

24    Q.  And approximately, how long have you been with the New York

25    State Department of Corrections?

I9PAAMAT5                    Coleman - Direct

1   A.  Approximately, ten and a half years.

2   Q.  And what's your title with the Department of Corrections?

3   A.  Offender Rehabilitation Coordinator.

4   Q.  OK.  What facility do you work at with the Department of

5   Corrections?

6   A.  Downstate Correctional Facility in Fishkill, New York.

7   Q.  And approximately, how long have you been with Downstate

8   Correctional Facility?

9   A.  During my entire stay, ten and a half years.

10          MR. KAYE:  Sorry.  How many years, ma'am?

11          THE WITNESS:  Ten and a half years.

12          MR. KAYE:  Thank you.

13  Q.  Feel free to move the microphone.

14          Ms. Coleman, are you familiar with the process for

15  placing inmates in New York State Correctional facilities?

16  A.  Yes.

17  Q.  What are some of the factors considered by the New York

18  State Department of Corrections when making placement

19  decisions?

20  A.  When an inmate comes to our facility they get mental health

21  clearance, medical clearance.  In my job as an offender

22  rehabilitation coordinator is to read their entire criminal

23  histories from the rap sheet down to the presentencing report,

24  as well as the commitment papers.  So I get the entire case and

25  then I interview the inmate.  So my job is to tell them what

1    prison they're going to.

2    Q.  OK.  What are some of the reasons that you conduct

3    interviews like that?

4    A.  Well, we basically, need to get clearance obviously, if

5    they have any medal issues mental health issues.  For me I need

6    to make sure that the case is complete in terms of their -- now

7    my job is to read like I said the rap sheet and their

8    presentencing report, write a synopsis of their criminal

9    record, as well as why they're there and make determination

10   based on that as to whether they're going to a minimum, medium

11   or a maximum facility.  So do the paperwork one day and then

12   the following day I do the interview with the inmate.

13   Q.  Do the responses the inmate provides affect the services he

14   or she receives as to the Department of Corrections?

15   A.  Yes.

16   Q.  Can you explain how so?

17   A.  For example, if an inmate has severe mental health problems

18   that can only go to certain facilities that are going to

19   facilitate whether they're on dialysis or chemo, the facility

20   they are going to be cleared to our facility they go to.  So we

21   all work to get a medical mental health and myself as to what

22   facility they're placed in.

23   Q.  Do you rely on a checklist or a questionnaire to conduct

24   these interviews?

25   A.  I do.  The interview process consists of asking them

1   whether they have any medical issues, mental health issues just

2   in case they forgot to tell the medical people.  So we do kind

3   of like a doublecheck with each other, as well as their

4   education, how far they've completed their education, the

5   motive for the crime that they're there.  So this is my

6   interview that, this is what it consists of, as well as whether

7   they belong to a gang.

8   Q.  OK.  And is -- what is important?  Why is it important to

9   know about an inmate's gang affiliation during the interview

10  process?

11  A.  Well, we take that very, very seriously in state prison

12  because it's obviously for, we are responsible for inmate's

13  safety, as well as the safety of the civilians and the staff.

14  Q.  Ms. Coleman, were you working at the Ulster County

15  Correctional Facility in January of 2018?

16  A.  I was.

17  Q.  I'd like to direct your attention to January 10th of 2018.

18  Did you conduct an interview of an inmate by the name of Juan

19  DeJesus on that day?

20  A.  I did so.

21  Q.  Did you ask DeJesus about whether or not he was a member of

22  a gang?

23  A.  Yes, absolutely.

24  Q.  And what was his response?

25  A.  He acknowledged that --

1          MR. KAYE:  Note my objection, your Honor, to the

2     hearsay.

3          THE COURT:  Noted.  Overruled.

4          You can answer it.  Continue your answer.

5     A.  Yes.  One of the questions during is, Are you a gang

6     member?  And whether they acknowledge or deny it, I write down

7     precisely what the inmate answers.

8     Q.  And was this the only time DeJesus told you about his gang

9     affiliation?

10    A.  No.  At the end of the interview I conduct a 63

11    questionnaire and there are four questions at the beginning of

12    that questionnaire.  Are you a gang member?  And again, whether

13    they deny it I still have to advise them that while they are in

14    state custody if they are found to be involved in any gang

15    activity that they would be in violation of Rule 105.13 which

16    they can face disciplinary actions as a result of being caught

17    in any gang activity.  So I do have to advise them of the

18    rights, as well as there are four questions in that

19    questionnaire is, Are you a gang member?  Have you ever been a

20    gang member?  In the past two years have been a gang member?

21    So they kind of rephrase the question during the time in this

22    questionnaire.  And he acknowledged gang membership.

23    Q.  Thank you.

24         Do you record this information?

25    A.  Yes, in writing, absolutely.

Q.   Describe this process whereby you take that information and what you do with it.

A.   OK.  That question, we just start gathering that information probably in the last four years.  It's called the Compass Assessment and it's a tool used by the Department of Corrections to place inmates in programs whether they're educational or maybe they have aggressive tendencies depending on what the results of their social isolation, et cetera.  So it covers an array of -- it produces a bar chart for us.

Q.   But when you elicit the information from the inmate, how do you record it?

A.   Through a computer.  It's all done through a computer.  So it's all recorded permanent record on the computer.

Q.   So when the inmate responds to your question, do you put it directly into your computer?

A.   Yes.

Q.   So while you're asking these questions and receiving the responses --

A.   I am entering it into the computer directly because the computer -- yeah, the 63 questions, as well as the interview.

Q.   Do you remember this particular interview?

A.   I do.

Q.   And how many -- Withdrawn.

     How many interviews of this nature do you do a day or a week in your position?

I9PAAMAT5                          Coleman - Cross

1  A.  I do about, probably about two per day, ten to 12 per week.

2  Q.  So this was back in January 2018, you remember this

3  interview in particular?

4  A.  I process a lot of cases and this one I remember in

5  particular because Mr. DeJesus's crime was very serious and

6  when I asked him for the motive of his crime I, normally the

7  robberies and the drugs, I always, I don't pay much attention

8  but this was someone who was almost killed and the reason he

9  gave me was --

10             MR. KAYE:  Objection.

11             THE COURT:  Sustained.

12             MR. GENTILE:  No further questions, your Honor.

13             THE COURT:  OK.

14             MR. GENTILE:  I am sorry, your Honor.  If I could just

15  address --

16  Q.  When you interviewed Mr. DeJesus about his gang membership,

17  did he specify which gang that he was a member of?

18  A.  He did.  The Bloods.

19             MR. GENTILE:  OK.  Thank you very much.  No further

20  questions.

21             THE COURT:  Thank you.

22             Mr. Kaye.

23  CROSS-EXAMINATION

24  BY MR. KAYE:

25  Q.  Good afternoon.

1   A.  Good afternoon.

2   Q.  Hi.  How are you?

3        Do you have any written material, any paperwork that

4   you brought with you?

5   A.  I'm not allowed to take anything out of the state prison,

6   any paperwork pertaining to the work that I do because just

7   against regulations.

8   Q.  You are not allowed to make a copy?

9   A.  (Witness shook head).

10  Q.  You are not allowed to hit "print"?

11       MR. GENTILE:  Sorry to interrupt, your Honor.  We've

12  produced all the reports that were generated as a result of

13  this interview to the defense.

14       THE COURT:  OK.

15       MR. KAYE:  I acknowledge that I have some paperwork

16  from the government.  I'm just trying to explore what the

17  witness prepared.

18  Q.  This assessment you said is done on a computer; is that

19  right?

20  A.  Yes.

21  Q.  So you're sitting there with the inmate and then you are

22  recording the answers by pressing the key of some sort?

23  A.  Um-hmm.

24       THE COURT:  Please answer aloud.

25  A.  Sorry.  Using a mouse I click on "yes", "no", "not sure".

1   Those are, the questionnaire has the "agree", "disagree", "not

2   sure", "agree" or "strongly agreed".  So there are five

3   choices.

4   Q.  And that was something that you did on January 10, 2018,

5   correct?

6   A.  Correct.

7   Q.  And I am going to just show you this six-page document.

8          MR. KAYE:  May I approach?

9   Q.  Is this the document that you generated?

10  A.  Yes.

11  Q.  OK.  So it can be printed?

12  A.  It can.  I am just not allowed to print it and take it out

13  of the prison.

14  Q.  Maybe if it was subpoena and you --

15  A.  That's correct.  But I have my name on it and I'm the

16  one --

17  Q.  I understand.  OK.  So I am going to ask you just to point

18  out to me where it says "Bloods".

19  A.  It's not in here in my interview process.  This one doesn't

20  record the actual gang membership but my interview does.  Right

21  here.

22  Q.  Oh, so?

23  A.  Right in this.  This is what I use.  This is my cheat sheet

24  from my interview with the inmate.

25  Q.  Where does it say "Bloods"?

1    A.   This is my blank.  I did not -- it's in the computer.

2    Q.   So that's what I'm asking you.  So we understand your

3    testimony, is that you interviewed the gentleman.  The

4    gentleman said he's a Bloods member.  You prepared some

5    paperwork.  The government subpoenaed some paperwork from your

6    employer but no where on the paperwork does it say -- hold on

7    you'll get a chance.  No where on the paper does it say what

8    you said he says?

9    A.   It does.  I can assure you.  There is a copy of my

10   interview that says, that says PSR indicates that blah, blah,

11   blah, that you are a gang member.  And I asked Mr. DeJesus is

12   this true or not and he acknowledged this.  So I would, in the

13   interview it does say that he acknowledged being a Blood

14   because in the interview we do distinctly mention the gang.

15   Q.   OK.  So you have the paper on which you indicated what he

16   said?

17   A.   Correct.

18   Q.   Can you show it to the jury?

19   A.   Oh, it's in the writing because even though I write it like

20   this I, as much as the inmate leaves I do put it into the

21   computer on like the 63 questionnaire which I do directly onto

22   the computer.

23   Q.   So that's my question.  Can we've agree that you have no

24   paper to corroborate what you are saying he said in court?

25   A.   Correct.  But it's in the record of my interview because

1   our interviews are recorded.  Well, on the computer as a

2   permanent record.

3   Q.  I don't want to talk over you.  Did you finish what you

4   wanted to say?

5   A.  No.  That is what I wanted to say, that it is recorded.

6   Q.  So tape recorded?

7   A.  No.  It's recorded on his permanent record.

8   Q.  By certain computer entries that you make?

9   A.  Correct.

10  Q.  And could the government have obtained the paperwork that

11  you generated that you say actually contains the word "gang"

12  and the word "Bloods" from the New York State Department of

13  Corrections if it wanted to?

14          MR. GENTILE:  Your Honor, if I can interject here.

15  Defense is looking at the wrong document.  The other documents

16  we provided in connection with this witness's testimony clearly

17  states that he was a Bloods member.  Happy to provide it to him

18  for a second time.

19          MR. KAYE:  But that's not from this date.

20          MR. GENTILE:  The date is written on the top.

21          MR. KAYE:  So let's look at that.

22          MR. GENTILE:  Labeled 3509.

23          THE WITNESS:  Actually, if you see --

24          (Pause)

25  Q.  You wanted to say something?

I9PAAMAT5                    Coleman - Cross

1    A.  That the date on it this questionnaire is the same date as

2    my interview.

3    Q.  The date on the paperwork I showed you.  OK.

4            So did he tell you that or did you learn that Juan

5    DeJesus has an arrest record going back to 2010?

6    A.  That's correct.

7    Q.  Did he tell you that?

8            MR. GENTILE:  Objection, your Honor.  Hearsay.

9            MR. KAYE:  This is counter to what the government

10   elicited, your Honor.

11           THE COURT:  I'll allow it.

12   Q.  Did he tell you that he had four prior felony convictions

13   for robbery, arson, gang assault and being a fugitive from

14   justice and robbery?

15   A.  That information I gather from the rap sheet, as well as

16   the presentencing report that is provided to the judge who

17   passes the sentence on the inmate.  So that's where I gathered

18   that information from.  That information does not come from the

19   inmate.

20   Q.  So I'm just going to ask you to take a look at all this

21   paperwork that we have.

22           MR. KAYE:  May I approach the witness, judge, to

23   identify where it says --

24   Q.  Just put my nose in it so to speak where it says "Bloods".

25           (Pause)

1             MR. GENTILE:  Your Honor, we didn't get a chance to

2    see what he just handed the witness.

3             MR. KAYE:  Everything you just handed me.

4    A.  It's the interview right there.

5             (Pause)

6    A.  It should be down at the bottom.

7    Q.  Is this what you are referring to?

8    A.  Yes.

9    Q.  OK.  I have interview --

10            THE COURT:  The document is not in evidence please

11   don't read from it.

12   Q.  Did you ask him more about this Bloods gang member such as

13   when he became a Bloods gang member?

14   A.  No.

15   Q.  Did you ask him where he became a Bloods gang member?

16   A.  No.

17   Q.  Is that not important to your assessment?

18   A.  My job is to get his acknowledgment or denial of being a

19   gang member and my -- I don't take that any further.  I am just

20   recording the fact whether he acknowledges or denies being a

21   gang member.

22   Q.  OK.  Did he admit to being a Bloods gang member at a

23   certain date or on a certain date?

24   A.  On the date of the interview.  I only get to see this

25   inmate once.  I work at a reception center.  So they don't stay

I9PAAMAT5                         Coleman - Cross

1   there.  I only see them once.

2   Q.  But if the paperwork said he admitted to being a Bloods

3   gang member, was this something after that admitted being a

4   Bloods gang member presently or admitted being a Bloods gang

5   member in the recent past or anything to give the jury some

6   context to when he became or when he was a Bloods gang member?

7   A.  No.  We don't address as to when he became a gang member.

8   Q.  Or when he was --

9   A.  When he came to Downstate Correctional Facility or doing

10  the interview, I was referring to his one and only time he

11  admitted to being a Bloods gang member.

12  Q.  Are you reading off of a form when you ask that question?

13  A.  After you do this over a period of time, you know you get

14  into the routine of asking the same questions because we

15  basically need to know that and that's one of the things that

16  is recorded.  And I know for a fact that the state prison

17  system uses that information to maintain some normalcy to the

18  state prison system.

19  Q.  Can you tell the jurors what the question was that you

20  asked him that elicited the answer "Bloods gang"?

21  A.  With what the question was?  I said to him the

22  presentencing report indicated that in the past you have been a

23  gang member.  And I never record anything but his answer but I

24  still need to advise him of that rights of being in violation

25  of Rule 15.13.  So I still have to, I do record whatever the

1    answer is whether he denies it, I put "deny gang membership".

2    Q.  What was the question you asked that elicit --

3    A.  "Are you a Bloods gang member"?

4    Q.  Six words?

5    A.  Um-hmm.

6    Q.  "Are you a Bloods gang member"?

7    A.  Um-hmm.

8    Q.  And he answered "yes"?

9    A.  He acknowledged it "yes".

10   Q.  Did he say yes or --

11   A.  He just said "yes".

12   Q.  OK.  So because you said you have a recollection of this

13   particular interview?

14   A.  Um-hmm, I do.

15   Q.  He said "yes" and it was that the end of it?

16   A.  And then I gave, I do have to advise him of his rights that

17   if I didn't tell him that he is in state custody, if he gets

18   into any trouble or is found to be involved in any gang

19   activity that he would be in violation of Rule number 15.13 and

20   face disciplinary action.

21   Q.  So did you interpret that to mean that he's a Bloods gang

22   member then --

23            MR. GENTILE:  Objection, your Honor.

24   Q.  -- on January 10, 2018 --

25            THE COURT:  Sustained.

1  Q.  -- when was he is Bloods gang member?

2           MR. GENTILE:  Objection.

3           THE COURT:  Sustained.

4  Q.  Did you ask him when he was --

5           THE COURT:  Don't answer when I sustain the objection.

6  Q.  Do you know if that was a reference to at the current time

7  or back on October --

8           MR. GENTILE:  Objection, your Honor.

9           THE COURT:  Sustained.

10 Q.  Does it matter for purpose of this forum when the inmate

11 acknowledges gang membership?

12 A.  I don't believe so.

13 Q.  All you care about is at some point the inmate was a

14 Bloods, a gang member?

15 A.  Or at the present time when I was interviewing him he

16 claimed that.

17 Q.  Am I correct that many times an inmate becomes a gang

18 member once they're admitted into a facility?

19 A.  That I'm not aware.

20           MR. GENTILE:  Objection.

21           THE COURT:  She answered.

22 Q.  You are not aware of whether or not gangs recruit people

23 that are newly admitted into the facilities?

24           MR. GENTILE:  Objection, your Honor.  This is, I don't

25 know the scope of her --

I9PAAMAT5                         Coleman - Cross

1          THE COURT:  Sustained.

2   Q.  Is there any person within the facility that you know of

3   not by name, by title who's job responsibility it is to

4   determine whether or not gang members are recruiting new

5   inmates to be gang members?

6   A.  No.  I have no information about that.

7   Q.  What facility did you conduct this interview in?

8   A.  Reception Center Downstate Correctional Facility.  That is

9   not a general confinement facility.

10  Q.  What type?

11  A.  It's a reception center.  Inmates come in once they're

12  sentenced by the Court.  They come into us from county jail for

13  processing.

14  Q.  Then they get filtered to a state facility from there?

15  A.  Correct.

16  Q.  How long had Mr. DeJesus been in city custody before that?

17  A.  I'm not sure.  I cannot, without the presentencing report

18  usually that tells me they do come in with a jail time

19  certificate which let's me know how much time you have they've

20  spent a county jail.  But we do not record that because that

21  becomes part of the permanent record.

22  Q.  Could he have become a part of a Bloods gang member while

23  he was in the city jail?

24  A.  I don't know.

25          MR. KAYE:  Thank you.

1          THE COURT:  Any more questions?

2          MR. GENTILE:  Yes, please.  Thank you.

3   REDIRECT EXAMINATION

4   BY MR. GENTILE:

5   Q.  Ms. Coleman, the information on an inmate's criminal

6   history, do you receive a when the inmate comes into custody or

7   comes to you?

8   A.  Yes.

9   Q.  And was that the case here?

10  A.  Yes.  I did a presentencing report and as well as the

11  entire criminal rap sheet history or New York State and any

12  other states outside of New York.

13  Q.  The report that you prepared in connection with your

14  interview on DeJesus do you know what type of information is on

15  it?  Is your name on it?  Do you sign it?

16  A.  All the information that I gather, yes, it has my name on

17  it.  I have a code number that I use, so my name is on every

18  piece of information that's generated at Downstate Correctional

19  Facility.

20  Q.  So your name is on his report, as well?

21  A.  Absolutely.

22  Q.  Would it be dated, as well?

23  A.  Absolutely.

24  Q.  Would the information about the inmate's gang affiliation

25  be recorded, as well?

1    A.  Yes.

2              MR. GENTILE:  No further questions.

3              THE COURT:  OK.  Thank you, ma'am.  You may step down.

4              Is government ready for its next witness?

5              MR. RODRIGUEZ:  Yes, your Honor.

6              The government calls Detective Paul Jeselson.

7     PAUL JESELSON,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. RODRIGUEZ:

12   Q.  Good afternoon, sir.

13   A.  Good afternoon.

14   Q.  Where do you work?

15   A.  I'm employed by New York Police Department.

16   Q.  What is your title there?

17   A.  I'm a detective.

18   Q.  Are you a detective of a particular grade?

19   A.  First Grade Detective.

20   Q.  Is that the highest ranking detective?

21   A.  Yes, it is.

22   Q.  How long have you worked with the New York Police

23   Department?

24   A.  I have been employed for over 21 years by the New York

25   Police Department.

I9PAAMAT5                    Jeselson - Direct

1    Q.  What units of the NYPD have you worked in?

2    A.  Currently, I'm assigned to the State Street Task Force

3    which is a task force comprised of NYPD and FBI.  We target

4    violent gangs and street crews in the five boroughs of New York

5    City.  I've been there for approximately one year.  Before that

6    I was assigned 13 years to the Bronx gang squad which we

7    primarily did the same thing, targeted violent street crews and

8    gangs in mostly the Bronx.

9    Q.  And prior to working in the Bronx gang squad, did you work

10   in any other units of the NYPD?

11   A.  I was assigned to the 28 Precinct.  I was in the 28

12   Precinct for approximately seven years.  I was in the Street

13   Narcotics Enforcement Unit which targeted street-level

14   narcotics and the Tracer Unit which targeted street-level

15   narcotics and quality of life violations.

16   Q.  Detective Jeselson, in connection with your work, have you

17   become familiar with an organization known as the "United

18   Bloods Nation"?

19   A.  Yes.

20   Q.  I am going to refer to that organization today for your

21   testimony as "The Bloods".  Is that OK?

22   A.  That's fine.

23   Q.  Are there articles and periodicals with information

24   regarding the activities of the Bloods?

25   A.  Yes.

1  Q.  Have you reviewed some of those materials to stay current

2  on practices and activities of The Bloods?

3  A.  Yes.

4  Q.  Are there law enforcement databases that contain

5  information regarding the activities of the Bloods?

6  A.  Yes.

7  Q.  Have you reviewed information from those databases to stay

8  current on the practices and activities of The Bloods?

9  A.  Yes.

10  Q.  Have you worked on investigations involving members or

11  associates of The Bloods?

12  A.  Yes, I have.

13  Q.  Approximately, how many such investigations?

14  A.  Probably, somewhere around ten.

15  Q.  Of those ten investigations, how many, if any, were you the

16  lead investigator?

17  A.  Approximately, three or four.

18  Q.  And approximately, what was the length of those

19  investigations?

20  A.  Anywhere from six months to about a year, year and a half.

21  Q.  During the course of those investigations, have you spoken

22  to other law enforce the personnel about The Bloods?

23  A.  Yes.

24  Q.  What sort of have investigative techniques have you used

25  over the years in your investigations involving Bloods?

1   A.  The briefing of people arrested, confidential informants,

2   controlled buys, undercover buys, wiretaps, social media

3   searches, social media warrants.

4   Q.  You mentioned social media, a few times.  Let's start

5   there.  Do you sometimes review social media connection with

6   your investigations?

7   A.  Yes.

8   Q.  Why do you do that?

9   A.  Because social media is being updated by the members

10  themselves gives me basically real time.

11  Q.  What types of social media do you review in connection with

12  these investigations?

13  A.  Basically, Facebook and YouTube.

14  Q.  Have you reviewed information from social media accounts

15  maintained by suspected members and associates of the Bloods?

16  A.  Yes, I have.

17  Q.  Approximately, how many such accounts?

18  A.  It's hard to estimate because it's an ongoing thing.

19  Sometimes I'll keep checking the account to see what's updated.

20  So maybe of different people, a hundred-ish maybe.  It's an

21  estimate.

22  Q.  Do Bloods social media accounts that you've reviewed tend

23  to remain unchanged over time?

24  A.  Can you repeat that?

25  Q.  Do the accounts that, the social media accounts of

1    suspected Bloods members and associates, do they tend to remain

2    unchanged over time?

3    A.  No.  They change.  They change the screen name.  They

4    change pictures, stuff like that.

5    Q.  Detective Jeselson, have you participated in physical

6    surveillance of suspected members and associates of the Bloods?

7    A.  Yes, I have.

8    Q.  Approximately, how many in total have you done that?

9    A.  An estimate, 50 to 100.

10   Q.  Why do you conduct such physical surveillance of The Bloods

11   members and associates?

12   A.  Cause during the course of investigations we have

13   undercovers out there, confidential informants.  We're

14   listening go wire calls, trying to intercept drugs or firearms.

15   So we're out there on the street surveilling, making sure one

16   of the undercover the confidential informants are all right if

17   they're purchasing drugs or firearms and just in general

18   watching the members, see where they're selling and who they

19   are associating with.

20   Q.  I believe you mentioned wiretaps a few times.  What is a

21   wiretap?

22   A.  Wiretap is a court authorized interception of someone's

23   phone.

24   Q.  Have you participated in wiretaps in which communications

25   by members and associates of Bloods were intercepted?

1    A.  Yes.

2    Q.  Approximately, how many times?

3    A.  Called or?

4    Q.  Let's start with -- well, have you participated at all in

5    such wiretaps?

6    A.  Yes.

7    Q.  Approximately, how many different phone lines for wiretaps

8    related to your associates and members of Bloods have you

9    participated on?

10   A.  I am going to estimate seven to ten.

11   Q.  What about receptive communications on those lines?

12   A.  Over a thousand.

13   Q.  You review some of those communications?

14   A.  Yes.

15   Q.  Have you participated in interviews of members and

16   associates of the Bloods?

17   A.  Yes.

18   Q.  Approximately, how many such interviews?

19   A.  50-ish estimate.

20          MR. RODRIGUEZ:  Your Honor, at this time the

21   government offers Detective Jeselson as an expert witness on

22   the Bloods.

23          MR. KAYE:  Brief voir dire?

24          THE COURT:  Yes.

25   VOIR DIRE EXAMINATION

1    BY MR. KAYE:

2    Q.   Detective, when was the first time you testified in federal

3    court as an expert in the Bloods?

4    A.   First time?  Here today.

5    Q.   Today?

6    A.   Correct.

7    Q.   And prior to today, how many judges of any court have found

8    that you were an expert on this topic?

9    A.   On the Bloods?

10   Q.   Right.

11   A.   None.  Today.

12   Q.   So this is your maiden voyage, so to speak?

13   A.   On The Bloods?

14   Q.   Right.

15   A.   Sure.

16   Q.   Aren't you primarily an expert in the Trinitarios gang?

17   A.   I am an expert in the Trinitarios gang but over my 14 years

18   on doing all gangs I've become quite a knowledgeable on The

19   Bloods also.

20   Q.   Well, when did you start acquiring knowledge about The

21   Bloods entity?

22   A.   So back in -- I was assigned a gang back in 2004.  I did

23   primarily non investigative stuff.  We targeted violent areas.

24   In 2007 I became partners with Detective John Keely who was the

25   investigator who investigated O.G. Mack who was the founder of

I9PAAMAT5                    Jeselson - Direct

1   The Bloods on the east coast in New York.  So, for two years I

2   was partnered with Detective Keely and we quite often spoke

3   about his Bloods case, how he took down O.G. Mack.

4   Q.  And that was in 2007?

5            MR. RODRIGUEZ:  Objection, your Honor, to scope.

6            THE COURT:  Overruled.

7   Q.  That was in 2007 that you started learning from your

8   partner Detective Keely?

9   A.  2007-ish I started working with him and we were in the car

10  everyday together.

11  Q.  So the information that forms the foundation of your

12  knowledge came from speaking to another police detective?

13  A.  Well, I also testified in the O.G. Mack case before that in

14  federal court.

15  Q.  Did you testify as an expert or as a fact witness?

16  A.  As a fact witness.

17  Q.  So you learned things as a fact witness about The Bloods

18  gang?

19  A.  Well, you hear from other people and you investigate.  And

20  when I was part of the 28 Precinct we, during our arrests we

21  arrested some members of The Bloods.  But when I got to Gang in

22  2004 we were investigating all gangs in the Bronx.

23  Q.  I'm trying to understand and if you could tell us what is

24  it that you learned that an average person could not have

25  determined on their own?

1    A.   Well, I debriefed a lot of confidential informants that are

2    members of The Bloods.  I debriefed prisoners that were

3    arrested that were members of The Bloods.  And a lot of times

4    they give information, a lot of cooperating witnesses down here

5    in federal court.  Conducted numerous cases, assisted in

6    numerous cases with the Bloods intercepted phone calls by

7    members of The Bloods and associates, purchased drugs off of

8    members and associates.

9    Q.   And have you ever been proffered by any prosecutor as an

10   expert in The Bloods before today?

11   A.   Proffered before today?

12   Q.   Yes.

13   A.   No.

14   Q.   You haven't testified but has any prosecutor asked that you

15   be deemed an expert previously?

16   A.   No.

17   Q.   So you are not saying you've been denied expert status.

18   It's just nobody's ever asked you before?

19   A.   Correct.

20   Q.   How do you make yourself available?  How do you make

21   yourself known to the government as a potential expert in this

22   field?

23            MR. RODRIGUEZ:  Objection.

24            THE COURT:  Sustained.

25            MR. KAYE:  Judge, we object to the expert status.

1    Well, no, I don't need to make a record.  The Court has heard

2    it all.

3            THE COURT:  Your objection is noted.

4            I deem the expert qualified for purpose of testifying

5    as an expert on The Bloods.

6    BY MR. RODRIGUEZ:

7    Q.  Detective Jeselson, when approximately was the United

8    Bloods Nation founded?

9    A.  In 1993.

10   Q.  Where was The Bloods founded?

11   A.  Rikers Island.

12   Q.  How was it founded?

13   A.  O.G. Mack who is Omar Portee founded The Bloods along with

14   another member O G dead eye.  They were incarcerated at the

15   time and there was, they formed The Bloods in New York to

16   protect themselves against other rival gangs inside Rikers

17   Island.

18   Q.  You mentioned that they formed it in New York.  Previously

19   had there been a Bloods presents in the east coast?

20   A.  No.

21   Q.  Where are some of the places that The Bloods operate

22   outside of Rikers Island?

23   A.  Outside?  California, New York or --

24   Q.  Geographically?

25   A.  They were founded in California but there's a west

1   coast/east coast -- Well, there's west side, east side, south

2   side and mid side and that's Chicago, New York, California and

3   another one.  That's their primary.

4   Q.  Within New York?

5   A.  And Texas.

6   Q.  Excuse me.  Within New York where are the Blood activities

7   limited to a particular borough?

8   A.  No.  They're citywide.

9   Q.  Do The Bloods have any particular rivals?

10  A.  Yes.

11  Q.  Who?

12  A.  Mainly, The Crips.

13  Q.  Are you familiar with the term "set" in connection with The

14  Bloods?

15  A.  Yes.

16  Q.  What is that term "set" mean in this context?

17  A.  It's basically a subset.  It's a group underneath The

18  Bloods.

19  Q.  What are some examples of Bloods sets that currently

20  operate in the New York area?

21  A.  Mac Ballers Brims, Hounds, Milla, Bounty Hunters, G-Shine.

22  There's more.

23  Q.  Was one of the sets that you mentioned "Milla"?

24  A.  Yes.

25  Q.  Do Bloods sets typically operate out of specific physical

1   territories?

2   A.  Yes.  So, a lot of times a geographical location will take

3   on a set name.  So it'll be like a neighborhood will have a set

4   name.  Now you can have people from outside the neighborhood

5   because like I said before, a lot of interaction happens in

6   Rikers Island.  So Rikers Island has, is a jail for all five

7   boroughs.  So you have people from Brooklyn, people from the

8   Bronx, people from Manhattan all together while they're

9   incarcerated.  So when they leave they might stay under their

10  set which they're supposed to do.

11  Q.  What kind of hierarchy, if any, is there typically within a

12  Blood set?

13  A.  They use, the lowest will be like is a soldier, then a one

14  star general, two star, three star, all the way up to five-star

15  general, then an OG and a godfather.

16  Q.  Are you familiar with the term in the context of The Bloods

17  "big homie"?

18  A.  Yes.

19  Q.  What does that term mean within the context of The Bloods?

20  A.  So a big homie would be someone that is higher ranked then

21  you in The Bloods.  You would refer to him as "your big homie"

22  and someone that has rank would refer to someone lower than him

23  as their "little homie".  But also I've seen it used as someone

24  with basically a lot of time in The Bloods.

25  Q.  The someone you are referring to in your testimony with lot

1  of time in the Bloods that's the big homie?

2  A.  Yes, I'm sorry.

3  Q.  What role does a big homie play in a set?

4  A.  He basically keeps everyone together.  He is in charge.

5  Like I said before, it's someone with rank.  So someone with

6  less time or lesser rank would look up to that person.

7  Q.  How does The Bloods refer to members who do not have any

8  leadership positions?

9  A.  "Soldier".

10 Q.  What are some of the basic operational rules of the Bloods?

11 A.  No set jumping.  You are not supposed to jump from set to

12 set.  No sleeping with the enemy.  You have to protect your

13 territory, your neighborhood and your Bloods.  Different

14 things.

15 Q.  The end of your testimony you said "to protect your

16 Bloods"?

17 A.  Yes.

18 Q.  What are you referring to when you say to "protect your

19 Bloods"?

20 A.  So basically, if we're on -- Bloods when they're in the

21 same gang they're supposed to protect their fellow brother.

22 Q.  Thank you.

23      Do members of the Bloods sometimes have financial

24 obligations to The Bloods?

25 A.  Yes.

1   Q.  Can you explain that?

2   A.  So people of lesser rank will pay, basically, dues and

3   money up to other members to put into any other members from

4   the set are incarcerated to send the money upstate into their

5   commissary for them to get different things.

6   Q.  Do Bloods sets sometimes have more specific rules than the

7   rules applicable to all Bloods?

8   A.  Yes.  A lot of sets do make up some of their own rules.

9   Q.  Now just generally speaking, how are the rules and

10  obligations of the Bloods enforced?

11  A.  How are they enforced?

12  Q.  Yes.

13  A.  Through fear and violence.

14  Q.  Are some of these rules committed down to a writing?

15  A.  Yes.

16  Q.  What about the history of The Bloods, is that typically

17  committed to writing?

18  A.  Yes.

19  Q.  What about the history of a particular set?  Is that

20  typically committed to writing?

21  A.  I haven't come across the sets so much but I have seen

22  sets.  But usually it's The Bloods being founded in general but

23  different sets do write down their rules and their lingo.

24  Q.  What do you mean by "lingo"?

25  A.  So different gang members will use code words to talk to

I9PAAMAT5                    Jeselson - Direct

1  each other and different words to kind of make it so the police

2  don't understand and stuff like that.

3  Q.  Why?  You mentioned so the police don't understand.  With

4  respect to lingo?

5  A.  Yes.

6  Q.  Is that your testimony?  With respect to the history of the

7  gangs and the sets, why are those things typically committed to

8  writing?

9  A.  Because they pass it on to newer members and they want them

10  to know their history, what basically, the organization they're

11  joining, the gang they're joining and what it's about, where it

12  was founded and basically their history and someone with rank

13  can G-check someone, check their "G" status and ask them

14  questions about the history and the lingo and the stuff like

15  that.  There's certain phrases that are said by Bloods and

16  responses should come back in a certain way.

17  Q.  You just used a phrase "G-check".

18  A.  Yes.

19  Q.  What did you mean by "G-check"?

20  A.  Basically, questioning someone.

21  Q.  With respect to their potential membership?

22  A.  Yeah, their membership and --

23  Q.  Were you done?

24  A.  Yes.  Who they are and what set they're from and stuff like

25  that.

1   Q.  How does someone become a member of the Bloods?

2   A.  There's multiple different ways.  You could be banged-in

3   which is using violence.  You could be blooded-in which is like

4   beating almost.  A lot of females are sexed-in.  You can be

5   born in if your parents are Bloods.

6   Q.  You testified earlier about a set called "Milla"?

7   A.  Yes.

8   Q.  Is there any significance to that set with respect to the

9   number 21?

10   A.  Zero 21?

11   Q.  What is that significance?

12   A.  Yes.  The Milla is underneath the New York Bloods.  And a

13   lot of sets including Milla used 021 instead of the original

14   031.  031 was the original code for The Bloods.  New York

15   Bloods seemed to be using 021.

16   Q.  Are you familiar with the term "drop" in the context of The

17   Bloods?

18   A.  Yes.

19   Q.  What's "drop" in the context of the Bloods?

20   A.  So a "drop" could be someone's literal child that was born

21   into Bloods or if I have rank and I recruit someone I bring him

22   into The Bloods, then like that's my drop.  That's my Blood

23   drop.

24   Q.  What, if anything, are Bloods members expected to learn

25   about The Bloods when they become members?

1    A.   The rules.

2    Q.   And where do Bloods members learn about these things?

3    A.   Through other members, through the codes and what's been

4    memorialized.

5    Q.   I think you testified earlier about these things being

6    committed to writing?

7    A.   Yes.

8    Q.   How are they committed to whiting?

9    A.   Older members that have been around writing them down.

10   People with rank writing this down and they give them to the

11   new members.

12   Q.   Do members and associates of The Bloods sometimes signify

13   their membership in the gang?

14   A.   Yes.

15   Q.   What are some of the reasons why they would do that?

16   A.   To show loyalty, to show pride, to show other members,

17   rival gang members and other members who they are, what gang

18   they're with.

19   Q.   What are some of the ways that members and associates of

20   The Bloods signify their membership in the gang?

21   A.   Years ago it used to be primarily through bandanas, beads

22   nowadays.  Used to be burn marks.  Now there is tattoos, social

23   media.

24   Q.   Are there any particular types of colors that Bloods

25   sometimes use to display their membership?

1   A.  Most primarily red but some sets use burgundy, green,

2   black.

3   Q.  Are there any particular articles of clothing that are worn

4   by Bloods members to?

5   A.  The Bandanas I mentioned but a lot of times red clothing in

6   general or clothing that depicts your affiliation with the

7   Bloods or a specific set.

8   Q.  What kind of hand signals, if any, are used by members and

9   associates of The Bloods to demonstrate their membership?

10  A.  So it used to be the small "b".  Nowadays recently -- do

11  you want me to demonstrate?

12  Q.  If you can demonstrate, I'll ask you just to demonstrate

13  nice and high and vocalize and describe what you are doing?

14  A.  So I'm putting my index figure and my thumb together in a

15  circle and putting my ring finger, middle finger and pinky

16  finger straight up.  That would be Blood.  But nowadays one of

17  the signs in the NBA for a three-pointer is very similar.  So a

18  lot of Bloods from speaking to them what they're starting to do

19  is starting to drop the middle finger to the thumb and put the

20  index finger straight up, also looking like a "b" but that's to

21  get away from the popularity of the NBA three-pointer.

22  Q.  What kind of handshakes, if any, do members and associates

23  of The Bloods use to display their membership?

24  A.  So a lot of Bloods and a lot of Bloods members have

25  specific handshakes.  I can't do them.

1    Q.   Do members and associates of The Bloods sometimes promote

2    themselves in The Bloods on social media?

3    A.   Yes.

4    Q.   How do they go about doing that?

5    A.   A lot of times you'll see a lot of the hash tags, even on

6    Facebook hash tags, maybe like one I see a lot during one of my

7    other cases is MBF Mac Baller.

8             MR. KAYE:   I have on objection to social media.

9    Anything that the average person can see should not be a

10   subject for an expert.  But if the expert wants to talk about

11   things relating to or required through his expertise to render

12   his opinion, I wouldn't have an objection to that.  I find

13   myself going on social media or a juror can do that, I think

14   that's well outside.

15            THE COURT:   If there are specific things that require

16   an expert to interpret what would be seen even social media, I

17   think that would be within the cannon of an expert.

18   BY MR. RODRIGUEZ:

19   Q.   Detective Jeselson, were you finished with your answer?

20   A.   So one I used to see all the time, MBF, Mac Baller family,

21   so the hash tags and their sets, a lot of times they'll put up

22   videos from YouTube on depicting their set and Blood songs and

23   stuff like that.

24   Q.   I think you testified their hash tagging their sets.  In

25   your experience do Bloods members use hash tags that refer to

I9PAAMAT5                      Jeselson - Direct

1    their particular sets when posting on social media?

2    A.  Yeah.  I see hash tags a lot.

3    Q.  What about emogis or symbols?  Do Bloods members or

4    associates sometimes use specific emogis or symbols when

5    posting content on social media?

6    A.  It depends on the specific person.

7    Q.  You testified earlier about something called a "G-check".

8    A.  Yes.

9    Q.  How is that sometimes performed in-person or in other ways?

10   A.  A lot of times in person and in front of other people.

11   Q.  Can it be performed any other way?

12   A.  I'm used to in-person.

13   Q.  Are there ways in which the actions of a Bloods member can

14   increase the member's position in the gang?

15   A.  Yes.

16   Q.  What are some of those ways, generally speaking?

17   A.  Fighting, shooting, causing violence to rival gang members,

18   protecting your territory.  That'll increase the status, being

19   loyal to the Bloods, paying your dues and kicking up like you

20   are supposed to.

21   Q.  Let me ask you the flip side of the question.  Are there

22   ways in which a member's position can be damaged in The Bloods?

23   A.  Yes.

24   Q.  Generally speaking, what are some of those ways?

25            MR. KAYE:  Note my objection.  Are we talking about

1    the Milla Bloods specifically or the general Bloods Nation

2    here?

3            THE COURT:  Do you want to clarify.

4    Q.  The question is with respect to the Bloods?

5            MR. KAYE:  Defense has an objection because this

6    should being limited I believe to something more geographically

7    relevant.  We've heard testimony that this is an east coast,

8    west coast, Chicago middle America thing and I think that's a

9    little bit far afield of here in the Southern District.

10           THE COURT:  OK.  I am going to overrule the objection.

11           You can continue.

12   Q.  Detective Jeselson, you mentioned "lingo" earlier or "code

13   words".  What are some of the code words that Bloods use when

14   speaking to each other?

15   A.  So --

16           MR. KAYE:  It's the same objection, judge.  It's such

17   a generalization.  Does that apply here?  Is it relevant to

18   this case?  Could the government focus more on the Bronx?  In

19   October of 2017, if possible?

20           MR. RODRIGUEZ:  Your Honor, may we approach?

21           THE COURT:  Yes.

22           (Continued on next page)

23

24

25

1              (side bar)

2              MR. RODRIGUEZ:  Your Honor, the racketeering

3      enterprise, it's defined in the indictment is The Bloods.  This

4      witness has defined The Bloods as the United Bloods Nation

5      which is an enterprise that is essentially east coast presence

6      of Bloods.  Of course it's also relevant that the defendant is

7      charged with being a member of a set of The Bloods called the

8      Milla Bloods.  But the set is part of The Bloods.  So there's

9      no limitation on the presentation of evidence to the specific

10     set of The Bloods.  He is not just a member of the Milla

11     Bloods.  He is a member of the entire United Bloods Nation and

12     that's relevant to the charges in the indictment.

13             MR. KAYE:  Judge, we disagree with that.  I think

14     that's just an unfair assessment.  It's like saying what the

15     entire NFL does as opposed to a specific team.  We're concerned

16     with the specific team here.  The indictment may have very well

17     referred to Bloods but we all know that the accusation here is

18     that the defendant is Milla Bloods from Bronx County.  And it's

19     just so unduly prejudicial to allow an expert who's never been

20     declared an expert before to start infecting this jury with

21     national nationwide gang criteria and customs and practices

22     that may very well have absolutely no applicability to this

23     case, to this defendant and to this jurisdiction.

24             What's the point of asking what these national customs

25     are?  We're concerned with something much closer to home and I

1     would ask that the government focus on that.  This is just

2     really going beyond what the government needs to establish.

3     The jury doesn't need a lesson in the overall Bloods Nation

4     from the expert.  They need relevant evidence.

5              So can the government preface more of its questions or

6     all of its questions with the Milla Bloods?

7              MR. RODRIGUEZ:  The defendant himself in evidence that

8     will be presented from his phone explicitly mentioned using

9     lingo from UBN, The United Bloods Nation.  In fact, he texted a

10    certain code word to another member, the member has questions

11    about what it is and the defendant responds that's UBN lingo.

12    So the defendant's membership in the enterprise is his eye

13    identity is not limited to Milla Bloods.  It's part of The

14    United Bloods Nation.

15             The NFL comparison is completely inapposite.  It's

16    like saying that the Cowboys and Giants are two members of the

17    Bloods under the same umbrella.  It's just not at all relevant

18    to the right framework.  The Milla Bloods exists within the

19    umbrella of the United Bloods Nation.  There is evidence that

20    this defendant associated himself using the lingo of the United

21    Bloods Nation.  That's part of the -- that is the enterprise

22    charged in the indictment.

23             THE COURT:  It is the charged enterprise.  The

24    testimony is that it's a subset of The Bloods.  You'll be able

25    to cross-examine to argue about the limitations about it.  And

I9PAAMAT5                    Jeselson – Direct

1    I think it's relevant testimony and I've qualified him as an

2    expert on The Bloods.  So I am going to allow it.

3                   (In Open Court)

4                   (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2   BY MR. RODRIGUEZ:

3   Q.  Detective Jeselson, the testimony you've given today about

4   the Bloods, and the United Blood Nation and their practices,

5   based on your experience, is that consistent with what you've

6   seen of Blood sets in the Bronx?

7   A.  Yes, for the most part.

8   Q.  We were talking about codewords before the break.  In your

9   experience -- and I think you testified about this earlier --

10  do the Bloods sometimes use codewords when speaking to each

11  other?

12  A.  Yes.

13  Q.  Are you familiar, in the context of the Bloods, with the

14  phrase "putting in work"?

15  A.  Yes.

16  Q.  What does that mean in that context?

17  A.  It's a phrase meaning you've got to put in work, you have

18  to basically cause violence to rivals.

19  Q.  Do members and associates of the Bloods sometimes use the

20  acronym "EKG"?

21  A.  Yes.

22  Q.  What does that stand for in that context?

23  A.  So even though it's EKG -- EKG, it's East Coast Gangsta.

24  The Bloods, a lot, they change the C either to a B or to a K,

25  so it's a way -- because the C is the Crips' symbol, so it's a

1    way of showing disrespect.  So a common phrase nowadays is to

2    call someone's house their crib, so instead of -- if you're a

3    Blood, you're not going to say I'm going to his crib, you're

4    saying I'm going to his brib.  They'll change the C to a B.

5    And I've also seen that more recently with a K instead of a C.

6    Q.  When Bloods are writing to one another, will they sometimes

7    not use the letter C?

8    A.  They'll change it to primarily a B or cross out the C.

9    Q.  For reasons that you were just testifying about?

10   A.  Yes.

11   Q.  Detective Jeselson, are most members of the Bloods men or

12   women?

13   A.  Most are primarily men, but there are women.

14   Q.  Do the Bloods make use of women who are not full members of

15   the Bloods, but merely associates?

16   A.  Again, men --

17           MR. KAYE:  Can I please have my objection noted to

18   such broad testimony, what some members do, what some people

19   do.  I just feel it's so broad, that it's overbroad and bears

20   no direct relationship to the issues before this jury.

21           THE COURT:  Your objection is noted.

22           THE WITNESS:  Not only women, but men, too.  There's

23   associates that aren't full-fledged members, men and women.

24   BY MR. RODRIGUEZ:

25   Q.  Do members of the Bloods sometimes use female associates to

1    assist with the activities of the Bloods?

2    A.  Yes.

3              MR. RODRIGUEZ:  One moment, your Honor?

4              (Pause)

5              MR. RODRIGUEZ:  No further questions at this time.

6    Thank you.

7              THE COURT:  Thank you.

8              Mr. Kaye?

9              MR. KAYE:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. KAYE:

12   Q.  Good afternoon, Detective.  How are you?

13   A.  Good afternoon, sir.

14   Q.  Detective, before you were a first grade detective, am I

15   correct that you were a narcotics officer?

16   A.  So I was a street narcotics enforcement officer in the 28th

17   Precinct, which is a precinct level, it's not a borough level

18   narcotics.  So I wasn't assigned to narcotics.

19   Q.  So you were making street-level arrests for narcotics at

20   that time?

21   A.  Correct.

22   Q.  And then you were promoted to third grade detective, I

23   imagine?

24   A.  I was transferred to the Bronx gang squad, where I was

25   there for approximately three years, and then was promoted to

1   third grade detective.

2   Q.  Are your primary duties now to assist law enforcement in

3   investigating and arresting alleged gang members?

4   A.  Primarily my primary duty is to investigate.  I will assist

5   whoever law enforcement that needs it, but I still investigate.

6   Q.  Am I correct that you have zero involvement in the

7   investigation of this case?

8   A.  Correct.

9   Q.  So at no time did --

10           MR. KAYE:  That's got to be the tenth time I did that,

11   Judge.  Can I put that on the floor?

12  Q.  Were you ever asked by Detective Cole to come in and assist

13  this case in looking at anything, reading any of the evidence,

14  seeing any of the videos, anything of that nature?

15  A.  No.

16  Q.  Is it fair to say that you have worked closely with the

17  team of federal prosecutors in this case and their colleagues

18  on many occasions?

19  A.  This is the first time I'm working with any of the

20  prosecutors, but I've worked with their colleagues before.

21  Q.  Is it fair to say that, in working with them, you develop a

22  close relationship with them, professionally?

23  A.  I think I met them before today twice and spoke to them

24  over the phone twice.

25  Q.  Not specifically these three --

1    A.  Oh, okay.  Yes.

2    Q.  -- you develop a close professional relationship with the

3    other Assistant United States Attorneys from their office?

4    A.  Yes.

5    Q.  Namely, you have worked with Ms. Krissoff from their

6    office?

7    A.  Yes.

8    Q.  You've worked with Mr. Maimin from their office?

9    A.  Yes.

10   Q.  You've worked with Mr. Sini from their office?

11   A.  Yes.

12   Q.  You've worked with Mr. Smith from their office?

13   A.  Yes.

14   Q.  In fact, you traveled down to Washington, D.C., with all of

15   those other federal prosecutors from this office to receive an

16   award at some point, didn't you?

17   A.  I traveled with my old partner, Detective Alfonso, but they

18   were there, also, yes.

19   Q.  I believe you were receiving an award from Jeff Sessions?

20   A.  Correct.

21   Q.  And he's their boss?

22   A.  Correct.

23   Q.  If you know, as a gang expert, is every crime committed by

24   an admitted gang member always a hundred percent of the time a

25   gang offense?

1    A.  No, it's not.

2    Q.  For example, let's assume that I'm taking the train to

3    Barclays Center to see Drake in concert, and there are some

4    gang members on the train, and I accidentally step on one of

5    their toes, and I get beat up.  I'm there with my grandmother.

6            That's not a gang-related offense, is it?

7    A.  It's a gang-related offense, not a gang-motivated offense.

8    Q.  How does that constitute a gang offense, that I'm with my

9    grandmother, and I'm no threat to any of these people?

10   A.  Because it's the gang itself that was together that made

11   you an assault victim.  So because the gang is together, and

12   they assault you, it's related.  If you were another gang

13   member, and they saw that you were another gang member, and

14   they assaulted you, then it would be gang motivated.

15   Q.  But you're telling me that there are times when even gang

16   members can commit nongang-related crimes?

17   A.  Yes.

18   Q.  Okay.  Let me present another scenario to you.

19           Let's say it's a crime of passion.  Let's assume a

20   gang member's wife is having an affair with another man, and

21   the gang member takes his revenge and kills that other man.

22           Is that a gang offense?

23   A.  No.

24   Q.  Well, what's the difference?

25   A.  What's the difference?

I9PKMAT6                        Jeselson - Cross

1    Q.  Between the first example and the second example.  Neither

2    involves --

3    A.  Right.

4    Q.  I'm going to give you a chance.  Neither involves a victim

5    that is gang related.

6    A.  Right.

7    Q.  Now you can tell the jury what the difference is.

8    A.  Sure.

9              So the second one is still gang related, it's not

10   motivated.  Because that gang member is involved, it's

11   automatically related, it's not motivated.  It's not motivated

12   by the gang culture.

13   Q.  What about jealousy, jealousy?  Let's say an attack, an

14   assault, is motivated by a gang member who's just jealous of

15   the success of another person.  Is that gang motivated?

16   A.  Is the other person a gang member?

17   Q.  No.

18   A.  So if you have one gang member, it's always going to be

19   related.  If the second person is a gang member, then it's

20   motivated.

21   Q.  I don't understand.  Can you say -- can you explain that

22   again?

23   A.  Sure.

24   Q.  It sounded like you said the same thing, but I could be

25   wrong.

I9PKMAT6                    Jeselson - Cross

A.  So if there's a gang member involved, it's always going to
be related, gang related.  If the other person is a gang
member, then the definition would be motivated.

Q.  If a gang member is involved, it's always going to be gang
related?

A.  Correct.

Q.  So if A is a gang member, B is not, this is a crime of
passion, in your expert opinion, that's a gang-related assault?

A.  Yes, gang related.

Q.  Don't you have to kind of get into the head of the
individual to know that, to really know what's going on in
someone's mind?

A.  That would be motivation.

Q.  Precisely.

A.  I'm distinguishing between the two.

Q.  I mean, in my scenario where I'm on the train, and I am
going to Barclays, and, you know, I accidentally step on
someone's toe, you don't really ever know what's in the mind of
another person unless you know, unless the person tells you;
everything else is kind of just your best guesstimate, true?

A.  Correct.  But from speaking to gang members in that
situation, a lot of times, they're with their friends.  So
they -- someone steps on them, they're going to -- they feel
the peer pressure to do something.

Q.  Right.  But that's a generalization, Detective?

I9PKMAT6                         Jeselson - Cross

1   A.  Correct.

2   Q.  If we had 17 gang members sitting in this audience, are all

3   17 going to have that same opinion?  Are they all going to

4   share that opinion?

5   A.  Most likely not.

6   Q.  "Most likely not."

7        Let's say I'm a gang member, and I just don't like my

8   neighbor, he's a jerk, and I commit a crime against him.  Is

9   that a gang-motivated offense?

10  A.  If it's just your neighbor, and you're doing something to

11  your neighbor because you don't like them, is it motivated?

12  No.

13  Q.  Is it gang related?

14  A.  Yes.

15  Q.  Just because I'm a gang member --

16  A.  Yes.

17  Q.  -- any crime I commit thereafter is gang related?

18  A.  Yes.

19  Q.  And who says so?

20  A.  It's the definition that we use in the New York City Police

21  Department.

22  Q.  The New York City Police Department believes that to be the

23  case?

24  A.  Correct.

25  Q.  But the New York City Police Department can't get inside

1   every person's head, true?

2   A.   Correct.  But if you look at it, the person is a gang

3   member, so whatever he does is related to himself, which that's

4   why it's gang related and not specifically motivated.

5   Q.   All right.  Let's change the scenario a bit.  Instead of

6   talking about gang members versus nongang members, let's talk

7   about gang member versus gang member.

8   A.   Okay.

9   Q.   Let's say -- I'm going to ask you to assume that you're a

10  gang member, okay?

11  A.   Sure.

12  Q.   And I'm a gang member.  You're a Shark, I'm a Jet.

13  A.   Okay.

14  Q.   Although it's not West Side Story.

15  A.   Gotcha.

16  Q.   I'd like you to further assume that we went to the same

17  elementary school together, we went to the same middle school

18  together, we grew up in the same neighborhood, but we just

19  don't like each other.  It's not gang related, it's not gang

20  motivated.  I think you're a jerk, and you think I'm a jerk.

21  Okay?

22          One day, you just snap, and you beat me up.  Is that

23  gang motivated?

24  A.   Yes.  In that instance that you talk about, a lot of times,

25  even though kids do go to middle school together and high

1    school together, they form their friendships, which are usually

2    two different crews, and that's what causes a lot of the

3    gang-motivated crime, a lot of the crew-related stuff.

4    Q.  Now, let's assume for a moment that you're right.  Let's

5    assume that you're correct.

6    A.  Okay.

7    Q.  We never know if you're correct, because this is your

8    opinion, true?

9    A.  On this story, yes.

10   Q.  This is your subjective best belief –- it's an honestly

11   held belief, but this is just your belief of Detective Paul

12   Jeselson, true?

13   A.  Correct.

14   Q.  It doesn't make it law?

15   A.  No.

16   Q.  It doesn't make it gospel?

17   A.  No.

18   Q.  And others may disagree?

19   A.  Yes.

20   Q.  Now, is it possible for gang members to commit crimes when,

21   in their mind, they have no intention to commit that crime with

22   the purpose of increasing their gang clout?

23            MR. RODRIGUEZ:  Objection, your Honor; 704(b), 403.

24            MR. KAYE:  I'm going to have to look that up.

25            Can the government articulate that for us?

1              MR. RODRIGUEZ:  Your Honor, can we approach?

2              THE COURT:  He's just asking in general.  I don't

3      think he's --

4              MR. KAYE:  I'm not eliciting reputation.

5              THE COURT:  He's not talking about 704(b).  I think

6      he's making the general point.  I think I'm going to give him a

7      little leeway to do it.  Overruled.

8              MR. KAYE:  I've completely forgotten the question.

9      Could I ask the reporter to read it back?

10             THE COURT:  I can read it.

11             MR. KAYE:  Thank you.

12             THE COURT:  "Is it possible for gang members to commit

13     crimes when, in their mind, they have no intention to commit

14     that crime with the purpose of increasing their gang clout?"

15             THE WITNESS:  I'm sorry, your Honor, could you repeat

16     it again?

17             THE COURT:  "Is it possible for a gang members to

18     commit crimes when, in their mind, they have no intention to

19     commit the crime with the purpose of increasing their gang

20     clout?"

21             THE WITNESS:  I guess they can.  A gang member can

22     commit a crime -- can commit a crime without trying to increase

23     his clout.

24     BY MR. KAYE:

25     Q.  Or his position?

I9PKMAT6                         Jeselson - Cross

1    A.  Or his position.

2    Q.  Or can commit a crime without, in his or her mind,

3    intending to maintain their position in the gang, whatever

4    level they are?

5    A.  It's possible.

6    Q.  Can we agree that sometimes it can be difficult to know or

7    determine, with any degree of accuracy, whether a violent act

8    is or is not intended to be --

9            MR. RODRIGUEZ:  Objection.

10   Q.  -- in furtherance of --

11           MR. KAYE:  I'm just going to stop until the Court

12   rules.

13           THE COURT:  Overruled.  I'm going to allow it.

14           Do you want to start again?

15   BY MR. KAYE:

16   Q.  Can we agree that sometimes it can be difficult at times to

17   know or determine, with any degree of accuracy, whether or not

18   a particular violent act is or is not intended to be in

19   furtherance of gang activity?

20   A.  Are you talking about in the person's mind?

21   Q.  Initially, yes.  It's difficult to make that determination?

22   A.  Well, it depends on the circumstance.

23   Q.  Well, can we agree that it's subject to interpretation?

24   A.  It's subject to interpretation depending on the

25   circumstance.

1   Q.  For example, a prosecutor might see a scenario and say,

2   that's in furtherance of gang activity?

3           MR. RODRIGUEZ:  Objection.

4           THE COURT:  Sustained.

5   Q.  A defense attorney may see a scenario --

6           MR. RODRIGUEZ:  Objection.

7   Q.  -- and --

8           THE COURT:  Sustained.  I want to give the jurors a

9   break mid-afternoon break, but are you almost done?

10          MR. KAYE:  No.

11          THE COURT:  Okay.  Let's take ten minutes, folks.

12  Leave your pads on your chairs, please.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE WITNESS:  Do I stay?

3              THE COURT:  Would you step out.  Thank you.

4              THE WITNESS:  No problem.

5              THE COURT:  Do you want to address this objection

6    issue briefly?

7              MR. KAYE:  Is the Court referring to me?

8              THE COURT:  Both counsel.

9              MR. KAYE:  Well, I -- from the defense perspective, we

10   should be given wide latitude to elicit opinion from an expert

11   that weighs in favor of what the defense needs to establish.

12   The government was certainly given very wide latitude to elicit

13   nationwide customs and practices.

14             THE COURT:  Right, but now you've made the point about

15   the idea that gang motivated is a tricky issue to get inside

16   the head of the person, but that's outside the scope of what he

17   was really testifying about.  He was testifying about customs,

18   and signals, and things like that.

19             MR. KAYE:  If you're telling me to stop, okay.

20             THE COURT:  Well, I am telling you to stop.  I don't

21   think it's a 704(b) problem because I don't think he was

22   testifying about the defendant's state of mind.

23             MR. KAYE:  No.

24             MR. RODRIGUEZ:  Your Honor, I think what it is, is

25   it's very close to a jury confusion issue, which is to say:

1    Obviously why this shooting happened and the motivation behind

2    it is a fundamental ultimate issue for the jury to decide.

3    We're getting very close to having the jury believe that not

4    what your Honor's instructions are going to be on motivation

5    are what governs, but the New York City Police Department's

6    detectives, what's gang related/gang motivated.  That's the

7    confusion issue, and that, I think is maybe the better way to

8    frame the government's objection.

9              THE COURT:  Right.  It's a fair point.  I almost

10   interjected.  The fact that the NYPD thinks of something as

11   gang related is irrelevant to charging decisions and certainly

12   irrelevant to how I'm going to instruct the jury about the

13   elements of the offenses.  But you've made your point.  I

14   allowed it, right or wrong, and I think you need to move on

15   from that issue.

16             MR. KAYE:  I'm happy to move on, but I know that the

17   government, in summation, is going to refer to the testimony

18   they elicited from Detective Jeselson, and they're going to ask

19   the jurors to make certain inferences based on his testimony.

20   So I, in fairness, think that I need to lay a proper foundation

21   to support inferences that I'm going to urge the jury to make.

22             THE COURT:  Okay.  But I think you made the specific

23   point.

24             MR. KAYE:  Okay.

25             MR. RODRIGUEZ:  Your Honor, the only thing I'll add to

1    this point:  I think the instruction that your Honor just

2    articulated about the NYPD is an appropriate one.  Whether it

3    happens now or during the jury charge, the government does

4    think that it is appropriate to address this issue.

5              THE COURT:  Okay.  I'm not going do it now, but we'll

6    see how things play out.

7              Do you all want to take ten minutes?

8              (Recess)

9              THE COURT:  Is everybody ready?

10             MR. KAYE:  Yes, your Honor.

11             MR. RODRIGUEZ:  Yes, your Honor.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good afternoon, folks.

3          We have the witness?

4          All right.  Mr. Kaye, you may proceed.

5          MR. KAYE:  Thank you, your Honor.

6   BY MR. KAYE:

7   Q.  Detective, you've told us that the Bloods is a larger

8   national entity, correct?

9   A.  Correct.

10  Q.  And that it has a hierarchal structure as well?

11  A.  Correct.

12  Q.  But local sets aren't necessarily in contact with members

13  of the larger hierarchal leadership, true?

14  A.  Are you talking about, like, different states and stuff

15  like that?

16  Q.  Different states, different geographic locations.

17          Assuming they're not meeting in Rikers Island, there's

18  no, like, meeting, there's no annual meeting, is there?

19  A.  So Bloods do have what they call powwows, which is meetings

20  of the Bloods and a lot of sets.  So if -- just for example, if

21  I'm a particular Blood set, I can have a set in one area of

22  Manhattan and then another area of Manhattan, area of the Bronx

23  and Brooklyn, and those members will travel to those different

24  locations to kind of coordinate and do stuff.

25  Q.  But am I correct that these are independent entities?

I9PKMAT6                    Jeselson - Cross

1   A.   Independent entities of the Bloods?

2   Q.   You told the jury there's Milla Bloods, there's a couple of

3   other different sets.  Are those different sets separate,

4   independent entities unto themselves?

5   A.   So they do function by themselves, but they do, and are

6   supposed to, follow the rules of the larger Bloods

7   organization, UBN, but --

8   Q.   Right, okay.  So they have things a lot of things in

9   common, a lot of rules in common?

10  A.   Correct.

11  Q.   But am I correct that the smaller, local sets have also a

12  tenuous relationship to the larger Bloods Nation?

13  A.   Can you rephrase it?

14  Q.   Well, the local sets may mimic the culture, they may mimic

15  the tattoos, but they are not, on a daily, weekly basis

16  communicating with other larger entities?

17  A.   I mean, that would be their OG or the godfather set's job,

18  to keep communication with the other sets.

19  Q.   And the OG -- did you testify the OG is the overall leader?

20  A.   That's the godfather.  The OG is right below.  If there's

21  no godfather, then the OG --

22  Q.   How many OGs are there?

23  A.   Of a set?

24  Q.   Is there an OG of the Bloods Nation, or does each set have

25  an OG?

I9PKMAT6                         Jeselson - Cross

1    A.  Each set could have an OG -- each set has an OG, and then

2    there's the overall OGs of different areas and OG --

3    Q.  Is OG the ultimate leader of a set?

4    A.  Yes.  Well, godfather, but if there's no godfather, then an

5    OG, yeah.

6    Q.  So is this something that you know with a hundred percent

7    accuracy, that every one of these sets has an OG, and then --

8    what was the next level down?

9    A.  Down from OG?  Five-star general.

10   Q.  Five-star general?

11   A.  A five-star general is usually charge in security and stuff

12   like that, so you --

13   Q.  What's below that?

14   A.  A four-star.

15   Q.  What's below that?

16   A.  Three-star.

17   Q.  And below that?

18   A.  Two-star.

19   Q.  And then lower?

20   A.  One-star.

21   Q.  And then?

22   A.  Soldier.

23   Q.  Soldier?

24        Where does big homie fit in?

25   A.  Like I said before, big homie is what someone would refer

I9PKMAT6                         Jeselson - Cross

1   from a lower rank to someone of a higher rank.

2   Q.  A big homie can mean somebody who's been in the gang for a

3   long time?

4   A.  For a long time or, if I'm a one-star general, my big homie

5   is going to be a two-star general, three-star general, someone

6   above me.

7   Q.  But a big homie is not necessarily a leader in every case?

8   A.  It's a leader of the set, leader of the set.  I wouldn't

9   say -- well, yeah, because your OG is going to be a big homie

10  too.  You understand?  So someone of a lower rank.

11  Q.  It doesn't matter whether I understand; it only matters

12  whether the jurors understand.

13          Isn't "big homie" primarily a West Coast slang term?

14  A.  Well, it was developed on the West Coast, but it was

15  brought to the East Coast.

16  Q.  Well, isn't the term "homie" a very common phrase in

17  modern-day parlance?

18  A.  Yes, but when you're saying big homie in reference to

19  another gang member of the Bloods, you're referring to someone

20  above you in rank.

21  Q.  But nongang friends call each other "homie," don't they?

22  A.  I've heard nongang -- yeah, "this is my homie."

23  Q.  "This is my homie" or "this is my big homie"?

24  A.  Well, "homie," not "big homie."  "Big homie," I hear it in

25  reference to gang terminology.

1   Q.  Well, are you saying that under no circumstances can

2   someone call someone else "big homie," without it having a gang

3   connotation?

4   A.  I'm saying what I have heard.  I've heard people say, "Oh,

5   it's my homie," but as far as "that's my big homie," that's

6   gang slang.

7   Q.  Well, if you know a lot of about gangs, you know a lot

8   about rap music then, right?

9   A.  Yes.  Well, a little bit.

10  Q.  Can we agree that many rappers take the name "Big Homie"?

11  A.  Take the name "Big Homie"?

12  Q.  Yes.

13  A.  Can you give me an example?

14  Q.  I can.  I knew you were going to ask me that.

15  A.  I figured you would.

16  Q.  Have you heard of Big Homie Will, the rapper Big Homie

17  Will?

18  A.  No.

19  Q.  Big Homie Rover?

20  A.  No.

21  Q.  Big Homie Q?

22  A.  No.

23  Q.  Big Homie Squad?

24  A.  No.

25  Q.  Big Homie Coal?

1   A.  No.

2   Q.  The Big Homie Superdave?

3   A.  No.

4   Q.  Are you sure you know about rap music?

5   A.  I told you, a little bit.

6   Q.  Don't even Twitter users have the handle "@bighomie"?

7   You're on social media, you told us?

8   A.  Yes.

9   Q.  Don't you see that, "@bighomie," not gang related, it's

10  just Twitterers?

11  A.  I see "big homie," but I'm investigating gangs, so I see it

12  in reference to gangs.

13  Q.  Okay.  But it's not only in reference to gangs, true?

14  A.  In my opinion, it is -- when they're saying, "that's my big

15  homie," they're talking about rank structure.  That --

16  Q.  Go ahead.  I don't want to interrupt you.

17  A.  Now, can you give me a more specific information on the

18  person so I can look deeper in and see if they are Blood

19  affiliated or something to that nature?

20  Q.  I mean, as a first grade detective and a gang expert, as of

21  today, don't you look at things differently?  I mean, you're

22  looking at these things through the lens of a gang detective?

23  A.  Correct.

24  Q.  So you might interpret it -- to you, it's gang, to somebody

25  else, you know, it may not be gang?  Let's assume it's not

I9PKMAT6                        Jeselson - Cross

1   gang, but you can make a mistake because you're coming at it

2   from the perspective of, I'm a gang detective, true?

3   A.   True, I'm looking at it as a gang detective.

4   Q.   I mean, have you ever seen nongang Instagram members have

5   "big homie" in their Instagram name?

6   A.   No.

7   Q.   You have Instagram?

8   A.   Do I have?  No.  I mentioned before --

9   Q.   You don't even have Instagram?

10  A.   Facebook and YouTube is what I do.

11  Q.   Well, you may want to have get an Instagram account.  IG.

12  A.   Yeah, a lot of people do.

13  Q.   Let me ask you what you know about the Milla Bloods.

14  A.   Okay.

15  Q.   Do you know much about them?

16  A.   So there was an investigation out of my office a couple

17  years ago where I was part of the field team that was out there

18  with a couple operations.  I was not the lead detective on

19  that, but I've spoken to the officers that conducted that case.

20        I was also approached by an officer from parole, who

21  had an informant from the Milla Bloods that was looking to

22  start something, and I handed that off to someone else.

23  Q.   Where are the Milla Bloods, geographically?

24  A.   In the Bronx.  Throg's Neck is a big location.

25  Q.   Is there an OG for the Milla Bloods?

1   A.  Is there an OG?  OG set?  Yes.

2   Q.  OG set?  Or isn't an OG a person?

3   A.  OG of a set, yes.

4   Q.  I'm sorry, we talked over each other.  Say that again.

5   A.  Yes, there is an OG of a set.

6   Q.  So is there more than -- withdrawn.

7           There's more than one Milla Bloods set?

8   A.  Yes.

9   Q.  Who is the OG of the Milla Bloods set in Throg's Neck?

10  A.  I don't know.

11  Q.  Well, who is the five-star?

12  A.  I don't know.

13  Q.  Who's the four-star?

14  A.  I don't know.

15  Q.  Who's the big homie?

16  A.  I don't know.

17  Q.  Can there be more than one big homie?

18  A.  Yes, because you're referring -- someone of a lower rank

19  refers to someone as a higher rank as a big homie.

20  Q.  But below big homie, is there a homie?  Just homie?

21  A.  No.

22  Q.  Is there little homie?

23  A.  No.

24          Yes, there is.

25  Q.  What does that mean?

1  A.  That is someone of a lower rank.

2  Q.  What about the significance of tattoos?  The government

3  asked you about tattoos, correct?

4  A.  I think I responded, tattoos, as part of my answer to one

5  of their questions.

6  Q.  Well, are tattoos a common way that gang members identify

7  themselves?

8  A.  Yes.

9  Q.  Do the Bloods have a certain tattoo that you see with

10 regularity, and allows you to make an identification of a

11 person as a Blood affiliate?

12 A.  There's multiple tattoos that Bloods use.

13 Q.  What are they?

14 A.  Five-point star, tattoos depicting different initials of

15 different sets, a lot -- well, the old school was the dog paw.

16 There's many different tattoos.

17 Q.  So if I were to show you a tattoo, would you be able to

18 opine whether or not that's a gang-related tattoo or

19 nongang-related tattoo?

20 A.  A tattoo?

21 Q.  Yes.

22 A.  I'd be -- yeah.

23 Q.  Excuse me?

24 A.  Yes.

25 Q.  Would a tattoo of a person's shortened version of their

I9PKMAT6                         Jeselson - Cross

1    first name necessarily be a gang tattoo?  Let's say my name is

2    Bruce.  If I had "Bru" on my forearm, would that have gang

3    significance?

4    A.  It depends.  If that's what people call you, if you're in

5    the Bloods and that's what people call you, Bru, Bloody Bru or

6    Bru, something like that, and it's tattooed in red, then --

7    Q.  But if I'm not in the Bloods, I'm not in a gang --

8    A.  I don't --

9    Q.  I mean, if you had a tattoo that said "Paul" on your

10   forearm and you're not in a gang, is that a gang tattoo?

11   A.  No.

12   Q.  It's not a paw, it's not a five-star, it's not one of these

13   customary tattoos associated with the gang, true?

14   A.  Correct.

15   Q.  Would a big homie be somebody that would customarily be

16   heavily tattooed?

17   A.  It depends.

18   Q.  What kind of factors would go into that?

19   A.  I've seen -- I've seen members of the Bloods all tattooed

20   up, some tattoos, and some with no tattoos.

21   Q.  I think you testified on direct examination that a woman

22   can be a gang member?

23   A.  Correct.

24   Q.  I think that's common knowledge, but in terms of Bloods,

25   would that be called a Bloodette?

I9PKMAT6                          Jeselson - Cross

1   A.  Yes.

2   Q.  Is that a term that's still used?

3   A.  I've heard it still used, yes.

4   Q.  Can an 18-year-old woman be a Bloodette?

5   A.  An 18-year-old woman?

6   Q.  Yes.

7   A.  Yes.

8   Q.  I'd like you to assume that a young woman starts a Facebook

9   chat with a Bloods gang member she's never met.  They FaceTime,

10  and then they meet.  And I'd like you to further assume that

11  when they meet, the young woman is wearing a T-shirt of a

12  Bloods set.

13          Do you have an opinion whether it's more likely than

14  not that that woman is a Bloodette?

15  A.  Can you repeat the first -- the beginning?

16  Q.  Absolutely.  The whole thing?

17  A.  Yeah.

18  Q.  Okay.  I'd like you to assume that a young woman starts a

19  Facebook chat with a Bloods gang member she's never met.  They

20  FaceTime, they meet.  I'd like you to further assume that when

21  they meet, the young woman is wearing a T-shirt bearing the

22  name of a Bloods set.

23          Do you have an opinion whether it's more likely than

24  not that that woman is a Bloodette?

25  A.  What's the name of the set?

I9PKMAT6                    Jeselson - Cross

1    Q.   GMB --

2    A.   GMB?

3    Q.   -- in that scenario.

4    A.   Okay.  So I would assume that, she's going to meet a member

5    of the Bloods and she's wearing a set name, that she either

6    wants to join or is an associate.

7    Q.   How common are these shirts?  Are they custom-made?  Can

8    anyone buy them?

9    A.   It depends.  Different sets do make up their own shirts.

10   Q.   That's not something that's household, off the rack?

11   A.   GMB?  Not sure.

12   Q.   Generally speaking, do women gang members also commit

13   violent acts in furtherance of gang activity?

14   A.   Yes.

15   Q.   Are there gangs in Wilkes Barre, Pennsylvania?

16   A.   Say it again.  Sorry.

17   Q.   Are there gangs, Blood gangs, sets, in Wilkes Barre,

18   Pennsylvania?

19   A.   I'm not sure.

20   Q.   Does Pennsylvania have Bloods?

21   A.   Yes.

22              (Continued on next page)

23

24

25

I9PAAMAT7                    Jeselson - Cross

1   BY MR. KAYE:

2   Q.   What about drugs?  Is it more likely than not that gang

3   members commit violence when they're high?

4   A.   When they're high?

5   Q.   Right.

6   A.   Drug use is -- people do commit violent acts when they're

7   high.

8   Q.   Well, could it be that gang members, like non gang members

9   are more likely to lose their inhibitions when they're high?

10            MR. RODRIGUEZ:  Objection.

11            THE COURT:  Sustained.

12   Q.   Do Bloods always have to wear something with red or bright

13   colors when they're outside?

14   A.   No.

15   Q.   Is a big homie more likely than not to wear red or a bright

16   color when he's outside?

17   A.   Depends on the person.  Most of the big homies are known in

18   their area but a lot of them would like to represent the set

19   and flag.

20   Q.   Would a big homie have a friendship with a crip?

21   A.   Back in the days, no.  But nowadays, yes, even though into

22   The Bloods -- you are not supposed to be friends with Crips.

23   But I have had where Bloods and Crips are friends.

24   Q.   So, how would we know if somebody's a crip?  Do they have

25   distinctive clothing?

I9PAAMAT7                     Jeselson - Cross

A.   Crips?  Usually blue, purple.  They also have blue beads.
They also have tattoos that are distinctive to them, social
media.

Q.   Wouldn't a gang member risk losing credit with a gang by
acting foolishly?

A.   What do you mean "foolishly"?

Q.   Impetuously?

A.   Can you be specific or foolishly?  It depends.  Foolishly
could be shooting off a gun.  Foolishly could be robbing.

Q.   Let's take your example.  Wouldn't a gang member actually
lose status, lose credibility by shooting off a gun for a
stupid meaningless reason?

A.   No.  It depends on the circumstance.  If he's shooting at
rivals or if he is shooting in a opposing drug territory or
something of that nature, it's showing that he is willing to
protect the turf and it's also showing that he is willing to
use a gun.

Q.   So can we agree then it's really dependent upon the
situation and the surrounding circumstances as to whether or
not the use of a gun by a Blood on any particular occasion is
likely to increase or affect, decrease that member's status in
the gang?

A.   Well, if you're using gun it's most likely going to
increase.  That's why I asked about foolishly.  So if he's
using a gun and willing to use gun it's more likely going to

1   increase, it's going to show his fellow gang members that he is

2   willing to use a gun and protect territory and stuff like that.

3   Q.  Would that mean that other fellow gang members approved of

4   that one gang member's use of the gun?

5           MR. RODRIGUEZ:  Objection.

6           THE COURT:  Sustained.

7   Q.  Do all gang members have -- Withdrawn.

8           Do all gang members agree or have to agree if one of

9   them using violence?  Do they get -- do they need permission?

10          MR. RODRIGUEZ:  Objection.

11          THE COURT:  Sustained.  Rephrase it.  I don't think

12  you want to ask about all gang members.

13  Q.  When a gun is used is it more likely than not that the

14  person using the gun has conferenced the use of the gun and

15  gotten permission to do it or is it more likely that the member

16  has just gone off on his or her own or depending on the

17  situation, you would just be speculating?

18          MR. RODRIGUEZ:  Objection to form.

19          THE COURT:  If you understand and you have expertise

20  on the matter, then you can answer.

21  A.  So depending on the situation, depending who that person is

22  shooting at, sometimes the other members authorize it.

23  Sometimes the other members don't, but know about the gun.  It

24  could be a gun store on the block and stuff like that there's

25  an agreement that that's for protection.

1    Q.  For protection, not for affirmative act, as opposed to an

2    affirmative act of violence?

3    A.  No.  When I say "protection", I mean other rivals coming.

4    It's there for the use of who's ever part of that set.

5                MR. KAYE:  Thanks for your time.

6                THE WITNESS:  You are welcome.

7                THE COURT:  Thank you.  Any redirect?

8                MR. RODRIGUEZ:  Nothing further from the government,

9    your Honor.

10               THE COURT:  Thank you.  You may step down.

11               THE WITNESS:  Thank you, your Honor.

12               THE COURT:  Are you prepared with the next witness?

13               MR. GENTILE:  We are, your Honor.

14               The United States calls Detective Elvis Cole.

15    ELVIS COLE,

16         called as a witness by the Government,

17         having been duly sworn, testified as follows:

18    DIRECT EXAMINATION

19    BY MR. GENTILE:

20    Q.  Good afternoon, detective.

21    A.  Afternoon.

22    Q.  Where are you employed?

23    A.  The New York Police Department.

24    Q.  And approximately, how long have you worked for New York

25    Police Department?

1   A.  Over ten years.

2   Q.  Was your title?

3   A.  Detective.

4   Q.  And what unit are you assigned to within the New York

5   Police Department?

6   A.  The Bronx Violent Crime Squad.

7   Q.  And approximately, how long have you been a detective with

8   the Bronx Violent Crime Squad?

9   A.  About a year.

10  Q.  And what are your duties and responsibilities as a

11  detective in the Bronx Violent Crime Squad?

12  A.  Well, I handle shootings and homicides that are gang and

13  drug related.  And we try to determine shootings and homicides

14  if they can be prosecuted federally.

15  Q.  Are you assigned to a particular geographical area in the

16  city?

17  A.  Yes.

18  Q.  Where is that?

19  A.  In the Bronx.

20  Q.  Detective Cole, did you become involved in an investigation

21  into the shooting that occurred on October 20th of 2017 in the

22  vicinity of 2693 Morris Avenue?

23  A.  Yes.

24  Q.  Approximately, when did your involvement in the

25  investigation begin?

I9PAAMAT7                        Cole - Direct

1   A.  About a week or two after the shooting.

2   Q.  And what initial steps did you take in the investigation?

3   A.  I first reviewed the squad detective's case file and

4   reviewed videos he recovered and I also took my own steps.  I

5   interviewed witnesses.  I interviewed complainants.  I

6   interviewed victims.  I tried to identify social media.  I also

7   do my own video canvassings and try to collect video on my own.

8   Q.  Did you speak with any of the victims in this incident?

9   A.  Yes.

10  Q.  And how many victims were there?

11  A.  There was three.

12  Q.  Did you speak with all three victims?

13  A.  No.

14  Q.  And why is that?

15  A.  I wasn't able to get in contact with one of the victims but

16  I was successful in meeting with two.

17  Q.  What videos did you review?

18  A.  I reviewed video from the deli on Creston Avenue and East

19  Kingsbridge Road which is 77 East Kingsbridge Road and I

20  reviewed video on Morris Avenue between East 196 Street and

21  East Kingsbridge Road and video I collected from the laundromat

22  at 2625 Jerome Avenue.

23  Q.  I want to show you some portions of the video from 77

24  Kingsbridge Road.  Please tell the jury what type of location

25  77 Kingsbridge Road is?

1  A.  It's a deli grocery store.

2          MR. GENTILE:  I am going to ask Ms. Parisi, can you

3  please publish Government Exhibit 402-C and 402-E and put them

4  side by side please.

5          (Pause)

6  Q.  Detective Cole, please take a look at these two photographs

7  and can you tell us what we're looking at here?

8  A.  The left photo is the corner of Creston Avenue and East

9  Kingsbridge Road.  That is the deli grocery I was referring to

10  before.  And the right photo is another angle to the same deli

11  grocery.

12  Q.  Did you visit this deli grocery?

13  A.  Yes, I did.

14  Q.  Can you describe the layout of the deli grocery, the inside

15  layout?

16  A.  Yes.  The outside as you can tell the, entrance is straight

17  ahead to the corner.  So it has glass windows that you can see

18  in and out of.  It's clearly marked "deli/grocery".  When you

19  first enter the deli there's a register to the left.  There's a

20  sandwich machine to the left.  As you continue there's racks of

21  chips, soda machines.  To the back there's a little hallway

22  with a bathroom and stairs that lead to the basement.

23  Q.  And can you tell the jury what intersection this is that

24  we're looking at?

25  A.  This is East Kingsbridge Road and Creston Avenue.

1          MR. GENTILE:  I want to show you a map of the area as

2     well.

3          Ms. Parisi, can you put up Government Exhibit 400.

4          (Pause)

5          MR. GENTILE:  And can you just fill the whole screen.

6          (Pause)

7          MR. GENTILE:  I am going to ask you to point on the

8     screen and then circle the area where the deli is.

9          (Pause)

10          MR. GENTILE:  Can you circle the area where the

11     shooting took place on October 20, 2017.

12          (Pause)

13     Q.  So how far is the shooting area from the deli?

14     A.  About a block.

15     Q.  Detective Cole, I want to show you some clips from the

16     video at 77 Kingsbridge but first I want to ask, do you know

17     the defendant, Leonard Mathews?

18     A.  Yes.

19     Q.  How do you know him?

20     A.  I arrested him.

21     Q.  Do you see Leonard Mathews in the courtroom today?

22     A.  Yes.

23     Q.  Can you please point him out and identify him by an article

24     of clothing he is wearing?

25     A.  He is in the second table, gray shirt, the one without the

1   blazer.

2           MR. GENTILE:  Your Honor, may the record reflect that

3   the witness has identified the defendant.

4           THE COURT:  Yes.  The record reflects the

5   identification of the defendant.

6           MR. GENTILE:  Ms. Parisi please publish Government

7   Exhibit 201-L and play from the beginning and stop the video at

8   21:49:41.

9                   (Videotape playing)

10  Q.  Detective Cole, please identify the date and timestamp on

11  this video clip?

12  A.  October 20, 2017 at 21:49 which is 9:49 p.m.

13  Q.  Can you identify the camera number in the lower right hand

14  corner of the video?

15  A.  Camera 14.

16  Q.  Is this one of the videos you viewed in connection with

17  your investigation?

18  A.  Yes.

19          MR. GENTILE:  Ms. Parisi, please publish Government

20  Exhibit 201-S and start at 22:13, please and play to 22:13:25.

21                  (Video playing)

22  Q.  Detective Cole, can you identify the date and timestamp on

23  this video?

24  A.  October 20, 2017 at 10:12 p.m.

25  Q.  Can you identify the camera number at the bottom right of

1    screen?

2    A.   Camera 15.

3    Q.   Is this one of the videos you viewed in connection with

4    your investigation?

5    A.   Yes.

6    Q.   And is this -- can you tell the jury what camera angle

7    we're looking at here on this video?

8    A.   Yes.  This directly above it's right above the front door

9    to the store facing north on Creston Avenue.

10           MR. GENTILE:  Ms. Parisi, if you can, look to play

11   22:13 to 22:13:25.

12           (Video playing)

13   Q.   When you visited this location, Detective Cole, were you

14   able to observe this item right here?

15   A.   Yes.

16   Q.   And what is that?

17   A.   That's where they stored the ice for sale.  It is an ice

18   box.

19           MR. GENTILE:  Thank you.

20           (Video playing)

21           MR. GENTILE:  Thank you, Ms. Parisi.

22           Can you please publish Government Exhibit 201-QQ and

23   play from the beginning.

24   Q.   Detective Cole, can you please identify the date and

25   timestamp on this video?

I9PAAMAT7                          Cole - Direct

1   A.  October 20, 2017 at 10:42 p.m.

2            (Video playing)

3            MR. GENTILE:  Ms. Parisi, I am going to ask you to

4   stop at 22:43:02.

5   Q.  Can you tell the jury what camera angle we're looking at

6   here?

7   A.  This is right above the front door which splits Creston

8   Avenue and East Kingsbridge Road directly above.

9            MR. GENTILE:  Can you please publish Government

10  Exhibit 201-MM and start at 22:35:10.

11           (Video playing)

12           MR. GENTILE:  And play to 22:35:37.

13  Q.  Detective Cole, can you please identify the date and

14  timestamp of this video?

15  A.  October 20, 2017, 10:35 p.m.

16  Q.  Can you identify the camera number at the bottom?

17  A.  Camera 13.

18  Q.  Can you tell us what camera angle we are looking at here?

19  A.  This is right above the front door which splits Creston

20  Avenue and East Kingsbridge Road.

21           MR. GENTILE:  Thank you, Ms. Parisi.

22  Q.  Detective Cole, did you recover any video in this

23  investigation yourself?

24  A.  Yes.

25  Q.  And from where did you recover that video?

I9PAAMAT7                          Cole - Direct

1   A.   A laundromat on Jerome Avenue.  The address is 2625 Jerome

2   Avenue.

3   Q.   I am going to hand you what's been marked as Government

4   Exhibit 405-A.

5           MR. GENTILE:  Can we just publish Government Exhibit

6   405-A just to the witness.

7           (Pause)

8   Q.   Do you recognize the location in this photo?

9   A.   Yes.

10  Q.   And what are we looking at here?

11  A.   This is the laundromat I mentioned before about the video I

12  collected at 2625 Jerome Avenue.

13  Q.   Does that photo fairly and accurately represent the outside

14  of the laundromat at 2625 Jerome Avenue?

15  A.   Yes.

16          MR. GENTILE:  Your Honor, the government offers

17  Government Exhibit 405-A into evidence.

18          THE COURT:  405-A is received.

19          MR. KAYE:  No objection.

20          (Government's Exhibit 405-A received in evidence)

21          MR. GENTILE:  May we publish?

22          THE COURT:  Yes.

23          MR. GENTILE:  Please publish to the jury.

24          (Pause)

25          MR. GENTILE:  Ms. Parisi, can you please publish

I9PAAMAT7                          Cole - Direct

1   Government Exhibit 405-B to the witness.

2          (Pause)

3   Q.  Detective Cole, can you tell us what we're looking at here

4   in this photo?

5   A.  The same laundromat at 2625 Jerome Avenue.  It's just more

6   directly to the front of it.  It's a better angle.

7   Q.  Does that fairly and accurately represent the laundromat

8   you visited in reference to the video?

9   A.  Yes.

10          MR. GENTILE:  Your Honor, the government offers

11  Government Exhibit 405-B in evidence.

12          MR. KAYE:  No objection.

13          THE COURT:  405-B received.

14          (Government's Exhibit 405-B received in evidence)

15          MR. GENTILE:  Can you please publish 405-A and 405-B

16  side by side with "A".

17          (Pause)

18  Q.  Detective Cole, when did you visit the laundromat to

19  recover the video?

20  A.  November 9, 2017.

21          MR. GENTILE:  I'm sorry.  Ms. Parisi, can you just

22  publish 405-B.  Just blow it up please.

23          (Pause)

24  Q.  Can you point to the cameras on the outside that are

25  attached to laundromat and circle them with your finger on the

I9PAAMAT7                          Cole - Direct

1   screen.

2              (Pause)

3              MR. GENTILE:  Can you put them side by side again

4   Government Exhibit 405-A and 405-B.

5              (Pause)

6   Q.  Detective Cole, where is this laundromat in relation to the

7   defendant's residence?

8   A.  It's right next door to the defendant's residence.

9   Q.  Can you circle on Government Exhibit 405-A the door to the

10  building where the defendant resides.

11             (Pause)

12  Q.  Thank you.

13             How do you know where the defendant reside, Detective

14  Cole?

15  A.  I arrested him in that building during a search warrant and

16  arrest warrant.

17  Q.  So did you, you executed a search warrant and an arrest

18  warrant at that location?

19  A.  Yes.

20  Q.  We'll talk about that in a bit.  We'll come book.  Right

21  now I am going to hand you a DVD that's marked as Government

22  Exhibit 202.

23             (Pause)

24  Q.  Do you recognize that DVD?

25  A.  Yes.

1    Q.  Can you tell the jury what it is?

2    A.  This is a video I collected from 2025 Jerome Avenue, the

3    laundromat.

4    Q.  How do you know it's the same DVD?

5    A.  My initials are on it.

6            MR. GENTILE:  The government offers Government Exhibit

7    202 and it's sub-exhibits Government Exhibits 202-A through

8    202-F into evidence.

9            We intend to bring out its relevance later on with

10   another witness, your Honor.

11           THE COURT:  OK.  202-A through "F" are received.

12           MR. GENTILE:  Thank you.

13           (Government's Exhibits 202-A - 202-F received in

14   evidence)

15   Q.  Detective Cole, did you recover any other video from the

16   laundromat at 2625 Jerome Avenue?

17   A.  Yes.

18   Q.  When did you recover this video?

19   A.  December 13, 2017.

20   Q.  I am going to hand you a DVD that is marked Government

21   Exhibit 203.  Do you recognize that DVD?

22   A.  Yes.

23   Q.  And what is it exactly?

24   A.  The video I collected at the same location, the laundromat

25   at 2625 Jerome Avenue in December.

1  Q.  And how do you recognize it?

2  A.  My initials are on it.

3          MR. GENTILE:  Your Honor, the government offers

4  Government Exhibit 203 with its sub-exhibits 203-A and 203-D in

5  evidence and we will bring out its relevance later on.

6          THE COURT:  They are received.

7          (Government's Exhibits 203-A - 203-D received in

8  evidence)

9  Q.  Detective Cole, you've testified previously that you

10  executed a search warrant of the defendant's residence.  Can

11  you tell the jury exactly where that warrant was executed?

12  A.  It was at the defendant's apartment, 2615 Jerome Avenue,

13  apartment number 52, on the fifth floor.

14  Q.  When did you execute the search warrant?

15  A.  January 26, 2018.

16  Q.  And at what time did you execute the warrant?

17  A.  A little after six a.m.

18          MR. GENTILE:  Your Honor, we have a significant amount

19  more with this witness.

20          THE COURT:  Right.  It's just about five o'clock, so

21  why don't we break for the day.

22          Folks, it's one minute before five o'clock and we'll

23  let you go by five o'clock each day if possible.  Please try to

24  be on time tomorrow, if possible.  I'd like to start at 9:30

25  possible.  Your breakfast will be there in the morning.  So I

1    hope you can arrive by 9:15 and we'll start by 9:30.

2            I Just want to remind you are not discussing the case

3    with anyone, do any research on the case, talking about the

4    case.

5            Have a good night, everybody.  Please leave your pads

6    on your chairs and we'll see you tomorrow morning.

7            (Jury not present)

8            THE COURT:  You may step down.

9            You can be seated.

10           How much longer do you think you have with Detective

11   Cole?

12           MR. GENTILE:  Probably at least another 20 minutes,

13   maybe 25.

14           THE COURT:  All right.  The one unresolved issue as to

15   him is I believe is the Miranda issue regarding affiliation

16   with gang membership.

17           MR. KAYE:  We're withdrawing that.

18           THE COURT:  OK.  So that issue is withdrawn.

19           Anything else we need to talk about?

20           MR. RODRIGUEZ:  Yes, your Honor.

21           Our expectation is that Detective Maye will be in a

22   position to testify tomorrow which puts us in a tough spot here

23   with respect to which portions of the video that defense

24   intends to use.  So the government requests that we get that

25   information from the defense rather quickly.  Certainly, within

1    the next couple hours like seven o'clock or so so that we can

2    be in a position to evaluate its appropriateness.

3              THE COURT:  So can we start with some information

4    about what the government is going to be putting Detective Maye

5    on to cover.  Specifically, I am wondering whether he'll be

6    testifying about any of his statements of DeJesus from that

7    video or not.

8              MR. GENTILE:  He'll be testifying about statements

9    that were made to him by the defendant when Detective Maye

10   interviewed him earlier this year in January of 2018.

11             THE COURT:  All right.

12             MR. KAYE:  Can I ask Mr. Gentile a question?

13             THE COURT:  Yes.

14             MR. KAYE:  Are you going to put in the video or just a

15   elicit sum and substance of what the defendant said?

16             MR. GENTILE:  No.  We're going to put it clips of the

17   videos.

18             MR. KAYE:  Just selected clips?  You're not going to

19   play it all through?

20             MR. GENTILE:  Selected clips, yes.

21             MR. KAYE:  My intention if permitted with Detective

22   Maye was not to use the video.  I was just going to ask him in

23   sum and substance what Mr. DeJesus said with regard to the

24   felony complaint and read the testimony, his testimony in the

25   grand jury.  I have no intentions of playing the 40-minute

1   video for the jury.

2          THE COURT:  He was talking about the video of the

3   defendant.

4          MR. KAYE:  Right.  But because we're talking about

5   videos and that's my witness to cross and introduce this

6   subject, just wanted the government to know that my intention

7   is not the play a video.  I wouldn't imagine I would be sharing

8   with Mr. Rodriguez the minutes and the seconds that I intend to

9   offer, assuming the Court permits it.

10         MR. RODRIGUEZ:  Your Honor, if I'm understanding

11  Mr. Kaye correctly, he is intending to offer what sounds like

12  double hearsay through the form of -- what DeJesus said that is

13  quoted by Detective Maye in a grand jury which is an

14  out-of-court proceeding and then also in the felony complaint.

15  So I am still not quite clear on how any of this is proper,

16  whether it's through the video or through the ways that

17  Mr. Kaye is suggesting.

18         MR. KAYE:  Well, it's proper because I am eliciting

19  the statement from Detective Maye that the declarant made to

20  Detective Maye.  I am not going to ask him what he said

21  necessarily in the grand jury but I am going to use that as the

22  sum and substance of what I intend to elicit from Detective

23  Maye.

24         For example, isn't it true that you took a statement

25  from Mr. DeJesus?  Isn't it true that Mr. DeJesus said in sum

I9PAAMAT7                    Cole - Direct

1   and substance, she is going to tell on me.  I decided she was

2   the weakest link and I decided to kill her.  And isn't it true

3   that at no time did he ever mention that the defendant, at

4   least to you that the defendant was involved in that?

5        THE COURT:  OK.  So that's why you wanted me to look

6   at the last 40 minutes of the video because that's where those

7   statements are?

8        MR. KAYE:  Right.

9        THE COURT:  OK.  So as I understand the case law

10  having looked at United States v. Salvador and United States v.

11  Camacho 804(b)(3), in a criminal case under these circumstances

12  would allow a statement of interest like that -- I'm sorry -- a

13  statement against penal interest only in circumstances where

14  there is corroborating evidence as to the, statement.

15  Corroborating evidence supporting the trust worthiness of the

16  statement.  Am I reading the rule correctly?

17       MR. KAYE:  Declaration against interest rule?

18       THE COURT:  Right.  I understand that's your

19  objection.

20       MR. RODRIGUEZ:  Yes, your Honor, but it's not only the

21  statement but also the declarant.  So the corroborating

22  circumstances and of the declarant in both circumstances and

23  the declarant himself.

24       THE COURT:  So I think I need to hear from Mr. Kaye

25  about what is his proffer or presentation as to what that

1    corroborating circumstance would be with respect to both the

2    statement and the declarant.

3        MR. KAYE:  Well, it seems that the taker of the

4    statement, Detective Maye, believed the statement

5    wholeheartedly because he swore under oath to the contents of

6    the statement in the grand jury presentation when he was asked

7    what did Mr. DeJesus tell you and he told the grand jury, had

8    to believe what he was telling the grand jury was true.

9        The detective then also swore out a felony complaint

10   and you oath under penalty of perjury indicating again for the

11   second time, the same statement in sum and substance that

12   DeJesus said she was going to tell on me and I decided to kill

13   her.  I think it's internally corroborated in that it's a four

14   hour videotape.  He didn't come out and just blurt it out.

15   They cracked him and they essentially got him to break down and

16   confess and it's corroborated.  It's truthful because the

17   detective that took the statement swore to its contents and I

18   don't think that any of us would imagine that the detective

19   would ever do that, both the grand jury and a felony complaint.

20       There's also absolutely no evidence to suggest that it

21   didn't happen that way.  The closest that the government comes

22   to that is after the shooting they allegedly enter my client's

23   apartment when the gun is allegedly wiped clean and deposits

24   there.  Ms. Edwards excuses herself from the room and goes to

25   the bathroom.  While she's in the bathroom the two are left

1    together talking.  She then leaves with DeJesus and within a

2    matter of hours he does this heinous act to her.  And that's

3    entirely consistent with what DeJesus says.

4           It's not consistent with the government's theory that

5    he defendant ordered directed it or knew about it even.  I

6    think we discussed this from day one.  They shouldn't even be

7    able to make that argument based upon such flimsy evidence

8    capable of so many different interpretations, the least of

9    which is that he knew what DeJesus was going to do.  If DeJesus

10   was actually conjuring up in his mind that he was going to kill

11   her, in that closed door meeting with the defendant he might

12   not have left the apartment without a handgun.  But the

13   government's information is that he didn't take the handgun,

14   that he left the handgun there and that what weighs against the

15   governments interpretation and weighs in favor of the

16   defendant's interpretation, I think under all those

17   circumstances there is sufficient corroboration.

18          THE COURT:  Well, if they're just using Detective Maye

19   to address other statements, is it even within the scope of the

20   direct?

21          MR. KAYE:  I'll call him on my own case then.  I think

22   it is.  He is going to testify to the statement he took from

23   the defendant.  He is going to testify to his interactions with

24   Ciara Edwards but if the Court is not inclined to see it that

25   way, I imagine I can come to court with a subpoena and I'll

1    serve him and we'll put him on the defense case.

2              THE COURT:  Well, putting aside the scope issue, let

3    me hear from the government on this.  Because having looked at

4    the cases, I realize there is this strict requirement and the

5    burden is on the defendant in this situation to establish the

6    circumstances and corroborating truthfulness.  But this is a

7    situation where there really is no direct evidence supporting

8    the government's theory as to the slashing of Ms. Edwards.

9              MR. RODRIGUEZ:  Your Honor, I'll be focusing on

10   something here.  Your Honor identified one of the key questions

11   here which is the corroborating circumstances requirement.

12   Detective Maye's state of mind may have been that he believes

13   these statements as they relate to Mr. DeJesus but there's

14   nothing corroborative about the statements as to Mr. Mathews,

15   whatsoever, right?  This is in the context of charging

16   Mr. DeJesus.  There's no corroboration that they would be

17   truthful as to Mr. Mathews that defense counsel as presented.

18             THE COURT:  Well, I don't know what that means

19   exactly.  If the statement is I tried to kill her because I had

20   my own reason to do it, period, and that is a hundred percent

21   of my reason, then that means I did it not at the direction of

22   someone else.  So what does it mean to say not corroborating as

23   to the defendant?

24             MR. RODRIGUEZ:  Well, because there's an incentive in

25   that circumstance for DeJesus to protect Mathews and leave him

1    out.

2              THE COURT:  But it is true in the other prosecution

3    became a part of the prosecution that he did this for those

4    reasons and intends to support the defense as to that part of

5    the government's case.

6              MR. RODRIGUEZ:  I'm not sure -- it's certainly true

7    that in the other prosecution he was prosecuted for attempted

8    murder of Ciara, of Ms. Edwards.  But the defendant's

9    involvement in that or was just not an issue.  It was not an

10   issue at all.  And in fact he said in his post-arrest, I'm not

11   putting nobody's name in nothing.  I am going to take my

12   responsibility.  This is Mr. DeJesus.  His whole interrogation

13   was, yes, I'm talking about me but I am leaving Mr. Mathews and

14   everybody else out of it and that's the key here.  It's not

15   corroborative as to Mr. Mathews.

16             THE COURT:  Well, I think it would be.  It depends.  I

17   might have to look at the statements more closely.  I guess

18   you're saying that it's not corroborative because he explicitly

19   said, I'm not going to throw anyone else under the bus.

20             MR. RODRIGUEZ:  This is very different from being on

21   the corner with his confederates.  He is in an interview with

22   New York City detectives and he has someone to protect.  So

23   that's, the circumstances here matter in addition to what he

24   explicitly said about his unwillingness to name other names.

25             MR. KAYE:  May I just say, he is referring to -- I

1    interpreted -- he is referring to the shooting.  I'm not going

2    to name names or implicate anybody else in the shooting.

3              THE COURT:  Well, why would he make that distinction?

4    That doesn't really make sense.  If he says I'm not going to

5    name other names, why would he suddenly limit that to the

6    shooting but not the slashing?

7              MR. KAYE:  How does the government reach the

8    conclusion that he's talking about all of it?  I am not going

9    to name names and as to the shooting and that's also reflective

10   of his veracity of as to the slashing.  It seems like they're

11   talking about the slashing incident the whole time with him and

12   her.  They're putting photos of her with stitches in front of

13   him.  They are then directing him, threatening to arrest his

14   girlfriend.  The girlfriend's only relevance to all of this is

15   that she walked through the park with him, the park that he did

16   the slashing in, just the overall theme of this confession is

17   with regard to Ms. Edwards.

18             MR. RODRIGUEZ:  Your Honor, that's just false.  This

19   is a confession in which Mr. DeJesus was confronted with video

20   from the bodega, video of himself chamber in the round and the

21   gun which he calls "the situation" in the video.  And it was a

22   confession that resulted in him being charged with two counts

23   of attempted murder, one with respect to Ms. Edwards and one

24   with respect to the shooting.  He is shown stills from the

25   corner store relating to the shooting.  It's about both.  It is

1    absolutely about both.  So to suggest otherwise is just wrong.

2    It's just false.

3           MR. KAYE:  Judge, can I just add something to the mix

4    and just bring the Court's attention to a decision by Judge

5    Sweet?  It's Jeffrey Cohn, C-O-H-N.  It's Westlaw 2000, Westlaw

6    145 9795.  It's a situation where Judge Sweet allows in a plea

7    allocution introduced by the defense, not exact, not precisely.

8    But in the statement of another individual involved in an

9    offense and he accepts it into evidence under 804(b)(3).

10          THE COURT:  OK.

11          MR. KAYE:  He says it satisfies 804(b)(3) and it's

12   under oath.  So I have that plea allocution.  I can show that

13   to the Court but it doesn't have the same flavor because it's

14   very dry with recitation where the Court is asking, do you

15   plead guilty and the defendant's under oath and says nothing

16   more than "yes".

17          THE COURT:  So are you planning to use the plea

18   allocution?

19          MR. KAYE:  Well, I will use the plea allocution if I'm

20   not permitted to introduce through Detective Maye the -- excuse

21   me -- DeJesus's confession which is exculpatory to the

22   defendant but it's not a substitute.  I'm just trying to assert

23   that the defense has a right to present a defense and the

24   government is blocking it under the guise of this absence of

25   corroboration.

1           To what level does it have to be corroborated?

2    Because clearly it's not beyond a reasonable doubt if it's a

3    preponderance standard.  I think it's more likely than not that

4    it is corroborated by all the circumstantial evidence and the

5    surrounding circumstances.

6           THE COURT:  What exactly is the -- what are the

7    statements that you seek to elicit?

8           MR. KAYE:  He had been talking about telling on me, so

9    I just stabbed her.  And I'll tell, your Honor, at this point

10   I'm satisfied to just introduce that because I don't want to

11   push too much and make the Court feel uncomfortable that it's

12   just trying to level the playing field, so to speak.  I feel

13   that that statement and the grand jury testimony are

14   consistent, then I would love to be able to introduce both of

15   them but that is certainly one of the statements and it's short

16   and it's concise and it says what needs to be said but the

17   grand jury reference is as follows:

18          He tells the grand jury he was worried about her

19   talking to the police because she had said that she got caught.

20   She would tell what happened.  So he is thinking in his mind

21   that he was probably going to kill her.

22          THE COURT:  So that's what, that's the grand jury

23   testimony?

24          MR. KAYE:  Correct.

25          THE COURT:  Of May?

I9PAAMAT7                    Cole - Direct

1          MR. KAYE:  Correct.  I can hand it to the Court and

2     maybe the Court wants to look at the video while it makes its

3     decision.

4          THE COURT:  So that's the sworn statement of Maye?

5          MR. KAYE:  Right.  The sworn statement of Maye.

6     They're both the sworn statements of May but --

7          THE COURT:  What's the other one?

8          MR. KAYE:  In the felony complaint.  It's in the first

9     person.

10          THE COURT:  What does that say?

11          MR. KAYE:  That is as follows:

12          She had been talking about telling on me, so I just

13     stabbed her.

14          THE COURT:  And the government doesn't agree that that

15     should come in?

16          MR. RODRIGUEZ:  Correct, your Honor.  Again, it's not

17     in the context of a sworn statement made by Mr. DeJesus like

18     his plea allocution which draws the distinction the case as

19     counsel cited.  It is made in the context of an interview with

20     the police department where he has every incentive as a

21     low-ranking member of the gang to protect a higher ranking

22     member of the gang.  This is not a circumstance with

23     corroborating circumstances that go, that would corroborate the

24     truthfulness of that statement and it's not an insurmountable

25     murder.  It's not that the government is blocking.  It's the

1      rules of the evidence and it's the preponderance of evidence.

2              THE COURT:  OK.  Well, I am going to reserve my

3      decision on that and let you know tomorrow.

4              All right.  Are there any other open issues we have or

5      other housekeeping matters?

6              MR. KAYE:  I don't believe so.

7              THE COURT:  Could I get a preview of tomorrow,

8      anything you tell me about who is next on tap?

9              MR. RODRIGUEZ:  Your Honor, at this point I expect

10     Detective Cole will take up a fair amount of the morning based

11     on what we've heard.  I do expect him to be followed by

12     Ms. Edwards which sounds like it is going to take up a decent

13     part of the day, as well.  The government will follow what it's

14     been doing the past couple days and let defense counsel know

15     the next handful or so of witnesses once we have a chance to go

16     back and regroup.

17             THE COURT:  OK.

18             MR. KAYE:  Can I, as we have been doing, ask that they

19     do that at least by eight o'clock since we are getting out of

20     here at 5:30?

21             MR. RODRIGUEZ:  Yes.  Your Honor, we have no problem

22     by that time.

23             THE COURT:  OK.  Great.  All right.  Thanks,

24     everybody.

25             (Adjourned to September 26, 2018 at 9:30 a.m.)

```
1                       INDEX OF EXAMINATION

2    Examination of:                           Page

3    CARLOS GUIJA

4    Direct By Mr. Gentile . . . . . . . . . . . .94

5    Cross By Mr. Kaye . . . . . . . . . . . . . 100

6    Cross . . . . . . . . . . . . . . . . . . . 110

7    Redirect By Mr. Gentile . . . . . . . . . . 112

8    STEPHANIE ABDUL-JABBAR

9    Direct By Mr. Gentile . . . . . . . . . . . 114

10   Cross By Mr. Kaye . . . . . . . . . . . . . 126

11   Redirect By Mr. Gentile . . . . . . . . . . 134

12   Recross By Mr. Kaye . . . . . . . . . . . . 135

13   COLLEEN HORAN

14   Direct By Mr. Gentile . . . . . . . . . . . 139

15   Cross By Mr. Kaye . . . . . . . . . . . . . 154

16   Redirect By Mr. Gentile . . . . . . . . . . 166

17   ANTHONY CALTABIANO

18   Direct By Mr. Rodriguez . . . . . . . . . . 167

19   Cross By Mr. Kaye . . . . . . . . . . . . . 185

20   SHAUN McGEE

21   Direct By Mr. Rodriguez . . . . . . . . . . 209

22   Cross By Mr. Kaye . . . . . . . . . . . . . 213

23   ALTAGRACIA COLEMAN

24   Direct By Mr. Gentile . . . . . . . . . . . 221

25   Cross By Mr. Kaye . . . . . . . . . . . . . 227
```

1    Redirect By Mr. Gentile  . . . . . . . . . . . 238

2    PAUL JESELSON

3    Direct By Mr. Rodriguez  . . . . . . . . . . 239

4    Cross By Mr. Kaye  . . . . . . . . . . . . . 265

5    ELVIS COLE

6    Direct By Mr. Gentile  . . . . . . . . . . . 295

7                   GOVERNMENT EXHIBITS

8    Exhibit No.                          Received

9     401-A to 401-J   . . . . . . . . . . . . . 119

10    100 and 101   . . . . . . . . . . . . . . . 123

11    108   . . . . . . . . . . . . . . . . . . . 144

12    402-A, B, C, D and E   . . . . . . . . . . 170

13    201-A-201-RR   . . . . . . . . . . . . . . 178

14    1001   . . . . . . . . . . . . . . . . . . 217

15    405-A   . . . . . . . . . . . . . . . . . . 303

16    405-B   . . . . . . . . . . . . . . . . . . 304

17    202-A - 202-F   . . . . . . . . . . . . . . 306

18    203-A - 203-D   . . . . . . . . . . . . . . 307

19

20

21

22

23

24

25