IA1AAMAT1                         Jury Trial

1    I9IYMATC

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x

4    UNITED STATES OF AMERICA,

5              v.                            18 CR 124 (JPO)

6    LEONARD MATHEWS,

7              Defendant.

8    ------------------------------x

9                                           New York, N.Y.
                                            October 1, 2018
10                                          9:30 a.m.

11

12   Before:

13                     HON. J. PAUL OETKEN,

                                            District Judge
14

15                       APPEARANCES

16   GEOFFREY S. BERMAN
          United States Attorney for the
17        Southern District of New York
     JUSTIN VICTOR RODRIGUEZ
18   DOMINIC A. GENTILE
     EMIL JOSEPH BOVE, III
19        Assistant United States Attorneys

20   BARASCH MCGARRY SALZMAN PENSON & LIM
          Attorneys for Defendant MATHEWS
21   BY:  BRUCE KEVIN KAYE

22   ALSO PRESENT:  Sabrina Parisi, Paralegal

23

24

25

IA1AAMAT1                    Jury Trial

1                (Trial resumed; jury not present)

2                THE COURT:  Good morning, everyone.

3                Any preliminary matters to address?

4                MR. RODRIGUEZ:  Your Honor, just a few things from the

5      letter that we filed over the weekend on Saturday.  First of

6      all, in response to the request from Mr. Kaye, the government

7      has no objection to the Court including the language from

8      United States v. Berk in its charge.  The government also

9      recited some authority for the Court following the charging

10     conference about the instruction on false exculpatory

11     statements.  We think the authority we cited --

12               THE COURT:  We reviewed the letters and given the

13     parties agreement on the language from Berk, I changed the

14     language that I had in there to the precise language proposed

15     by defense counsel on that.  I agree with you on false

16     exculpatory statement.  So we put in the language which is

17     verbatim from standard Sand Instruction I believe and then you

18     were to go on.

19               MR. RODRIGUEZ:  The next issue being the instruction

20     on New York conspiracy law for purposes of ^the -- we've laid

21     out some New York State law on that issue as well.  And again,

22     we think the language that the Court had in its draft

23     instructions should be retained because it's consistent with

24     that law.

25               With respect to the special interrogatories on Count

IA1AAMAT1                        Jury Trial

1   Four, the government addressed some of the questions that

2   defense counsel raised about the Roseman case and the knowledge

3   requirement in that case.  And specifically, I think as it

4   relates to the discharge, the fact that there's no mens rea

5   requirement in the statute for the discharge.  So again, I

6   think the draft instructions are all correct in that regard as

7   well.

8          And then finally, your Honor, there is the issue --

9   well, two other issues.  We spoke at the charging conference

10  with respect the motive requirement for the ^buy cars use of

11  language at least in part.  I believe the defense had an

12  objection to that.  And as we laid out in our letter, that is

13  language that the Second Circuit has approved of before,

14  specifically, in the Soto case but the government would have no

15  objection to changing that language to conform it to other

16  language that's in Sands, I believe as well as language that

17  Judge Kaplan used in a similar charge using the language about

18  the defendants or the person's general purpose for --

19         THE COURT:  Yes.  So the last two points you mentioned

20  I agree with you and I've kept the charge as drafted from

21  Friday.  On this point I've taken out at least in part in the

22  various place it appears I've kept in the Court's explanation

23  of purpose and the language that it does not have to be the

24  only purpose.  I think that's adequate to make the point.

25         MR. RODRIGUEZ:  Thank you, judge.

1           Then finally, we made some requests following our

2     charge conference on Friday about the instructions that the

3     Court would give on aiding and abetting.

4           THE COURT:  Hold on one second.

5           MR. RODRIGUEZ:  This is just to make clear the jurors

6     the two different ways in which motive and gang related motives

7     are at play here.  To make clear that it's not only the

8     defendant's motive to act the way he did to maintain or

9     increase his position in the gang but it's also relevant what

10    Juan DeJesus' motive was to maintain and increase his position

11    in the gang and if the defendant aided and abetted him in the

12    commission of those crimes.

13          THE COURT:  Or willfully caused.  So this is for

14    Counts One and Three?

15          MR. RODRIGUEZ:  Correct, your Honor, yes.

16          THE COURT:  Because it doesn't implicate two because

17    it's conspiracy.

18          MR. RODRIGUEZ:  That's correct, your Honor.

19          THE COURT:  Right.  And I read your letter.  I think

20    to make the changes throughout as the government has proposed

21    in the letter is actually confusing.  So what I am proposing

22    and will shortly give you a clean version reflecting all of

23    this.

24          Let me find it.

25          (Pause)

1        THE COURT:  Rather than put in sort of in the

2   alternative or Juan DeJesus acted for that purpose, at various

3   points I think it might be simpler to have a single paragraph

4   the end of the fifth element explanation that says something

5   like the following:

6        Alternatively, I want to remind you that you may find

7   the defendant guilty of Counts One or Three under an aiding and

8   abetting theory of liability or willfully causing theory of

9   liability.  Under either of these two theories of liability,

10  the government must prove beyond a reasonable doubt that

11  defendant aided and abetted or willfully caused DeJesus to

12  commit the alleged crimes knowing that DeJesus acted for the

13  purpose of gaining entrance to and maintaining a position in or

14  increasing a position in the Bloods.

15       My earlier instruction on element of purpose or motive

16  equally apply when you are assessing DeJesus' purpose.

17       MR. RODRIGUEZ:  Thank you, your Honor.

18       MR. KAYE:  I have no objection to that language.

19       MR. RODRIGUEZ:  Just for the last piece of

20  housekeeping from the government, your Honor, we've prepared a

21  cart with all of the admitted exhibits from the trial, as well

22  as a clean laptop for the jury to view the digital evidence.

23  We've provided Mr. Kaye with the exhibit lists that we've

24  proposed to send back with the jury and we'll certainly give

25  Mr. Kaye an opportunity inspect the cart at lunchtime or

IA1AAMAT1                    Jury Trial

1   whenever before it goes back to the jury.

2          THE COURT:  Great.  Thank you.

3          And thanks for looking into those issues over the

4   weekend I appreciate both sides follow-up.  I know you've been

5   working very hard on those remaining issues.  As I say, I'll

6   give you a paper version of the final clean version of the

7   charge in case you want to consult it just before or during

8   your summations.  Although, obviously, I don't want you

9   instructing the jury because that's going to be my role.

10          Mr. Kaye, is there going to be any defense case?

11          MR. KAYE:  Judge, I'm going to ask the Court to voir

12   dire the defendant on whether he is going to exercise his right

13   to testify.

14          THE COURT:  OK.  Right now?

15          MR. KAYE:  Yes.

16          THE COURT:  OK.  Mr. DeJesus.

17          MR. KAYE:  "Mathews".

18          THE COURT:  I'm sorry.  Mr. Mathews, would you mind

19   pulling the mic towards you.

20          You have had a chance to talk to Mr. Kaye about

21   whether you choose to testify in the case?

22          THE DEFENDANT:  Barely.  But I don't choose.  I was

23   not prepped or I'm not going to do it so I choose not to

24   testify.

25          THE COURT:  You understand have you a right to testify

1    if you want to but you also have a right not to testify?

2              THE DEFENDANT:  I understand that.

3              THE COURT:  You have that right to make that decision.

4              THE DEFENDANT:  Yes.

5              THE COURT:  Have you had a chance to talk to Mr. Kaye

6    about that?

7              THE DEFENDANT:  Very briefly, yes.

8              THE COURT:  And you understand the fact that you do

9    have the right to testify or the right not to testify?

10             THE DEFENDANT:  Yes.

11             THE COURT:  OK.  What's your choice?

12             THE DEFENDANT:  I choose not to testify.  I was not

13   prepped to.

14             THE COURT:  OK.  Anything else you think I need to

15   ask?

16             MR. KAYE:  Whether this is a voluntary, knowing

17   decision on his part I think is appropriate to ask.

18             THE COURT:  OK.  Is it a voluntary decision not to

19   testify on your part?

20             THE DEFENDANT:  I was not prepped to so, yes, I would

21   rather not testify.

22             THE COURT:  But you choose not it testify?  Is it a

23   voluntary decision on your part?

24             THE DEFENDANT:  I mean, it's my decision, yes.

25             THE COURT:  All right.  And it's based on your

IA1AAMAT1                    Jury Trial

1   understanding and knowledge that you have the right to if you

2   chose to?

3                  THE DEFENDANT:  Can you say that again please?

4                  THE COURT:  You have the right to testify if you chose

5   to; do you understand that right?

6                  THE DEFENDANT:  Yes, I understand that right.

7                  THE COURT:  And you still choose not to testify?

8                  THE DEFENDANT:  Yes.  I was not prepped to testify, so

9   I choose not to testify.

10                 THE COURT:  OK.

11                 MR. KAYE:  Do you require me to say anything in

12  response to that?

13                 THE COURT:  Does the government have any proposed

14  questioning that needs to be asked?

15                 MR. RODRIGUEZ:  Your Honor, I think at this point

16  Mr. Mathews has to make a clear choice and not just, no, that

17  he wasn't prepped to testify.  He is either making a choice to

18  testify or not and not just rely on this notion that he wasn't

19  prepped and so I think that that has to be put to him pretty

20  clearly.

21                 THE COURT:  OK.  You have the right to testify if you

22  want to.

23                 Do you understand that?

24                 THE DEFENDANT:  Yes.

25                 THE COURT:  And it's up to you whether you testify.

IA1AAMAT1                    Jury Trial

1    You can choose to testify or you can choose not to.  It's your

2    choice.

3              THE DEFENDANT:  I choose not to testify because I was

4    not prepped to testify like other people.  I am not ready to

5    get up on the stand.  I would like to get up on the stand but I

6    don't want to damage anything else that's been damaged.  I was

7    told not to and I'm not going to get on the stand.

8              THE COURT:  When you say you were not prepped, do you

9    want --

10             THE DEFENDANT:  I have no -- I am just not going to

11   get on the stand and that's just it and I don't know what's

12   expected to come from me, me being in this courtroom around all

13   these Harvard people, I'm not used to it.  So I'm out of my

14   element of norm.  So for me to stay in my norm I will not get

15   on there and testify to jeopardize or do anything that's, I'm

16   not supposed to be --

17             THE COURT:  Well --

18             THE DEFENDANT:  -- put this a certain type of way.

19             THE COURT:  Right.  But Mr. Kaye has been your counsel

20   for many months.  You have had a chance to meet with him many

21   different times.

22             THE DEFENDANT:  A few times.

23             THE COURT:  You do have a right to testify.

24             THE DEFENDANT:  I know that and I choose not to

25   testify.

1        THE COURT:  OK.  Thank you.

2        Anything you want to add, Mr. Kaye?

3        MR. KAYE:  I don't think it's appropriate for me to

4   put on the record the private conversations I have had with my

5   client, but suffice it to say that I have been to see him

6   multiple occasions.  I think the Court is well aware that our

7   relationship has been strained at times and then there are

8   periods when there's cohesiveness and clarity.  I did go to see

9   him last night -- I'm sorry -- yesterday morning.  And spent

10  several hours with him.  But admittedly, we went back to a

11  period of tension and I did leave and it is not all together

12  clear to me when I left what his intentions were, which is why

13  I asked the Court to engage in this voir dire with him.

14       Needless to say although, it's the 11th hour, if he

15  wants to testify then I will request an opportunity to speak to

16  him in the back and spend some time with him right now even

17  though it may disrupt the timing of the proceedings.  So that's

18  a decision that I would ask him to make and if that is what he

19  wants to do, then I would request leave of court to do that.

20       THE COURT:  How long do you think something like that

21  would take if he chose to take advantage of it?

22       MR. KAYE:  A few hours.

23       THE COURT:  Well, Mr. Mathews, let me ask you this.

24  It's ten o'clock.  If we took an hour or two, even two hours to

25  give you an opportunity to speak with Mr. Kaye, would that

IA1AAMAT1                        Jury Trial

1    change your decision as to whether you'll voluntarily testify

2    in the case.

3              THE DEFENDANT:  I appreciate your leniency but, no.

4              THE COURT:  It wouldn't change?

5              THE DEFENDANT:  No.

6              THE COURT:  Thank you.

7              So we'll go forward.  Anything else for defendant's

8    case?

9              MR. KAYE:  Defense is not going to call Detective Cole

10   and I'll rest in front of the jury.

11             THE COURT:  All right.  Everyone's ready for

12   summations?

13             MR. KAYE:  Yes.

14             THE COURT:  Mr. Gentile, you are doing the government?

15             MR. GENTILE:  Yes, your Honor.

16             THE COURT:  And rebuttal?

17             MR. GENTILE:  Rebuttal is Mr. Rodriguez.

18             THE COURT:  All right.  Shall we bring the jury out?

19             (Jury present)

20             THE COURT:  You may be seated.

21             Good morning ladies and gentlemen.  Welcome back.

22   Hope you had a good weekend.

23             The government rested on Friday and now Mr. Kaye.

24             MR. KAYE:  Good morning, ladies and gentlemen.

25             The defense rests.

IA1AAMAT1                    Jury Trial

1           THE COURT:  OK.  Ladies and gentlemen, both sides have

2     rested.  You heard all of the evidence in the case.  You've

3     kept an open mind as I hope as I've instructed you and you've

4     heard a lot of evidence over the course of last week.

5           Now is the opportunity for each side to present what's

6     called a closing argument or summation.  As with the opening

7     statements the summations or closing arguments are not evidence

8     but the parties, the lawyers for each side have an opportunity

9     to refer to the evidence, remind you of the evidence and try to

10    help you make sense of the evidence in the way that each side

11    would you like to view the evidence.

12          And toward that, we'll start with the government's

13    summation.

14          Mr. Gentile.

15          MR. GENTILE:  Thank you, your Honor.

16          Exactly one week ago today the government stood here

17    and address you for the very fist time.  We told you that the

18    evidence in this case would prove that Leonard Mathews is a

19    member of a street gang called The Bloods and that Mathews and

20    other members of The Bloods conspired to shoot and kill someone

21    called Ike, also known as, "Isaac Toribio", because Toribio

22    bested Mathews in a street brawl on a corner that Mathews

23    controlled.

24          As the gang's "big homie" Mathews couldn't let this

25    humiliation go unanswered.  So he ordered one of his gang

1   members to shoot Toribio and worked with the gang to carry out

2   that plan.  But as you know, that plan didn't go well.  Instead

3   of shooting Toribio, three innocent bystanders were shot.  All

4   three had nothing to do with the dispute between Mathews and

5   Toribio.

6          We also told you that the evidence would show that

7   Mathews and members of The Bloods or the Gangsta Milla Bloods

8   as they call themselves sold drugs in certain areas of the

9   Bronx that they controlled.

10         Ladies and gentlemen, we kept our word.  The evidence

11  that was presented to you proves beyond a reasonable doubt that

12  Leonard Mathews is guilty as charged.

13         You heard testimony from a number of different

14  witnesses during this trial, witnesses who told you about the

15  fight that Mathews had with Toribio, "The Big Homie", when he

16  got into that fight with Toribio and was embarrassed.  You

17  heard how he called his enforcer, Juan DeJesus, almost

18  immediately after the altercation.  And how DeJesus an and gang

19  members rallied behind their leader on the corner of Creston

20  and Kingsbridge.

21         Ciara Edwards was there too that night and she told

22  you about what she saw and what she heard.  She explained how

23  DeJesus told her that they had to put in some work for The Big

24  Homie and that DeJesus directed her to follow another gang

25  member to a location near by to get "the grip", street slang

IA1AAMAT1                      Jury Trial

1    for a gun.

2              When Edwards returned Mathews directed her and DeJesus

3    into the backroom of the corner deli on Creston and

4    Kingsbridge.  She was there when Mathews and DeJesus went to

5    Morris Avenue to hunt down and shoot Ike and as you all saw she

6    was there when DeJesus fired the shots that struck three

7    innocent bystanders.

8              Edwards described in great detail how after the

9    shooting Mathews, DeJesus and other members of the gang went

10   back to Mathews apartment on Jerome Avenue.  Once inside the

11   apartment they went into Mathews bedroom where she handed

12   Mathews the gun.  He proceed to wipe the gun down to remove any

13   fingerprints that might remain.  Edwards told you about how

14   Mathews told her to "keep it low".  In other words, keep your

15   mouth shut.  She described how after walking out of defendant's

16   bedroom, Mathews, DeJesus and other gang members shut the door

17   and met briefly.  Less than three hours later Ciara Edwards lay

18   dying in the street.

19             Edwards got on that stand and told you about

20   everything she did everything, she heard and everything she

21   experienced that night.  You know she told you the truth

22   because of all the other evidence that was presented to you in

23   this case.  Evaluate that evidence in light of the video

24   evidence that shows exactly what Mathews and DeJesus were doing

25   before, during and after the shooting.  Evaluate her testimony

IA1AAMAT1                    Jury Trial

in light of the information pulled from the defendant's

cellphone, the screen shots pulled from Facebook, the phone

company records and most importantly the defendant's own words.

          In addition to the firsthand account Edwards provided

you, you also heard from one of the shooting victims who was

shot twice on October 20.  Deeana Seabrooks told you about her

relationship with the defendant.  She told you how she's been

purchasing crack cocaine from him for years and that for some

reason only a few days after she got out of the hospital he

gave her crack for free.

          Keisha Hood took the stand and provided raw and

emotional testimony about her relationship with the defendant

and how frightened she was to be here.  She described her years

long addiction to crack and her reliance on the defendant to

provide her with that crack.  She also described the phone call

she received from the defendant on the night of the shooting

and how he told her that the defendant got someone to shoot

Toribio.

          Before we talk about the other pieces of evidence that

we're going to go through today, I'd like to speak to you a

little bit about the charges that the defendant faces here.

I'll discuss them with you in a little bit more later on but

there are a few things that might help you sort out the

evidence as we go through it.  I'll preface my remarks somehow

and later with a caveat that Judge Oetken's instructions on the

1    law control.

2          The indictment charges the defendant with a total of

3    six counts.  The first three counts charge Mathews with violent

4    crimes in aid of racketeering.  These counts require proof of,

5    among other things, Mathews' membership in the enterprise.

6    That enterprise is the Bloods gang.  These counts also require

7    proof that the enterprise engaged in racketeering activity.

8    That activity is drug trafficking and acts of violence

9    including the attempted murder of Isaac Toribio and the

10   attempted murder of Ciara Edwards.

11         Count One through Five all relate to the shooting on

12   the night of October 20, 2017.  Count One charges the defendant

13   with the attempted murder of Toribio and the attempted

14   murder -- sorry -- Count Two charges him with conspiring with

15   one DeJesus and other members of the Bloods to kill Toribio.

16   Count Three There Throw charges Mathews with the assault of the

17   three innocent victims who were shot by mistake.  Count Four

18   charges the defendant with aiding and abetting the possession

19   of a firearm during a crime of violence.  count Five charges

20   him with aiding and abetting with possession of ammunition by

21   someone previously convicted of a crime punishable by more than

22   one year and count Six is a narcotics distribution count

23   involving distribution of more than 28 grams of crack cocaine.

24         The proof the government has offered is that Leonard

25   Mathews ordered the shooting of Isaac Toribio and that he

1    worked with other gang members to carry that out.  It's not the

2    government's theory that Mathews carried out the shooting

3    himself and nor do these charges require that he did.  But I

4    expect that Judge Oetken will instruct you that with respect to

5    Counts One, Three, Four, Five and Six, that you may find the

6    defendant guilty if he aided and abetted these particular

7    crimes.

8          What's at the heart of this matter with respect to

9    those charges is that the defendant caused or ordered these

10   crimes to be committed.

11         Count Six on the other hand relates to the

12   distribution of crack cocaine.  Defendant has all but conceded

13   this point.  In fact, during our opening remarks Mr. Kaye

14   himself told you that Mathews was a petty street-level crack

15   dealer.  His argument is not that Mathews is not a crack dealer

16   but rather, that his drug dealing is trivial at best.  But

17   there is no triviality defense in the law.  The terms of a

18   statute are what control and the government has proven that

19   charge through the evidence we're about to go through now.

20         So let's move to the evidence of the defendant's

21   membership in The Bloods, the Gangsta Milla Bloods.  You may

22   recall that during the trial Mr. Kaye asked a number of the

23   government's witnesses whether they had ever heard Leonard

24   Mathews being called "The Big Homie".  Well, the answer is

25   clearly "yes".  Ciara got up there and told you that herself.

IA1AAMAT1                    Jury Trial

1   In fact, she didn't know him by any other name than "The Big

2   Homie".

3           But there's another person who called him by that

4   name.

5           (Videotape playing)

6           So what should we take away from that video?

7           One:  GMB, GMB.  The defendant is proclaiming his

8   affiliation with the gang.

9           Two:  Big Homies' on the set.  Big Homie's on the set.

10  This is the defendant himself calling himself the big homie.

11          What else is important about in video?  He refers to

12  himself as "Ls".  And that will become important later on as we

13  go through the evidence.

14          But when the defendant says GMB, GMB, Big Homie's on

15  the set, you know what those words mean.  You heard Detective

16  Jeselson, a 21-year veteran of the NYPD tell you about the

17  significance of the term "big homie".  How it's a moniker for a

18  gang member with rank or seniority.  He also told you about the

19  hand signs and social media hash tags that are commonly used by

20  Bloods members and that they use these hash tags to name their

21  sets.

22          Detective Jeselson told you about one of the ways

23  blood members are initiated into gang.  Specifically, how they

24  can be blooded in or beaten by fellow gang members.

25          And he told you about the significance of the number

IA1AAMAT1                    Jury Trial

1    21.  So when the defendant shouts "GMB, GMB, Big Homies' on the

2    set" you know the meaning behind those words.  And remember the

3    video we just viewed came from the defendant's phone and was

4    recorded by the defendant himself.

5        What are some of the other evidence found on the

6    defendant's phone?  Well, there are his text messages.  Here

7    you see Mathews communicating via text with someone identified

8    as GMB Piff and that Mathews is discussing Milla history and

9    using the acronyms Detective Jeselson told you about such as

10   EKG which stands for East Coast Gangster.  Note the pattern of

11   replacing the letter "C" with the letter "K" so as not to use

12   the initials of their dreaded rival The Crips.  You'll also see

13   GMB Piff listed in DeJesus' phone.  There are additional text

14   where Mathews continues discussing Milla history and identifies

15   him as Gangsta Ls.

16       Even more text show the defendant speaking about UBN

17   lengo which Detective Jeselson identifies that acronym as

18   United Blood Nation.

19       There's also the video as narrated by the defendant

20   filming the beating of a new recruit for 21 seconds.

21           (Videotape playing)

22       MR. GENTILE:  Twenty-one.  On top of all this evidence

23   you heard Detective Cole get up there on the stand and testify

24   about what the defendant said to him on the car ride down to

25   court.  "I'm a Milla Blood".

IA1AAMAT1                    Jury Trial

1          Let's look at some of the other members of the GMB

2     set.  First there's Juan DeJesus pictured on the left with the

3     defendant.  Juan DeJesus, as we all know, is Mathews loyal foot

4     soldier and the person he called immediately after the fight

5     with Toribio.  DeJesus' phone contacts contain evidence of his

6     relationship with the defendant as this picture shows and of

7     his membership in the gang.  He listed Mathews as GMB Gangsta

8     "L".

9          Take note of the picture on the right where you can

10    see DeJesus and others, especially the person all the way on

11    the far right with the blades.  He'll play an important role in

12    some of the evidence that we'll go through today.

13         When texting with others DeJesus identified himself as

14    Dolla Gangsta Milla Blood Two.  And you heard testimony from

15    the Department of Corrections about how DeJesus as recently as

16    June 2018 admitted that he was a Bloods gang member.

17         Altagracia Coleman told you how she specifically

18    remembered the interviews she conducted with DeJesus and how he

19    told her on two separate occasions that he was a member of the

20    Bloods.

21         Other gang members include Antonio Avila a/k/a "Bigz

22    Milla" senior posing with Mathews on the right under the

23    "caption whole bunch of gangstas".

24         Look on the right next to the term "whole bunch of

25    gangstas" you'll see the red box "B".  You see Mathews flashing

1    the lower case "b" gang sign, a sign that Detective Jeselson

2    told you about.  And look at how they post their messages.

3    They continue to use the "K" instead of the letter "C".

4              But you also heard testimony from Deeana Seabrooks

5    about how Bigz Milla sells drugs for the defendant, a fact

6    known to her because she was told that by the defendant and

7    because she bought drugs from Bigz Milla.  There were times

8    when Seabrooks went to the defendant to buy crack and he

9    referred her to Bigz Milla telling her he has my work.

10             Where else do we see Bigz Milla?  Here in the Bloods

11   video we just watched.  You see him on the left wearing the red

12   shoes, the red beads and the red hoody, all colors of The

13   Bloods gang.

14             Anthony Avila's brother, Bigz Milla is David Avila,

15   a/k/a Drock Da Don.  David Avila is another member of the

16   Gangsta Milla Bloods.  And you were shown screen shots of him

17   from Facebook dressed in red posing with others including his

18   brother flashing gang signs as can be seen in these two photos

19   on the bottom.

20             What's significant about David Milla is that he was a

21   part of a pack of gang members seen with Mathews and DeJesus on

22   the night of the shooting on the corner of Kingsbridge Road an

23   Creston Avenue by the deli.

24             And then there's Francisco Padilla a/k/a "Frank White"

25   shown in this photograph with two men flashing gang signs.  He

was a gentleman I referred you to before in the picture with
DeJesus.  Frank White was identified by both Edwards and
Seabrooks as one of the individuals surrounding the defendant
on the night of the shooting.  His name was mentioned on a jail
call between DeJesus and Mathews after DeJesus' arrest for the
attempted murder of Ciara Edwards.  Edwards also testified that
Frank White was one of the people who along with DeJesus, the
defendant and others, was present in the defendant's bedroom
after the shooting when Mathews wiped off the gun in an effort
to remove the fingerprints.  And he was one of the people who
remained in the bedroom after Ciara Edwards exited and waited
outside.

          To be clear, these aren't the only members of GMB as
represented in this photo which shows gang members including
Juan DeJesus gathered around for a group and using the hash tag
"GMB".

          Here you see the contacts list of DeJesus' phone.  And
if we go through just a few of them GMB Booda, GMB DNA, GMB
Flipp, GMB Gangsta L, these are all gang members.

          But we know that Bigz Milla and Juan DeJesus and Frank
White are the ones who the defendant trusts the most.  When
Mathews needed help after the October 20 fight with Toribio,
who did he call for backup?  Juan DeJesus.  When the defendant
was unable to accommodate his drugs customers, who did he send
them too?  Bigz Milla.  When defendant convened a meeting in

IA1AAMAT1                        Jury Trial

1    his bedroom after the shooting, frank White was among those

2    included.  Whereas Bigz Milla sells drugs for Mathews

3    generating the income that's so vital to the gang's existence,

4    Juan DeJesus inflicted punishment on those who challenged or

5    disrespected the gang, its turf, its members, especially its

6    big homie.

7            What I want to do now is go through a timeline with

8    you of evidence that you've already seen, video clips that

9    you've already seen.  But I want to present them to you in a

10   chronological order to help you understand the events that

11   unfolded that night October 20, 2017.

12           As we go through these clips I am going to note the

13   time and each PowerPoint slide and I am also going to point you

14   to the government exhibit in the bottom right-hand corner of

15   each one.  So, if there is any particular slide or piece of

16   evidence that you find particularly relevant, write it down and

17   you'll know what to look for during your deliberations.

18           I am going to walk through the shooting with you but

19   there are three locations that I want you to keep in mind.

20   There is the defendant's residence which as you know is located

21   next door to a laundromat and a place where the defendant sold

22   drugs.  There's a deli on the right-hand side of this

23   PowerPoint slide on the corner of Creston Avenue and

24   Kingsbridge Road which served as sort of a base of operations

25   for the defendant and his crew.  And then there's the scene of

IA1AAMAT1                         Jury Trial

1    the shooting at 2693 Morris Avenue.

2              This, ladies and gentlemen is the heart of GMB

3    territory.  At the deli you saw a number of different camera

4    angles.  The entrance shown here with Mathews and Edwards

5    inside is an overhead shot on the inside.

6              Next, there are two outdoor angles, on pointing up

7    Creston on top and the other pointing down Kingsbridge Road

8    which can be seen on the bottom.

9              As you go through the videos please pay close

10   attention to the timeline in the clips and the screen shots as

11   they make clear how quickly the events of that night unfolded.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GENTILE:  (Continuing)  Here, you're going to see

2    Mathews and Toribio get into a heated discussion, and you will

3    see just how close Edwards is to the action.  So when she told

4    you about the exchanges between Mathews and Toribio, she was

5    within inches of the two participants.

6          The time on this video is 9:42 p.m.  And this is the

7    first of the videos leading up to the shooting.

8          In the next clip, Toribio appears to say something to

9    Mathews that forces him to respond.

10          As we go through these videos, ladies and gentlemen,

11    there's a lot going on, I know, but please keep an eye out for

12    the people around him:  The guy walking into the picture now

13    with the blue backpack, the guy trying to break up the fight in

14    the red.

15          As you can see, ladies and gentlemen, Toribio did not

16    back down that night.  Immediately after the fight -- we're at

17    9:49 p.m., six minutes later -- you see Mathews get on the

18    phone and call his enforcer, Juan DeJesus.

19          Here is another clip right after the fight, at

20    10:00 p.m.  Isaac Toribio just walked out of view.

21          Whatever description you want to assign this fight --

22    whether it's a scuffle or a brawl -- clearly, Leonard Mathews

23    thought of it as something more.

24          We are now at 10:08 p.m.  Minutes later,

25    reinforcements arrive:  Juan DeJesus, Frank White, David Avila,

1    the man in the red, the guy with the blue backpack, and then

2    Ciara Edwards.

3            Next, you watch how the Big Homie rallies his troops

4    to plot revenge.

5            We're at 10:13 p.m. now.  So who is in this video?

6    Juan DeJesus, Frank White, David Avila, blue backpack, and this

7    gentleman with the baseball cap.

8            So the next slide, we're at 10:25 p.m.  You have

9    additional gang members showing up.  Light blue hoody, Gap

10   hoody, pay close attention to these two individuals as well.

11   You'll see them throughout the videos that we watch, and you

12   will see them return after the shooting to Mathews' apartment

13   on Jerome Avenue.

14           After the plan to shoot Toribio was hatched, DeJesus

15   told Edwards that they had to put work in for the Big Homie.

16   Edwards told you how she was directed by DeJesus to go retrieve

17   the gun.  Watch as Edwards follows the three members of

18   Mathews' gang down the block.

19           Remember, ladies and gentlemen, this is exactly how

20   Ciara Edwards explained it.

21           While Edwards is retrieving the gun, you can see

22   Mathews is still angry about the confrontation earlier in the

23   evening.

24           We're at 10:35 p.m. now.  Less than five minutes

25   later, Edwards returns, and the defendant directs her and

IA1KMAT2                    Summation - Gentile

1    DeJesus into the deli.  Ladies and gentlemen, watch this video

2    closely, as it leaves little doubt who is in charge here.

3            At this point, Edwards has the gun in her waistband,

4    and he directs her into the deli right there.

5            The defendant is not just directing the activities of

6    DeJesus and Edwards, but everyone around him.  Think to

7    yourself:  Who is calling the shots here?

8            After being directed into the deli by Mathews, DeJesus

9    and Edwards go into the deli, so that DeJesus can make sure his

10   gun is locked and loaded.  But before we get to that video,

11   these are the gestures that the defendant is making when

12   Edwards comes back with the gun.

13           We're now at 10:41 p.m.

14           Edwards told you what Mathews' instructions were, and

15   you just saw it on video.  Mathews knew that DeJesus had a gun

16   because he just directed him into the deli to check it.

17           So the next two videos I want to play you, I'm

18   requesting to play side by side.  They're two separate angles

19   of the deli, and they don't completely correspond timewise.  So

20   I'm going to start one first, and then when it gets to a

21   certain point, I'm going to start the other, so that you will

22   see basically a 90-degree angle of the deli, you'll see the

23   overshot, overhead angle out the front door, and then you'll

24   see the Creston Avenue side of the deli.

25           This is when DeJesus comes out of the deli after

1    checking the gun.  We're at 10:42 p.m. here.  He goes to the

2    corner with Mathews and has a private discussion with him.

3              At the same time, Edwards is still inside the deli.

4              They're both playing side by side now.

5              Watch Mathews as he crosses the street with the white

6    shoes.  Edwards comes out is sent back in.

7              On the right-hand side, in the dark, you can barely

8    see the dark figure across the street.

9              David Avila now crosses the street over to where

10   Mathews is standing.

11             David Avila comes back.  And now the light blue hoody

12   will be directing her out.

13             The screen on the right, you're going to see Mathews

14   cross the street and join Edwards and DeJesus walking up

15   Creston Avenue.  The other gang members will now go down

16   Kingsbridge up towards Morris.

17             The next group of photos are still photos of the

18   videos we just viewed.  I just want to point out to you the

19   important parts of the video.  Mathews giving the instructions.

20   Look at his sneakers on the top left photo.  He crosses the

21   street.  As the bottom left photo shows, Edwards and DeJesus

22   walk up Creston from coming out of the deli, and you see those

23   white sneakers cross the street.

24             This is the route they traveled.  So the deli is on

25   the corner of Creston and Kingsbridge.  They come out of the

1    deli, walk up Creston towards 196th Street, make the left, and

2    then the left again on Morris Avenue, up to the scene of the

3    shooting, at 2693.  And, of course, we know what happens

4    minutes later.

5        Now, this video shows a 9:40 timestamp.  We know

6    that's not correct.  Based on all the other videos and all the

7    other evidence that you've been presented, we know that's an

8    hour off, at least.  Here, you see what looks like Isaac

9    Toribio crossing the street, over by 2693 Morris Avenue.  And

10   here comes DeJesus with Edwards in tow as he fires multiple

11   gunshots in the direction of Isaac Toribio.

12       You heard from the responding police officers and the

13   evidence collection officer about the spent bullet recovered in

14   front of 2693 Morris and the five shell casings that were

15   recovered near 2725 Morris.

16       After the shooting was over, you watched Mathews,

17   DeJesus, Edwards, and other gang members walking back to the

18   defendant's apartment, where Edwards gives Mathews the gun, and

19   he wipes it down.

20       We're now at 10:50 to 10:54 p.m.  On the left, you'll

21   see one of the people I pointed out to you on the corner of

22   Creston and Kingsbridge on the top left.  And to the left of

23   him that's not circled in red is Frank White.

24       On the top right, you'll see the defendant, and then

25   in the red box, you'll see the Gap and the guy with the light

IA1KMAT2                    Summation - Gentile

blue hoody.  The bottom left is DeJesus, and the bottom right
is Edwards.

These video and screenshots establish a clear timeline
of events for the night of October 20, 2017.  From the time
that Mathews got into the fight with Isaac Toribio on the
corner of Kingsbridge and Creston to the time that he, DeJesus,
Edwards, and the other gang members arrived back at the
defendant's apartment on Jerome Avenue after the shooting, a
little less than an hour and ten minutes had elapsed.

The video evidence supports everything that Ciara
Edwards has told you.  It supports her testimony about Mathews
being the big homie of the Gangsta Milla Bloods; about being
told by DeJesus to go get a gun; about how Mathews was with
DeJesus when they went to shoot Isaac Toribio, and it supports
her statements about being in the defendant's apartment after
the shooting.

How else do you know that the defendant is involved in
this shooting?  Several hours after the shooting, in the early
morning hours of October 21st, the defendant gets a text
message from Juan DeJesus, and it says:  "Yo, bro, don't talk
about today to no one, not even Cindy."  Mathews writes back:
"Stop hit me like that.  I'm grown.  I love you to death, bro,
but dead.  LOL.  You're the only one who talk."  Now, he didn't
send that message, and I think the reason he didn't send that
message is because it was so incriminating, because at

1   12:46 a.m., Ciara Edwards was getting stabbed or had just

2   gotten stabbed 16 times in St. Mary's Park.

3          But Mathews doesn't send this message.  He deletes it

4   instead because he knows that they can't speak about it.  And

5   Mathews meant what he said because only a week later, as he's

6   interviewed by Detective Maye, what does he do?  He lies about

7   knowing Juan DeJesus.

8          He tells Detective Maye:  "I don't know nobody in the

9   photos that you just gave me."  Those photos were of Ciara

10  Edwards and Juan DeJesus.

11         The defendant told Detective Maye a bunch of other

12  lies that evening.  He told them that he was at the deli on

13  Creston and Kingsbridge when the shooting took place, but

14  didn't hear about the incident until three or four days after

15  the fact.  Then midway through the interview, Mathews admits to

16  being on the block of the shooting and hearing four shots being

17  fired.  Mathews also told Maye that he was alone when the

18  shooting occurred and wasn't with Edwards or DeJesus, all of

19  which you know is not true.

20         These false exculpatory statements are evidence of

21  Mathews' consciousness of guilt.  The whole time this is going

22  on, Mathews is checking the news every day to see if there are

23  any reports on the attack that he ordered DeJesus to commit.

24  These are just some of the searches that the defendant had on

25  his phone.  "Innocent Bystander Shot in the Bronx; Suspect

IA1KMAT2                     Summation - Gentile

Sought."

          By mid-November, it's no surprise that Juan DeJesus is
in jail and facing charges in connection with the shooting and
the attack on Ciara Edwards.  But the defendant continued to
try and tie up loose ends, and in at least one conversation
with DeJesus, who was in prison at the time, the two men
discuss the severity of the charges DeJesus faced.

          At one point, Mathews tells DeJesus that he tried to
see if he could have the little birdie disappear.  We all know
what he means by that.  We know what he means by that because
of DeJesus' response:  "Once she's out of medical."  Ciara
Edwards is out of the hospital at this point, on November 14,
2017, but these defendants don't know that.

          During the same conversation, DeJesus and Mathews
discuss David Avila, who is Bigz Milla's brother and who was
presented on the corner of Creston and Kingsbridge on the night
of the shooting.  And Mathews tells or reassures DeJesus that
he would send David Avila to help him out while he is in jail.

          In addition to Edwards' testimony, you heard from two
of the victims who came here and provided testimony, even
though they both still live in the neighborhood that is home
turf to Mathews' gang.  First, Deeanna Seabrooks told you about
what she experienced the night of October 20th, 2017, when she
was gunned down, and she told you about how she knew the
defendant and the members of his crew.  Seabrooks admitted to

being a heavy crack user, and that she's been using crack for

years.  And she told you about her strange twist of fate where,

after only a couple of days out of the hospital, she runs into

the defendant, and he gives her free crack.  Why is that?  To

keep her quiet.

     For more years than she was able to remember,

Seabrooks told you about her crack habit and who she purchased

her drugs from.  Leonard Mathews.  Seabrooks testified that on

a regular basis, she purchased two bags of crack from the

defendant for many years, and that even though the defendant

typically charged her $10 for each bag, he gave her free crack

two days or a couple of days after she got out of the hospital.

     But that's how someone like Leonard Mathews operates;

when the wrong people get shot, he just gives them crack.

Seabrooks told you that there were many times when the

defendant would direct her to Bigz Milla, who worked with

Mathews and who, according to the defendant, has my work.

     Keisha Hood also testified at length about her

dealings with the defendant and described her drug habit in

terms that were both tragic and astonishing.  In the year

leading up to the shooting, Hood told you she purchased $50

worth of crack from the defendant every single day.  But you

know that Deeanna Seabrooks and Keisha Hood weren't the

defendant's only customers.  How do you know that?  Because he

was arrested in December of 2017 for selling crack.

1          Here, you see the defendant sell crack to an elderly

2     man with a cane.  You heard from the officers who arrested him

3     that day and saw the events of December 12, 2017, unfold from

4     beginning to end.  You saw Mathews exit his apartment building

5     after being called by this customer and responding to the

6     laundromat to provide him with the crack.

7          Even after his arrest in December 2017 for selling

8     crack inside the laundromat, the defendant didn't slow down.

9     The very next month, Detective Cole went into his apartment and

10    found crack cocaine.  He found cocaine, a scale, and

11    drug-packaging materials.  The items seized during the search

12    warrant and the photos Detective Cole took during his execution

13    further corroborate Ciara Edwards' testimony.  These items were

14    recovered from the same bedroom that Ciara Edwards told you she

15    was in on the night of the shooting and the same bedroom she

16    left shortly before being stabbed 16 times by Juan DeJesus.

17         Edwards told you about the electronic scale and the

18    Ziploc bags she observed the defendant use to weigh and package

19    drugs.  In fact, she identified the electronic scale in the

20    photos Detective Cole took as the same electronic scale she saw

21    when she was in the apartment with Mathews and DeJesus.

22         There is no real dispute that Leonard Mathews is a

23    drug dealer.  You heard Mr. Kaye tell you that during our

24    opening remarks.  But the government's case doesn't rest on

25    whether the defendant is a kingpin or a wholesaler of drugs.

IA1KMAT2                    Summation - Gentile

The government alleges that the defendant, as a street-level

drug dealer, tried to have somebody killed who he felt

threatened his position as a big homie in the Gangsta Milla

Bloods.  The amount of drugs the defendant distributed is only

relevant to the extent that he sold 28 grams or more of crack

cocaine, which, as demonstrated above, he clearly did, but

we'll go into the math later on.

          But even a street-level crack dealer can wreak havoc

in a community.  In fact, you need not look beyond Ciara

Edwards, Deeanna Seabrooks, or Keisha Hood, or the man with the

cane to understand the effects of the poison this man sells.

Each of those individuals bears scars from the epidemic that

the defendant promotes.  For Deeanna Seabrooks, the elderly man

with the cane, and Keisha Hood, it's the effects of

consumption, whereas with Ciara Edwards, she's a casualty of

the violence that plays a part in the business of running a

drug ring.

          We spoke briefly about the charges before, but I'm

going to say a little bit more about them.  Before I do, I just

want to say, once again, that the instructions that Judge

Oetken will give you control.

          As I stated before, the defendant is facing six

charges.  Counts One, Two, and Three are violent crimes in aid

of racketeering.  Counts Four and Five relate to firearms and

ammunition in connection with the shooting.

IA1KMAT2                        Summation - Gentile

1        There are five elements for Counts One through Three,

2    and the government must prove beyond a reasonable doubt the

3    existence of, one, an enterprise.  In this case, the enterprise

4    is the Bloods gang.  Here, the defendant was a member of the

5    enterprise, or the Bloods, for years, going back as far as at

6    least 2014, as you saw in those Facebook posts that were

7    entered into evidence.

8        The second element is that the enterprise was engaged

9    in racketeering activity.  The government alleges two

10   categories of racketeering activity that the government must

11   prove beyond reasonable doubt:  The attempted murders and

12   conspiracy to commit murder of Isaac Toribio and Ciara Edwards.

13       There's also the defendant's drug-dealing, which there

14   is little dispute about.  Here, you not only heard about the

15   defendant's drug-dealing, but you saw him in action.

16       The third element is interstate commerce.  You heard

17   testimony from the ATF special agent that the shell casings

18   that were recovered at the scene of the shooting were

19   manufactured outside of New York State.  And, in addition, I

20   expect that Judge Oetken will instruct you that drug-dealing,

21   even purely local drug-dealing, has a substantial effect on

22   interstate commerce.

23       And, four, the violent crimes that the defendant is

24   being charged with can be found in Counts One, Two, and Three.

25       And the motive:  The defendant's motive was to

maintain or increase his position in the gang.  That's what the

government has to prove beyond a reasonable doubt.  The

defendant's motive here is to sell drugs in connection with his

activities.  In fact, the only reason the defendant is able to

control his territory and continue to sell crack is through the

protection that his gang provides.  DeJesus, as a member of

that gang, knew it was expected of him to shoot Toribio because

his superior in the gang ordered him to do it.

          With respect to Counts One and Three, please listen

carefully to Judge Oetken's instructions on aiding and

abetting, because even if the defendant did not have the motive

to kill Toribio to keep or maintain his position in the gang,

it is enough if Juan DeJesus followed the defendant's orders to

maintain his position in the gang.  And evidence of this is

found in DeJesus' statement to Edwards, that he had work to do

for the big homie.

          Count Four is the firearms possession.  The defendant

is charged with aiding and abetting DeJesus' possession of a

firearm.  There are three elements to this charge:  That the

defendant willfully caused or aided and abetted someone else's

use, carrying, or possession of the firearm.  Here, the

defendant knew that DeJesus was carrying a firearm because he

was the one who ordered him to do the shooting, he was the one

who ordered him into the deli, and he was the one who

accompanied him when he fired those shots.

1      The second element is that the defendant willfully

2  caused or aided and abetted someone else's use or carrying of a

3  firearm during and in relation to one of the crimes of violence

4  charged in Count One or Count Three.  Likewise, the defendant

5  was the one who ordered DeJesus to shoot Isaac Toribio on

6  October 20, 2017, and worked with DeJesus to obtain the firearm

7  for that purpose.

8      The third element is that Mathews acted knowingly.

9  And, clearly, the defendant acted knowingly because he planned

10 the shooting and ordered his fellow gang member, DeJesus, to

11 participate in it.

12     Count Five is an ammunition offense.  There are three

13 elements to this charge:

14     One, that Mathews was convicted of a crime punishable

15 by a term of imprisonment of more than one year.  Here, the

16 parties stipulated to the fact that he was convicted of a crime

17 punishable by a term of imprisonment of more than one year.

18     The second element is aiding and abetting, that the

19 defendant knowingly possessed ammunition, or willfully caused

20 another person to knowingly possess ammunition, or aided and

21 abetted another person -- person's knowing possession of

22 ammunition.  It is sufficient that the government proves beyond

23 a reasonable doubt that Mathews aided and abetted the

24 commission of these offenses or that the defendant willfully

25 caused someone else to commit the offense.  But, again, please

1    listen carefully to Judge Oetken's instructions in this regard.

2            Finally, interstate commerce.  As previously stated,

3    you heard testimony about where the five shell casings that

4    were recovered at the scene of the shooting were manufactured.

5    They were not manufactured in New York State.

6            And the last count is the narcotics distribution

7    charge.  There are three elements to this charge:

8            That the defendant distributed or possessed with the

9    intent to distribute crack cocaine.  Again, there is little

10   dispute that the defendant is a crack dealer.  You saw him on

11   video, and he was arrested again for that conduct in January of

12   2018 by Detective Cole.

13           The second element is that he was a knowing

14   participant.  Likewise, there is no dispute that the defendant

15   was a knowing participant in the activities he organized and

16   supervised.

17           And the third is that the substance was, in fact,

18   crack cocaine.  You heard testimony from two criminalists from

19   the New York City Police Department laboratory, who testified

20   as to the presence of crack cocaine in the items seized from

21   the defendant.  The only real dispute here is the amount of

22   drugs.  Mr. Kaye has emphasized throughout the trial that

23   Mathews was a small-time dealer.  That's because Mathews is

24   charged with distributing 28 grams or more of crack cocaine.

25           However, in the year leading up to the shooting,

1    Keisha Hood told you she purchased $50 of crack cocaine from

2    the defendant every day.  The cumulative amount of the

3    defendant's crack sales to Keisha Hood alone are more than

4    enough to meet the threshold of 28 grams.  She testified that

5    she purchased $50, or five bags of crack, from Mathews every

6    day for a year.  That would mean the defendant sold over 1800

7    bags of crack cocaine to Keisha Hood alone.  If each of these

8    bags weighed approximately 0.082 grams, as calculated by the

9    two police criminalists in their analyses of drugs recovered

10   from the defendant's apartment and the drugs recovered from a

11   sale the defendant made on December 12th, 2017, that means the

12   defendant sold more than 145 grams of crack cocaine to Keisha

13   Hood alone during that year.

14           Even if you reduce that amount by three-quarters, it

15   would still amount to more than 35 grams, well beyond the

16   statutory threshold of 28 grams.

17           Ladies and gentlemen, when we first addressed you here

18   last week, we asked you to do three things:  To listen to Judge

19   Oetken's instructions, pay close attention to the evidence, and

20   to use your common sense.  I'm going to ask you to do those

21   same three things as you listen to the rest of the closing

22   arguments and then as you go back to deliberate.  If you do

23   those three things, you'll reach the only verdict consistent

24   with the evidence, with the law, and your common sense, and

25   that's that Leonard Mathews is guilty as charged.

IA1KMAT2                        Summation - Mr. Kaye

1              Thank you.

2              THE COURT:  Thank you, Mr. Gentile.

3              Ladies and gentlemen, counsel for the defendant,

4    Mr. Kaye, will now have an opportunity to address you.  Let me

5    first ask if anybody needs a quick bathroom break?

6              Yes?  I think a couple of them do.  Why don't we take

7    a five- to ten-minute bathroom break.  Please leave your pads

8    on your chairs, and then we'll have closing argument of defense

9    counsel.

10             (Jury not present)

11             THE COURT:  We will recess for ten minutes.

12             (Recess)

13             THE COURT:  All set?

14             MR. KAYE:  Yes.

15             THE COURT:  Okay.

16             (Jury present)

17             THE COURT:  Members of the jury, we will now hear the

18   closing argument on behalf of the defendant.

19             Mr. Kaye.

20             MR. KAYE:  Thank you, your Honor.

21             Good morning, ladies and gentlemen.

22             JURY MEMBERS:  Good morning.

23             MR. KAYE:  Ladies and gentlemen, your verdict, of

24   course, will be meaningful to Leonard Mathews, but your verdict

25   will also stand the test of time here.  It will have meaning to

the community principally because your verdict will last

forever.  This verdict will be on the book, so to speak, for

eternity, and I know that you want to get it right.  And I know

that you will.

Each of you individually are a force to be reckoned

with.  You have power, you have influence, individually and as

a whole, you are the gatekeepers, you stand between the mighty

power of the federal government and one of its citizens.  You

each have been chosen to serve because you are men and women of

sound judgment and fairness.  You have each taken an oath, as

jurors, to deliberate fairly and honorably in judgment of a

fellow citizen, and I know that you will do that.

In a very real sense, any defendant on trial relies

upon his jury for the protection of his life, his liberty, and

his happiness.  And I remind you that if any one of you has a

reasonable doubt as to the defendant's guilt on any of these

charges, it is your duty to vote not guilty.

The verdict sheet speaks for itself.  It speaks about

the presumption of innocence.  When you receive the verdict

sheet, you will see lines.  The first line on the verdict sheet

is "Not guilty."  The line to the right is "Guilty."  It's like

that for a reason -- the defendant is presumed innocent, he is

cloaked with innocence.  Not until you are convinced,

individually, beyond a reasonable doubt that the government has

met its burden, has held up its part of the bargain, does that

1    cloak of innocence fade away.  And that is why the verdict

2    sheet will begin with the words "Not guilty."

3         It is not my role -- it is not the defendant's role --

4    to prove innocence.  It is the government's role to establish

5    guilt beyond a reasonable doubt.  The point I am trying to make

6    is that jury deliberation is what this is all about, not jury

7    capitulation.  You are not to simply give in because we have

8    all spent hours and hours of our lives here day, after day,

9    after day.  Each of you, separately and individually, are

10   entitled to your own vote.

11        And I ask you to stand your ground.  If you have a

12   reasonable doubt, listen to your jurors, deliberate with your

13   fellow jurors, by all means, but if you have done so, and you

14   still harbor a reasonable doubt, even one juror, that juror is

15   entitled to his or her own verdict.  I am not encouraging a

16   modern-day 12 angry men and women; I am just emphasizing what

17   you already know.

18        Now, the evidence has shown that Leonard Mathews is

19   indeed a small-time, street-level petty drug dealer.  He sells

20   tiny pinky nail size bags of crack cocaine to poor people in a

21   poor neighborhood, a neighborhood that he grew up in, a

22   neighborhood that he went to school in.  He lives in a sparsely

23   furnished room in his mother's apartment.  We know he has no

24   car.  We know he has no expensive watch or jewelry.  We know he

25   has no clothing to speak of.  A few hundred dollars of cash was

1    on hand in his room when Detective Cole executed the search

2    warrant.  Whether he sold as much as 28 grams over the time

3    period alleged in the indictment, I leave that in your capable

4    hands.  If you are convinced beyond a reasonable doubt that the

5    government's math adds up, you would be well within your role

6    as jurors to conclude that the sixth charge of the indictment

7    has been proven, and, frankly, I expect you will convict him of

8    the sixth count in the indictment.

9            Please don't get me wrong.  I am not encouraging crack

10   dealing.  I am not suggesting that crack dealing is not a

11   serious federal offense; it is, and there are serious

12   consequences.  But Leonard Mathews is innocent of the first

13   five charges in the indictment.  He is not guilty of the first

14   five charges in the indictment.  He did not do this.  Someone

15   else did this.  Other people committed those crimes.  I think

16   you know that.

17           He did not order Juan DeJesus to commit the crimes

18   that he and Ciara Edwards committed.  Nor did he aid and abet

19   Juan DeJesus in committing the crimes that Juan DeJesus himself

20   committed.

21           I told you in my opening statement that you would hear

22   about a modern-day Bonnie and Clyde, and I believe I have

23   delivered.  She and he, Ciara and Juan, were indeed a match

24   made in hell.  DeJesus with his RAP sheet as long as my arm --

25   robberies, assault, arson, attempted murder -- it's Juan

1    DeJesus that should be sitting here at this table.  It is Ciara

2    Edwards that should be sitting next to him at this table.

3    Because this crime was committed by them.  This was not

4    committed by Leonard Mathews.  It is not sufficient to conclude

5    that Leonard is guilty because he is the common denominator.

6    You must have proof beyond a reasonable doubt, which does not

7    fill this courtroom.

8            Human interaction in the form of videos, and clips,

9    and minutes and seconds does not add up like a math equation.

10   Human interaction is complex.  And I think you all know that.

11           I would like to talk to you about these five charges

12   and give you my impression of what we believe the evidence has

13   shown.

14           The first observation that I hope you make is that the

15   government itself doesn't really even know what happened here.

16   How could they know what happened here?  After all, they are

17   relying upon these silent movies that we have seen, narrated by

18   Ms. Edwards, a extremely disturbed young woman.  This silent

19   movie is costarred by two distraught and dysfunctional

20   individuals.  The government, I submit, to you is literally

21   talking to you out of both sides of its mouth.

22           I have an analogy I'd like to speak to you about.  I'd

23   like you to assume, for the purposes of this analogy, that the

24   government has packed your lunch.  They have fed you two

25   dishes.  The first dish:  Leonard Mathews ordered a hit on Ike

IA1KMAT2                         Summation - Mr. Kaye

1  to maintain his position in the Bloods.  You don't like the way

2  that dish tastes?  Okay.  Spit that out and try this other

3  dish.  Second dish:  Leonard didn't order a hit on Ike, it was

4  Juan DeJesus' idea, but Leonard aided and Leonard abetted Juan

5  DeJesus.  Two separate theories are being submitted to you.

6  Two separate theories are being argued to you by the

7  government:  A willfulness theory and an aiding and abetting

8  theory.

9          What I'm suggesting to you is that should tell you

10  that they don't know.  That, ladies and gentlemen, is the

11  essence of reasonable doubt.  The government doesn't know; they

12  want you to figure it out.  I asked Detective Cole on

13  cross-examination:  Detective Cole, does fight two play a role

14  in the motive for the shootings?  Fight two being the

15  Leonard-Ike scuffle.

16          At the transcript, page 365, if you want to ask for

17  it, he says:  Yes, it does.  Fight two does play a motive in

18  the shooting.

19          I asked Detective Cole whether fight one with the

20  Mexicans is connected to fight two, and he said he did not

21  know.

22          Well, Ciara Edwards was shown a video of fight one.

23  That's also in the transcript at page 574.

24          Why haven't you been shown the video by the government

25  of fight one?  These fights are interrelated.  You have to

IA1KMAT2                    Summation - Mr. Kaye

1   determine motive.  How do you determine motive beyond a

2   reasonable doubt without seeing the video of fight one, when

3   it's related to fight two?

4          You may want to infer that that is because Leonard is

5   a peacemaker in fight one.  At the transcript page 574, that's

6   what Ciara Edwards told us:  During fight one, between these

7   two Mexican individuals and Leonard, Leonard -- I'm sorry, and

8   DeJesus, Leonard broke it up, Leonard acted as a peacemaker.

9   These fights are related, and these fights are the motive for

10  the shootings somehow, and no witness called by the government

11  has reliably told us what was said.

12         It's not so much what we see, it's what is said.  You

13  know, in your daily lives, if someone says something to you,

14  that can set you off.  Then all we would see is you or me or

15  anyone going off.  It's what is said that triggers the fight

16  that's of critical importance.  That's motive.

17         We see what happened on fight two, but we don't know

18  what was said.  Whatever it was, I submit to you, will hold the

19  key to the motive for this ugly incident.

20         In case you don't recall what Ciara Edwards testified

21  to about fight two, what words she heard, I will remind you.

22  At the transcript, page 583, I asked her:

23  "Q.  Did you tell Detective Cole on January 8th, 2018, I really

24  don't remember, in all honesty, what Leonard and Toribio were

25  arguing over?  Did you tell them that?"

1    She answered:  "Yes, I do remember that."

2    She does not remember, in all honesty, what these two

3    were arguing over.  That is the end of the analysis.  She does

4    not know; she does not remember.

5    Now, none of us can rely on the government's motive,

6    that he was disrespected and acted out of a sense of revenge.

7    She was standing right there, can't deny that, we see that on

8    video, but she doesn't know what was said or she doesn't

9    remember what was said.  If you remember nothing else from my

10    summation, please remember that.

11    The first five charges are violent crimes and firearms

12    offenses in furtherance of racketeering.  In order to convict,

13    you must find beyond a reasonable doubt, among other things,

14    that the shooting was a racketeering activity and done in order

15    to maintain or increase Leonard's position in the Bloods gang.

16    But I ask you:  How can you exclude the possibility

17    that this was a purely personal shooting, personal between two

18    friends, having nothing to do with gangs, nothing to do with

19    racketeering activity?  When no one called by the government

20    knows what either fight was about, how do we exclude that?  I

21    submit, you cannot.

22    I mean, really, gangs are, for the most part, a bad

23    thing -- no one should doubt that -- but these people are

24    individuals too.  They are human beings.  They have lives, and

25    they have loves, and they have happiness, and they have

conflict, just like each of you.  Not every conflict they will

become embroiled in is a gang-related conflict, and the

government has not proven beyond a reasonable doubt what the

fight was about.  Ciara, in all honesty, she said did not know.

You may conclude, at the end of this case, that

Leonard Mathews did every single thing the government says he

did and that the video does involve, but that this was a purely

personal conflict, and if you find that, you must acquit.  That

is not a racketeering act; that is a personal act.

The subject of this fight has an unlimited number of

interpretations.  Last night, I Googled, what are the top five

pointless things people fight about?  Politics, no surprise;

religion; sports; race; and relationships.  But you all know

that it's endless.  We argue, and fight, and debate, and

bicker, and flip out over an endless myriad of topics.  The

problem with this is that we are in federal district court, we

are in the Southern District of New York, and you're being

asked to conclude that this fight was a gang-related fight,

that this fight motivated a racketeering activity.  And the

proof on that critical subject is not here beyond a reasonable

doubt.

Your verdict is not intended to make anyone happy.

Please don't be concerned about making either side happy or

sad.  That's got nothing to do with it.  It's not about doing

anything but the right thing.  You took an oath, as jurors, to

1    deliberate fairly.  You are not going to solve crime in this

2    city or in Bronx County by reaching a verdict of guilty on less

3    than proof beyond a reasonable doubt.  That is not justice.

4           We've heard the detective, the gang expert, testify to

5    you.  He was terrific.  Even though this was the first time he

6    had ever been qualified as a gang expert, he was a very

7    knowledgeable gentleman.  What he told you, though, was that it

8    depends on the subjective belief of the person.

9           Do you remember I said to him:  Oh, I want to give you

10   scenario one and scenario two.  Scenario one, I'm on the train,

11   I'm going to the Barclays Center to see Drake, I'm with my

12   grandmother, and there's a gang member on the train, and I

13   accidentally step on his toe, and he just beats the daylights

14   out of me.  Is that a gang offense?  I think he said that was

15   gang motivated, right?  If he was doing that in front of his

16   other garage members, then that could have been gang motivated

17   to show he's tough, nobody can step on his toe.  But at the end

18   of the day, it's subjective, it's in the person's mind.  What

19   are they thinking?  What was DeJesus thinking?  What was

20   Leonard thinking?  Has the evidence filled that void?  Do we

21   know what people are thinking?  We don't know what they're

22   thinking.  The government didn't call the right witnesses to

23   fill that gap.

24          The bottom line is I submit to you what the government

25   has done is they have thrown two very different theories at you

IA1KMAT2                    Summation - Mr. Kaye

like a bowl of spaghetti, hoping that it's going to stick upon

each of you.

          I believe also in my opening statement, I told you

that Detective Cole was a smooth talker.  And, again, I believe

I delivered on that promise.  How many times during my

cross-examination of the detective did he say, "I don't

remember, I don't know"?  I don't know, I don't know, I don't

know, I don't remember.  He could not remember even what he was

looking at in one of these black looseleafs that sat in front

of him for a week.  I hope you remember that line of the

examination.

          Detective Cole wouldn't or couldn't even admit to me,

and you, that looking at one of his own writings, something he

jotted down, would refresh his recollection of what one of the

witnesses said to him.  Think about that for a second.  You

take notes of a conversation you had with a friend.  Someone

asks you, well, what did the friend say to you?  I don't -- I

don't remember, you say I don't remember.  Well, would looking

at the notes that you took of the conversation refresh your

recollection?  Of course it would.  It would every day of the

week, it would every month of the year, but not to the NYPD

Detective Elvis Cole.  Think about that when you start thinking

about the credibility of the witnesses that the government has

put before you.

          I submit to you, that was dishonesty.  The Court will

tell you in its instructions, if you feel that a witness has

lied about one thing, you're well within your rights to believe

the rest of that witness' testimony or discount that testimony

entirely.

Detective Cole also repeatedly dodged questions.  Do

you remember all those questions I posed to him about Facebook?

Who posted it?  All he had to say was simply:  I don't know.

The Facebook seemed to be the account of someone named Bigz

Milla.  My point was unless we're there in the room when Bigz

Milla is putting up, uploading, the photograph, we don't know

that Bigz Milla is the person that did it.  It could have been

his father, it could have been his brother, it could have been

his son.  The point is a simple point:  The detective could not

bring himself to be honest on that point and just say, I don't

know, counselor.  And I would have moved on.  Instead, we spent

ten or fifteen pages of the transcript just battling back and

forth on a silly point.  But it's turned into something

significant.

Think about the police witnesses.  If the police

witnesses are willing to be such a member of Team USA, can you

only imagine the pressure on the civilians, the nonpolice

witnesses, to do what's expected of them, to say what's

expected of them.

Do you remember the first witness in this case,

Detective Steven Reyes?  He sat there, he put into evidence the

1   shooting video where you see the flash coming out of the gun

2   that Juan DeJesus is firing.  I said to him:  Is that the

3   defendant firing the gun?  We all know now that was not the

4   defendant firing the gun; that was DeJesus firing the gun.  But

5   what did Detective Steven Reyes say?  He said haltingly, I

6   would say yes.  What is the mindset of a police detective that

7   would, without any basis, say what he thinks the right thing to

8   say was for the government?  He was wrong, he was dishonest.  I

9   think it's just outrageous.

10          So when you start to examine this case that they

11   brought you under a microscope, as you must, as jurors,

12   remember these things.  This is not a personal win and loss.

13   We are in a criminal matter of great importance and

14   significance to Mr. Mathews.  You can't just say, yeah, I think

15   it is, it's him, it's him.

16          Now, I also asked Detective Cole if he interviewed

17   Toribio, and he said he did.  You see how the government

18   dragged Deeanna Seabrooks and Keisha Hood in here, subpoenaing

19   them, literally dragging these women in here and giving them

20   both nonprosecution agreements?  These are two of the most

21   vulnerable women you have ever seen.  They are drug taking,

22   they are irritable, they are restless addicts, and above all,

23   they are unreliable.  Detective Cole managed to bring these two

24   in here, didn't he?  And ask yourselves:  Did the government

25   play all of the videos they have collected, or did they just

IA1KMAT2                        Summation - Mr. Kaye

play snippets of videos here and snippets of videos there, in

their 20th Century Fox presentation to you, the ones that they

believed benefit their prosecution?

They didn't even look for video on Creston Avenue.

Creston Avenue is the street where you see Ciara and DeJesus

make a left turn out of the bodega, walk up the street past the

ice machine on their left, they continue up the street.  Then

you see Leonard cross the street and walk with them.  Where

does Leonard go after that?  Where is the video of what Leonard

Mathews does after that?  That's a critical video.  Does he

walk with them all the way up the block?  Does he go all the

way with them to 196th Street?  Is he present when DeJesus

takes the gun out of Ciara's back?  Is he present when Ciara

and DeJesus now start walking west on 196th Street?  Is he

present when they reach the corner of Morris Avenue and 196th

Street?  Is he there when they make a left turn, where the

shooting event actually takes place?  There's buildings all

around.  There's buildings from East Kingsbridge Road all the

way up to 196th Street.  Where is that video?  Ask yourselves

that when you're determining whether or not the government has

satisfied you with proof beyond a reasonable doubt or whether

or not the government has essentially treated you not as

jurors, but as moviegoers, moviegoers that are fed a script,

and showed certain videos, and asked to arrive at certain

conclusions.

1        Again, I make this food analogy.  Food is my favorite

2   thing; it may be most of yours.  They are the chefs in a

3   kitchen, and this is their meal plan, and it's true that they

4   can bring you whatever they want to serve you.  You are their

5   customers, but don't swallow it.  If you don't like the way it

6   tastes, that means you have a reasonable doubt.

7        I want to talk a little bit about Deeanna, also known

8   as Chicago, but I'm not going to belabor this point, because is

9   there really much sense in highlighting her testimony?  Sixteen

10  criminal convictions.  Sadly, she is homeless, and we have all

11  seen the homeless far too often in our city and their emotional

12  problems.  Chicago has a 40-year history of drug use and

13  40-year history of drug-dealing, including prostitution.  She

14  told us if she's inside, she's high; if she's outside, she's

15  looking to get high.  She was high the day before she

16  testified, and she was probably high when she testified.

17       It's sad.  And this is, again, a matter of great

18  importance to the defendant.  The government has to bring you

19  witnesses to build a solid foundation.  They need to bring you

20  witnesses that form a foundation made of concrete and of rebar.

21  But I submit to you, when you analyze the testimony of a

22  witness like Chicago, they are akin to a house of cards.

23       The government brings you these most vulnerable

24  witnesses, with 40 years' worth of cocaine use, and I submit to

25  you, gets them to say whatever they want them to say on the

IA1KMAT2                    Summation - Mr. Kaye

1   penalty of federal perjury charges.  Both Keisha and Chicago

2   have nonprosecution agreements.  Do you know what the

3   prosecution agreements -- the nonprosecution agreements say?

4   The government didn't put them into evidence.  You don't even

5   know the terms of them.  You don't know the sentences, and the

6   commas, and the periods.  That was kept from you.  You were

7   given all the video, but none of the prosecution's

8   nonprosecution agreements with these witnesses.

9          All we know is they won't be prosecuted for their

10  lifetime of crimes, for coming in here and testifying to what

11  the government wants them to testify to.  We all observed the

12  demeanor of Keisha Hood.  What a shame.  She literally said she

13  could not remember her own name.  Did she not say that?  I

14  believe she did.  Unfortunately, she also referred to herself

15  as retarded, which is personally a word that I despise.

16         She does not even know the name of the store she said

17  she works in.  She told us she stopped working there because

18  her boss went on vacation.  I do give the government credit for

19  one thing in regard to Keisha:  They stated, on direct

20  examination of Keisha, in the form of a question:  Keisha, in

21  sum and substance, you weren't entirely truthful with us, were

22  you, at the beginning?  And she said no.  What an

23  understatement.  But given everything we know about her, I just

24  could not put her through a vigorous cross-examination.  I

25  basically let her go out of here.  And you saw her off the

IA1KMAT2                    Summation - Mr. Kaye

1    stand:  God bless you, God bless you, God bless you.  I want to

2    get out of here; let me out of here.  That's a house of cards

3    witness.  That is not a house of mortar, rebar, and concrete

4    witness.

5            I will say another thing about the substance of her

6    testimony:  If you find that the records show that Keisha

7    called Leonard first, you may want to infer that that was a

8    call to buy crack.  Secondly, Keisha did testify that that was

9    not her phone.  And, thirdly, and very significantly, the

10   government did not introduce to you any technical information,

11   any subscriber information, for Keisha's phone.  We heard that

12   the phone has the last four numbers, 1414, because it was

13   subpoenaed.  Was that Keisha's phone?  Or was that Chicago's

14   phone?  Because Chicago sure didn't testify that Leonard said

15   he had somebody do it.  That was Keisha that said that.  But

16   there's also testimony they used phones.  One had a phone, one

17   didn't have a phone.  There was also testimony that they're not

18   friends.

19           Finally, apparently, there was a recording of this

20   critical conversation that we haven't heard, another piece of

21   evidence we didn't hear from the government.  I asked Keisha:

22   Was the conversation you allegedly had with my client taped?

23   She said it was.

24           I will also say this to you:  If Leonard was indeed

25   sending a message to Chicago that he's sorry, assuming you want

IA1KMAT2                    Summation – Mr. Kaye

1    to credit her testimony, ask yourselves:  Is that the demeanor

2    of a ruthless Bloods gang leader that orders a hit?

3                (Continued on next page)

1    MR. KAYE:  Tell her I'm sorry.  I mean really, he

2    supposedly orders a hit at ten or 11 o'clock and then

3    apologizes to someone a few hours later?  He sees fight one

4    happening and he's portrayed as a peacemaker.  He records a

5    video of a couple of kids beating up another couple of kids and

6    maybe it was a gang thing.  I don't know.  Maybe it wasn't a

7    gang thing but I can tell you what I saw.  And I saw Leonard

8    being protective of whomever it was being up.  This just

9    doesn't seem like the demeanor of somebody who is going to try

10   to increase the status by ordering a hit of somebody that he

11   had a scuffle with, somebody that he had a lifelong

12   relationship with, somebody who was not his rival over

13   something that no one knows.

14        Come on.  I think Mr. Gentile described the scuffle as

15   a "street brawl".  Did that look like a street brawl to you?

16   He said that Leonard was humiliated.  He said that Leonard was

17   embarrassed.  Humiliated and embarrassed, I think that's quite

18   a bit of an overstatement.  That was nothing.  That was not

19   even a fight.  No one was injured.  No one even had a scratch

20   on them.  Leonard's shirt wasn't even ripped or torn because

21   you see he puts his shirt back on.  They were basically just

22   holding onto each other.  Nobody was even throwing punches at

23   one another.  There is maybe one punch thrown to start the

24   fracas.  No one, I submit to you, goes to war over that with a

25   lifelong acquaintance who is not a rival.

1    Leonard sells crack.  Ike sells weed.  They're not in

2    competition.  Remember, you have to find this a racketeering

3    activity.  You have to find motive and intent to kill for gang

4    business, somebody who's not a drug dealer and rival to you,

5    somebody that you've known forever, something we don't know.

6    That's the essence of reasonable doubt in this case.

7    The defense put in only two pieces of evidence.  The

8    first one was the photograph of Ciara and I asked her, are you

9    smiling?  After you participated in the attempted murder of an

10   individual, is that you smiling?  And she said, no, I can see I

11   am biting my lip.  And I said something to her like, well, you

12   certainly aren't frowning, are you?  And I don't recall what

13   she said.  That's not the point.  You can take the photograph

14   into evidence with you.  It's here.  Look at it in the light.

15   Get a microscope if you need it.  I will tell you it certainly

16   looks to me like this young lady is very pleased with herself.

17   Is that the same person we saw on the witness stand?  I submit

18   to you, it was not.

19   The other defense exhibit was a still photo from the

20   Ike/Leonard scuffle.  And I show this to you only because it

21   starts with Ike's left hand on Leonard's right shoulder.  This

22   is how who people that are friends talk to each other about

23   something in conflict.  You don't know what they said but just

24   look at the body language here.  These people know each other.

25   This is not a gang hit.  If anything, this is a personal beef

1  between these two guys.  They even separate.  They separate

2  without fighting and then Toribio walks almost into the

3  crosswalk lines and he says something.  Again, we don't know

4  but he says something to Leonard and then Leonard comes in and

5  then they start getting into it.  We need to know what that

6  was.  And Ciara said, in all honesty, I don't know what it was.

7  Forget about all the other things she said.  Oh, they were

8  talking about a set.  They were talking about a soldier.  How

9  do you reconcile on direct-examination, Ciara saying the fight

10  was about the word "set", was about the word "soldier".  You

11  can't have your soldier do things?  How do you reconcile that

12  with her telling you that, in all honesty I don't know what the

13  fight was about.  I don't think you can, not in a criminal

14  case, not where the defendant is presumed innocent until/unless

15  the government removes that cloak of innocence.  This is

16  important.  Again, I think that shows affection.  The fight

17  video was Government Exhibit 201-1.  Feel free to request and

18  watch it.  Arrive at your own conclusion.  It lasts about one

19  minute.  To us it doesn't make much sense that a one-minute

20  scuffle is going to get a nonrival childhood friend killed.

21          So, when Keisha tells you that he said he had someone

22  do the shooting, I think that just makes no sense.  Leonard is

23  a dealer in that spot.  Is he really going to kill someone or

24  have someone killed and then expect to return there selling

25  dime bags the next day or the next week?  Does that make sense?

1   That's just not good for business over a one-minute scuffle.  I

2   mean as a city, as New Yorkers are we so afraid of the gang

3   word, of The Bloods connotation that we think these men and

4   women are all killers?  I know that they're not.  Not every

5   petty slight, not every harsh word or scuffle is going to serve

6   as the motivation of a shooting even if you believe they are

7   all Bloods gang members, even if you believe they are all Milla

8   Bloods people.

9        Let's not forget who this evidence that Leonard set it

10   up is coming from by the way, a witness with zero credibility

11   saying what the government wants her to say.  Think long, think

12   hard before you credit the testimony of these witnesses, ladies

13   and gentlemen.  I ask you this and I'm not trying to be smart.

14   Ask yourselves, would you let Keisha Hood hold your cellphone

15   overnight?  Let that sink in for a second.  Keisha is someone

16   that came rambling off the stand.  Our cellphones are our

17   lifeline.  I don't think any one of you to be honest, to be

18   perfectly honest, would entrust that woman with your cellphone

19   and that is a reasonable doubt as to her testimony.  We could

20   go on for days here with examples.

21        What about Deeana Chicago?  Would you let her walk

22   your favor pet?  Would you let her housesit for you?  Do you

23   trust that woman with your phone, with your pet, with your

24   home, with your belongings?  It's a rhetorical question.  The

25   answer is "absolutely not".  Well, if you can trust her with

1  personal property why in the world can you attach credibility

2  to her in an -- setting such as this and preclude that she's

3  provided you proof beyond a reasonable doubt?  That makes no

4  sense.

5       If your answer is to yourselves quietly in your head,

6  I wouldn't do it.  I submit to you they have no credibility and

7  you have no business attaching credibility to them.

8       I will say one thing that is entirely consistent

9  however between the testimony of Chicago and Keisha.  Neither

10  one of them ever referred to Leonard as "big homie".  If

11  Leonard Mathews was a gang leader or big homie, he would likely

12  have the gang tattoos that Detective Jeselson talked to us

13  about, the paw.  There's a stipulation in evidence that was

14  read to you.  Leonard Mathews has no gang tattoos.

15       There would also likely be more than one witness

16  referring to him as "big homie".  The only witness that refers

17  to him as "big homie" is Ciara.  Remember, we're talking about

18  the credibility of police officers, how they handled themselves

19  on cross-examination.  Detective Reyes flatout lying that it's

20  the defendant shooting.  Is it beyond the realm of possibility

21  that one of the police officers in this case fed Ciara the name

22  "big homie".  Just say he is big homie, big homie, big homie

23  over and over and over again.  Nobody else refers to him as

24  "big homie".

25       Is it in his contacts?  Did they show you any of these

other contacts where somebody else in the gang calls him big

homie?  Did anybody else call him big homie?  No.  The

government shows you a video of him drunk at a party in what

looks like his own apartment pouring alcohol into the mouth of

a young girl saying "GMB.  Big homie on the set."  He is the

big homie in his apartment.  That is not evidence that he is

big homie of a set.

Let's also not forget Jeselson's other testimony.

"Big homie" could mean somebody who's got a lot of time in the

gang.  It doesn't always mean the leader.  And that's from the

20 plus year police detective gang expert believes she wasn't

trying to help the defense.

So I submit to you that apply to the facts of this

case, you would well within your rights to conclude that in

this case as applied to Leonard "big homie" means he's got a

lot of time in, not necessarily a leader.  But I would like to

discuss the gang connection and why I submit to you there's

insufficient proof that Leonard is a leader and that Leonard

did order this hit.

First of all, labels don't matter.  Do they?  I mean,

you can call someone a leader and they can be a follower.  You

can call someone a follower and they can be leader.  You can be

a rookie quarterback and they put you in.  You can be a

seasoned quarterback and they you sit on the bench.  It's what

you do.  It's not so much your moniker.

1         Here's the facts.  Let's apply that to "big homie".

2    What did he do to earn that moniker "big homie"?  He looks like

3    he is in his late 20s, early 30s.  We don't know what he did to

4    become The Big Homie.  He lives with his mommy.  The police

5    execute a no-knock warrant at six o'clock in the morning and

6    what do they recover?  Six or seven fingernail-sized zip-locks

7    of crack cocaine, a small scale, more empty zip-locks, allergy

8    pills, muscle relaxers, no weapons, no gang paraphernalia, no

9    gang paperwork.  There is no objective evidence here of status,

10   wealth or power.  He hangs out with a bunch of other guys.  Can

11   you tell status?  Can you tell power from a gesture?

12        Could it be that Juan DeJesus is the leader of this

13   gang?  Doesn't that make more sense?  Juan DeJesus being the

14   big homie in which case it means the leader.  Let that sink in

15   for a second.

16        He is a vicious maniac.  We know that.  He just got

17   out of prison.  He recruits, literally, recruits this very

18   troubled Ciara Edwards.  He gives her a G-check.  He pimps her

19   out.  He charges her rent to stay at his mother's apartment.

20   He takes on these two Mexican individuals by himself an slaps

21   the mess out of them.  During the scuffle there's a big guy in

22   red.  I think he's got a baseball cap on.  If Leonard was the

23   leader big homie of this fight and not somebody engaged in a

24   personal fight with a friend, wouldn't you expect that big

25   dude, that guy in red to step in and inflict damage on the

1  person that is fighting his big homo?  That guy in red, that

2  very substantial man just basically stands there.  He waits.

3  He watches.  He let's them fight and then eventually when he

4  steps in he is just kind of like, make sure that nobody gets

5  hurt.  That just does not have the flavor of somebody that is

6  protecting a gang leader.  I don't think it's likely that if

7  he's the big homie leader type that this guy's just going to

8  stand by and let somebody put their hands on the leader like

9  that unless, of course, he's fighting with somebody he knows

10  over something that's not gang business.  And that's what I

11  submit to you is going on here.

12          When DeJesus allegedly tells Ciara, says he has to put

13  in work for The Big Homie or we have to put in work for the Big

14  Homie, how do we know that that's what DeJesus actually said to

15  her?  We have to credit Ciara for that.  But let's take it a

16  step back.  How do we know that that's what Leonard told Juan

17  DeJesus?  Do you see all these layers that you have to accept

18  that Leonard told Juan DeJesus?  You have to put in work for

19  me, whatever that means.  Juan DeJesus then said to Ciara he

20  said, we have to put in work for The Big Homie.

21          I mean, this is like an adult version of the telephone

22  game.  Who knows what gets lost.  Who knows if that even

23  happened.  Where is the proof beyond a reasonable doubt?  Are

24  you telling me you don't have a doubt, that you can give a

25  reason for not crediting the story of Ciara, that with all her

1    problems she was told something and she relays it accurately,

2    she didn't hear what, if anything, Leonard said of she is

3    hearing it secondhand.  This is the house of cards that I keep

4    referring to.

5           Now, aside from all of us having to accept the word of

6    Ciara it is, if you look at the videos it is Juan DeJesus that

7    gestures to Ciara to follow someone to go get the gun he kind

8    of like says go, go, go get the gun.  But it's not Leonard.

9    Leonard doesn't tell her to go get a gun.  Leonard never

10   touches a gun.  She tells you that.  And of course we discussed

11   this already when they exits the bodega to go do this shooting.

12   Leonard is across the street.  What role does Leonard actually

13   play in when the decision is made to go?  He is across the

14   street.  He is not in the bodega.  In the bodega is DeJesus and

15   Ciara.  So this big homie leader doesn't tell them to go do

16   anything.  He gets called over by DeJesus.  I just realized

17   that looks like he gets called over by DeJesus which is another

18   piece of evidence for you to consider as to whether or not it's

19   DeJesus that's the leader.  Yet the government has just piled

20   on all of this circumstantial evidence because they want you to

21   conclude that's Leonard.  That's the monster.  Really, it's

22   DeJesus, far more evidence that's DeJesus than Leonard.  We

23   know that DeJesus has a horrendous criminal record.  And you

24   have already learned that Leonard has one felony drug sale

25   conviction.

IA1AAMAT3                    Closing Statement – Kaye

1        Just two final words on this issue of who is the
2    actual leader.
3        First word, the texts between DeJesus and Leonard
4    afterwards.  DeJesus says essentially, yo, don't tell nobody
5    about what happened, not even Cindy.  So does that soldier tell
6    a leader what to do?  This is DeJesus telling Leonard what to
7    do or what not to do.  Does that make sense?  I know I am
8    sounding a little repetitive but let that sink in.
9        Second, Leonard lies to Detective Maye.  We know he
10   lies to the detective.  He says I don't even know that guy.  So
11   you may properly infer that he is protecting his leader even at
12   great risk to himself lying to the detective, 26 years on the
13   police department.  So when Leonard has this scuffle with Ike
14   and Leonard calls DeJesus you may infer that what is actually
15   having is Leonard is calling the leader to inform the leader
16   that Leonard had a fight with Toribio who is somehow related to
17   the fight that DeJesus had the day before.  DeJesus says be
18   there in two minutes.
19       Maybe's what a real leader does.  Somebody else is
20   having a scuffle, he gets there in two minutes and we know he
21   shows up.  You see, not knowing the answers to these questions
22   is not a problem in daily life.  OK?  It's just it's an
23   inconvenience, right, to not know when the train is going to
24   arrive.  It's stomach churning to know that you are not going
25   to meet a deadline at your office.  Again, in the context of a

1  criminal trial, not knowing material facts means that the

2  government hasn't carried its burden.

3          We all want information which brings us to Leonard's

4  online search history.  Admittedly he searched online multiple

5  times for a news story.  What, if anything, that proves is pure

6  speculation.  He searched several days in a row.  Do you not

7  all have CNN apps on your phone an Wall Street apps on your

8  phone?  Do you not search the news if something happens in your

9  neighborhood on your block, on your street?  Something really

10  bad happened and he has a role in some of it somehow.  So

11  please don't attach too much weight to the fact that he is

12  searching online for it.  All that proves is that he's

13  interested in this newsworthy event.  I doubt he is the only

14  one that is hungry for news.

15          Let's talk about the first six counts in the

16  indictment.  First count, attempted murder in aid of

17  racketeering.

18          Now just as Mr. Gentile told you, the lawyers do not

19  substitute for the judges instructions which you will receive

20  at the end of the case.  I just want to give you my thoughts on

21  how the facts may be applied to the various elements of the

22  crime.

23          Now the first element that the organization was an

24  enterprise beyond a reasonable doubt.  I believe you will

25  conclude that the Bloods are an enterprise as it will be

1    defined to you by the Court.  What I am not so confident about

2    is whether this loosely organized subset, this Milla subset

3    operating in this very limited area whether that constitutes an

4    enterprise like the umbrella organization does, I am not so

5    sure that the subset itself is an association in fact.  The

6    language of the charge says it has to be an association fact,

7    factually.

8          We have heard very, very minimal evidence about the

9    formation of Milla, about the structure of Milla, about the

10   hierarchy of Milla.  Who was the leader?  Who was the five

11   star?  Who was the four star?  Who are the members?  What

12   racketeering activity have they actually engaged in these guys?

13         We have seen the Facebook posts of packaged weed back

14   from 2015.  We've seen group photos.  We saw a 20-second video,

15   21 seconds filmed by Leonard.  But where is the racketeering

16   activity necessary to find that the government has proven the

17   first element of the first of six charges?  You are here to

18   determine whether the shooting was in fact an act of

19   racketeering.  But the government speaks as if it's a foregone

20   conclusion that this Milla subset engages in racketeering

21   activities just because of these drug sales and this shooting

22   event.  It's almost circular logic.  They engaged racketeering

23   activities because they engaged in crimes that you are here to

24   determine whether or not they engaged in.  You make that

25   decision.  That's not a foregone conclusion that they engaged

1    in racketeering activities.

2            You have to determine whether it's personal or it's

3    gang-related.  So the only other activities to determine

4    racketeering are narcotics sales, drug sales, which we don't

5    see.  Let's talk about the photo with 20 or 30 guys in the

6    photo there.

7            What does that photo show?  They are all hanging out

8    together, a bunch of guys.  Does that mean they're all Blood

9    gang members?  Does that mean that they're all Milla members?

10   Imagine this was not the Bronx but some leafy New Jersey

11   community and the people all gathered together.  Would we rush

12   to conclude that this was a gang photograph?  I don't think we

13   would.  I just think that maybe one or two of them are dealers.

14   Looks like this guy Bigz Milla sells.  But I think you would be

15   hard pressed on this evidence to conclude that they are an

16   enterprise engaged in racketeering activity.

17           I am sure The Bloods has an umbrella organization.

18   This is a Bronx local set and the connection is an extremely

19   tenuous one.  I think as to narcotics the evidence at best

20   establishes that Leonard sells crack.  But the connection

21   between his drug sales and the Milla is just very tenuous.  It

22   seems more likely that Leonard is his own man.  He engaged in

23   his own dealing.  If you find that Leonard is a gang member.

24   It's totally within your province and no one will debate you on

25   that or call your judgment into question but I don't think it's

the end of the equation.  You need to find the enterprise

engaged in drug sales as a racketeering activity.  And where is

the proof that he is sharing drug sale profits with other

members?  Where is the proof that he is committing other drug

crimes with other members with other people?  There is evidence

that Bigz Milla posted these red glassines on a Facebook

account in 2014 or 2015 but that's not evidence that in 2017

beyond a reasonable doubt Bigz Milla and Leonard and the rest

of them was engaged in a racketeering activity.  I submit to

you the evidence only proves that Leonard sold drugs on his

own.  There were one or two sales allegedly made by Bigz Milla

to Chicago where Chicago told us that Leonard told her that

Bigz had his work.  One or two sales, I mean that could mean

that Leonard is sick that day.  He's got the stomach virus that

day and Bigz got my work.  This doesn't suggest narcotics

conspiracy.  That doesn't suggest a cohesive group that Leonard

is working with Bigz Milla.  That just doesn't.  That doesn't

scream out to you that this is racketeering drug dealing.

        The evidence is very strong that Leonard sells but two

occasions where Bigz Milla sold, even if you believe sold

Leonard's stuff to one of these ladies, I submit to you that

that does not satisfy the definition of the Bloods gang engaged

in racketeering activity.  We are not seeing piles of cocaine

here and bricks of drugs here.  Again, I leave that to your

judgment.

1          Another element I would like to discuss is the

2     underlying crimes charged.  Has the government proven to your

3     satisfaction beyond a reasonable doubt that the intent was to

4     kill?  Was the intent to kill?  Was the intent to injure?  Was

5     the intent to scare?  Was the intent to scatter?  Let's assume

6     for a moment that you credit Ciara's testimony that DeJesus

7     really said I got to put in work for my homie.  OK?  What does

8     that mean?

9          Now let's go to the next level.  What does it mean?

10    Go create general mayhem in the area.  Go cause panic and

11    disorder.  Does it mean that?  I don't know.  Do you know what

12    was said?  Its' their burden.  This is their case.  Is this

13    really an intent to kill or is this an intent to wound?  Is

14    this an intent to injure?  Is this an intent to cause panic?

15    Just because shots are blown off, this is the workings of the

16    mind of a madman.  That's not a place you want to occupy.

17    That's not a place any of us can think.  This is the workings,

18    the machinations of DeJesus' mind.  Who knows what his intent

19    was.  We certainly don't know what, if anything, Leonard told

20    him to do or not do.  It's not sufficient to conclude that this

21    was an intent to kill or an intent to wound just because

22    bullets are flying.  This is not a case where somebody takes a

23    small caliber gun and presses it into the back of someone's

24    head and fires.  That's an intent to kill, unmistakably so.

25    But those aren't facts here.  Not proven.

1          It's easy for to government to stand here and say

2   Leonard Mathews had an intent to kill or Juan DeJesus fired a

3   gun with intent to kill.  But that's guesswork.  It's

4   speculation.  They are telling you to look at video.  Who would

5   fire a shot on the street?  I think human nature being what it

6   is, people are capable of all kinds of thoughts.  And these are

7   not rational thoughts.  Remember, these aren't people that

8   we're going to give our phones to.  These aren't the people

9   that are going to housesit for us.

10         We haven't been given much evidence of how close or

11  how far away the target was.  Where was Ike?  I know

12  Mr. Gentile said "and that could be Ike crossing the street".

13  Could be Ike or could be one of another hundred people that was

14  on the street.  Nobody's identified that person as Ike.  So

15  when we talk about what the target was, what the intent was,

16  where was the target?  I think the only person who said she saw

17  Ike there running was Deeana.  And we know Deeana.

18         Second count is this conspiracy to commit murder.  And

19  this charge requires you to find beyond a reasonable doubt that

20  there was an agreement between two or more people to kill.

21  "Conspiracy to commit murder" means an agreement to commit

22  murder.  The record I submit to you is completely barren of any

23  evidence that there was ever a meeting of the minds.  Where was

24  there an actual meeting?  Where was there a meeting in fact?

25  Where?  How?  I am not saying it requires two people to sit

1  down across the table to sign a contract agreement, we agree to

2  kill.  It doesn't.  That's not the law.  But nonetheless, where

3  is the proof that there was an agreement?  It's not here.  So

4  when you're considering that count on the racketeering,

5  conspiracy to commit murder, look for proof beyond a reasonable

6  doubt of an agreement.  I don't think you are going to find one

7  to your satisfaction.  Meaning, the object of the conspiracy

8  has not been established, just like the object of the shooting

9  has not been established, just like the motive has not been

10  established.

11         Now in your deliberations and I don't want to get in

12  into your deliberations because it's your private world but I

13  will say this.  If one juror expresses the opinion that the

14  government's proven Juan DeJesus' intent to kill, for example,

15  if you feel differently, share your thoughts.  Stand up.  Raise

16  your hand.  Let your opinion be known.  Each of you are a force

17  to be reckoned with.  You must each be convinced beyond a

18  reasonable doubt, all 12 of you unanimously convinced and that

19  should tell you how important every single vote is.  So you may

20  have a different opinion.  If you do, stand up and express your

21  opinion that firing and dealing with the sick mind of DeJesus

22  does not clearly establish beyond a reasonable doubt that there

23  was an intent to kill or a conspiracy to kill.  You will know

24  it.  You will know reasonable doubt when you hear it.

25         It's like you leave the house in the morning.  You get

1   down to the street.  Not all of you live in the city.  I know

2   that.  Make your way over to the train station.  You are at the

3   platform waiting for the train.  And then you say to yourself,

4   Did I lock the door?  Did I lock the door?  My keys are in my

5   bag.  I usually lock the door every morning.  I locked the

6   door.  I'm sure I locked the door.  But I am not sure that I

7   locked the door.  There's a doubt.  There is that nagging

8   annoying doubt.  And sometimes you go all the way up out of the

9   train station.  You walk all the way home.  You get back into

10  the building.  You go through your yard and you check the lock.

11  You looked the door.  And you're like, Jesus.  And you go all

12  the way back.  That's a doubt.

13          It is not dissimilar to this tomb much doubt.  It a

14  feeling.  It's a gut feeling.  Remember the first words I said

15  to you was your verdict will last forever.  It will last

16  throughout all of eternity.  It will always be on the books.

17  You must get it right.

18          Or did I shut the stove off?  I made breakfast for the

19  kids.  I made eggs, then I got busy and I got them out of the

20  door, you know?  And you're like, I always shut the stove off.

21  But sometimes I do leave the stove on.  And then you smell that

22  smell when it's actually the pot burning.  It's not that

23  dissimilar.  If you have that nagging feeling that you just,

24  you know what, I just don't know.  I hear what the government

25  is saying.  And I like Mr. Rodriguez and you like Mr. Gentile

1    and like Mr. Bove and they seem like nice guys and you want to

2    believe their witnesses but you have that doubt.

3         Well, then you have to vote "not guilty".  And

4    nobody's going to question your verdict.  I will submit to you

5    that the most critical problem here with the government's case

6    and the primary reason why we submit you must acquit him are

7    Counts One through Six is the final element, the last element

8    of the charge.  And it's not my role to give you the law.

9    Believe me.  I do not know the law half as well as Judge

10   Oetken.  But I want you to remember this.  So I'm going to

11   refer to this as the maintain or increase language which is

12   built into the racketeering statute.  Maintain or increase, you

13   must find beyond a reasonable doubt that the defendant's

14   general motivating purpose in willfully ordering this crime,

15   Theory A, right, Dish A, was to maintain or increase his

16   position in the Bloods.

17        If you don't find beyond a reasonable doubt that

18   Leonard did it and did it with the intent in his mind to

19   maintain or increase his position in The Bloods, this is an

20   acquittal.  Not guilty on One, Two, Three, Four and Five.  I

21   know you are going to convict him of Six.  You have to find

22   beyond a reasonable doubt that that's what was intended.  Or

23   you must find beyond a reasonable doubt that Leonard's general

24   motivating purpose in aiding and abetting DeJesus' commission

25   of the crime was to maintain or increase his position in the

1    gang.

2            You can see the difference between the proof here,

3    right?  Look at the proof of the drug dealing.  It's really

4    substantial.  It's overwhelming in fact.  I'd be pretty foolish

5    to not come before you and take the position I've taken that

6    it's proven.  I need to have credibility with the jury.  Now

7    contrast that with the proof of maintaining an increase.

8    That's that nagging feeling again.  That's the, Did I lock the

9    door?  Was this done to maintain and increase someone's

10   position within the gang or again, was this just personal

11   stuff, silly stuff or the mind of DeJesus?  You're being asked

12   to get inside the head of these people and they don't have the

13   evidence that let's you do that.

14           I say again, the government's proceeded on two

15   separate theories relating to the shooting.  Believe me.

16   They're equally happy for you to accept either one and convict

17   Mr. Mathews but I maintain that the two separate theories is

18   working against them.  It shows the weakness of the proof.  If

19   the government doesn't know it, how should you the jury be able

20   to figure it out for them?

21           Theory one, Leonard willfully did it.  Theory Two,

22   Leonard, he aided an abetted it.  Whichever you believe, they

23   don't care.  We submit that it can be both and the uncertainty

24   of the very charge is the essence of reasonable doubt.  The

25   shooting of October 20th is tragic and is utterly senseless but

1    to convict Leonard Mathews of it because you don't approve of

2    his lifestyle to convict Leonard because you don't approve of

3    his gang affiliation and his occupation is equally tragic and a

4    direct violation of your oath as jurors.  You are never going

5    to right any wrong by cherrypicking a theory of the prosecution

6    and convicting Leonard because his friend is a very bad man.

7            Now the evidence that Ciara and DeJesus committed this

8    crime is overwhelming, right?  That's beyond a reasonable

9    doubt.  The case against them is what beyond a reasonable doubt

10   looks like and tastes like and feels look.  But the case

11   against Leonard should leave you scratching your head.  And

12   this maintain or increase language that you must find beyond a

13   reasonable doubt, I submit to you is a huge amount.  It's a

14   gigantic amount.  It's Mount Kilimanjaro that you have to climb

15   to get to the top of to convict this man.

16           Now the government has argued that Leonard was

17   disrespected.  He was disrespected by Ike and he had to prove

18   that he was tough.  I submit to you that on these facts though

19   that is simply a ridiculous argument.  It makes no sense that

20   Leonard would do that to Ike, a none rival that he grew up with

21   that placed his hands on his shoulder like friends that

22   disagree do.  Their beef, whatever it was, seems equally likely

23   to have been personal, doesn't it?  And not business at all.

24   And if Leonard did have DeJesus do a shooting to increase his

25   status, where is the proof of that?  Where is the proof that

1    Leonard had the motive to increase his status?  It requires

2    speculation.

3           The government will tell you that the proof is this

4    random comment that Leonard, by Leonard that DeJesus is a rat.

5    Do you remember that testimony from Ciara?  She said she

6    overheard him say he is a rat and he is going to pull his

7    papers.  They need you to accept this concept hook, line and

8    sinker, right?  Because if you accept the testimony of Ciara

9    that Leonard said oh, he's a rat, if you accept that then

10   you're almost there to what they want you to believe that this

11   was done by DeJesus to prove his loyalty.  That's how you get

12   into his head.  Oh, he did the shooting.  So he doesn't get his

13   papers pulled.  OK?  But they need you to accept it as coming

14   from Homie.

15          Who does that important evidence come?  From one

16   person, one individual and that's Ciara.  Suicidal individuals

17   like Ciara Edwards, need emotional support.  They need that

18   support.  They feel that they have no where to turn.  We don't

19   know what kind of support she's getting.  We don't know what

20   kind of situation she goes home to.  We don't know her actual

21   psychiatric diagnosis even.  We don't know whether she's a

22   rational person in command of her thoughts, much less her

23   memory.  You heard and you saw her affect, very flat,

24   rehearsed, run-on sentences, throwing the kitchen sink into as

25   many answers as she possibly could.  I hope that some, if you

not all, of you appreciate how very unlikely it is that Leonard would ever say that he is actually thinking about pulling DeJesus' papers in front of a young girl that he knew how long? Two hours.  He knows her two hours.  She's standing here him in front of his building and he is probably selling.  He is talking to someone else and he is going to say that in front of her?  That just doesn't have the ring of truth.  That just doesn't make any sense.  And let's not forget it's coming from her.

Now, alternatively, this second theory if DeJesus did this on his own and Leonard aided and abetted him, how exactly do you conclude on these facts that Leonard aided and Leonard abetted DeJesus?  What did Leonard do?  What did he actually do?  What proof is there beyond a reasonable doubt that Leonard aided and abetted DeJesus?  He may have called DeJesus over to tell him he just got into a fight with this guy, a fight that somehow related to fight DeJesus got into the day before.  That makes sense to me.  I can accept that.  But beyond that, did Leonard point Toribio out to the shooter?  There is no evidence of that.  It was most likely Ciara that targeted Toribio because there is no evidence that DeJesus ever met Toribio.  So let that sink in.

First fight, DeJesus, the two Mexicans.  Toribio's not there.  The second fight, Leonard and Toribio.  DeJesus is not there.  DeJesus doesn't even know Toribio.  There is no

1    evidence that he knows Toribio.  It's likely that Ciara Edwards

2    targeted him for assassination.  She was right there and she

3    knew him.  There is no evidence that Leonard aided and abetted.

4           Did Leonard help DeJesus acquire the gun?  Is there

5    any evidence that Leonard assisted them in acquiring the gun?

6    Any of the phone record any of the Facebook record?  Any of the

7    websites they visited?  Any of witnesses say anything?  No.

8    There is no evidence of that.  Did Leonard wipe down the gun?

9    Are you convinced beyond a reasonable doubt that Leonard wiped

10   down that gun after it's all over?  Let's not forget that.

11   Again, it's back to Ciara.  And even assuming she's remembering

12   that correctly, that would be after the fact.

13          It's the same analysis for this little birdie call.

14   Again, you can infer he doesn't want to see DeJesus go to

15   prison.  I submit to you that is a just talk, just BS, talking,

16   talking, talking.  One guy in jail.  One guy not in jail.

17   Yeah, make a birdie disappear.  What does that mean?  Is there

18   any evidence that anybody made any efforts to hurt her?

19   Intimidate her?  No.  It's talk.  That's all these guys do is

20   talk, talk, talk.  They're on Facebook.  They're on texting, on

21   the phone.  Facebook must be the greatest law enforcement tool

22   since the fingerprint but it's just talk.

23          Let's go to the timeline here.  Only the evidence that

24   doesn't require you to accept anything that Ciara testifies to.

25   Leonard gets into this scuffle.  He calls DeJesus.  DeJesus

1    comes over.  There's a flurry of activity.  DeJesus has Ciara

2    acquire the gun.  DeJesus and Ciara hand out inside the bodega.

3    Leonard is outside across the street.  DeJesus exits.  She

4    exits with him.  They turn left and start to walk up the block

5    passed the ice machine.  Leonard crosses the street.  Does

6    Leonard continue to walk with them?  We don't know.  This is

7    where there's no video.  They have video up, down and sideways

8    but they don't -- it's a full city block.  Then when you reach

9    196 they travel another full city block.

10          I remember I asked every police witness about video.

11   Their answer was either nobody asked me to get to video or I

12   don't know.  This is their case.  They have to prove it beyond

13   a reasonable doubt.  They have to prove Leonard aided and

14   abetted.  What did he do?  All he did was call probably his

15   boss and then hangs out.  Yeah, he looks like he is in charge

16   and might be somebody was taking his water or giving him water.

17   That's not evidence.  That's speculation.  We know the shots

18   were fired and three innocent people were stricken.  But based

19   on this evidence, I submit to you Leonard is merely present.

20          When the Court charges you on the law, there's a

21   specific charge on mere presence.  Please pay close attention

22   to that mere presence charge when you are considering whether

23   or not the government has proven beyond a reasonable doubt that

24   Leonard aided and abetted.  The Court will tell you in

25   substance that mere presence even with full knowledge of what's

1   going on is not a criminal act if you don't have the intent to

2   commit a criminal act.  You can literally be standing there

3   when somebody commits a crime, know they are going to commit a

4   crime.  But if you are not involved it, you are standing right

5   next to them, you've committed no crime.

6          But again, we are discussing this all important final

7   element of the racketeering statute, proof that this was done

8   to increase or maintain Leonard's status beyond a reasonable

9   doubt.  So in order to convict Leonard of Counts One through

10  Six, you need to fully credit Ciara's testimony on multiple

11  planes.  That's Ciara that tells us that Ike and Leonard were

12  arguing or sets and the word "soldiers".  But it's also Ciara

13  who told Detective Cole she can't remember what they argued

14  over.  That is reasonable doubt staring us in the face.  It is

15  also Ciara who tells you about that pulling of papers business.

16  So let's talk about Ciara.

17         This gives me no pleasure, whatsoever, because she is

18  plainly troubled.  She is a prolific liar.  We know that.  And

19  she is a deeply disturbed woman.  She's been selling drugs

20  since the age of nine or ten, astonishingly.  She was kicked

21  out of school for selling weed.  She was placed on juvenile

22  probation for posting revenge photos of her boyfriend's

23  ex-girlfriend on Facebook.  What mind does that?  What a

24  devious mind.  She violated probation by running away to New

25  York City to deliver her baby here.  She was abandoned by her

mother.  She worked as an unaged prostitute.  She sold weed and
ecstasy here in New York City and God knows what else.  She is
caught driving a car without a license and in possession of
cocaine.  She was arrested and convicted of these crimes after
being warned by Mr. Rodriguez to stay out of trouble.  And the
government signed her up with a non prosecution agreement even
after she got back into trouble.  Sadly, she has attempted
suicide.  She's proud to wear a gang affiliated T-shirt.  Her
mother tried to kill her.  Her mother's ex-boyfriend tried to
have a sexual relationship with her.

          Supposedly, she takes the oath very seriously.  She
told us that, I take the oath very seriously and then proceeds
to lie before the Bronx Grand Jury.  She lied that she didn't
acquire the gun after taking the same oath she took before you.
She wasn't truthful with the Detective Cole.  She wasn't
truthful with the Bronx prosecutor.  She didn't stay out of
trouble and she tells us she committed this crime sober.  She
was not high.  She also tells us that she was willing to
smuggle contraband into jail.  What kind of person is this to
base a verdict beyond a reasonable doubt on?

          Ciara, how could you not have that nagging feeling in
the pit of your stomach despite all the video and all the
technology?  I don't use any of that.  I am coming to you
talking to you person to person without any -- how can you base
a verdict on her?

1    She has select memory loss.  She doesn't remember how

2  many times she referred to Leonard Mathews as a friend in the

3  grand jury, instead of "big homie".  She doesn't remember if

4  she told the government about this pulling DeJesus' papers

5  story.  She doesn't remember what she and AUSA Rodriguez were

6  discussing before she told him the pulling of papers story.

7  She lies to you that she was going to report herself to the

8  police had she not been stabbed in the park by DeJesus.  Do you

9  remember that?  She told you that, yeah, if that never happened

10  to me I was going to report it.  I was going to turn myself in.

11  Do you remember that?  I hope you remember that because if you

12  remember that and you believe that, I have a bridge down the

13  street that I'd like to sell you.  Pick either one, the

14  Brooklyn Bridge or the Manhattan Bridge or the Williamsburg

15  Bridge.  I own them all.

16    After all of this she has the audacity to tell you

17  that she still thinks that she's one of the most honest people

18  alive.  It's hard to fathom.  It's hard for me to imagine this

19  woman's values, her morals and what she would or would not do

20  to save herself from a long prison sentence.  Ask yourselves

21  what is it about Ciara that inspires confidence in her ability

22  to tell the truth?  Sadly, not a thing.  And if you decide that

23  she is not smiling in that photograph, OK.  I'm willing to

24  accept that that's your impression.  But if she is, then my

25  blood thirsty Bonnie and Clyde analogy from my opening

1    statement did come to pass.

2          Leopard Mathews lives in a neighborhood where Bloods

3    and Crips live an hang out.  These are people he went to school

4    with.  They are sometimes friends and they are sometimes at

5    odds.  You may not like what he does.  You may not approve of

6    the way he speaks.  You may not like the way he handles himself

7    and people you associates with, the way he talks but this is

8    the United States District Court.  This is the trial of the

9    criminal matter where your number one concern is identifying

10   proof beyond a reasonable doubt.  You don't have to like him.

11   It's not what this is about.  Where is the evidence that is

12   subjective personal intent was to increase or maintain his

13   position by having DeJesus do this shooting?  Everyone of first

14   five charges low from this increase and maintain concept.  If

15   you did not find that the government has proven that beyond a

16   reasonable doubt, then you must vote guilty -- not guilty to

17   Count One, not guilty to Count Two, not guilty to Count Three,

18   not guilty to Count Four and not guilty to count Five.  All of

19   these firearms offenses, they all flow from the increase and

20   maintain concept.

21         I know that you will each deliberate openly and

22   honestly to the best of your ability.  Many of you have no

23   prior jury experience, just what you've read and just what

24   you've seen on TV.  And for those of you I think we can agree

25   that real trial work is nothing like Netflix.  In a real

1    courtroom we have the Constitution to abide by.  And the case

2    is not wrapped up in 45 minutes plus commercials.  Here the

3    stakes are very real.  If the motive was purely personal,

4    motive for money, love, jealousy, ego and had nothing to do

5    with crack or weed or blood, then this is not a violent crime

6    in furtherance of racketeering.  This is just a narcotics case

7    against Leonard Mathews.  And if you are not convinced beyond a

8    reasonable doubt that on either theory the motivation was to

9    maintain or enhance Leonard's position, again, there is just a

10   narcotics case against Leonard.

11          So I ask you to listen carefully for Mr. Rodriguez's

12   explanation of why there are two separate theories of the

13   government's case.  Listen and remember my words as

14   Mr. Rodriguez tries to justify it because he will get the last

15   word.  That's the system.  If the government doesn't know, the

16   entity that has charged the defendant and brought the defendant

17   to trial before you, if it doesn't know it was the defendant's

18   idea or he ordered it or if it was DeJesus' idea and the

19   defendant aided and abetted him, that ladies and gentlemen is

20   the essence of reasonable doubt.

21          I honesty wish I could change Leonard's life with the

22   waive of my hand but I can't.  It's in your hands.

23          THE COURT:  Thank you, Mr. Kaye.

24          Ladies and gentlemen, there's one additional closing

25   argument before we break for lunch and that is the government's

1    rebuttal summation.

2            Mr. Rodriguez, you may proceed.

3            MR. RODRIGUEZ:   I'm standing up here because it is the

4    government's burden of proof in this trial.   We have the burden

5    of proving beyond a reasonable doubt that the defendant,

6    Leonard Mathews, is guilty and we have met that burden of

7    proof.

8            Mr. Kaye could have said nothing throughout this

9    entire trial because the defendant doesn't have the burden to

10   do anything.   But because he got up here for the past hour and

11   35 minutes, I get a chance to respond.   I get a chance to tell

12   you and explain to you how everything he just said was nothing

13   more than a sideshow and a distraction from the devastating

14   overwhelming proof of the defendant's guilt.

15           You have the right to scrutinize everything Mr. Kaye

16   just said.   Just like you've scrutinized everything that every

17   other person in this courtroom has said.   Look past the

18   distractions.   Juan DeJesus is not on trial right now.   Ciara

19   Edwards is not on trial right now.   Leonard Mathews is on trial

20   right now and we have proven lis guilt beyond a reasonable

21   doubt.

22           Before I get to some of Mr. Kaye's specific arguments,

23   let's start with the bedrock foundational evidence in this case

24   and it fits into five categories.

25           First, the surveillance video, the video that showed

1    you exactly what happened on the night of the shooting.  Now

2    Mr. Kaye says that these are violent movies.  But as you saw

3    from the presentation from Mr. Gentile today, these movies told

4    you exactly what happened that night.  They told you almost

5    everything you need to know about the defendant and the role he

6    played in these crimes.

7            Second, the phones, the phone that was recovered from

8    Mr. Mathews and the phone that was recovered from Mr. DeJesus

9    with the text messages and the pictures and videos that they

10   never thought you would see; evidence that proves to you that

11   the defendant is a leader in the GMB set of The Bloods and that

12   the shooting of ice ache Toribio was motivated by gang

13   membership of both the defendant and Juan DeJesus.

14           Third piece of bedrock foundational evidence, the call

15   records, records that show that the defendant called his

16   soldier, Juan DeJesus, to his side minutes after the fight.

17   Records that show that the defendant called Keisha Hood and

18   spoke to her multiple times after the shooting.  Why?  To

19   silence her, to silence her and to silence Deeana Seabrooks.

20   Records that reflect hundreds of calls and text messages over

21   the course of almost a year between the defendant and Ms. Hood.

22   These communications went on as he sold her poison everyday.

23           Fourth, the Facebook posts, posts that confirm the

24   membership of this gang and the pride that the defendant's foot

25   soldier showed and being part of the gang's violence and drug

1  dealing.

2          Fifth and final, the defendant's own recorded works.

3  You saw that video of the defendant proudly declaring that he's

4  a big homie in the Bloods.  You saw the defendant days after

5  the shooting tell blatant lies to Detective Maye, lies in which

6  he claimed to not even know who his trusted foot soldier was.

7  He lied because he knew he was guilty.  Why?  Because he was

8  motivated to try and protect DeJesus and other members of the

9  gang for their roles in the shooting of Isaac Toribio and the

10  stabbing of Ciara Edwards.

11          Two weeks after that you heard the defendant on a call

12  with DeJesus who was already in jail.  And in that call he

13  referred to someone he recruited in the gang as his brother.

14  He referred to Bigz Milla and his brother.  He used code words

15  to tell DeJesus that he tried to have Ciara Edwards murdered.

16  He tried to have Ciara Edwards murdered after DeJesus failed to

17  finish the job on the night of October 20, 2017.  You heard the

18  defendant joke about how DeJesus had put her in medical time.

19          All of this core bedrock evidence, the videos, the

20  phones, the call records, the Facebook posts, the defendant's

21  own words, this evidence shows you that the government's

22  witnesses told the truth.  And when you hear and follow Judge

23  Oetken's instructions on the law, you will know that all of

24  this core evidence demonstrates that the defendant is guilty of

25  each one of six charges in the indictment.

1    So let's turn to some of Mr. Kaye's more specific

2    arguments.  Let's talk about Ciara Edwards.  Mr. Kaye got up

3    here and said she is a prolific liar.  You'll remember from his

4    opening statement, Mr. Kaye had this to say about the agreement

5    between Ms. Edwards and the government.  They literally made a

6    deal with -- well, you know the end -- the devil.

7    Did Ciara Edwards look like the devil to you?

8    Remember that video of her outside of the deli the night of the

9    shooting nervously crossing her hands in front before she was

10   being directed to carry a gun for members of the Bloods, a

11   child amongst a group of men with a history of violence and

12   access to weapons.

13   She admitted that she was a willing participant in

14   this, at least up until the part where DeJesus tried to kill

15   her.  She accepted responsibility for her role.  But remember

16   what that role was.  She was a courier for a gun that was used

17   by DeJesus in the shooting ordered by the defendant.  She

18   carried a gun for these men who were working together to kill

19   someone.  Her role in this hardly makes her the devil in this

20   group of men including the defendant.

21   Did she sound like the devil when she was up there on

22   that witness stand?  I submit to you that the answer is

23   "absolutely not".  She was completely unapologetically honest

24   about her prior crimes, about the times in her past when she

25   was not truthful and about the personal horrors that she's

1  experienced.  About Juan DeJesus forcing her to sell her body,

2  about her mother trying to kill her and about her history of

3  drug dealing.

4       Now, Mr. Kaye wants you to believe that because she

5  signed a non prosecution agreement, that she got some sort of

6  sweetheart deal out of this, a deal that you'll never see, even

7  though Mr. Kaye could have shown you that agreement and

8  introduced it into evidence.

9       But when you think about that and you think about this

10  deal that she got, think about the 650 stitches she got.  Think

11  about her collapsed lung.  Think about the horrors that she's

12  been living through as a result of October of 2017.  Now

13  Ms. Edwards told you on redirect, she doesn't have any

14  ill-feelings against the defendant.  No bias.  She was here to

15  do one thing, tell you the truth, tell you the truth and move

16  on with her life.

17       Now it's true that Ms. Edwards has not always been

18  truthful in the past.  And she owned up to that.  She was not

19  entirely truthful with the state grand jury on October 31,

20  2017.  Put yourself in her shoes on that day.  Where did she

21  come from that day?  She had to testify on the same day she was

22  released from the hospital.

23       (Continued on next page)

24

25

IA1KMAT4                     Rebuttal - Mr. Rodriguez

1            MR. RODRIGUEZ:  (Continuing)  She was scared to death.

2            And, yes, when she met with Detective Cole at a diner

3       for an interview earlier this year, she kept some things from

4       him as well, and she told you that.  Why?  Because she was

5       still scared to death.

6            It's up to you to think about what you saw in this

7       courtroom, as you evaluate the testimony of Ciara Edwards.  And

8       as you do that, please pay careful attention to how her

9       testimony is consistent with and supported by all of the other

10      types of evidence:  The video, the phones, the phone records,

11      the Facebook posts, and the defendant's own words.

12           Now, Mr. Kaye got up here, and he made a lot of

13      arguments about why this shooting happened.  Maybe it was for

14      purely personal reasons, sports, politics.  Who knows?  Who

15      knows what they were thinking, he said.  He said the government

16      called the wrong witnesses.  I guess we should have called

17      mindreaders to the stand.

18           But we didn't need to call mindreaders to the stand,

19      because we know what this fight was about.  Ciara Edwards told

20      us what this fight was about.  She was standing right there.

21      She told you that the person that Mathews fought with told him,

22      this wasn't for your soldier to handle.  If there's problems

23      with the set, it's for you to handle.  She told you about how

24      he said something disrespectful to Leonard Mathews.

25           Now, I expect that Judge Oetken will instruct you that

1    one of the elements of Counts One, Two, and Three is that the

2    crime was committed for the general purpose of maintaining or

3    increasing status in the Bloods.  It doesn't have to be the

4    only motivation.  Ladies and gentlemen, we met our burden on

5    this element.

6            Ike insulted the defendant verbally and physically in

7    the heart of Bloods territory that the defendant controlled.

8    In light of all of the evidence of the defendant's proud

9    leadership in this gang, it simply defies common sense to argue

10   that he ordered this shooting based on some purely personal

11   motive.  That's just not what the evidence shows.

12           You saw on video as he assembled the members of his

13   gang, as he continued to stalk Toribio, as he reenacted the

14   fight for his fellow gang members, as he directed DeJesus to

15   get the gun, and get in that store, and check it out, as he

16   walked with DeJesus to go find Toribio.  And where did they go

17   after?  You saw them reassemble the members of his gang at his

18   own apartment.

19           Ladies and gentlemen, the motivation of Juan DeJesus

20   matters, too.  As you think about the evidence of what

21   motivated this crime, please listen carefully to Judge Oetken's

22   instructions about aiding and abetting and willfully causing

23   these crimes.  I expect Judge Oetken will instruct you that if

24   the defendant knowingly caused Juan DeJesus to commit this

25   shooting, and he knew that when he did that, that DeJesus was

motivated by his own status in the gang, that DeJesus would obey his command because the defendant was his big homie.

If that happens, the government has met its burden. You know that DeJesus participated in this to maintain and increase his status in the gang. During the fight on October 19, outside that same bodega on Kingsbridge and Creston, the defendant -- excuse me, DeJesus was acting as the bodyguard for the defendant, on the defendant's own drug territory. He was protecting the defendant on the gang's turf.

On the night of the shooting, the defendant summoned him to that same bodega and ordered him to go after Ike. The basic rules of the gang required him to follow that command. And DeJesus knew what he was doing. He knew that by doing what he would do, he would increase his status in the gang, because of his willingness to engage in acts of violence.

The government is not giving you two plates of food and asking you to choose whichever one you want. Both, both Leonard Mathews and Juan DeJesus did what they did to maintain and increase their own positions in the gang and the positions of one another. The soldier helped his leader. His leader gave the soldier an order.

Now, Mr. Kaye has made several arguments as well about the defendant's drug-dealing operation, how he's just a lone wolf drug dealer completely unconnected to the Bloods. This argument is a sideshow, for a few reasons:

IA1KMAT4                         Rebuttal - Mr. Rodriguez

1          First, let's be clear:  This argument has nothing to

2     do with Count Six, a count that Mr. Kaye didn't really have

3     much to say about.  Judge Oetken will instruct you that for

4     purposes of Counts One, Two, and Three, the government has the

5     burden of establishing that the Bloods were involved in

6     racketeering activity.

7          Now, there are two types of racketeering activity

8     involved.  One involves attempted murder and conspiracy to

9     commit murder.  The other involves drug-dealing.

10         So, even if Mr. Kaye is right that the defendant was

11    some sort of a lone wolf drug dealer, it's clear that the gang

12    he lead was involved in this alleged violence-related activity.

13    Gang members attempted to kill Isaac Toribio.  On the same

14    night, a gang member attempted to kill Ciara Edwards.  And

15    three weeks after the slashing, the defendant admitted on a

16    prison call with Juan DeJesus that he tried to kill Ciara

17    Edwards again.

18         So even if Mr. Kaye is correct about this

19    drug-dealing, the government has still met its burden on the

20    elements of Counts One, Two, and Three, because the gang was

21    involved in racketeering activity involving attempted murder

22    and conspiracy to commit murder.

23         But here's the thing:  Mr. Kaye was wrong.  Very

24    wrong.  The defendant's drug-dealing was related to the Bloods,

25    because he sold drugs in his gang's territory while protected

1    by his other gang members.

2              Remember the scale from the defendant's apartment?

3    That scale was covered in crack residue in January 2018.  And

4    it was found in a place that was not only the defendant's

5    bedroom, but one of his gang's central locations.  The place

6    where they all met up to wipe down the gun that had been used

7    to try and kill Ike.

8              And you know from Bigz Milla's Facebook posts that he

9    was selling marijuana for the Bloods.  Remember those pictures

10   of packaged marijuana in Bloods' red bags.  And you know from

11   the testimony of Deeanna Seabrooks that Bigz Milla helped the

12   defendant -- helped Bigz Milla sell crack cocaine with the

13   defendant.

14             Now, Mr. Kaye wants you to believe that Bigz Milla was

15   some sort of substitute teacher when Leonard Mathews had the

16   day off.  Nonsense.  Bigz Milla was out there selling crack

17   cocaine at the direction and with the assistance of Leonard

18   Mathews.

19             So, for all these reasons, the defendant's gang was

20   involved in racketeering activity that included drug-dealing.

21   The government has met its burden on that element.

22             Mr. Kaye seems to suggest that when it comes to being

23   the big homie, Leonard Mathews is a very different kind of big

24   homie.  He is just the big homie of his own apartment, the big

25   homie of 2615 Jerome Avenue.  Nonsense.  You saw that video.

IA1KMAT4                    Rebuttal - Mr. Rodriguez

1   You've seen all of the evidence of the defendant's leadership

2   in the gang, and you heard the testimony of Ciara Edwards.

3   Mr. Kaye says where was this meeting of the minds to shoot and

4   kill Isaac Toribio?  You saw it on video.  You saw an actual

5   meeting in front of that deli.  Mr. Kaye wants you to believe

6   that whatever happened was led not by Mr. Mathews, but by

7   Mr. DeJesus.

8            Remember that video of Mr. Mathews standing in the

9   center, surrounded by other people?  Ask yourselves:  Who was

10  the leader in that situation?

11           Do you remember Mr. Mathews directing Ciara Edwards

12  into that convenience store?  Ask yourselves:  Who was the

13  leader?  Mr. Mathews.

14           Mr. Kaye also wants you to believe that with this

15  shooting, there was no intent to kill.  How could you possibly

16  infer from someone shooting a gun at another person that there

17  was an intent to kill?

18           Did you see on that video Juan DeJesus firing the gun

19  straight up in the air?  Or did you see him firing right down

20  the block at someone who's running ahead of him?  More

21  distractions and nonsense, to get you not to focus on the

22  evidence.

23           Ladies and gentlemen, I don't have the time, nor do I

24  need to go through each of the distracting arguments that the

25  defense made today, but let me say this:  He said a lot about

1    the burden in this case.  And make no mistake about it:  The

2    burden is the government's, and we embrace it.  It's the

3    standard that has been used in every criminal case in the

4    history of this country.  But it's not magical.  It's guided by

5    common sense.  It's not insurmountable.  And it's been met

6    here.

7          Very shortly, Judge Oetken is going to instruct you on

8    the law, but you, the jury, are entrusted with finding the

9    facts in this case.  Look past the distractions.  Look at the

10   evidence.  You know the defendant was a Bloods leader.  He

11   ordered his Bloods soldier, Juan DeJesus, to shoot and kill

12   Isaac Toribio, the person who disrespected the defendant.

13   Didn't need to knock him out, didn't need to tear his shirt, he

14   raised his hand, and he showed disrespect on the corner where

15   the defendant sells drugs.

16         The defendant helped Juan DeJesus find Ike and do the

17   shooting.  He called him to his side.  He directed traffic.  He

18   walked with him up Creston to find Ike, to point him out.

19         The defendant worked with DeJesus, with Ciara Edwards,

20   and with others, to get it done and then cover it up.  Three

21   people were shot because of what the defendant did.  People

22   were shot because of an order the defendant gave to maintain

23   his revered position in the Bloods, an order he gave knowing

24   full well that his foot soldier would gladly obey it, an order

25   the defendant himself helped carry out.

IA1KMAT4                        Rebuttal - Mr. Rodriguez

1          The defendant gave this order to Juan DeJesus because

2     he knew his foot soldier wouldn't think twice about putting in

3     some work for his big homie.  Because that's what's expected of

4     a foot soldier like Juan DeJesus.  That's what a foot soldier

5     has to do to keep his position in the gang - follow orders and

6     get the job done by any means necessary.

7          Let me end with this:  As you deliberate, think about

8     the three women who the defendant wants to silence.  Think

9     about that jail call between Mathews and DeJesus a few weeks

10    after the shooting, the call that Mr. Kaye refers to as just

11    talk, the call that when Mathews told DeJesus he was trying to

12    see if he could make that little birdie disappear.  Mathews was

13    talking about Ciara Edwards and how he wanted her dead, how he

14    wanted to make sure she would never take that stand and testify

15    against him.

16         Think about Deeanna Seabrooks, how the defendant

17    wanted to silence her.  The defendant didn't care that she got

18    shot because of what he did.  He gave her free crack cocaine,

19    so that she would keep her mouth shut and keep buying from him.

20         Think about Keisha Hood.  The defendant made crystal

21    clear to her on the phone, on the night of the shooting, he's

22    the one who did this, so keep your mouth shut.

23         Ladies and gentlemen, the defendant failed to keep his

24    women quiet.  They courageously sat on this stand, and they

25    laid bare who the defendant is and what mattered most to him.

IA1KMAT4

He's a person who sells poison.  He's a person who did whatever it took to maintain his position as a big homie in the Gangsta Milla Bloods, no matter how many people got hurt along the way.

I submit to you that you should believe these three women.  These three women are completely backed up by all of the other evidence in this case:  The video, the phones, the phone records, the Facebook posts, and the defendant's own words.

Hold the defendant accountable for the lives he has ruined.  Return the only verdict that is consistent with the evidence, the law, and common sense.  On every crime charged, every count, the defendant is guilty.

THE COURT:  Members of the jury, you've now heard the closing arguments of both parties in the case.  I have to tell you one more time not to discuss the case.  I'm going to let you go for lunch.  We'll take an hour for lunch.  The reason I have to tell you that one more time is because I haven't yet instructed on the law.  I want you to have lunch before that because I will go through in great detail how you need to think about every single count under the law, and precisely what each element is for that count, and what the meaning of those elements are.

So you're not yet deliberating.  After I instruct you on the law, I will send you to the jury room to begin your deliberations.  So one more time, you're not to discuss the

IA1KMAT4

1    case because you're not yet deliberating.  We'll come back at

2    2:30, and, at that point, I'll instruct you on the law, and

3    then you'll begin your deliberations.

4              Thanks, everybody.  Please leave your pads on your

5    chairs.  Have a good lunch.

6              (Jury not present)

7              THE COURT:  Thanks, everyone.  We'll be in recess till

8    2:30.

9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IA1KMAT4

AFTERNOON SESSION

2:45 PM

1
2
3          (Trial resumed; jury not present)

4          THE COURT:  Good afternoon.

5          COUNSEL:  Good afternoon.

6          THE COURT:  Everybody ready for the jury?

7          MR. RODRIGUEZ:  Yes, your Honor.

8          Two quick things:  The exhibit cart is ready to go.

9   We did include the transcripts that were admitted as aids to

10  the jury in there.  We did not include the controlled

11  substances.  If I suppose the jury wants to see them, they can

12  send a note, and we'll have them ready, but we didn't include

13  it in the cart.

14          THE COURT:  Okay.

15          MR. KAYE:  Also, your Honor, I have the two defense

16  exhibits.  Maybe I can include them on that cart or hold them

17  separately.  What would you suggest?

18          THE COURT:  We should probably put them on the same

19  cart.  Or do you have a preference?

20          MR. KAYE:  No.

21          MR. RODRIGUEZ:  That's fine with the government.

22          Okay.  Everybody ready?

23          MR. KAYE:  Yes, Judge.

24          (Continued on next page)

25

1         (Jury present)

2              THE COURT:  Good afternoon.

3              JURY MEMBERS:  Good afternoon.

4              THE COURT:  Members of the jury, you have now heard

5    all the evidence in the case as well as the final arguments of

6    the parties.  We have reached the point where you are about to

7    undertake your final function as jurors.  You've paid careful

8    attention to the evidence, and I am confident that you will act

9    together with fairness and impartiality to reach a just verdict

10   in this case.

11             My duty at this point is to instruct you as to the

12   law.  There are three parts to these instructions.  First, I'm

13   going to give you some general instructions about your role and

14   about how you're to decide the facts of the case.  These

15   instructions really would apply to just about any trial.

16   Second, I'll give you some specific instructions about the

17   legal rules applicable to this particular case.  And Third,

18   I'll give you some final instructions about procedure.

19             It is your duty to accept these instructions of law

20   and to apply them to the facts as you determine them.  With

21   respect to legal matters, you must take the law as I give it to

22   you.  If any attorney or witness has stated a legal principle

23   that differs from those in my instructions, it is my

24   instructions that you must follow.  You must not substitute

25   your own notions or opinions of what the law is or ought to be.

1          Listening to these instructions may not be easy.  It

2   is important, however, that you listen carefully and

3   concentrate.  I ask you for your patient cooperation and

4   attention.  You'll notice that I'm reading these instructions

5   from a prepared text.  It would be more lively, no doubt, if I

6   just improvised, but it's important that I not do that.  The

7   law is made up of words, and those words are very carefully

8   chosen.  So it's critical that I use exactly the right words.

9          Now, you'll have copies of what I am reading in the

10   jury room to consult, so don't worry if you miss a word or two.

11   But for now, listen carefully and try to concentrate on what

12   I'm saying.  Remember, you are to consider these instructions

13   together as a whole.  You're not to isolate or give any undue

14   weight to any single instruction.

15          As members of the jury, you are the sole and exclusive

16   judges of the facts.  You pass upon the evidence.  You

17   determine the credibility of the witnesses.  You resolve such

18   conflicts as there may be in the testimony.  You draw whatever

19   reasonable inferences you decide to draw from the facts as you

20   have determined them, and you determine the weight of the

21   evidence.

22          Do not conclude from any of my questions, or any of my

23   rulings on objections, or anything else that I have done during

24   this trial that I have any view as to the credibility of the

25   witnesses or how you should decide the case.  Any opinion I

might have regarding the facts is of absolutely no consequence.
It is your sworn duty, and you have taken the oath as jurors to
determine the facts.

          Just as I have my duties as a judge, and you have your
duties as jurors, it has been the duty of each attorney in this
case to object when the other side offered testimony or other
evidence that the attorney believed is not properly admissible.
It has been my job to rule on those objections.  Therefore, why
an objection was made or how I ruled on it is not your
business.  You should draw no inference from the bare fact that
an attorney objects to any evidence.  Nor should you draw any
inference from the fact that I might have sustained or
overruled an objection.

          From time to time, the lawyers and I have had
conferences outside of your hearing.  These conferences
involved procedural and other matters, and none of the events
related to these conferences should enter into your
deliberations at all.

          To be clear, personalities and the conduct of counsel
in the courtroom are not in any way at issue.  If you formed
reactions of any kind as to any of the lawyers in the case,
favorable or unfavorable, whether you approved or disapproved
of their behavior as advocates, those reactions should not
enter into your deliberations.

          In reaching your verdict, you must remember that all

1    parties stand equal before a jury in the courts of the United

2    States.  The fact that the government is a party and the

3    prosecution is brought in the name of the United States does

4    not entitle the government or its witnesses to any greater

5    consideration than that accorded to any other party.  By the

6    same token, you must give it no less deference.  The government

7    and the defendant stand on equal footing before you.

8         It would be improper for you to consider, in reaching

9    your decision as to whether the government has sustained its

10   burden of proof, any personal feelings you may have about the

11   defendant's race, religion, national origin, gender, sexual

12   orientation, or age.  All persons are entitled to the same

13   presumption of innocence, and the government has the same

14   burden with respect to all persons.

15        Similarly, it would be improper for you to consider

16   any personal feelings you have about the race, religion,

17   national origin, gender, sexual orientation, or age of any

18   other witness or anyone else involved in the case.  The

19   defendant is entitled to a trial free from prejudice, and our

20   judicial system cannot work unless you reach your verdict

21   through a fair and impartial consideration of the evidence.

22        Now I will instruct you on the presumption of

23   innocence.  The law presumes the defendant to be innocent of

24   all charges against him.  In this case, the defendant before

25   you has pleaded not guilty.  In so doing, he has denied the

1   charges in the indictment; thus, the government has the burden

2   of proving the defendant's guilt beyond a reasonable doubt.

3          This burden never shifts to the defendant.  In other

4   words, the defendant does not have to prove his innocence.  He

5   is presumed to be innocent of the charges contained in the

6   indictment.  The defendant thus began the trial here with a

7   clean slate.  The presumption of innocence was in his favor

8   when the trial began, continued in his favor throughout the

9   entire trial, remains with him even as I speak to you now, and

10   persists in his favor during the course of your deliberations

11   in the jury room.

12          This presumption of innocence alone requires you to

13   acquit the defendant unless you, as jurors, are unanimously

14   convinced beyond a reasonable doubt of his guilt after a

15   careful and impartial consideration of all the evidence in the

16   case.  The presumption of innocence is removed if, and only if,

17   as members of the jury, you are satisfied that the prosecution

18   has sustained its burden of proving the defendant guilty beyond

19   a reasonable doubt.

20          Now, the question naturally arises:  What exactly is a

21   reasonable doubt?  The words almost define themselves.  A

22   reasonable doubt is a doubt that a reasonable person has after

23   carefully weighing all the evidence.  It is a doubt founded in

24   reason and arising out of the evidence in the case, or the lack

25   of evidence.  Reasonable doubt is a doubt that appeals to your

IA1KMAT4                        Charge

1   reason, your judgment, your experience, your common sense.

2   Proof beyond a reasonable doubt must, therefore, be proof of

3   such a convincing character, that a reasonable person would not

4   hesitate to rely and act upon it in the most important of his

5   or her own affairs.

6           I must emphasize that beyond a reasonable doubt does

7   not mean beyond all possible doubt.  It is practically

8   impossible for a person to be absolutely and completely

9   convinced of any disputed fact that, by its very nature, cannot

10  be proved with mathematical certainty.  In the criminal law,

11  guilt must be established beyond a reasonable doubt, not all

12  possible doubt.

13          Further, the government is not required to prove each

14  element of the offense by any particular number of witnesses.

15  The testimony of a single witness may be enough to convince you

16  beyond a reasonable doubt of the existence of the elements of

17  the charged offense if you believe that the witness has

18  testified truthfully and accurately related -- if you believe

19  that the witness has truthfully and accurately related what he

20  or she has told you.

21          That all said, if, after a fair and impartial

22  consideration of all the evidence and the lack of evidence, you

23  have an abiding belief as to the defendant's guilt beyond a

24  reasonable doubt, a belief that you would be willing to act

25  upon without hesitation in important matters in the personal

1  affairs of your own life, then it is your sworn duty to convict

2  the defendant.

3           On the other hand, if, after a fair and impartial

4  consideration of all the evidence and the lack of evidence, you

5  are not convinced of the guilt of the defendant with respect to

6  the charges in the indictment, if you do not have an abiding

7  conviction of the defendant's guilt, in sum, if you have such a

8  doubt as would cause you, as prudent persons, to hesitate

9  before acting in matters of importance to yourselves, then you

10 have a reasonable doubt, and in that circumstance, it is your

11 sworn duty to return a verdict of not guilty on that count in

12 the indictment.

13          In reaching that determination, your oath as jurors

14 commands that you are not to be swayed by sympathy or

15 prejudice.  You are to be guided solely by the evidence in this

16 case, and you are to apply the law as I instruct you.  As you

17 sift through the evidence, you must ask yourselves whether the

18 prosecution has proven the defendant's guilt.  Once you let

19 fear, or prejudice, or bias, or sympathy interfere with your

20 thinking, there is a risk that you will not arrive at a true

21 and just verdict.  Thus, if you have a reasonable doubt as to

22 the defendant's guilt, then you must render a verdict of not

23 guilty.  But if you should find that the prosecution has met

24 its burden of proving the defendant's guilt beyond a reasonable

25 doubt, then you should not hesitate because of sympathy or for

1    any other reason to render a verdict of guilty.

2              The question of possible punishment to the defendant

3    is of no concern to the jury and shouldn't enter into or

4    influence your deliberations.  The duty of imposing sentence in

5    the event of a conviction rests exclusively upon the Court.

6    Your function is to weigh the evidence in the case and

7    determine whether or not the defendant is guilty beyond a

8    reasonable doubt solely on the basis of such evidence.  Under

9    your oath as jurors, you cannot allow any consideration of

10   punishment that may be imposed upon the defendant, if he is

11   convicted, to influence your verdict.

12             Similarly, it would be improper for you to allow any

13   feelings you might have about the nature of the crimes charged

14   to interfere with your decision-making process.  Your verdict

15   must be based exclusively upon the evidence or the lack of

16   evidence in the case.

17             Now, I've repeatedly referred to the evidence in the

18   case.  That raises an important question:  What is evidence?  I

19   instruct you that evidence consists of the sworn testimony of

20   the witnesses, the exhibits received in evidence, and the

21   stipulations of the parties.  In determining the facts, you

22   must rely upon your own recollection of the evidence.

23             What, then, is not evidence?  I instruct you that the

24   following does not count as evidence:

25             First, testimony that I have stricken or excluded is

IA1KMAT4                      Charge

not evidence.  You may not use it in rendering your verdict.
If certain testimony was received for a limited purpose, you
must follow the limiting instructions I have given and use the
evidence only for the limited purpose I indicated.

          Second, any exhibit that was not received into
evidence is not evidence.  Thus, exhibits marked for
identification, but not admitted, are not evidence, nor are
materials that were used only to refresh a witness'
recollection.

          Third, arguments by the lawyers are not evidence.  The
reason is simple:  Advocates are not witnesses.  The opening
and closing arguments of both sides explain how both side wants
you to analyze the evidence, which consists of the testimony of
witnesses, the documents, and other exhibits that were entered
into evidence and the stipulations of the parties.  What the
lawyers have said to you is intended to help you understand the
evidence, and the lack of evidence, as you deliberate to reach
your verdict.  However, if your recollection of the facts
differs from the lawyers' opening statements, questions to
witnesses, or summations, it is your recollection that
controls, not theirs.  For the same reasons, you are not to
consider a lawyer's or a party's questions as evidence.  Only
the witnesses' answers are to be considered evidence, not the
questions.

          Finally, any statements that I may have made do not

1     constitute evidence.  It is for you alone to decide the weight,

2     if any, to be given to the testimony you have heard and the

3     exhibits you have seen.

4            I will now discuss at slightly greater length some

5     important matters related to evidence.

6            There are two types of evidence that you may properly

7     consider in reaching your verdict.

8            One type of evidence is direct evidence.  Direct

9     evidence is testimony by a witness about something he knows by

10    virtue of his own senses – something he has seen, felt, touched

11    or heard.  For example, if a witness testified that when he

12    left the house this morning, it was raining, that would be

13    direct evidence about the weather.

14           The second type of evidence is circumstantial

15    evidence.  Circumstantial evidence is evidence that tends to

16    prove a disputed fact indirectly by proof of other facts.

17    There is a simple example of circumstantial evidence that we

18    often use in this courthouse.

19           Assume that when you came into the courthouse this

20    morning, the sun was shining, and it was a nice day outdoors.

21    Assume that the courtroom shades were drawn, and you couldn't

22    see anything outside.  Assume further that as you were sitting

23    here, someone walked in with an umbrella that was dripping wet,

24    and then a few minutes later, somebody else walked in with a

25    raincoat that was dripping wet.

1          Now, because you couldn't look outside the courtroom,

2     and you could not see whether it was raining, you would have no

3     direct evidence of that fact.  But, on the combination of facts

4     that I've asked you to assume, it would be reasonable and

5     logical for you to conclude that it was raining.

6          That is all there is to circumstantial evidence.  You

7     infer, on the basis of your reason, experience, and common

8     sense from one fact that's established, the existence or

9     nonexistence of some other fact.

10          As you can see, the matter of drawing inferences from

11     facts in evidence is not a matter of guesswork or speculation.

12     An inference is a logical, factual conclusion that you might

13     reasonably draw from other facts that have been proven.

14          Many material facts, such as someone's state of mind,

15     are rarely easily proven by direct evidence.  Usually such

16     facts are established by circumstantial evidence and the

17     reasonable inferences that you draw.  Circumstantial evidence

18     may be given as much weight as direct evidence.  The law makes

19     no distinction between direct and circumstantial evidence, but

20     simply requires that, before convicting a defendant, the jury

21     must be satisfied of the defendant's guilt beyond a reasonable

22     doubt based on all the evidence in the case.

23          There are times when different inferences may be drawn

24     from the evidence.  The government asks you to draw one set of

25     inferences.  The defendant asks you to draw another set of

IA1KMAT4                         Charge

1     inferences.  It is for you, and you alone, to decide what

2     inferences you will draw.

3           You've heard evidence in the form of stipulations that

4     contain facts that were agreed to be true.  In such cases, you

5     must accept those facts as true.  However, it is for you to

6     decide what weight, if any, to give to those facts.

7           As I've already explained, you should draw no

8     inference or conclusion, for or against, any party by reason of

9     lawyers making objections or my rulings on such objections.  By

10    the same token, nothing I say is evidence.  If I commented on

11    the evidence at any time, do not accept my statements in place

12    of your recollection or your interpretation.  It is your

13    recollection and interpretation that govern.

14          Further, do not concern yourself with what was said at

15    sidebar conferences or during any discussions with counsel.

16    Those discussions related to rulings of law.

17          At times, I may have admonished a witness or directed

18    a witness to be responsive to questions or to keep his or her

19    voices up.  At times, I may have asked a question myself.  Any

20    questions that I asked or instructions I gave were intended

21    only to clarify the presentation of the evidence and to bring

22    out something that I thought might be unclear.  You should draw

23    no inference or conclusion of any kind, favorable or

24    unfavorable, with respect to any witness or any party in the

25    case by reason of any comment, or question, or instruction of

mine.  Nor should you infer that I have any views to the

credibility of any witness, as to the weight of the evidence,

or as to how you should decide any issue that's before you.

That is entirely your role.

         You have had the opportunity to observe the witnesses.

It will now be your job to decide how believable each witness

was in his or her testimony.  You are the sole judges of the

credibility of each witness and of the importance of his or her

testimony.

         To that end, I'm going to give you a few general

instructions on how you may determine whether witnesses are

credible and reliable, whether witnesses told the truth at this

trial, and whether they knew what they were talking about.  It

is really just a matter of using your common sense, your good

judgment, and your experience.

         First, consider how well the witness was able to

observe or hear what he or she testified about.  The witness

may be honest, but mistaken.  How did the witness' testimony

impress you?  Did the witness appear to be testifying honestly

and/or candidly?  Were the witness' answer direct or were they

evasive?  Consider the witness' intelligence, demeanor, manner

of testifying, and the strength and accuracy of the witness'

recollection.  Consider whether any outside factors might have

affected a witness' ability to perceive events.

         Consider the substance of the testimony.  How did the

1    witness' testimony compare with other proof in the case?  Is it

2    corroborated, or is it contradicted by other evidence?  If

3    there is a conflict, does any version appear reliable, and, if

4    so, which version seems more reliable?

5         You may consider whether a witness had any possible

6    bias or relationship with a party or any possible interest in

7    the outcome of the case.  Such a bias or relationship does not

8    necessarily make the witness unworthy of belief.  These are

9    simply factors that you may consider.

10        In passing upon the credibility of a witness, you may

11   also take into account any inconsistencies or contradictions as

12   to material matters in his or her testimony.

13        In summary, you should carefully scrutinize all of the

14   testimony of each witness, the circumstances under which each

15   witness testified, the impression the witness made when

16   testifying, the relationship of the witness to the controversy

17   and the parties, the witness' bias or impartiality, the

18   reasonableness of the witness' statement, the strength or

19   weakness of the witness' recollection viewed in light of all

20   the other testimony, and any other matter in evidence that may

21   help you decide the truth and the importance of each witness'

22   testimony.

23        If a witness has shown knowingly or willfully to have

24   testified falsely concerning any material matter, or to have

25   previously committed perjury, you have a right to distrust such

1   witness' testimony in other particulars and give it such

2   credibility as you think it deserves.

3          It is for you, the jury, and you alone -- not the

4   lawyers, not the witnesses, and not me as the judge -- to

5   decide the credibility of witnesses who testified and the

6   weight that their testimony deserves.  The ultimate question

7   for you to decide in passing upon credibility is:  Did the

8   witness tell the truth before you?

9          The defendant did not testify in this case.  Under our

10  Constitution, a defendant has no obligation to testify or to

11  present any evidence because it is the government's burden to

12  prove the defendant guilty beyond a reasonable doubt.  That

13  burden remains with the government throughout the entire trial

14  and never shifts to the defendant.  The defendant is never

15  required to prove that he or she is innocent.  You may not

16  attach any significance to the fact that the defendant did not

17  testify.  No adverse inference against the defendant may be

18  drawn because he did not take the witness stand.  You may not

19  consider this against the defendant in any way in your

20  deliberations in the jury room.

21         You have heard from witnesses who testified that they

22  were involved in criminal conduct and/or that they were

23  involved in the conduct charged in the indictment.  They have

24  entered into nonprosecution agreements with the government.

25  Those witnesses are Ciara Edwards, Keisha Hood, and Tina

1    Seabrooks, also known as Chicago.  You have heard a great deal

2    in counsel's summations about these so-called accomplice or

3    cooperating witnesses and whether or not you should believe

4    them.

5         Experience will tell you that the government

6    frequently must rely on the testimony of cooperating witnesses

7    and other witnesses who have admitted participating in crimes.

8    The government must take its witnesses as it finds them and

9    frequently must use such testimony in a criminal prosecution

10   because otherwise it would be difficult or impossible to detect

11   and prosecute wrongdoers.

12        The testimony of such cooperating witnesses is

13   properly considered by the jury.  If cooperating witnesses

14   could not be used, there would be many cases in which there was

15   real guilt, and conviction should be had, but in which

16   convictions would be unobtainable.

17        For these very reasons, the law allows the use of

18   cooperating witness testimony.  Indeed, it is the law in

19   federal courts that the testimony of a single cooperating

20   witness may be enough in itself for conviction if the jury

21   believes that the testimony established guilt beyond a

22   reasonable doubt.  At the same time, the jury is free to

23   discount the testimony of a cooperating witness in part or in

24   its entirety if it disbelieves the cooperating witness

25   testimony.

1        Because of the possible interest a cooperating witness

2   may have in testifying, the cooperating witness' testimony

3   should be scrutinized with care and caution.  The fact that a

4   witness is cooperating -- is a cooperating witness can be

5   considered by you as bearing upon her credibility.  It does not

6   follow, however, that simply because a person has admitted to

7   participating in one or more crimes, that she is incapable of

8   giving truthful testimony.

9        Like the testimony of any other witness, cooperating

10  witness testimony should be given the weight that it deserves

11  in light of the facts and circumstances before you, taking into

12  account the witness' demeanor, candor, the strength, and

13  accuracy of a witness' recollection, her background, and the

14  extent to which the testimony is or is not corroborated by

15  other evidence in the case.

16       You heard testimony about agreements between the

17  government and the witnesses, Ms. Edwards, Ms. Hood, and

18  Ms. Seabrooks, also known as Chicago.  I must caution you that

19  it is no concern of yours why the government made an agreement

20  with a particular witness.  Your sole concern is whether a

21  witness has given truthful testimony here in the courtroom

22  before you.

23       In evaluating the testimony of a cooperating witness,

24  you should ask yourselves whether this cooperating witness

25  would benefit more by lying or by telling the truth.  Was the

IA1KMAT4                         Charge

1   witness' testimony made up in any way because she believed or

2   hoped to somehow receive favorable treatment by testifying

3   falsely?  Or did the witness believe that her interests would

4   be best served by testifying truthfully?  If you believe that

5   the witness was motivated by hopes of personal gain, was the

6   motivation one that would cause the witness to lie, or it was

7   one that would cause the witness to tell the truth?  Did this

8   motivation color her testimony?

9            If you find that the testimony was false, you should

10   reject it.  If, however, after a cautious and careful

11   examination of the cooperating witness' testimony and demeanor

12   upon the witness stand, if you are satisfied that the witness

13   told the truth, you should accept it as credible and act upon

14   it accordingly.

15            Your sole concern is to decide whether the witness was

16   giving truthful testimony in this case before you.  In sum, you

17   should look at all the evidence in deciding what credence and

18   what weight, if any, you will give to a witness' testimony.

19            As I have previously instructed you, the issue of

20   credibility need not be decided in an all-or-nothing fashion.

21   Even if you find that a witness testified falsely in one part,

22   you may still accept her testimony in other parts, or may

23   disregard all of it.  Credibility is a determination entirely

24   for you, the jury.

25            You have heard testimony from what we call expert

IA1KMAT4                      Charge

witnesses.  Specifically, Detective Colleen Horan was an expert
in microscopic analysis of ballistics evidence, Detective Paul
Jeselson was an expert in the Bloods gang, Special Agent
Tenitris McInnis was an expert in ammunition identification,
and Daphne Mavris and Ashley Chapman were experts in controlled
substance analysis.

          An expert is a witness who, by education or
experience, has acquired learning or experience in a
specialized area of knowledge.  Such witnesses are permitted to
give their opinions as to relevant matters in which they
profess to be an expert and give their reasons for their
opinions.  Expert testimony is presented to you on the theory
that someone who's experienced in the field can assist you in
understanding the evidence or in reaching an independent
decision on the facts.

          Now, your role in judging credibility applies to
experts as well as other witnesses.  You should consider the
expert opinions that were received in evidence in this case and
give them as much or as little weight as you think they
deserve.  If you should decide that the opinion of an expert
was not based on sufficient education, or experience, or on
sufficient data, or if you should conclude that the
trustworthiness or credibility of an expert is questionable for
any reason, or if the opinion of the expert was outweighed in
your judgment by other evidence in the case, then you might

1   disregard the opinion of the expert entirely or in part.

2           On the other hand, if you find the opinion of an

3   expert is based on sufficient data, education, and experience,

4   and the other evidence does not give you reason to doubt his or

5   her conclusions, you would be justified in placing reliance on

6   his or her testimony.

7           You have heard the testimony of law enforcement

8   witnesses and other government employees.  The fact that a

9   witness may be employed by the federal government or a state or

10  city government as a law enforcement agent or employee does not

11  mean that his or her testimony is deserving of more or less

12  consideration or greater or lesser weight than that of an

13  ordinary witness.

14          In this context, defense counsel is allowed to try to

15  attack the credibility of such a witness on the ground that his

16  or her testimony may be colored by a personal or professional

17  interest in the outcome of the case.

18          It is your decision, after reviewing all the evidence,

19  whether to accept the testimony of the law enforcement or

20  government employee witness and to give to that testimony the

21  weight you find it deserves.

22          In deciding whether to believe a witness, you should

23  specifically note any evidence of hostility or affection that

24  the witness may have towards one of the parties.  Likewise, you

25  should consider evidence of any other interest or motive that

1  the witness may have in cooperating with a particular party.

2  You should also take into account any evidence of any benefit

3  that a witness may receive from the outcome of the case.

4          It is your duty to consider whether the witness has

5  permitted any such bias or interest to color his or her

6  testimony.  In short, if you find that a witness is biased, you

7  should view his or her testimony with caution, weigh it with

8  care, and subject it to close and searching scrutiny.

9          Of course, the mere fact that a witness is interested

10  in the outcome of the case does not mean he or she has not told

11  the truth.  It is for you to decide from your observations, and

12  by applying your common sense and experience, and all the other

13  considerations mentioned whether the possible interest of any

14  witness has intentionally or otherwise colored or distorted his

15  or her testimony.  You are not required to disbelieve an

16  interested witness.  You may accept as much of his or her

17  testimony as you deem reliable and reject as much as you deem

18  unworthy of acceptance.

19          During the trial, you heard the names of several other

20  individuals mentioned in connection with this case.  Some of

21  those other individuals have been mentioned in connection with

22  what the government alleges was illegal activity.

23          I instruct you that you may not draw any inference,

24  favorable or unfavorable, toward the government or the

25  defendant from the fact that there may be people who have not

IA1KMAT4                    Charge

 1   been tried as defendants in this case.  Further, you may not

 2   speculate as to the reasons why those other people are not on

 3   trial or what became of them in the legal system.  Those

 4   matters are wholly outside your concern and have no bearing on

 5   your duties as jurors in this case.

 6            You have heard evidence during the trial that

 7   witnesses have discussed the facts of the case and their

 8   testimony with the lawyers before the witnesses appeared in

 9   court.  Although you may consider that fact when you're

10   evaluating a witness' credibility, I should tell you that there

11   is nothing unusual or improper about a witness meeting with

12   lawyers before testifying, so that the witness can be aware of

13   the subjects he or she will be questioned about, focus on those

14   subjects, and have the opportunity to review relevant exhibits

15   before being questioned about them.  Such consultation helps

16   conserve your time and the Court's time.  In fact, it would be

17   unusual for a lawyer to call a witness without such

18   consultation.

19            Again, the weight you give to the fact or the nature

20   of a witness' preparation for his or her testimony and what

21   inferences you draw from such preparation are matters

22   completely within your discretion.

23            There are several people whose names you have heard

24   during the course of the trial, but who did not appear here to

25   testify.  I instruct you that each party had an equal

1   opportunity or lack of opportunity to call any of these

2   witnesses.  Therefore, you should not draw any inference or

3   reach any conclusions as to what they would have testified to

4   had they been called.  Their absence should not affect your

5   judgment in any way.

6           You should, however, remember my instruction that the

7   law does not impose on a defendant in a criminal case the

8   burden or duty of calling any witness or producing any

9   evidence.  The burden remains with the government to prove the

10  guilt of the defendant beyond a reasonable doubt.

11          There has been evidence that the defendant made

12  statements to law enforcement authorities or other

13  investigators.  Evidence of these statements was properly

14  admitted in this case and may be properly considered by you.

15  You are to give the statements such weight as you feel they

16  deserve in light of all the evidence.

17          Whether you approve or disapprove of the use of these

18  statements may not enter into your deliberations.  I instruct

19  you that the statements were both made and obtained in a lawful

20  manner, and that no one's rights were violated, and the

21  government's use of the evidence is entirely lawful.

22          You have heard testimony that defendant made

23  statements in which the defendant claimed that his conduct was

24  consistent with innocence and not with guilt.  The government

25  claims that these statements in which the defendant exculpated

IA1KMAT4                          Charge

1    himself are false.

2           If you find the defendant gave a false statement in

3    order to divert suspicion from himself, you may infer that the

4    defendant believed that he was guilty.  You may not, however,

5    infer on the basis of this alone that the defendant is, in

6    fact, guilty of the crimes for which the defendant was charged.

7           Whether or not the evidence as to a defendant's

8    statements shows that the defendant believed that he was

9    guilty, and the significance, if any, to be attached to any

10   such evidence are matters for you, the jury, to decide.

11          You have heard reference in the arguments and

12   cross-examination of defense counsel in this case to the fact

13   that certain investigative techniques were or were not used by

14   the government.  There's no legal requirement, however, that

15   the government prove its case through any particular means.

16   While you are to carefully consider the evidence adduced by the

17   government, you are not to speculate as to why they used the

18   techniques they did or why they did not use other techniques.

19   The government is not on trial.  Law enforcement techniques are

20   not your concern.  However, you are free to consider a lack of

21   evidence in your determination of whether the government proved

22   the charged crimes beyond a reasonable doubt.  Your concern is

23   to determine whether, on the evidence or lack of evidence, the

24   defendant's guilt has been proven beyond a reasonable doubt.

25          You have also heard testimony about evidence seized in

IA1KMAT4                      Charge

certain searches.  Evidence obtained from these searches was

properly admitted in this case and may properly be considered

by you.  Whether you approve or disapprove of how it was

obtained should not enter into your deliberations because I now

instruct you that the government's use of this evidence is

entirely lawful.

You must, therefore, regardless of your personal

opinions, give this evidence full consideration along with all

the other evidence in the case in determining whether the

government has proved the defendant's guilt beyond a reasonable

doubt.

Some of the exhibits that were admitted into evidence

were in the form of charts or summaries.  I decided to admit

these charts and summaries in place of, or in addition to, the

underlying documents that they represent in order to save time

and avoid unnecessary inconvenience.  You should consider these

charts and summaries as you would any other evidence.

Video or audio recordings of certain conversations

have been admitted into evidence.  Whether you approve or

disapprove of the recording of these conversations may not

enter into your deliberations.  I instruct you that these

recordings were made in a lawful manner, and that no one's

rights were violated, and that the government's use of this

evidence is lawful, and it was properly admitted into evidence

at this trial.

1          You must, therefore, regardless of any personal

2    opinions, give this evidence consideration along with all the

3    other evidence in the case in determining whether the

4    government has proved the defendant's guilt beyond a reasonable

5    doubt.

6          In addition, the government has been permitted to hand

7    out transcripts of certain of the recordings.  These

8    transcripts, which the government prepared, were given to you

9    as an aid or guide to assist you in listening to the

10   recordings.  However, the transcripts are not, in and of

11   themselves, evidence.  Therefore, when the tapes were played, I

12   advised you to listen very carefully to the tapes themselves.

13   You alone should make your own interpretation of what appears

14   on the tapes based on what you heard.  If you think you heard

15   something differently from what appeared on the transcript,

16   then what you heard is controlling.

17         If you wish to hear any of the recordings again, or

18   see any of the transcripts of those recordings, they will be

19   made available to you during your deliberations.

20         Among the exhibits received in evidence, there are

21   some documents and recordings that were redacted.  Redacted

22   means that part of the document or recording was taken out.

23   You are to concern yourself only with the part of the item that

24   has been admitted into evidence.  You should not consider any

25   possible reason why the other part has been redacted.

IA1KMAT4                     Charge

1          Now I'm going to turn to the substantive instructions.

2          Let us first turn to the charges against the defendant

3     as contained in the indictment.  The indictment, as I said

4     earlier, is not evidence.  It is an accusation, a statement of

5     the charges made against the defendant.  It gives the defendant

6     notice of the charges against him.  It informs the Court and

7     the public of the nature of the accusation.

8          A defendant begins trial with an absolutely clean

9     slate and without any evidence against him.  Remember that the

10    charges in the indictment are merely accusations.  What matters

11    is the evidence that you heard and saw in the trial.

12         The indictment consists of six charges, or counts.

13    Each count is a separate crime or offense.  Each count must,

14    therefore, be considered separately by you, and you must return

15    a separate verdict of guilty or not guilty on each count.

16    Whether you find the defendant guilty or not guilty as to one

17    count should not affect your verdict as to any other count

18    charged.

19         Counts One, Two, and Three charge that on or about

20    October 20, 2017, the defendant committed violent crimes in aid

21    of racketeering.

22         Count One charges that on or about October 20, 2017,

23    the defendant willfully caused and aided and abetted the

24    attempted murder of Isaac Toribio, also known as Ike, in the

25    vicinity of East 196th Street and Morris Avenue in the Bronx

for the purpose of gaining entrance to and maintaining and

increasing his position in the Bloods.

Count Two charges that, on or about October 20, 2017,

the defendant conspired with others to murder Isaac Toribio,

also known as Ike, for the purpose of gaining entrance to and

maintaining and increasing position in the Bloods.

Count Three charges that, on or about October 20,

2017, the defendant willfully caused and aided and abetted an

assault with a dangerous weapon of multiple people in the

vicinity of East 196th Street and Morris Avenue in the Bronx

for the purpose of gaining entrance to and maintaining and

increasing position in the Bloods.

Count Four charges that, on or about October 20, 2017,

during and in relation to the attempted murder charged in Count

One and the assault with a dangerous weapon charged in Count

Three, that the defendant willfully caused and aided and

abetted the knowing use and carrying of a firearm, and in

furtherance of such crimes, possession of a firearm, which was

brandished and discharged.

Count Five charges that, on or about October 20, 2017,

the defendant, after having previously been convicted of a

crime -- convicted in a court of a crime punishable by a term

of imprisonment exceeding one year, knowingly did possess, or

willfully caused another person to possess, ammunition in and

affecting commerce and aided and abetted the same.

IA1KMAT4                    Charge

1          Count Six charges that, from at least in or about

2     May 2016 up to January 26, 2018, the defendant intentionally

3     and knowingly distributed, or possessed with the intent to

4     distribute, 28 grams or more of mixtures and substances

5     containing a detectable amount of cocaine base in a form

6     commonly known as crack, and willfully caused and aided and

7     abetted the same.

8          Before I march on to the charges in the indictment, I

9     want to instruct you now on two different ways that you may

10    find the defendant guilty of the crimes charged in Counts One,

11    Three, Four, or Six; that is, all the charges except for Count

12    Two, which charges conspiracy to commit murder in aid of

13    racketeering, even if the defendant himself did not physically

14    commit those crimes.

15         First, you may find that the defendant -- sorry.

16    First, you may find the defendant guilty of those crimes on an

17    aiding and abetting theory of liability.  Second, you may also

18    find the defendant guilty of those crimes if he willfully

19    caused someone else to commit those crimes.

20         Either one of these two different theories of

21    liability would be sufficient to convict the defendant on

22    Counts One, Three, Four, five, or Six even if the defendant

23    himself did not physically commit those crimes.

24         First, I will explain "aiding and abetting," and then

25    I will explain what it means to "willfully cause" a crime.

1          Aiding and abetting liability is its own theory of

2      criminal liability.  In effect, it is a theory of liability

3      that permits a person to be convicted of a specific crime if

4      the person, while not himself physically committing the crime,

5      assisted another person or persons in committing the crime.

6          The federal aiding and abetting statute, Section 2(a)

7      of Title 18 of the United States Code, provides that:  "Whoever

8      commits an offense against the United States or aids, abets,

9      counsels, commands, induces, or procures its commission, is

10     punishable as a principal."

11         You should give these words -- aids, abets, counsels,

12     demands, induces, or procures -- their ordinary meaning.  A

13     person aids or abets a crime if he knowingly does some act for

14     the purpose of aiding or encouraging the commission of that

15     crime with the intention of causing the crime to be committed.

16     To counsel means to give advice or recommend.  To induce means

17     to lead or move by persuasion or influence as to some action or

18     state of mind.  To procure means to bring about by unscrupulous

19     or indirect means.  To cause means to bring something about, to

20     effect something.

21         In other words, it is not necessary for the government

22     to show that a person physically committed a crime in order for

23     him to be held legally responsible for that crime.  You may

24     find that the defendant committed the substantive crime if you

25     find that the government has proven beyond a reasonable doubt

1    that another person actually committed the crime and that the

2    defendant aided and abetted that person in the commission of

3    the offense.

4          As you can see, the first requirement is that another

5    person has committed the crime charged.  Obviously, no one can

6    be convicted of aiding and abetting the criminal acts of

7    another if no crime was committed by the other person.  But if

8    you do find that a crime was committed, then you must consider

9    whether the defendant aided or abetted the commission of the

10   crime.

11         To aid and abet another to commit a crime, it is

12   necessary that the individual willfully and knowingly

13   associated himself in some way with the crime, and that the

14   individual willfully and knowingly sought by some act to help

15   make the crime succeed.  Participation in a crime is willful if

16   action is taken voluntarily and intentionally.

17         The mere presence of a person where a crime is being

18   committed, even coupled with knowledge by that person that a

19   crime is being committed, or the mere acquiescence by a person

20   in the criminal conduct of others, even with guilty knowledge,

21   is not sufficient to establish aiding and abetting.  An aider

22   and abettor must have some interest in the criminal venture,

23   and must know that the crime is being committed, and must act

24   in a way that is intended to bring about the success of the

25   criminal venture by taking some action to assist or encourage

IA1KMAT4                        Charge

1   the commission of the crime.  In addition, aiding the

2   perpetrators only after the criminal objective has been

3   entirely accomplished, without any intent to bring about the

4   crime before it was entirely accomplished, is insufficient to

5   establish that the defendant was guilty of aiding and abetting.

6           To determine whether the defendant aided and abetted

7   the commission of the crimes charged in Counts One, Three,

8   Four, Five, or Six, ask yourself these questions:

9           Did the defendant participate in the crime charged as

10  something he wished to bring about?

11          Did the defendant associate himself with the criminal

12  venture knowingly and willfully?

13          Did the defendant seek, by his actions, to make the

14  criminal venture succeed?

15          If so, then the defendant is an aider and abettor and,

16  therefore, guilty of the offense charged in that count.

17          Another way that a defendant can be found guilty of

18  the crimes charged in Counts One, Three, Four, Five, or Six is

19  by willfully causing someone else to commit the crime.  Section

20  2(b) of the aiding and abetting statute, which relates to

21  willfully causing a crime, reads as follows:

22          "Whoever willfully causes an act to be done which if

23  directly performed by him or another would be an offense

24  against the United States shall be guilty of a federal crime."

25          So what does the term willfully caused mean?  It means

1    that it is not necessary for the defendant himself to have

2    physically committed the crime.

3            To determine whether the defendant willfully caused

4    the commission of the crime, ask yourself these questions:

5    First, did the defendant intentionally take action that caused

6    someone else to commit an act that would have been a crime if

7    the defendant himself had committed the act?

8            Second, did the defendant intend that the crime would

9    actually be committed by someone else?

10           If the answer to both of these questions is yes, then

11   the defendant is guilty just as if the defendant himself had

12   physically committed the crime.

13           To summarize, you may find the defendant guilty of

14   Counts One, Three, Four, Five, or Six -- that is all the counts

15   except Two, Count Two -- if you find that the government has

16   proven beyond a reasonable doubt that either:  (1) the

17   defendant physically committed the crime; or (2) the defendant

18   aided and abetted someone else in the commission of a crime; or

19   (3) the defendant willfully caused someone else to commit these

20   crimes.  If you do not find that the defendant has proven

21   beyond a reasonable doubt that any of those three -- if you do

22   not find that the government has proven beyond a reasonable

23   doubt any of those three, then you must find the defendant not

24   guilty.

25           Depending on your view of the evidence, there could be

IA1KMAT4                         Charge

1    a subtle distinction with respect to whether the defendant

2    caused somebody else to commit a crime or whether he aided and

3    abetted someone else in committing a crime.

4            If that question should come up in your deliberations,

5    you should think of it in terms of the difference between

6    causing someone to do something as opposed to facilitating or

7    helping someone do it.  If you are persuaded beyond a

8    reasonable doubt that the defendant willfully caused someone

9    else to commit the crimes charged in Counts One, Three, Four,

10   Five, or Six, you must find him guilty as someone who wilfully

11   caused the commission of the crime.

12           If, on the other hand, you are persuaded beyond a

13   reasonable doubt that the defendant, with the knowledge and

14   intent that I described earlier, sought by his actions to

15   facilitate or assist another person in committing the crime,

16   then he is guilty as an aider and abettor.

17           Now, Counts One, Two, and Three charge the defendant

18   with committing violent crimes in aid of racketeering.

19           Count One charges the defendant with willfully causing

20   and aiding and abetting an attempted murder in aid of

21   racketeering.

22           Count Two charges the defendant with conspiracy to

23   commit murder in aid of racketeering.

24           Count Three charges the defendant with willfully

25   causing and aiding and abetting an assault with a dangerous

IA1KMAT4                    Charge

1   weapon in aid of racketeering.

2            All three of these charges are in violation of Section

3   1959 of Title 18 of the U.S. Code, which provides in relevant

4   part as follows:

5            "Whoever . . . for the purpose of gaining entrance to

6   or maintaining or increasing position in an enterprise engaged

7   in racketeering activity, murders . . . or assaults with a

8   dangerous weapon . . . in violation of the laws of any state or

9   the United States, or attempts or conspires to do so, is guilty

10   of a crime."

11            With respect to Counts One, Two, and Three, in order

12   for you to find the defendant guilty, the government must prove

13   beyond a reasonable doubt that each of the following -- must

14   prove beyond a reasonable doubt each of the following elements:

15            First, that an enterprise existed;

16            Second, that the enterprise engaged in a racketeering

17   activity or activities;

18            Third, that the enterprise engaged in or its

19   activities affected interstate or foreign commerce -- let me

20   read that again -- third, that the enterprise engaged in or its

21   activities affected interstate or foreign commerce;

22            Fourth, that the defendant committed the violent crime

23   alleged, which in Count One is willfully causing or aiding and

24   abetting attempted murder, in Count Two is conspiracy to commit

25   murder, and in Count Three is willfully causing or aiding and

IA1KMAT4                        Charge

1    abetting assault with a dangerous weapon;

2            Fifth, that the defendant's general purpose in doing

3    so was to gain entrance to the enterprise or maintain or

4    increase his position in the enterprise.

5            I will now instruct you on the law applicable to each

6    of those elements that I just mentioned.

7            The first element the government must prove beyond a

8    reasonable doubt with respect to Counts One, Two, and Three is

9    that the enterprise alleged, the Bloods, existed.

10           Under the racketeering statute, the term "enterprise"

11   includes any legal entity, such as a partnership, corporation,

12   or association, or a group of individuals who are associated in

13   fact, although not a legal entity.  The enterprise does not

14   have to have a particular name or, for that matter, have any

15   name at all.  Nor must it be registered or licensed as an

16   enterprise.  It does not have to be commonly recognized -- a

17   commonly recognized legal entity, such as a corporation, a

18   trade union, partnership, or the like.

19           An enterprise may be a group of people informally

20   associated together for a common purpose of engaging in a

21   course of conduct.  This group may be organized for a

22   legitimate and lawful purpose or it may be organized for an

23   unlawful purpose.  In addition to having a common purpose, this

24   group of people must have a core of personnel who function as a

25   continuing unit.

IA1KMAT4                          Charge

1            If the government proves beyond a reasonable doubt

2       that there was a group of people characterized by a common

3       purpose or purposes, an ongoing formal or informal organization

4       or structure, and core personnel who functioned as a continuing

5       unit during a substantial period, then an enterprise existed.

6            (Continued on next page)

IA1AAMAT5                    Jury Charge

1          The second element that the Government must prove

2     beyond a reasonable doubt with respect to Counts One, Two, and

3     Three is that the enterprise alleged, the Bloods, engaged in

4     racketeering activity.  The Government alleges that the Bloods

5     engaged in the following forms of racketeering activity:

6          Attempted murder and conspiracy to commit murder, in

7     violation of New York law; and Dealing in controlled

8     substances, including the distribution of heroin, crack

9     cocaine, and marijuana, the possession of heroin, crack

10    cocaine, and marijuana with intent to distribute, and

11    conspiracy to so distribute or possess, in violation of federal

12    law.

13         The Government is not required to prove beyond a

14    reasonable doubt that the enterprise engaged in all of these

15    forms of racketeering activity.  To satisfy the second element

16    of Counts One, Two, and Three, it is sufficient for the

17    Government to prove beyond a reasonable doubt that the

18    enterprise engaged in only one form of the alleged forms of

19    racketeering activity.

20         As I just explained, the Government alleges with

21    respect to Counts One, Two, and Three that among the

22    racketeering activities that the enterprise engaged in were

23    attempted murder and conspiracy to murder, in violation of New

24    York State law.  I will describe those crimes now.

25         Attempted Murder I will now describe the law

1    pertaining to attempted murder.

2              Under New York law, "a person is guilty of an attempt

3    to commit a crime when, with intent to commit a crime, he

4    engages in conduct which tends to effect the commission of such

5    crime." Mere preparation is not sufficient to find that a crime

6    was attempted.  The acts committed by the person, or those he

7    is aiding and abetting, must be those acts which are required

8    to carry the project forward within "dangerous proximity" of

9    the criminal end to be attained.

10             There are two elements to the crime of murder under

11   New York State law:

12             First, that an individual caused the death of the

13   victim, or aided and abetted the same;

14             and Second, that the individual did so with the intent

15   to cause the death of the victim or another person.

16             There are three elements to the crime of conspiracy to

17   commit murder under New York State law.

18             First, that the individual agreed with one or more

19   other persons to engage in or cause the performance of a

20   murder;

21             Second, that the individual did so with the intent

22   that such murder be performed;

23             and Third, that the individual, or one of the people

24   with whom he agreed to engage in or cause the performance of

25   the murder, committed an overt act in furtherance of the

IA1AAMAT5                    Jury Charge

conspiracy.  A person can be found guilty of conspiracy to

commit murder even if the murder that is the object of the

conspiracy does not happen.  The term "intent" under New York

conspiracy law has its own special meaning.  "Intent" means

conscious objective or purpose.  Thus, a person acts with the

intent that a murder be performed when his conscious objective

or purpose is that the murder should occur.

        The Government must also prove that one of the

conspirators committed an overt act in furtherance of the

conspiracy.  The agreement to engage in or cause the

performance of a crime is not itself an overt act.  The overt

act must be an independent act that tends to carry out the

conspiracy.  The overt act can be, but need not be, the

commission of the crime that was the object of the conspiracy.

        Under New York law, a person may be guilty of

conspiracy even though one or more or all of the other parties

to the agreement are not guilty of conspiracy or the murder.  I

instruct you that the term "racketeering activity," for

purposes of the second element of Counts One, Two, and Three,

includes attempted murder and conspiracy to commit murder in

violation of New York law as I have just described those

crimes.

        As I mentioned, the Government alleges that another

form of racketeering activity that the Bloods engaged in was

dealing in controlled substances, including the distribution of

heroin, crack cocaine, and marijuana, possession of heroin,

crack cocaine, and marijuana with intent to distribute, and

conspiracy to so distribute or possess, in violation of federal

law. I will describe those crimes now.  To enable you to

consider whether the enterprise engaged in these forms of

racketeering activity for purposes of Counts One, Two, and

Three, I need to define some terms for you.

          "Distribution" means the actual, constructive or

attempted transfer of a controlled substance from one person to

another.  To distribute simply means to deliver, to pass over,

to hand over something to another person, or to cause it to be

delivered, passed on, or handed over to another.  Distribution

does not require a sale.  "Possession with Intent to

Distribute" The phrase "possession with intent to distribute"

has two components: the "possession" of a controlled substance

and the "intent"—that is, the state of mind or purpose—to

distribute a controlled substance to another person or persons.

The legal concept of possession may differ from the everyday

usage of the term, so I will explain it in a little more

detail.  Actual possession is what most of us think of as

possession—that is, having physical custody or control of an

object.  However, a person need not have actual, physical

possession, that is, physical custody of an object, in order to

be in legal possession of it. If an individual has the ability

to exercise substantial control over an object that he or she

1   does not have in his or her physical custody, and the intent to

2   exercise such control, then he or she is in possession of that

3   article.  This is called constructive possession.  Control over

4   an object may be demonstrated by the existence of a working

5   relationship between the person having such control and the

6   person with actual physical custody.  The person having control

7   over an object possesses it because he or she has an effective

8   working relationship with the person who has actual physical

9   custody of it, and because the person having control can direct

10  the movement, transfer or disposition of the object.  More than

11  one person may exercise control of the same controlled

12  substances.  The law recognizes that possession may be sole or

13  joint.  If one person alone has actual or constructive

14  possession of a thing, possession is sole. If more than one

15  person has possession of it, as I have defined possession for

16  you, then possession is joint.  That is what is meant by

17  "possession." The phrase "intent to distribute" means a state

18  of mind or purpose to transfer a controlled substance to

19  another person.  Since no one can read another person's mind,

20  the determination as to a person's intent is inferred from his

21  or her behavior.  Basically, the question with regard to the

22  intent aspect of the underlying offense is whether any drugs in

23  the possession of any co-conspirator, that is, subject to his

24  or her control in the manner I have indicated, were or would

25  have been for his or her personal use, or instead were or would

1    have been for the purpose of distribution or delivery to

2    another.  Often it is possible to make the determination as to

3    whether drugs were possessed "with intent to distribute" from

4    the quantity of drugs that a person may have possessed.

5    Possession of a large quantity of drugs may mean that the

6    person possessing them intended to distribute them.

7    Furthermore, a person may have intended to distribute a

8    controlled substance even if he or she did not possess a large

9    amount of it.  Other physical evidence, such as paraphernalia

10   for the packaging and processing of drugs, can show an intent

11   to distribute.  There might be evidence also of a plan or a

12   scheme to distribute.  You should make your decision whether

13   there was an intent to distribute any drugs in the possession

14   of the defendant or any co-conspirator from all of the evidence

15   presented.  Conspiracy A "conspiracy" is a kind of criminal

16   partnership—a combination or agreement of two or more persons

17   to join together to accomplish some unlawful purpose.  For

18   purposes of drug-trafficking conduct that constitutes

19   "racketeering activity" for the second element of Counts One,

20   Two, and Three, please keep in mind that a conspiracy to

21   violate a federal law is a separate and distinct offense from

22   the actual violation of any such law, which is the so-called

23   "substantive crime."  Guilt of a conspiracy does not depend on

24   the ultimate success of the conspiracy.  In other words, the

25   accomplishment of the unlawful purpose or actual commission of

IA1AAMAT5                    Jury Charge

1     the substantive crime that was the object or goal of the
2     conspiracy is not required.  Congress has deemed it appropriate
3     to make conspiracy standing alone a separate crime, even if the
4     conspiracy to commit the underlying substantive crime was not
5     successful.  Of course, if someone participates in a conspiracy
6     and the crime or crimes which were the object of the conspiracy
7     were in fact committed, that person may be guilty of both the
8     conspiracy and the substantive crime.  The point simply is that
9     the crime or crimes that were the objective of the conspiracy
10    need not have been actually committed for a conspiracy to
11    exist.  A conspiracy has sometimes been called a partnership
12    for criminal purposes in which each partner becomes the agent
13    of every other partner.  To establish the existence of a
14    conspiracy the Government is not required to show that two or
15    more people sat around a table and entered into a formal
16    contract.  Indeed, it would be extraordinary if there were such
17    a formal document or specific agreement.  From its very nature
18    a conspiracy is almost always characterized by secrecy and
19    concealment.  It is sufficient if two or more persons, in any
20    manner, whether they say so directly or not, come to a common
21    understanding to violate the law.  Express language or specific
22    words are not required to indicate agreement to or membership
23    in a conspiracy.  It is not necessary that a conspiracy
24    actually succeed in its purpose for you to conclude that it
25    existed.  If a conspiracy exists, even if it should fail in its

purpose, it is still a crime.  In determining whether there has

been an unlawful agreement, you may judge the acts and conduct

of the alleged members of the conspiracy that are done to carry

out an apparent criminal purpose.  The saying "actions speak

louder than words" is applicable here.  Often, the only

evidence that is available with respect to the existence of a

conspiracy is that of what may initially appear to be

disconnected acts on the part of the alleged individual

coconspirators.  Different conspirators may undertake different

acts at different times.  So, you must first determine whether

or not the proof established beyond a reasonable doubt the

existence of a conspiracy.  In considering this, you should

consider all the evidence that has been admitted with respect

to the conduct and statements of each alleged coconspirator (or

any lack of evidence), and any inferences that may reasonably

be drawn from that conduct and those statements.  If, upon

consideration of all the evidence, direct and circumstantial,

you find beyond a reasonable doubt that the minds of two or

more of the conspirators met (we call this sometimes "a meeting

of the minds")—that is, that they agreed, as I have explained a

conspiratorial agreement to you, to work together in

furtherance of an unlawful scheme—then proof of the existence

of the conspiracy is established.  If you find that a drug

dealing conspiracy existed with respect to the second element

of Counts One, Two, and Three, that is the racketeering

IA1AAMAT5                         Jury Charge

activity, you must then determine whether the persons alleged

to be involved intentionally and knowingly became members of

that conspiracy.  You must determine not only whether a person

participated in the conspiracy, but also whether he did so

intentionally and knowingly—that is, did he participate in the

conspiracy with knowledge of its unlawful purpose and with the

specific intention of furthering the objective of that

conspiracy.  Knowledge is a matter of inference from facts

proved.  A person acts "intentionally" and "knowingly" if he

acts purposely and deliberately and not because of mistake or

accident, mere negligence, or other innocent reason.  That is,

the acts must be the product of the person's conscious

objective.  If you find that a conspiracy existed and that the

person you are considering participated knowingly and

intentionally in it, the extent of the person's participation

has no bearing on whether or not he is guilty.  In addition,

the duration and extent of a person's participation has no

bearing on the issue of guilt.  A person need not have joined

the conspiracy at the outset.  A person may have joined the

conspiracy at any time in its progress, and that person will be

held responsible for all that was done before he joined and all

that was done during the conspiracy's existence while he was a

member.  Each member of a conspiracy may perform separate and

distinct acts.  Some conspirators play major roles, while

others play minor roles in the scheme.  An equal role is not

IA1AAMAT5                    Jury Charge

what the law requires.  In fact, even a single act may be

sufficient to draw a person within the scope of the conspiracy.

Of course, mere association with a conspirator or mere presence

at a place where a conspiracy is ongoing does not make someone

a member of the conspiracy.  Nor is knowledge without

participation sufficient.  What is necessary is that the person

you are considering participated with knowledge of the unlawful

objective of the conspiracy and with intent to aid in the

accomplishment of that objective.  Ultimately, the question is

this:  Has the Government proven beyond a reasonable doubt that

the Defendant joined the conspiracy and knowingly and

intentionally participated in it with the awareness of its

basic purpose and as something he wished to bring about?

    I instruct you that the term "racketeering activity"

includes the distribution of heroin, crack cocaine, or

marijuana, and the possession with intent to distribute of

heroin, crack cocaine, or marijuana, and conspiracy to so

distribute or possess, in violation of federal law as I have

just described those offenses to you.  The term "racketeering

activity" also includes, as I mentioned earlier, acts involving

attempted murder and conspiracy to commit murder, in violation

of New York law as I described those offenses to you.  It is

for you to determine whether the enterprise engaged in the

racketeering activities alleged in the second element of Counts

One, Two, and Three.  You should give the words "engaged in"

their ordinary, everyday meaning. It may be established that an enterprise "engaged in" racketeering activity by evidence that individual members committed racketeering activity for the group or in concert with other members, or acted in ways that contributed to or furthered the purposes of the group, or that were facilitated or made possible by the group.  For an enterprise to be engaged in racketeering activity, it is enough to show that the enterprise committed or was planning to commit some racketeering activity within a period of time short enough under the circumstances so that it is appropriate to say that the enterprise was engaged in racketeering activity.  As I mentioned earlier, the Government is not required to prove beyond a reasonable doubt that the enterprise engaged in all of these forms of racketeering activity.  To satisfy the second element of Counts One, Two, or Three, it is sufficient for the Government to prove beyond a reasonable doubt that the enterprise engaged in only one form of the alleged forms of racketeering activity.

The third element that the Government must prove beyond a reasonable doubt with respect to Counts One, Two, and Three is that racketeering activity or activities the enterprise engaged in affected interstate or foreign commerce. Interstate and foreign commerce includes the movement of goods, services, money and individuals between states or between states and the District of Columbia or a U.S. Territory or

1  possession and between the United States and a foreign state or

2  nation.  Any effect on interstate or foreign commerce need only

3  have been minimal.  You need not find that the enterprise was

4  engaged in interstate or foreign commerce.  Nor is it necessary

5  to find that the effect on interstate or foreign commerce has

6  been adverse to commerce.  All that is necessary is that the

7  enterprise or a proven racketeering act through which the

8  affairs of the enterprise were conducted affected interstate or

9  foreign commerce in some minimal way.  The commerce affected or

10 potentially affected need not be lawful.  Activities affecting

11 or potentially affecting unlawful interstate activity such as

12 drug dealing and trafficking fall within the purview of the

13 statute.  Indeed, with respect to narcotics in particular,

14 Congress has determined that all narcotics activity, even

15 purely local narcotics activity, has a substantial effect on

16 interstate commerce.  This element is also satisfied if you

17 find beyond a reasonable doubt that one or more of the

18 racketeering activities of the enterprise included the use of

19 ammunition that traveled in interstate commerce, travel by

20 members of the enterprise between states, or their use of

21 telephones.  In addition, if you find that the Bloods engaged

22 in the types of narcotics-related racketeering activities that

23 I described to you, then this element is satisfied.

24          Count One charges the Defendant with willfully causing

25 and aiding and abetting the attempted murder of Isaac Toribio,

1    a/k/a "Ike".

2              Count Two charges the Defendant with conspiracy to

3    murder Isaac Toribio, a/k/a "Ike".

4              Count Three charges the Defendant with willfully

5    causing and aiding and abetting assault with a dangerous

6    weapon.

7              I have previously defined for you the content and

8    elements of the laws which define attempted murder and

9    conspiracy to commit murder in the state of New York.  I

10   instruct you to follow those definitions here to determine if

11   the Government has satisfied its burden as to the fourth

12   element of Count One—whether the Defendant attempted to murder

13   Isaac Toribio, a/k/a "Ike".  And the fourth element of Count

14   Two, whether the Defendant conspired to murder Isaac Toribio,

15   a/k/a "Ike".

16             I will now describe the law pertaining to assault with

17   a dangerous weapon as it relates to the fourth element of Count

18   Three.  Under New York law, a person is guilty of a crime when

19   "with intent to cause physical injury to another person, he

20   causes such injury to such person or to a third person by means

21   of a deadly weapon or a dangerous instrument." The crime of

22   assault with a dangerous weapon under New York State law has

23   two elements:

24             First, the Defendant caused, or aided and abetted the

25   causation of, physical injury to someone by means of a deadly

IA1AAMAT5                      Jury Charge

weapon or dangerous instrument;

and Second, the Defendant did so with the intent to
cause physical injury to that person or another person.

It is not required that the person who is injured be
the same person who was intended to be injured.

Here, "physical injury" means impairment of physical
condition or substantial pain.

"Deadly weapon" includes any loaded weapon from which
a shot, readily capable of producing death or other serious
physical injury, may be discharged.

As I have said, the Defendant is charged with
willfully causing and with aiding and abetting the attempted
murder of Isaac Toribio, a/k/a "Ike".  He is charged in Count
Three with willfully causing and with aiding and abetting
assault with a dangerous weapon.  As to each of those Counts, I
instruct you that the Government must prove beyond a reasonable
doubt that the Defendant willfully caused or aided and abetted
these offenses.  The Government is not required to prove that
the Defendant both willfully caused and aided and abetted these
offenses.

The last element that the Government must prove beyond
a reasonable doubt with respect to Counts One, Two and Three is
that the Defendant acted for the purpose of gaining entrance
to, maintaining a position in, or increasing a position in the
Bloods.  To establish that the Defendant acted for the purpose

of gaining entrance to or maintaining or increasing his

position in the Bloods, the government must prove beyond a

reasonable doubt that a general purpose of the Defendant, with

respect to Count One and Count Three, in willfully causing or

aiding and abetting someone else to commit the alleged crimes,

and in Count Two, in committing the alleged crime, was to gain

entrance to, increase, or maintain his own position in the

Bloods.  The motive requirement is satisfied if the Defendant

acted because it would allow him to gain entrance to the

enterprise, because he knew it was expected of him by reason of

his association with the enterprise, because it would enhance

his own position within the enterprise, or, with respect to a

high-ranking member of the enterprise, because he committed or

sanctioned the crimes to protect the enterprise's operations or

to advance the objectives of the enterprise.

        These examples, however, are by way of illustration

and are not exhaustive.  Maintaining or increasing his own

position need not have been the Defendant's only or primary

motive in committing the alleged crimes in order for him to be

guilty of Counts One, Two, or Three.  The Government must only

prove beyond a reasonable doubt that maintaining or increasing

his own position in the enterprise was a substantial motivating

factor in the Defendant's decision to participate in these

crimes.  Alternatively, I want to remind you that you may find

the Defendant guilty of Counts One or Three on an aiding and

IA1AAMAT5                          Jury Charge

abetting theory of liability or a willful causing theory of

liability.  Under either of these two theories of liability,

the Government must prove beyond a reasonable doubt that

Defendant aided and abetted, or willfully caused DeJesus to

commit the alleged crimes knowing that DeJesus acted for the

purpose of gaining entrance to, maintaining a position in, or

increasing a position in the Bloods.  My earlier instructions

to you on the element of purpose or motive equally apply when

you are assessing DeJesus's purpose.

          I will now turn to the firearms offense charged in

Count Four of the Indictment and instruct you on the elements

of that offense.

          Count Four alleges a violation of Section 924(c) of

the Federal Criminal Code.  That provision makes it a crime for

any person, "during and in relation to any crime of violence...

to use or carry a firearm," or, "in furtherance of any such

crime, to possess a firearm."

          Count Four charges the Defendant with willfully

causing and aiding and abetting someone else's knowing use,

carrying, and possession of a firearm during and in relation to

the attempted murder charged in Count One and the assault with

a dangerous weapon charged in Count Three.  So Count Four, by

its terms, is connected to Counts One and Three in the

Indictment.  This means that you cannot consider Count Four

unless you determine that the defendant is guilty of Count One,

Count Three, or both Count One and Count Three.

In order to convict the Defendant of the firearms offense in Count Four, the Government must prove the following elements beyond a reasonable doubt:

First, the Defendant willfully caused or aided and abetted someone else's use, carrying, or possession of a firearm, or any combination of those acts.

Second, that the Defendant willfully caused or aided and abetted someone else's use or carrying of the firearm during and in relation to one of the crimes of violence charged in Count One or Count Three, or willfully caused or aided and abetted someone else's possession of a firearm in furtherance of one of the crimes of violence charged in Count One or Count Three;

and, Third, that the Defendant acted knowingly.  In addition, in order to sustain its burden of proof on an aiding and abetting theory with respect to Count Four, the Government must establish (1) that the Defendant actively participated in the underlying crime of violence, here, the attempted murder charged in Count One or the assault with a dangerous weapon charged in Count Three, and (2) that the Defendant did so with advance knowledge that another participant in the crime of violence would use or carry a firearm, or possess a firearm in furtherance of that crime of violence.  Advance knowledge means knowledge at a time the Defendant can attempt to alter the plan

or withdraw from it.  Knowledge of the gun may, but does not have to, exist before the underlying crime is begun.  It is sufficient if the knowledge is gained in the middle of the underlying crime so long as the Defendant continues to participate in the crime and has a realistic opportunity to withdraw from it.  You may, but not need not, infer that the Defendant has sufficient knowledge if you find that the Defendant continued his participation in the crime after learning about the use, carrying or possession of a gun by a confederate.

Finally, if you find that the Government has satisfied its burden as to each of those elements, then you must also determine whether the Government has proved that the Defendant willfully cause or abetted and abetted the brandishing of the firearm, and whether the Government has proved that the weapon was discharged.  I will instruct you further about brandishing and discharge in a few minutes.

The first element the Government must prove beyond a reasonable doubt for Count Four is that the Defendant willfully caused or aided and abetted the use or carrying or possession of a firearm.  The Government does not need to prove all three.

"Firearm", A firearm is commonly known as a gun.  It is defined as "any weapon... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  In considering the specific element of whether

the defendant willfully caused or aided and abetted the use,

carrying, or possession of a firearm, it does not matter

whether the firearm was loaded or operable at the time of the

crime.

"Use", With respect to the use of a firearm, the

Government must prove beyond a reasonable doubt that the

Defendant willfully caused or aided and abetted another

person's active employment of the firearm during and in

relation to the commission of a crime of violence.  Actually

firing or attempting to fire a firearm would constitute use of

the firearm.

"Carry", With respect to the carrying of a firearm,

the Government must prove beyond a reasonable doubt that the

Defendant willfully caused or aided and abetted someone to

maintain the weapon within his control so that it was available

in such a way that it furthered the commission of the crime.

That person need not have held the firearm physically, that is,

have had actual possession of it on his person.  If you find

that person had dominion and control over the place where the

firearm was located, and had the power and intention to

exercise control over the firearm, and that the firearm was

immediately available to him in such a way that it furthered

the commission of the crime of violence, you may find that the

Government has proven that the defendant willfully caused or

aided and abetted the carrying of the weapon.

1        "Possess", possession of a firearm in furtherance of a

2    crime requires that the Defendant willfully caused or aided and

3    abetted another person's possession of a firearm and that the

4    possession advance or move forward the crime.  The mere

5    presence of a firearm is not enough.  Possession in furtherance

6    requires that the possession be incident to and an essential

7    part of the crime.  The firearm must have played some part in

8    furthering the crime in order for this element to be satisfied.

9    You should also apply the instructions I gave you earlier about

10   the legal concepts relating to possession, such as physical and

11   "constructive possession," and sole and joint possession.

12       The second element that the Government must prove

13   beyond a reasonable doubt with respect to Count Four is that

14   the Defendant willfully caused or aided and abetted either

15   another person's use or carrying of a firearm during and in

16   relation to a crime of violence, or possession of a firearm in

17   furtherance of such a crime.  Possession in furtherance, as I

18   indicated, requires that the possession be incident to and an

19   essential part of the crime.  The firearm must have played some

20   part in furthering the crime in order for this element to be

21   satisfied.  Mere possession of a firearm is not sufficient.  I

22   instruct you that the attempted murder charged in Count One and

23   the assault with a dangerous weapon charged in Count Three

24   qualify as crimes of violence.

25       The final element the Government must prove beyond a

reasonable doubt on the firearms count alleged in Count Four is

that the Defendant knew that the person he willfully caused or

aided and abetted was using, carrying, or possessing a firearm,

and that the Defendant acted knowingly in doing so.

     To satisfy this element, you must find that the

Defendant had knowledge that what he, or the other person, was

carrying or using was a firearm.  An act is done knowingly if

it is done purposefully and voluntarily as opposed to

mistakenly or accidentally.  In order for the Government to

satisfy this element, it must prove that the Defendant knew

what he was doing, for example, that he knew that he was

willfully causing or aiding and abetting the possession or

carrying of a firearm in the commission of a crime of violence

by another.  It is not necessary, however, for the Government

to prove that the Defendant knew that he was violating any

particular law.

     If you find the Defendant guilty on Count Four, you

must then make two special findings:

     First, whether the Government has proven beyond a

reasonable doubt that the Defendant willfully caused or aided

and abetted another person in "brandishing" the firearm; and

second, whether the Government has proven beyond a reasonable

doubt that the firearm was discharged.  To "brandish" a firearm

means to display all or part of the firearm, or to otherwise

make the presence of the firearm known to another person, in

order to intimidate that person, regardless of whether the

firearm is directly visible to that other person.  With respect

to the issue of "brandishing," the Defendant is guilty of

aiding and abetting the brandishing of a firearm if he had

advance knowledge that another participant in the attempted

murder in Count One, or the assault with a dangerous weapon

alleged in Count Three, or both, would display the firearm or

make the presence of the firearm known for purposes of

intimidation.  The term "discharge" means to fire or shoot,

whether intentionally or accidentally.  To willfully cause or

aid and abet the possession or carrying of a firearm that was

discharged, the defendant need not have advance knowledge that

the discharge would occur.  With respect to the issue of

"discharge," the Defendant is guilty of willfully causing or

aiding and abetting the discharge of a firearm if you find that

the Government has proved beyond a reasonable doubt (1) that

the defendant willfully caused or aided and abetted the

firearms offense in Count Four by another, and (2) the firearm

in question was in fact discharged.

I will now turn to the ammunition offense charged in

Count Five of the Indictment and instruct you on the elements

of that offense.

The relevant statute for Count Five is Title 18,

United States Code, Section 922(g)(1).  Title 18, United States

Code, Section 922(g)(1) provides, in relevant part, that it is

a crime for a person:

"who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year,... to... possess in or affecting commerce, any... ammunition...."
Count Five of the Indictment charges that, on or about October 20, 2017, the Defendant, after having been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess or willfully caused another person to knowingly possess, or aid and abetted another in the possession of, ammunition, specifically, five.40 caliber S&W bullets, which previously had been shipped and transported in interstate and foreign commerce.  In enacting this criminal statute, Congress was of the view that the ease with which persons, including those with certain prior convictions, were able to acquire firearms and ammunition was a significant factor in the prevalence of violent crime in the United States, and that federal control over gun dealers and the restriction of the distribution of firearms and ammunition would be helpful to state and local authorities in addressing this problem. Accordingly, Congress passed a series of laws designed to give support to federal, state and local law enforcement officials in combating crime and violence.

        In general, these laws include provisions which prohibit certain categories of people from possessing or receiving firearms and ammunition which were shipped in

1    interstate or foreign commerce.  The Government contends that

2    the Defendant is within the class of people prohibited from

3    possessing any firearm or ammunition shipped in interstate

4    commerce because he previously had been convicted of a crime

5    punishable by more than a year imprisonment.  In your role as

6    jurors, you are not to be concerned with the wisdom or the

7    policy of these laws.  Your verdict must be based on the

8    evidence in this case.  Your verdict may not be based on your

9    personal approval or disapproval of the firearm and ammunition

10   laws passed by Congress.

11         In order to sustain its burden of proof on Count Five,

12   the Government must prove each of the following three elements

13   beyond a reasonable doubt:

14         First, that the Defendant previously was convicted of

15   a crime punishable by imprisonment for a term exceeding one

16   year;

17         Second, the Defendant knowingly possessed ammunition,

18   or willfully caused another person to knowingly possess

19   ammunition, or aided and abetted another person's knowing

20   possession of ammunition;

21         and Third, that the possession of the ammunition was

22   in or affecting interstate or foreign commerce.

23         The first element the Government must prove beyond a

24   reasonable doubt is that the Defendant had been convicted of a

25   crime punishable by imprisonment for a term exceeding one year

IA1AAMAT5                      Jury Charge

1    in a court of the United States or any State prior to the date

2    he is charged with possessing ammunition, or causing another

3    person to possess ammunition, or aiding and abetting such

4    possession.  In this regard, you have heard evidence in the

5    form of a stipulation, or agreement by both sides, that the

6    defendant was convicted in state court of a crime punishable by

7    imprisonment for a term exceeding one year.  It has also been

8    stipulated that this conviction occurred prior to the time that

9    the Defendant is alleged to have possessed the ammunition as

10   charged in the Indictment.  As such, you must treat the first

11   element of Count Five as having been proved beyond a reasonable

12   doubt.

13          With respect to Count Five, I instruct you that the

14   prior conviction that is an element of the offense is only to

15   be considered by you for the fact that it exists and nothing

16   else.  You are not to consider it for any other purpose on

17   Count Five.  You may not consider the prior conviction in

18   deciding whether the Defendant knowingly possessed the

19   ammunition, or willfully caused another person to knowingly

20   possess the ammunition, or aided and abetted another person's

21   knowing possession of the ammunition as charged in Count Five

22   of the Indictment.

23          With respect to Count Five, the second element that

24   the Government must prove beyond a reasonable doubt is that the

25   Defendant knowingly possessed ammunition, or willfully caused

another person to knowingly possess ammunition, or aided and

abetted another person's knowing possession of ammunition.

Under the statute on which this charge is based, the term

"ammunition" means "ammunition or cartridge cases, primers,

bullets, or propellent powder designed for use in any firearm."

You should apply to your consideration of Count Five

the instructions I have already given you about the meaning of

"knowingly" and "possession," including physical and

"constructive possession" and sole and joint possession, as

well as my instructions regarding willfully causing the

commission of a crime and aiding and abetting the commission of

a crime.

The third element that the Government must prove

beyond a reasonable doubt is that the possession of the

ammunition was in or affecting interstate or foreign commerce.

This means that the Government must prove that at some time

before the Defendant possessed, or willfully caused someone

else to possess the ammunition, or aided and abetted someone

else's possession of the ammunition, the ammunition had

traveled in interstate or foreign commerce.  In this regard, it

is sufficient for the Government to satisfy this element by

proving that, at some point before the charged possession of

ammunition, the ammunition moved over a state line or the

United States border.  The Government does not have to prove

that the Defendant himself carried the ammunition across a

1    state line or the United States border, nor must the Government

2    prove who carried it across or how it was transported.  It is

3    also not necessary for the Government to prove that the

4    Defendant knew that the ammunition had previously crossed a

5    state or national border.

6          I will now turn to the narcotics offense charged in

7    Count Six of the Indictment and instruct you on the elements of

8    that offense.  The Defendant is charged with violating the Drug

9    Abuse Prevention and Control Act. That law makes it a crime, in

10   relevant part, "for any person knowingly or intentionally to …

11   distribute… or possess with intent to … distribute…a controlled

12   substance."

13         Count Six charges that, from at least in or about May

14   2016 to on or about January 26, 2018, the Defendant

15   intentionally and knowingly distributed a controlled substance,

16   and willfully caused, and aided and abetted the same. The

17   controlled substance alleged is 28 grams or more of cocaine

18   base in a form commonly known as "crack."

19         The Government must prove each of the following

20   elements beyond a reasonable doubt:

21         First, during the period alleged in the Indictment,

22   the Defendant either distributed a controlled substance, or

23   possessed a controlled substance with the intent to distribute

24   it;

25         Second, the Defendant did so knowingly;

and Third, the substance involved was in fact a

controlled substance.

The first element that the Government must prove

beyond a reasonable doubt with respect to Count Six is either

the "distribution" or "possession with intent to distribute" of

a controlled substance.  With respect to the this first

element, the Government need prove only that the Defendant

distributed the controlled substance, or that he possessed the

controlled substance with the intent to distribute it, or that

he willfully caused or aided and abetted another in the

distribution or possession with intent to distribute a

controlled substance.  You should apply in your consideration

of Count Six the previous instructions I have given you about

"distribution" and "possession with intent to distribute" when

I was discussing these terms in connection with the definition

of "racketeering activity" for purposes of Counts One, Two, and

Three.

The second element that the Government must prove

beyond a reasonable doubt with respect to Count Six is that the

Defendant acted knowingly.  To establish this element, the

government must prove that the Defendant knew that he

distributed, or possessed with intent to distribute, a

controlled substance.  The Government does not have to prove

that the Defendant knew the exact nature of the controlled

substance that he distributed, or that he possessed with intent

to distribute.  It is enough that the Government proves that the Defendant knew that he possessed some kind of controlled substance.

The third element that the Government must prove beyond a reasonable doubt with respect to Count Six is that the substance involved was, in fact, a controlled substance.  I instruct you that cocaine base or "crack" is a controlled substance.

If you find that the Government has satisfied its burden as to Count Six, then you are asked to make a special finding as to quantity.  You do not need to determine the precise quantity of drugs involved.  Rather, you need only decide whether the Defendant distributed or possessed with intent to distribute 28 grams or more of crack cocaine.  Your determination on drug quantity must be unanimous and beyond a reasonable doubt.  You will be given a verdict sheet on which to record the jury's answer to this question.

Now, in addition to dealing with the elements of each of the offenses, you must also consider the issue of venue as to each offense, namely, whether any act in furtherance of the unlawful activity occurred within the Southern District of New York.  The Southern District of New York includes Manhattan, the Bronx, as well as several other counties, so anything that occurs in Manhattan occurs in the Southern District of New York.  It is sufficient to satisfy the venue requirement if any

1    act by anyone in furtherance of the crime charged occurred

2    within the Southern District of New York.  The act need not be

3    a criminal act.  The act need not be taken by the Defendant, as

4    long as the act is caused by the conduct of the Defendant or is

5    reasonably foreseeable.  To satisfy this venue requirement

6    only, the Government need not meet the burden of proof beyond a

7    reasonable doubt.  The Government meets its burden of proof for

8    venue if it establishes by a preponderance of the evidence that

9    an act in furtherance of the crime occurred within the Southern

10   District of New York.

11          A preponderance of the evidence means that something

12   is more likely than not.  If you find that the Government has

13   failed to prove this venue requirement as to any of the Counts

14   in the Indictment, then you must acquit the defendant on that

15   count.

16          You will note that each count in the Indictment

17   alleges that certain acts occurred on or about various dates.

18   Unless I have specifically instructed you otherwise, it does

19   not matter if the evidence you heard at trial indicates that a

20   particular act occurred on a different date from what is

21   charged in the Indictment.  The law requires that the

22   Government prove a substantial similarity between the dates

23   alleged in the Indictment and the dates established by the

24   evidence.

25          You will now retire to decide the case.  Your function

1    is to weigh the evidence in this case and to determine the

2    guilt or lack of guilt of the Defendant with respect to the

3    charges in the Indictment.  You must base your verdict solely

4    on the evidence and these instructions as to the law, and you

5    are obliged on your oath as jurors to follow the law as I

6    instruct you, whether you agree or disagree with the particular

7    law in question.  Your verdict must be unanimous.  This means

8    that each and every one of you must agree upon your verdict.

9    Each juror is entitled to his or her opinion, but you are

10   required to exchange views with your fellow jurors.  This is

11   the very essence of jury deliberation.  It is your duty to

12   consult with one another and to deliberate with a view to

13   reaching an agreement.  If you start with one point of view,

14   but after reasoning with other jurors it appears that your own

15   judgment is open to question, then of course you should not

16   hesitate in yielding your original point of view if you are

17   convinced that the opposite point of view is one that truly

18   satisfies your judgment and conscience.  But you are not to

19   surrender a view of the case that you conscientiously believe,

20   merely because you are outnumbered or because other jurors

21   appear firmly committed to their views.  You should vote with

22   the others only if you are convinced on the evidence, the

23   facts, and the law that it is the correct way to decide the

24   case.

25            In sum, you, the jury, must deliberate as a body, but

each of you, as an individual juror, must discuss and weigh

your opinions dispassionately, and adopt that conclusion which

in your good conscience appears to be in accordance with the

truth.  No juror should surrender his or her conscientious

beliefs solely for the purpose of returning a unanimous

verdict.  I instruct you that you are not to discuss the case

unless all jurors are present.  Four or five or ten jurors

together are only a gathering of individuals.  Only when all

jurors are present do you constitute a jury and only then may

you deliberate.

          Remember at all times, you are not partisans.  You are

judges, judges of the facts.  Your sole interest is impartially

to assess the evidence to determine whether the Government has

met its burden of proving guilt beyond a reasonable doubt as to

each of the charges.  If you are divided, do not report how the

vote stands.  Simply state in you note that you are divided.

If you have reached a verdict, do not report what it is until

you are asked in open court.  Simply inform me that you have

reached a verdict.

          You are about to go into the jury room and begin your

deliberations.  The exhibits that were received into evidence

will be provided to you in the jury room.  If you want any of

the testimony to review, you may also request that.  Please

remember that it is not always easy to locate what you might

want, so be as specific as you possibly can in requesting

exhibits or portions of the testimony.  If you want any further

explanation of the law as I have explained it to you, you may

also request that.  Your requests for exhibits or testimony --

in fact any communications with the Court -- should be made to

me in writing, signed by your foreperson, and given to the

Marshal or the deputy clerk.  In any event, do not tell me or

anyone else how the jury stands on any issue until there is a

unanimous verdict.

          If you took notes during the trial, those notes are

only an aid to recollection.  They are not evidence, nor are

they a substitute for your recollection of the evidence in the

case.  Your notes are not entitled to any greater weight than

your actual recollection or the impression of each juror as to

what the evidence actually is.  I emphasize that if you took

notes, you should not show your notes to any other juror during

your deliberations.  They are only for yourself.  If you did

not take notes during the trial, you should not be influenced

by the notes of another juror, but instead you should rely upon

your own recollection of the evidence.  The fact that a

particular juror has taken notes does not entitle that juror's

views to any greater weight.

          I have prepared a verdict form for you to use in

recording your decision.  Please use that form to report your

verdict.  The verdict form does not represent either evidence

or instructions on the law.

At the beginning of deliberations, you must choose a foreperson.  The foreperson does not have any more power or authority than any other juror, and his or her vote or opinion does not count for any more than any other juror's vote or opinion.  The foreperson is merely your spokesperson to the Court.  He or she will send out any notes, and when the jury has reached a verdict, he or she will notify the Marshal that the jury has reached a verdict, and you will come into open court and give the verdict.

After you have reached a unanimous verdict, your foreperson will fill-in the form that has been given to you, sign and date it, and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you must be in agreement with the verdict that is announced in Court.  Once your verdict is announced in open court and officially recorded, it cannot ordinarily be revoked.

You are reminded that you took an oath to render judgment impartially and fairly, without prejudice or sympathy, solely upon the evidence in the case and the applicable law.  I am sure that if you follow your oath, listen to the views of your fellow jurors, and apply your own common sense, you will reach a fair verdict here.  Remember that your verdict must be rendered without fear, without favor, and without prejudice or sympathy.

 1            Members of the jury, this concludes my instructions to

 2     you.  I will ask you to remain seated while I confer with the

 3     attorneys to see if there are any additional instructions that

 4     they would like to have me give to you or anything I may not

 5     have covered in my previous statement.

 6            MR. RODRIGUEZ:  Nothing from the government.

 7            MR. KAYE:  No, your Honor.

 8            THE COURT:  Before you retire into the jury room I

 9     must inform you that the law provides for a jury of twelve

10     people in this case.  Therefore, two people, juror numbers 29

11     and 38, the two people seated in 13 and 14 are alternates.

12            You both will be allowed to leave the courthouse

13     during deliberations, but you are not yet excused as jurors in

14     the case.  You will not be present for deliberations at least

15     initially.  In the event that one of the non-alternate jurors

16     can no longer deliberate -- we have your contact information --

17     you will be recalled to continue your service, so I am

18     releasing you for now but I am not excusing you from jury

19     service yet.  For now, though, you may leave.  You have been

20     very attentive and very patient.  I am sorry that you will in

21     all likelihood miss the experience of deliberating with the

22     jury but the law provides for a jury of twelve people in this

23     case.

24            Before the rest of the jury retires to the jury room,

25     if you have any clothing or objects there, you are asked to

1   pick them up and to withdraw before any deliberations start.

2   Please do not discuss the case with anyone over the next few

3   days.  If you would like to be advised of the outcome of the

4   trial, please make sure that Mr. Hampton has a phone number at

5   which you can be reached.

6              THE COURT:  I am releasing you for now.

7              (Alternates released)

8              THE COURT:  Ladies and gentlemen, I want to thank you

9   for your patience in those instructions.  As I said, there will

10  be, all of the exhibits after you go back to begin your

11  deliberations will be sent back with you.  That will include

12  the video and other materials which will be on a laptop that

13  has only admitted evidence on it.  So you'll be able to view

14  any of those videos or audio recordings.  I will also bring

15  back a copy of the instructions, 12 copies of the instructions

16  in case you want to refer to any of the instructions which were

17  quite detailed and one copy of the verdict form that will be

18  come back to you.  You'll have notepaper to send out any notes.

19             At some point when you begin deliberations, your first

20  note ordinarily will be who has been chosen as the foreperson.

21  When you send out a note it should be addressed to me, Judge

22  Oetken.  It can just say "judge" and it should just be signed

23  by the foreperson, which can just be the juror number.

24             At this point I'd like to ask Mr. Hampton to swear-in

25  the marshal.

1              (Marshal sworn)

2              THE COURT:  Thank you, ladies and gentlemen.  You may

3     now begin your deliberations and you can now take your pads

4     back.

5              (jury deliberations)

6              THE COURT:  You may be seated.

7              If you folks would please let Mr. Hampton know where

8     you are.  Generally we'd like you to stay on the floor or at

9     least in the building and the very least please make sure he

10    has cellphone numbers in case there's a note we can gather

11    everybody quickly.

12             MR. KAYE:  Is there an extra copy of the verdict

13    sheet?

14             THE COURT:  We'll get one.  We'll bring down a few

15    copies.

16             All right.  We'll be in touch.

17             (Deliberations)

18             (Continued on next page)

19

20

21

22

23

24

25

IA1KMAT6

1             (In open court; jury not present)

2             THE COURT:  Okay.  We have received two notes from the

3      jury.

4             First, let me say:  Court Exhibit No. 1 is the copy of

5      the charge, paper copy, of which we gave 12 copies to the

6      jurors.  That's been marked as Court Exhibit No. 1.

7             The first note from the jury has been marked as Court

8      Exhibit No. 2.  It's from 4:38 p.m.  It just says:  "Judge,

9      Juror 44 is the foreperson."  That's the person sitting in seat

10     number 10.

11            And then the second note, which has been marked as

12     Court Exhibit No. 3, from 5:30 today, is a little longer:  "The

13     jury would like to break for the day.  We have the following

14     questions for our deliberation tomorrow:

15            "(1)  What time can we arrive tomorrow morning?

16            "(2)  The computer is not working.  Can we get another

17     working computer?

18            "(3)  Can we get a monitor to view the evidence on a

19     larger screen?

20            "(4)  Can we have some highlighters?

21            "(5)  We have some questions about the laws explained,

22     specifically related to the definition of racketeering.  Who

23     can clarify this for us?

24            "Thank you."  Signed Juror No. 44.

25            MR. KAYE:  I'm sorry, Judge, what was the first thing

1      they asked for?

2                  THE COURT:  No. (1) was:  "What time can we arrive

3      tomorrow morning?"

4                  (2) was:  "The computer is not working.  Can we get

5      another working computer?"

6                  And (3):  "Can we get a monitor to view the evidence

7      on a larger screen?"

8                  So I propose bringing them out and telling them I'll

9      address the questions in the morning, have them come back at

10     9:30.

11                 MR. RODRIGUEZ:  Judge, I guess the only question is

12     whether there's something we should do with respect to the

13     legal question that we can help them with now, if there's any

14     clarity we can give the jury so we can assist them with that.

15                 THE COURT:  The problem is, they said they have

16     questions but they don't really say what the questions are.

17     And since they said they want to go now, they said they would

18     like to break for the day, I don't know there's any point

19     getting into that now, because that would require them

20     conferring and being more specific, I think.  I can tell them

21     that I'm happy to answer any questions, but we might as well

22     deal with that tomorrow, I think.

23                 MR. KAYE:  Also, when they leave for the day, I would

24     have no objection to maybe one of the assistants or Ms. Parisi

25     trying to figure out why they can't get the computer working.

IA1KMAT6

1          Is it the government's laptop that they're having a

2    problem with?

3          THE COURT:  Yes.  It was a clean laptop from the

4    government.

5          MR. RODRIGUEZ:  It is.  We'll take a look at the

6    laptop and see either if we can get that laptop working or a

7    different laptop working.  I don't know if we'll have the

8    ability to get a bigger monitor beyond just the laptop that we

9    have.  I don't know if there's any technology available in the

10   jury room.

11         THE COURT:  There's nothing in there.  I'll have to

12   think about that one.  I've never done anything beyond a laptop

13   before.

14         So, in any event, I think, rather than get into it,

15   since they say they would like to go for the night, I think

16   I'll just tell them:  "Thank you.  We'll address your questions

17   in the morning.  Please come back at 9:30."  I think I'm going

18   to tell them they can't deliberate until they're all here.

19         Do you all have a preference as to whether, once the

20   twelfth one arrives, I bring them all out, I tell them to

21   start?  Or the other thing I've done sometimes is, I say:  When

22   the twelfth person arrives, you can send out a note saying, we

23   are all here, we're now deliberating.  I've done it both ways.

24         MR. RODRIGUEZ:  Your Honor, the government thinks the

25   note process, that confirms that they're all here and

IA1KMAT6

1    deliberating, makes sense.

2              MR. KAYE:  Agreed.

3              THE COURT:  Okay.

4              So I'll bring them out and get them started.  I mean,

5    send them home and tell them to come back.

6              MR. RODRIGUEZ:  Very good.

7              (Jury present)

8              THE COURT:  You may be seated.

9              Good evening, ladies and gentlemen.

10             JURY MEMBERS:  Good evening.

11             THE COURT:  I have your notes.

12             Just to be clear on the record:  I did receive the

13   note from 4:38 p.m., saying, "Juror No. 44 is the foreperson."

14   Thank you for that.

15             And then I received an additional note, from a few

16   minutes ago, 5:30, saying:  "The jury would like to break for

17   the day.  We have the following questions:

18             "What time should we arrive?

19             "The computer is not working.  Can we get another

20   working computer?  We'll look into that and see what we can do.

21             And:  "(3)  Can we get a monitor to view the evidence

22   on a larger screen?"  I'll have to look into that and see if

23   that's possible.  It may be we can only have a laptop but I'll

24   look into that.

25             "(4)  Can we have some highlighters?"  That's

IA1KMAT6

something we can do.  I have 12 highlighters for you, which
you'll have in there tomorrow morning.

          "(5)  We have some questions about the law as
explained, specifically as related to the definition of
racketeering.  Who can clarify this for us?"

          I'll address this in the morning as well as any other
questions you have.  Generally, any questions you have, about
the law after reviewing what I have already instructed on the
law, you can submit in a note, and I will do my best to address
it.  So I'll follow up with more detail tomorrow, but since I'm
letting you all go now, tonight, I'm just going to say, why
don't you all come back at 9:30 tomorrow morning.  Okay?

          So let's do the same thing:  We'll have some breakfast
for you in the morning around 9:15, so if you can shoot around
9:15, that would be great.

          There are a couple things I want to emphasize once
again:

          One is:  I think you heard me say when I was
instructing you that when there are nine or ten or eleven of
you, you're just a group of nice people, you're not a jury yet.
It's only when all 12 of you are present that you can begin
deliberating.  So when you're coming in, please don't discuss
the evidence or talk about the trial.  Don't deliberate until
all 12 of you are present.  It's only when all 12 of you are
present that you constitute the jury.

IA1KMAT6

1    So what we can do is:  When you're arriving in the

2    morning, when the 12th person arrives, I'll ask the foreperson

3    to send out a note saying:  "All of the jurors are present, and

4    we have begun deliberating."  At that point, you can begin

5    deliberating but only when all 12 of you are present, and you

6    can send a note to that effect.

7    The other matters we will work on and try to address

8    tonight.  So when you come back tomorrow morning -- by 9:30,

9    hopefully -- and are deliberating, you'll hopefully have a

10   working computer, at the very least.

11   Beyond that, the only other thing I want to emphasize

12   is that you are not deliberating when you leave.  You're only

13   deliberating when all of you are there in the jury room.  So

14   please don't do any research on the case, don't discuss the

15   case with anyone else, including each other, when you're not in

16   the jury room with all 12 jurors.  All right?

17   So thank you, all, for your patience and for your

18   attention.  And we'll see you tomorrow morning by 9:30.

19   Have a good night, everybody.

20   JUROR:  Good night.

21   (Jury not present)

22   THE COURT:  So you all will take a look at the laptop.

23   Maybe it's just that they weren't able to turn it on or

24   something.  I don't know if there's something like that.  If

25   not, you'll find another clean laptop with the same exhibits?

IA1KMAT6

1          MR. RODRIGUEZ:  Yes, your Honor.  We would just ask:

2     Obviously, the government doesn't want to go anywhere near the

3     jury room, but if the Court security officer or the marshal

4     could --

5          THE DEPUTY CLERK:  I'll get it.

6          THE COURT:  Okay.  Mr. Hampton will take care of

7     getting the laptop so that you all can check it.

8          I'll make some calls about a larger monitor.  Are

9     there any thoughts about this?  Does anyone have experience

10    with getting a larger monitor in there?  I have not, as I said,

11    done that.

12         MR. RODRIGUEZ:  Your Honor, we'll ask at the U.S.

13    Attorney's Office to see if we have any larger monitors

14    available that would be appropriate.  We'll hopefully report

15    back, but none of us here have had this experience in this

16    courthouse yet.

17         THE COURT:  Okay.

18         The question about racketeering:  "We have some

19    questions about the laws explained, specifically related to the

20    definition of racketeering.  Who can clarify this for us?"  I

21    think I said, you can send out any questions in a note.  I'm

22    not sure if you all think I should give any more guidance than

23    that.

24         MR. RODRIGUEZ:  Not from the government.

25         MR. KAYE:  I think it's perfectly fine to ask the jury

IA1KMAT6

1   to articulate what part of the charge they're having difficulty

2   with.  And if they're able to identify a section, maybe we can

3   just reread to them what we've already read.  Sometimes that

4   clicks and that does it.  If not, then we can perhaps go beyond

5   that.

6          MR. RODRIGUEZ:  Your Honor, our view is that they have

7   the charge back there, and so I think handling it the way that

8   your Honor first suggested would be our preference.

9          THE COURT:  Okay.

10          For now, I'm going to leave it at is.  The foreperson

11   was nodding when I said, if you have specific questions, you

12   can send a note about what that is, so -- after you've read the

13   charge I've already given.  So, hopefully, that's clear enough

14   that they need to specify which section it is.  Otherwise, I

15   may clarify that in the morning once they're all here.

16          And highlighters:  That we can do.

17          Anything else for tonight?

18          MR. KAYE:  No, your Honor.

19          MR. RODRIGUEZ:  No, your Honor.  Thank you.

20          THE COURT:  Have a good night, everyone.

21          (Adjourned to October 2, 2018 at 9:30 a.m.)

22                        *  *  *

23

24

25